

ATTORNEYS AT LAW

**Miami Tower**
100 S.E. Second Street | Suite 4200
Miami, Florida 33131-2113
P.O. Box 019101 | Miami, Florida 33101-9101
305.530.0050 | fax 305.530.0055
www.carltonfields.com

Atlanta
Florham Park
Hartford
Los Angeles
**Miami**
New York
Orlando
Tallahassee
Tampa
Washington, D.C.
West Palm Beach

March 3, 2020

Michael S. Pasano
305-530-4064 Direct Dial
mpasano@carltonfields.com

Vanessa Pulido                                           Email: vanessa_pulido@flsp.uscourts.gov
Senior U.S. Probation Officer
Wilkie D. Ferguson, Jr.
United States Courthouse
400 North Miami Avenue, 9th Floor South
Miami, FL 33128

      Re:    US v. Gustavo Adolfo Hernandez-Frieri
              Case No. 18-cr-20685-KMW

Dear Ms. Pulido:

      Set out below are Defendant Gustavo Adolfo Hernandez Frieri's ("Gustavo Hernandez") comments and objections to your Pre-Sentence Investigation Report ("PSR") in this case. We appreciate your hard work. Some of what is set out here was stated in my email to you dated February 17, 2020. We ask that you consider what I set forth here and all the materials we have provided and make appropriate changes to the PSR. The comments and objections below proceed by reference to the paragraphs of the PSR.

**Part A**

      We have a general comment about the way in which Mr. Hernandez's situation is woven into the overarching conspiracy. The main conspiracy began in 2014 or earlier and involved Venezuelans taking advantage of their country and stealing money. These men, many of whom are co-defendants, are referred to as "boliburgueses," or Venezuelan business elites. Mr. Hernandez was not one of them. The truth is that Mr. Hernandez NEVER knew any of these men, never spoke to these men, never took action on behalf of these men, and had no idea what was happening in 2014. This does not mean to say that Mr. Hernandez did not eventually become part of the conspiracy. He did, in 2016, through Abraham Ortega and Pedro Binaggia ("Binaggia" or "CS"). What is noteworthy about this is that Mr. Hernandez's crime is related only to the Ortega money. It comes long after the Venezuelans have stolen and moved hundreds of millions of dollars of their money. More importantly, it comes after Binaggia is cooperating with Government agents. Mr. Hernandez's involvement here, for which he accepts his culpability, is akin to a participant in a sting operation. This is significant in that it is Binaggia often talking about Mr. Hernandez or trying to get Mr. Hernandez involved in the other aspects of the conspiracy, and while there is talk, THERE IS NO ACTION. Mr. Hernandez NEVER talked to Krull. Mr. Hernandez never received or moved any money for anyone else other than Ortega/Binaggia and only the $12 million plus. The way the PSR reads, it seems to suggest that

121389558.1

Carlton Fields
Carlton Fields, P.A. practices law in California through Carlton Fields, LLP.

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 2

Mr. Hernandez was an integral part of the conspiracy, when in fact he appeared at the end of things and had at best a minor role in what is a major crime.  We refer you to the factual proffer that was part of Mr. Hernandez's plea and ask you to conform this PSR to that document.

We will now go to the specifics of the Part A paragraphs.

Para 11.  Mr. Hernandez was not released to home confinement in Italy.  Italy does not have "home confinement."  Mr. Hernandez was under arrest at all times.  He spent 20 days in jail in Messina.  He then was moved to residences dictated by the Italian Court.  He was later transferred to a Rome jail for another 10 days prior to his release to the custody of U.S. Marshals.  Per Italian law, Mr. Hernandez was under arrest and confined for nine months and eight days.  We ask that the PSR clarify this.

Para 16 – 43.  Mr. Hernandez is not involved in any of the acts described.  We ask that this be clarified.  Perhaps the heading that follows para 43 should read "Use of Hernandez's Investment Fund to Launder Ortega Money" to differentiate and spell out that Mr. Hernandez's involvement began in 2016.

Para 47. The quotes from the April 2, 2016 meeting are taken out of context. The meeting lasted more than an hour. The meeting was in the Spanish language. This is true of most of the recordings Binaggia made. There are issues with the translations. The key objection is to the phrase "fake mutual fund." This notion gets repeated throughout the PSR and is inaccurate. The Global Securities Trade Finance ("GSTF") fund, as is apparent in the materials we gave you, WAS AND IS A REAL INVESTMENT FUND. The recorded conversation on April 2 does not use the words "fake fund." This is akin to a money launderer using a car dealership to launder money and calling the car dealership a fake dealership. NO. GSTF existed for more than 10 years before Ortega invested. It had over 50 other investors/subscribers. The fact that Ortega and Binaggia wanted to use this investment vehicle to launder money makes GSTF no less a real investment vehicle.  We ask that you use here the language of the factual proffer:

"During a recorded meeting in Panama on April 2, 2016, Ortega introduced the CS to Frieri, who explained how he (Frieri) could invest money using his (Frieri's) investment advisor firm. Specifically, Frieri explained that his investment advisory firm, Global Security Advisors ("GSA"), operated from the United States, but primarily did business in Latin America and managed $2 billion. Frieri was aware that there was a high probability that his investment advisory firm would be used to conceal the source of the money received."

Moreover the so-called quotations from the April 2 transcript are misleading and mis-translated.

a. For example, a quote reads "*we'll make the transactions in such a way that the purchase will look legitimate.*"

   The government's Spanish transcript reads: "Y *nosotros hacemos las transacciones de tal forma que la compra sea legitima.*"  This translates to "will be (or "are") legitimate."

b. Another example from the 4/2/2016 meeting, reads "…*the money can be directed anywhere on the backend using "cards", or "checks", or even "wire transfers"*".  The

121389558.1

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 3

    c. passage is entirely unrelated to Ortega's investment in the Trade Finance fund, which does NOT provide any cards, checks or wires. The quote "pastes" passages from different sections of the conversation about unrelated topics.

    c. Third is the fallacious statement that Frieri went on to explain how he can avoid being tracked by authorities, such as Interpol. This is not a quote since there are no statements like this to quote from. Mr. Hernandez never said anything, directly or indirectly, about avoiding being tracked by authorities, in this meeting or in any other.

    d. Fourth, regarding the suggestion of using WhatsApp to communicate, in financial services and Latin American in particular, it is industry standard to use WhatsApp. Mr. Hernandez kept back-up of all WhatsApp exchanges and copies were made available to the AUSAs. There is no WhatsApp conversation where anything improper is discussed.

Para 48. Not "false investments." Krull and Mr. Hernandez did not work together. We object to the reference to international narcotics trafficking. This was an attempted "sting" by the CS. This statement is not part of the plea or the factual proffer.

Para 49-50 These have nothing to do with Mr. Hernandez. We ask that you note this.

Para 51. "Fake mutual funds." Should be changed to "investment fund." GSTF is not a fake fund. In fact, the paragraph should be re-written entirely. First, between April and June 2016, discussions with Ortega and Binaggia produced an initial subscription into GSTF totaling $7 million of Ortega's money. Later in 2016 and culminating in March 2017, an additional $5 million was invested in the GSTF fund. These are two (2) discrete transactions and the way Para 51 describes these events is confusing. Moreover, Mr. Hernandez had no involvement in establishing the Deltec Bank account and no control over this account. The account belonged to Ortega and Ortega's banker, Binaggia (the "CS"). Lastly, the monies were wired to GSTF's bank in New Jersey, but Ortega only had limited use of these monies per the subscription agreement and the rules of the GSTF fund.

Para 52. The translation is inaccurate. This is not what Mr. Hernandez said about the New Jersey bank. Or about Uruguay. These incorrect translations were addressed with the prosecutors and addressed in the final proffer. A more accurate translation of the discussion is as follows:

> Mr. Hernandez says CNB is a US bank used by his partners in the Uruguay broker dealer, that had a Fed window, and that it was good because it was the US but bad since the CS's clients did not "want" US banks.

> Mr. Hernandez says Vestin is a Puerto Rico bank that is not cheap, $100 dollars or so for a wire transfer, but the clients can have their accounts and get cards, order transfers, etc.

> Mr. Hernandez says we're not interested in owning banks. It is a conflict. But we have a relationship with the partners. Mr. Hernandez specifically says we don't have people inside.

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 4

Para 53. The $400,000 came out of the Class D subscriber monies per the rules of the GSTF fund, which much like an insurance policy or brokerage account, allow loans back out. The money was sent out per Binaggia's instructions. The so-called shell company was on Binaggia's end. Mr. Hernandez had nothing to do with it. There was no "fake" loan contract. Nor did the word "fee" appear anywhere in the documents or conversations.

Para 55. It is important to note that Mr. Hernandez was not a party to either Binaggia's conversation or the meeting with Gutierrez. Please clarify this.

Para 56. Please add that Mr. Hernandez had no involvement in establishing the entity Big Green Valley S.A. or opening its account at Zarattini Bank. Big Green Valley S.A. was owned by Ortega and existed before Ortega met Mr. Hernandez.

Para 57. The Ortega monies were sent to the same bank that handled all the GSTF funds, City National Bank in New Jersey. The contracts were not "fake." Any monies out of the GSTF classes C or D went per normal operations. If a subscriber wanted to loan himself or herself monies, contracts were written up to allow this. The contracts were real. Again, this does not excuse Mr. Hernandez's from his participation. This is merely meant to clarify that NO FAKE DOCUMENTS WERE EVER CREATED. Mr. Hernandez did not assist Ortega in opening any account in New Jersey. That bank handled the GSTF fund. Ortega's account at Vestin Bank in Puerto Rico was separate and unrelated to the GSTF fund.

Para 58-76. Much of these paragraphs relate to Krull. Krull himself has acknowledged that he NEVER MET OR TALKED TO Mr. Hernandez. Binaggia said a lot of things to different people. Much of what the CS said was intended to induce them into crimes. The conversations that related to Mr. Hernandez were TALK. We ask you to acknowledge that in each instance described here, Mr. Hernandez NEVER DID ANYTHING MORE. No emails inviting subscriptions. No contracts. No conversations or meetings with the "bad guys". No other money came into the GSTF fund. There was talk led by Binaggia, but no ultimate action. Again, this had nothing to do with the GSTF investment and was never used to receive any GSTF-related Ortega monies. This does not excuse Mr. Hernandez for his talk or his involvement with Ortega and the CS. But it does put in a fairer context the true scope of Mr. Hernandez's culpability.

Para 64. Please clarify that Mr. Hernandez never met with or spoke to Krull. The CS spoke to both men separately. Mr. Hernandez did not present any "solution" to Krull. We ask you to delete "immediately agreed." This was a long conversation between the CS and Mr. Hernandez which at the end produced no action.

Para 67. Please clarify that Mr. Hernandez was not party to these conversations. Mr. Hernandez never agreed to meet with Krull.

Para 68. This is misleading. The CS, Binaggi, called Mr. Hernandez, but Mr. Hernandez did not answer. Please clarify that Mr. Hernandez was not a part of the March 16 meeting in any way.

Para 70. This is misleading. Mr. Hernandez never spoke with Krull. Conversations between the CS and Hernandez were apart from conversations between the CS and Krull. Please clarify.

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 5

Para 75.  Please refer to the transcript of the August 25, 2017, meeting between the CS and Mr. Hernandez.  This paragraph as written is misleading.  The conversation is convoluted.  Mr. Hernandez does <u>not</u> respond in the affirmative to mention of kickbacks.  At page 41 of the transcript Mr. Hernandez says the lawyers "can't pay these two guys."  Admittedly, Mr. Hernandez keeps talking with the CS about what the lawyers could do.  However, Mr. Hernandez never takes any action and no monies from these lawyers ever come to Mr. Hernandez's fund.

Para 86. With all respect, Mr. Hernandez is NOT a "professional money launderer" and outside this case and his involvement with Ortega and Binaggia, Mr. Hernandez has led an exemplary life. There is no proof of this "label" and we ask that it be deleted.  The investment funds were not "fake."  Mr. Hernandez made no false reporting to banks and did not open any shell corporations or bank accounts.  Mr. Hernandez's plea and factual proffer clarify that he was willfully blind to how Ortega and the CS were using him and his fund.  Moreover, the starting date of his involvement here is April 2016, not March 2016.

Para 94.  Please note per the Plea Agreement that the parties disagree about application of the sophisticated money laundering enhancement.

Para 98.  Please note that the adjusted offense level is either 32 or 30.

Para 102.  Please note that the total offense level is either 29 or 27.

**Part B – Criminal History**

Para 106.  The car registration expired was not an arrest.  Please clarify this.

Para 109.  We ask this description of traffic citations be deleted.

**Part C – Offender Characteristics**

Para 112.  Maria is misspelled.  It is Maria Lucia.  Mr. Hernandez's sister Maria Elena is not unemployed.  She resides in Barcelona, Spain (not Colombia) and works in the family investment business.  She is not a realtor.

Para 114.  Mr. Hernandez was married in Brazil on April 17, 2007. The civil marriage in New York was on October 17, 2007.   Mr. Hernandez is now divorced.  His former spouse was let go by her company shortly following his arrest on the charged offense, and that it is because of this that she is actively seeking employment, which is the reason why she must move back to New York in order to find a job.

Para 115.  Mr. Hernandez graduated in Colombia in 1996 (not 1995) with a J.D. (not college degree in France).  He graduated in France in 1999 with a Masters and Doctoral Program in Political Economy.  In Nos. 122 and 123 the report does reflect the above accurately.

Para 124.  The report states Mr. Hernandez currently does not possess any professional licenses.  It should be clarified that his professional licenses, both in the US and abroad, were revoked after the indictment in the instant offense.

121389558.1

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 6

Para 126.  The legal name of the entity is "Global Securities Advisors GP, LLC." The period was since the inception of the firm in November 2002 until July 25, 2018, the date of Mr. Hernandez's arrest due to the instant offense. Variable profit was made by the "GSH entities, including GSI, GSA, GSC, PCG, Alpha and GRA" (not just GSI and GSA).  GSA was not "involved in the instant offense."   The entity was GSTF.

Para 127.  Profits and distributions varied every year. Mr. Hernandez has estimated anywhere between $150-250,000 in annual profit distributions.

Para 128 and 129.  "Two others" should be clarified that these others are Mr. Hernandez's eldest brother Cesar Gabriel Hernandez and his brother in law, Juan Carlos Gomez.

Para 130.  Domaine is not based in the Caymans. It is based in NYC.  The Bottled Asset Funds (I and II), are Cayman domiciled funds.

Para 131.  These entities were not discussed because they were all long dissolved. These entities (#s 132-134, 136-138) were related to real estate investments that date to the period of 2002-2005. Entities were dissolved when projects concluded.  The entity referenced in No. 135 was the "old" GSA, replaced by GSA GP. It should be clarified it is the same as in No. 126.

Para 139 and 140.  The entities referenced were not incorporated by Mr. Hernandez but acquired by an investment group which included Mr. Hernandez and his assets were later merged into a separate entity (Domaine) and the entity was dissolved.

Para 142.  Mr. Hernandez did report bank accounts. He reported the closure of different bank accounts (BOFA, Wells Fargo), which were closed by the banks after the indictment in the instant offense, and he listed the checks received after the closure of these accounts.
BAF funds I and II: the report indicates "no fair market value" but in parallel indicates a "partner capital" ($306,000) and an "undrawn commitment" amount ($247,500) which has no value.  Mr. Hernandez clarified in the material submitted that, after the indictment in the instant offense, he resigned his role as director of the BAF funds and the funds entered into liquidation. At this stage there is no current valuation for Mr. Hernandez's position but it is most probably worthless.

Para 144.  The monthly payment is ca. $1,200 (not $900). Mr. Hernandez provided the back up information for this insurance policy.

Para 145.  An internet search for the value of a brand of watch, irrespective of model specifications etc., will yield disparate results.  Mr. Hernandez submits that the watch in question is not worth anything remotely close to $95,000. It was a gift from his father and the market value should be no more than $3,000.

Para 147.  Mr. Hernandez provided copy of the title for this vehicle, which was registered under his former wife's name and his name, since he was a co-signer on the loan.  He did not include the vehicle since per the divorce settlement, the car is owned by his former wife, who has been paying the car for the past years and is in the process of selling it.

121389558.1

Vanessa Pulido
Senior U.S. Probation Officer
March 3, 2020
Page 7

Para 149.  The 597 Hibiscus Trust is not as 'owned' by the defendant and his former spouse, since the property was acquired in 2013 under a trust.  Mr. Hernandez never owned this property.  He resigned as co-settlor and co-trustee per the divorce settlement. His former spouse remains as sole settlor and trustee.  The 597 Hibiscus trust deed does not limit the property to passing upon death.  Mr. Hernandez's former wife, as sole trustee, has the power to convey the property to the children at any time.

Para 153.  Mr. Hernandez questions if this is accurate.

Para 158.  Mr. Hernandez has negative equity / cash flow.  We submit he is not capable of paying a fine.

**Part D – Sentencing Options**

Para 160.  We ask that this include language that, as is stated in # 6 of the PSR, per the plea agreement "the defendant will argue the sophisticated laundering enhancement does not apply."   And thus will argue that the proper total offense level is 27, not 29.

Para 171.  We submit these are ample grounds for a departure or variance, including, but not limited to Mr. Hernandez's significant charity activities.  We will spell all this out in detail in a sentencing memorandum to be submitted to the Court.

                                        Sincerely,

                                        Michael S. Pasano