GOVERNMENT
EXHIBIT
**21**
18-CR-20685

1        **UNITED STATES DISTRICT COURT**
         **SOUTHERN DISTRICT OF FLORIDA**
2                **MIAMI DIVISION**
         **CASE NO.  18-20685-WILLIAMS/Becerra**
3

4

    **UNITED STATES OF AMERICA,**
5
                    **Plaintiff,**
6
         **vs.**
7
                                    **Miami, Florida**
8                                   **May 17, 2019**
    **GUSTAVO ADOLFO HERNANDEZ FRIERI,   Pages 1-21**
9
                    **Defendant.**
10    _____

11                **TRANSCRIPT OF ARRAIGNMENT and**
              **STATUS CONFERENCE REGARDING BOND**
12         **BEFORE THE HONORABLE JACQUELINE BECERRA**
              **UNITED STATES MAGISTRATE JUDGE**
13

14    **APPEARANCES:**

15    **FOR THE PLAINTIFF:**        *United States Attorney's Office*
16                                  **BY:  MICHAEL NADLER, A.U.S.A.**
                                    99 Northeast Fourth Street
17                                  Miami,  Florida 33132

18
    **FOR THE DEFENDANT:**
19                                  *Carlton Fields Jorden Burt, P.A.*
                                    **BY:  MICHAEL PASANO, ESQ.**
20                                  100 Southeast Second Street
                                    Suite 4000
21                                  Miami, Florida 33131

22
    **TRANSCRIBED BY:**        **DAWN M. SAVINO, RPR**
23                              **Official Court Stenographer**
                                **400 N. Miami Avenue, 10S03**
24                              **Miami, Florida  33128**
                                **Telephone:  305-523-5598**
25

**TRANSCRIPT RECORDED BY DIGITAL AUDIO RECORDING**
**PRODUCED BY OFFICIAL STENOGRAPHER**

```
1              P-R-O-C-E-E-D-I-N-G-S

2         THE COURT:  United States versus Gustavo Hernandez

3    Frieri, 18-20685-criminal-Williams.

4         MR. NADLER:  Good morning, Your Honor.  Michael Nadler

5    on behalf of the United States.

6         THE COURT:  Good morning.

7         MR. PASANO:  Good morning, Your Honor.  Michael Pasano

8    on behalf of the Defendant, Gustavo Hernandez, and it's good to

9    see the Court.

10        THE COURT:  Thank you.  Good to see you.

11        So we're here today to arraign the Defendant and for a

12   bond hearing; is that correct?

13        MR. NADLER:  Yes, Your Honor.

14        MR. PASANO:  Yes, Your Honor.

15        THE COURT:  Okay.  Do you want to proceed with the bond

16   hearing or with the arraignment first?

17        MR. PASANO:  Arraignment is fast, Your Honor.  If you

18   want to go there, we're happy to.

19        THE COURT:  Let's do the arraignment.

20        MR. PASANO:  At this time, we would waive formal

21   reading of the indictment.  We would request trial by jury, we

22   would ask the Court to enter the standing discovery order and --

23   yeah.

24        THE COURT:  Okay.  So I'll accept the formal waiver

25   reading of the indictment, we'll enter a plea of not guilty,
```

1    I'll note your demand for jury trial which I think might be what

2    you forgot, right?

3            MR. PASANO:  We filed it as a written demand but --

4            THE COURT:  No problem.  So I didn't see that in the

5    record, but that's fine.  We'll note the request for jury demand

6    and the standing discovery order will be entered today.

7            All right.  How are we proceeding with bond?

8            MR. NADLER:  The parties have agreed to stipulate to a

9    bond to present to the Court, Your Honor.

10           THE COURT:  Okay.

11           MR. NADLER:  We're going to propose a $500,000 10% bond

12   and a $25 million personal surety bond co-signed by two

13   individuals whose names are?

14           MR. PASANO:  Family members.  Cesar Hernandez, his

15   brother who lives here in Miami, and Juan Carlos Gomez, his

16   brother-in-law who lives in Colombia, who is in Florida and in

17   Miami today.

18           MR. NADLER:  We are also asking for home confinement

19   with electronic monitoring to be paid for by the Defendant.  We

20   already have the Defendant's passports, but we've also agreed to

21   surrender the passports for Mr. Hernandez's children.  We'd ask

22   that the co-signers, as well as Mr. Hernandez, not encumber any

23   property or assets or investments.  Mr. Hernandez has also

24   agreed to pledge his share of the Homestead here in Miami.

25           THE COURT:  Anything else?

1        MR. NADLER:  I believe that is it, Your Honor.

2        THE COURT:  So why is the wife not pledging the

3   Homestead?

4        MR. PASANO:  Your Honor, she's present in court.

5   Mr. Hernandez was arrested almost nine months ago in Italy.  The

6   businesses have pretty much crumpled in the face of his

7   indictment, and the wife has been particularly adversely

8   affected both in her job and in her ability to pay and care for

9   the children and it's likely going to be a divorce.  And on the

10  advice of her divorce counsel, she's not available to execute.

11       THE COURT:  So the wife is refusing to pledge the

12  property?

13       MR. NADLER:  Her share.

14       MR. PASANO:  Her share, her half.

15       THE COURT:  I thought the property was held in some

16  sort of trust?

17       MR. NADLER:  It is.

18       THE COURT:  So does he have an interest in that trust

19  or no?

20       MR. NADLER:  He does.  He is the trustee.

21       THE COURT:  All right.  That doesn't mean he has an

22  interest in the trust.  So do you know what his interest in the

23  house is?

24       MR. PASANO:  The three children are the beneficiaries

25  of the trust, Your Honor.  But prior to the trust, Your Honor,

 1    and this is simply to point out the legal issue, the Government

 2    would have a stake, they may or may not win it, they filed a lis

 3    pendens to protect it with regard to his share of the property

 4    so it does have value and it is, I believe, a reasonable

 5    property to sit behind the bond in addition to these other

 6    terms.

 7              THE COURT:  Where is he going to reside?

 8              MR. PASANO:  At the house.  The wife -- we've had

 9    discussions late into the night.  It's on Hibiscus, it's not

10    actually that far from here, and he will live there and remain

11    there with his children and his wife as they go through this

12    process.  Now that he's back, I hope things will change, but I

13    can't tell the Court it will.

14              THE COURT:  I have to tell you, I'm not entirely

15    comfortable.  I think the bond is low given the nature of the

16    offense, given fact that he had to be extradited from Italy and

17    given the assets that involved are in the case.

18              MR. PASANO:  Judge, may I explain?  Because we

19    understand the Court's concerns.  As to the extradition,

20    Mr. Hernandez was, upon his arrest a day later, released into

21    house confinement in Italy and has been, in essence, at liberty

22    for nine months.  When the extradition rulings occurred in

23    January of this year, he decided not to further contest and so

24    withdrew further appeals and had his lawyers arrange with the US

25    to have him brought back.

**TRANSCRIPT RECORDED BY DIGITAL AUDIO RECORDING**
**PRODUCED BY OFFICIAL STENOGRAPHER**

1          Throughout the time that he was in Italy for those nine

2    months, he had his two passports.  He actually ultimately was

3    living for months in a house alongside the sea.  The idea that a

4    man who, for nine months could have fled, would agree to come

5    back to the United States knowing that he would be in custody

6    and then somehow leave here knowing potentially the chaos that

7    was awaiting him, we suggest, gives us further confidence as to

8    why he's not a bond risk.  But to protect against that, we've

9    agreed to the idea of home confinement.

10          As to assets, unfortunately whereas a year ago this was

11   a man who was well off with businesses that were functioning,

12   the businesses have all cratered.  He has no current assets and

13   his role in this very large alleged crime actually reduces

14   itself to receipt of some monies through his investment hedge

15   fund which are still available, ultimately to be returned to the

16   Government.  So it's not as if this is a man who received a lot

17   of money or who has money hidden abroad.  He actually has

18   nothing.  He has investments tied up, there's a protective order

19   in place that is covering those, and he's pledging all of that,

20   whatever he has, against his promise to return.

21          MR. NADLER:  Your Honor, I can comment a little bit

22   about the extradition.  In terms of he was extradited, he was

23   extradited because he was caught up in a complaint while on

24   vacation.  There was an individual flying into the United States

25   on a particular day that we felt if we didn't arrest him and

1    file a complaint on that day, then we may not have gotten him

2    again.  He was a German, I believe a German citizen with

3    concerns of extradition if he ever got out, so Mr. Hernandez was

4    caught up in that.  It wasn't that he was extradited because he

5    was living in some foreign country; he was literally on vacation

6    with his family.

7          In addition, at the beginning, within a couple days,

8    Mr. Pasano actually reached out, offered to surrender.

9    Unfortunately, he was caught up in the extradition and it wasn't

10   possible.

11         So given the current state of his finances, and we are

12   still working out the full extent, the year, the wife, we just

13   don't believe he is a flight risk based on this set of

14   circumstances.  But you're right, Your Honor, it is a risk.

15   We've had a large conversation over the last two days about

16   assets and we believe we pushed the bounds of liquidity as --

17         THE COURT:  I think the bounds of liquidity are $50,000

18   in this case?

19         MR. NADLER:  That's what I was told.  Anything else

20   would be loans from other people.

21         MR. PASANO:  As is for the last year, he has lived on

22   loans from friends and family.  When I say the business has

23   cratered, I'm not exaggerating, Your Honor.  There is no income

24   that he's receiving, and he's resigned from every position and

25   every entity because of this indictment.

1    MR. NADLER:  I know his business is, as far as we see,

2    not currently bringing much income or any income.  The original

3    asset, which was the trade finance, is no longer operating.

4        THE COURT:  I got to tell you, I'm uncomfortable not

5    having the wife sign.  I mean, they may think they're getting a

6    divorce, maybe she thinks she's getting a divorce now, but he's

7    going to go back and live in a fairly significant home with the

8    wife.  They have minor children.  Is the wife not surrendering

9    her documents?

10       MR. PASANO:  She works and travels when she gets a new

11   job outside the US.  Originally we had contemplated that.  She

12   is present in court.  If the Court wants to inquire, I have no

13   objection to that, Your Honor.

14       THE COURT:  Why is the Government not requesting that

15   she co-sign at least a personal surety bond?

16       MR. NADLER:  I asked, she said no.  So if she doesn't

17   do it, it's essentially asking for a detention.  She refuses.

18   So it's asking for something that's never going to happen.  So

19   Mr. Pasano and I had a long talk this morning.  Trust me, I

20   voiced the same concerns as the Court.

21       MR. PASANO:  Now Your Honor, his brother, who has a

22   business and who has been kind enough to agree to co-sign also,

23   you know, has significant property and family here in Miami.

24   Mr. Hernandez himself lived here for 20 years, he is a US

25   citizen, he was born in Colombia.  Both of his passports are in

1    the custody of the Government.  We are arranging so the three

2    minor children's passports will be held along with -- you know,

3    along with all these other conditions we urge the Court more

4    than suffices.  Again, if he was going to flee, he had ample

5    opportunity.  And the fact of electronic monitoring covers any

6    other additional risk if there was one.

7           Again, if this was the lead defendant in the case with

8    hundreds of millions of dollars of money passing through his

9    hands, I'd appreciate even more the Court's concern.  But, you

10   know, while not a small amount of money, the money that came

11   into his hedge fund and went back out in investments is not

12   money in his hands, and it is not anything compared to the

13   amounts of money that others were involved in.

14          THE COURT:  What about all the real property that's

15   noted in the forfeiture, Counsel?  Counsel for the Government?

16          MR. NADLER:  The house is -- has a lis pendens for

17   substitute.

18          MR. PASANO:  And there's investments that are also now

19   covered by Judge Williams' protective order.

20          MR. NADLER:  Correct.  The bottle asset fund which is a

21   fund into the distribution of certain wines, that is covered by

22   the protective order as well.  Those are assets that the

23   Defendant promises not to encumber as part of this.

24          MR. PASANO:  And those are the only items in that long

25   list that are his.

1          MR. NADLER:  There's a piece of property in New York

2     that's an irrevocable trust for the benefit of the kids that

3     Mr. Hernandez has no interest in.  He is not a trustee nor

4     beneficiary.

5          THE COURT:  Who is the trustee and the beneficiary of

6     that apartment?

7          MR. PASANO:  It's, as I understand it, one of his

8     wife's sisters and a family friend of the wife.

9          THE COURT:  All right.  This is what I'm going to do.

10    I mean, the Government has stated that it has no concerns that

11    the Defendant is a flight risk; is that correct?

12         MR. NADLER:  I wouldn't say I have no concerns.  I

13    believe the bond is sufficient to ensure he's showing up.  As I

14    told the Court, I do have concerns not having the wife sign.  I

15    was notified late last night.  We talked about it.  I am more

16    confident than not that he will not flee, that he will face

17    charges.

18         There's also other circumstances I prefer not to put

19    out into the public that go into that factor that I'm happy to

20    notify the Court at sidebar if the Court wants to know about

21    that, that alleviates a lot of my concern.

22         THE COURT:  I would actually like to know about that.

23    The parties can come to sidebar please.

24         (SIDEBAR CONFERENCE:

25         MR. PASANO:  It was not fun night last night, Your

1    Honor.

2              THE COURT:  $50,000 is nothing.  In fact, peanuts.

3              MR. PASANO:  But the home confinement is huge, and if I

4    had more, I mean, trust me, the Government has pushed for

5    everything.  Originally we thought we had the wife's signature,

6    we thought we had even the trustees.  I don't know what advice

7    she's gotten from an ex-judge who now does divorce work, but it

8    has complicated our lives.  We are finalizing a resolution of

9    the case in terms of a plea and he has already -- he's had a

10   reverse proffer, next week he'll be, court-permitting, meeting

11   with the Government to begin the process of debriefing and

12   cooperating, and you know --

13             MR. NADLER:  That is really the impetus behind allowing

14   the wife not to sign.  As you, I made a big deal about it but I

15   have been assured that we are on the path to plea, that

16   Mr. Pasano has assured me that the money we're asking for is it.

17   He has no other assets.

18             MR. PASANO:  And, Judge --

19             MR. NADLER:  And I've been assured that he is going to

20   cooperate to his fullest.

21             MR. PASANO:  And to that end, I've had occasion, the

22   family has been kind enough to have paid for my flights and such

23   to spend substantial time with the client in Italy while this

24   process was pending.  To the extent that, you know, we ever

25   believed that we've seen enough to have at least a sense of what

```
 1    this man can do or will do, I am satisfied there are no other

 2    accounts anywhere.  I've had substantial conversations, I've

 3    traveled to Colombia to verify that, I've met with family

 4    members down there, all of whom, you know, live there but are

 5    educated in the United States and who, you know, and others down

 6    there support him.  So in terms of my concern, I'm stronger than

 7    the Government, as you know it should be, that having seen him

 8    and, you know, believing in what he could have done and didn't

 9    and what he can do here, I'm convinced that, you know, the

10    personal bond which ties up not just him but his brother and the

11    brother-in-law.  But the brother-in-law has no assets in the US,

12    but the home confinement is the key.  The 50 is just the

13    sweetener to make sure that, you know, he -- but the reality is

14    in my opinion, based upon his agreement to work with the

15    Government, he's not going anywhere.

16         THE COURT:  So I'll tell you how I feel about the

17    electronic monitoring where that was a cinch, I can't tell you

18    how many cases I've had in the three and a half months I've been

19    here where people manage to cut those off and flee.

20         MR. PASANO:  It's --

21         MR. NADLER:  I agree.  The electronic monitor is not a

22    big deal.

23         THE COURT:  I mean, so --

24         MR. NADLER:  It's also -- I'm sorry.

25         THE COURT:  Go ahead.
```

1          MR. NADLER:  The extradition part is also kind of

2     interesting.  He was -- the Italian government determined that

3     he had certain health issues and they didn't want to confine him

4     in prison, so they let him stay in the villa that he had rented

5     with his passports with no armed guards.

6          THE COURT:  Right, but his ability to flee from Italy

7     is very different than his ability to flee from Miami.

8          MR. NADLER:  He doesn't have that many places to go.

9          MR. PASANO:  I would actually suggest it's easier from

10    Italy, Judge.  I've been there.  I mean, outside his door were

11    boats.

12         MR. NADLER:  He was in Messina, which is a coastal

13    town.

14         MR. PASANO:  It's -- I mean, any day he could have

15    walked away and it would have been days.

16         THE COURT:  Right.  But his ability to have the kind of

17    contacts he would need to effectuate fleeing are different in

18    Miami than they are in Italy.  You're not going to convince me

19    otherwise on that.  I'll save you some time.

20         MR. NADLER:  Your Honor, I do have the same concerns.

21    We have talked about it.  The wife was a big deal not only

22    because there was an agreement to sign, the refusal --

23         MR. PASANO:  It's a major issue for us.

24         THE COURT:  This is what I'm going to do.  I'm going to

25    -- I can't -- I'm not going to require the wife to sign because

1    I don't want to put you in a situation where it's a pretrial

2    detention issue necessarily, because the Government isn't asking

3    for that.  But I am going to increase the 10%, and if he can't

4    come up with that money, then, you know, what I'll do is I'll

5    reset it for a status two weeks from now before me.  But if he

6    can come up with 50, he can come up with 150.

7            MR. PASANO:  Judge, may I?

8            THE COURT:  I mean, the wife is sitting on a

9    multimillion dollar property.

10           MR. PASANO:  So if I can ask the Court to consider

11   this.  When it became apparent in the early conversations with

12   Michael that the Government was more interested in a cash bond

13   than in a corporate surety, we then went back to his

14   brother-in-law and to the wife when she was talking to me and

15   family, friends agreed that they could come up with as much as

16   100.  It wouldn't be easy.  Michael was kind enough to agree to

17   accept 50, which was easier.  If that's -- so if the Court's

18   inclined to increase it, I would ask you not to go over the 100

19   because at least I've heard that that number is money that they

20   could come up with.

21           THE COURT:  I'm going to go to 150.  I'll tell you

22   this, with the wife, I'm not entirely comfortable with it.

23   She's here.  She's not surrendering any of her travel documents,

24   which I think is concerning because he's going to go back to

25   live with her, right?  So I'm going to require $150,000 cash

1    bond.

2              MR. NADLER:  So 1.5 million.

3              THE COURT:  1.5, 10%.  And I'm going to ask for a

4    Nebbia on the 10%.

5              MR. NADLER:  I agree.

6              THE COURT:  I mean --

7              MR. NADLER:  A Nebbia was --

8              THE COURT:  Yeah.

9              MR. PASANO:  Will the Court accept, if we make the --

10   assuring the Government a stipulation on that as opposed to

11   having to come into court?

12             THE COURT:  Well, yeah.  I mean, if the Government is

13   satisfied on the Nebbia, I'll accept the Government's

14   stipulation on that, sure.  And let's see where we are two weeks

15   from now.  When is he scheduled for that debrief?

16             MR. NADLER:  We're going to start next week.

17             MR. PASANO:  He's been in custody, because we wanted to

18   work this out with the Government, so he arrived two weeks ago

19   and he's been at the FDC.  So my goal would be to work through

20   the weekend to see if we can get everything posted, satisfy the

21   Government on that condition, and then in our perfect world, we

22   would have him out on Monday.

23             THE COURT:  And if not, he can debrief from FDC.

24             MR. NADLER:  I'm happy to do a status if you comply

25   with the terms on Monday morning.  Or if the Court wants to

1    reset for two weeks to see.

2            THE COURT:  Well, we're going to change -- it's going

3    to be the 1.5, 10% with a Nebbia, all right?  So I could -- I

4    don't want to set it for Monday.  I think what I'd like to do is

5    reset it for a time for a status on the bond to see whether or

6    not he, in fact, is in a cooperative fashion with the

7    Government.  I'm going to note for the record that that -- I'm

8    taking that into consideration when I decide to give him this

9    bond.  If he should decide that, you know, maybe he doesn't want

10   to be as cooperative as he thinks he's going to be today, then I

11   want the ability to reconsider the bond.

12           MR. PASANO:  And I apologize for, you know, belaboring

13   this with Your Honor.  Does the Court then envision that he

14   remains in custody through that date, whatever the Court day is?

15           THE COURT:  No, if he can post 150 and --

16           MR. PASANO:  And satisfy the Nebbia.

17           THE COURT:  You know, he's going to be released.

18           MR. PASANO:  And then we can notify you that that's

19   happened.

20           THE COURT:  You'll notify me that that's happened.  I

21   still want a status in two weeks because if the cooperation is

22   not successful or it's not --

23           MR. PASANO:  You'll revisit bond.

24           THE COURT:  Then I'm going to revisit the bond.

25           MR. PASANO:  And it may be that something changes on

```
 1        the wife's end that might make the Court more comfortable.  I

 2        mean, I'm not giving up on that, but I've given up on it for the

 3        last 12 hours.

 4              MR. NADLER:  Hopefully this --

 5              THE COURT:  Well, walk me through on the issue with the

 6        house, right?  So the house is held in a trust.  He's got an

 7        interest in that trust.  She would not be able to sell or

 8        encumber the house because his interests has a lis pendens on

 9        it?

10              MR. PASANO:  Exactly.  So that's why the Miami property

11        is available.

12              THE COURT:  All right.  So that's what I'm --

13              MR. NADLER:  Cesar, the brother, who is co-signing has

14        a $2.7 million property.

15              MR. PASANO:  And he lives here.

16              MR. NADLER:  Here in Miami also.

17              MR. PASANO:  In Miami also.

18              MR. NADLER:  He can't encumber that.

19              MR. PASANO:  And that's why we --

20              THE COURT:  He cannot encumber that?

21              MR. NADLER:  He cannot encumber that.

22              MR. PASANO:  But the signature bond, that's what's made

23        this so complicated.  But Cesar will sign and not encumber any

24        of that property.  Gustavo will sign and not encumber his Miami

25        property, and they'll have the assistance because he will have
```

```
1    signed with the brother-in-law who comes back and forth between

2    Colombia.  They're the three business partners.  It's just --

3          THE COURT:  Well, I don't care who is coming back and

4    forth from Colombia, doesn't interest me one bit.

5          MR. PASANO:  I agree.

6          THE COURT:  But the two that are here in Miami, I mean,

7    why aren't they willing the pledge the properties?

8          MR. NADLER:  The wife?

9          THE COURT:  No, the brothers.

10         MR. PASANO:  I mean, he will agree not to encumber it

11   and he'll stand behind the $25 million personal bond.

12         MR. NADLER:  I mean, that was the point of not

13   encumbering it, it will be the asset backing it.  At least part

14   of the asset.  His business is also still generating income.

15         MR. PASANO:  Yeah, and it's a regulated business.  He's

16   the securities side of an investment business, separate from his

17   brother.

18         THE COURT:  Okay.

19         MR. NADLER:  Thank you, Your Honor.

20         THE COURT:  Well, that's how I'm going to change the

21   bond, and then we'll see you in two weeks.

22         (END OF SIDEBAR)

23         THE COURT:  Okay.  We're back on the record.  So we're

24   going to set the Defendant's bond to $1.5 million, 10% bond.

25   That 10% bond will have a Nebbia condition.  There will be a $25
```

Case 1:18-cr-20685-KMW   Document 194-1   Entered on FLSD Docket 08/21/2023   Page 19 of 21

19

1    million personal surety bond co-signed by the brother and the

2    business partner, Mr. Gonzalez.  Both the brother and

3    Mr. Gonzalez agree not to encumber any of their properties, in

4    particular the brothers -- is the brother in court today?

5             MR. PASANO:  He is, Your Honor.  That's Cesar and the

6    brother-in-law's name is Juan Carlos Gomez.  I apologize, Your

7    Honor.

8             THE COURT:  All right.  I think those -- that's my bad

9    handwriting, probably not your mistake.

10            So let's make sure that those bond papers make

11   particularly clear that there can be no attempt whatsoever to

12   encumber those properties because if there's any attempt to

13   encumber those properties, obviously that will be a violation of

14   the bond, and the brother and the business partner could face

15   their own civil and criminal penalties.

16            The Defendant will be home confined.  He will pay for

17   the confinement.  His children will surrender their passports.

18   And I've been told by the Government that there is a lis pendens

19   on the homestead which he will be living in.

20            In addition to that, he will execute whatever is

21   necessary with the bond paperwork to make sure that his interest

22   in that property is also pledged as part of the bond.

23            MR. NADLER:  Thank you, Your Honor.

24            THE COURT:  And then in addition to this, we're going

25   to have a status hearing before me two weeks from today.

```
1              MR. PASANO:  Judge, could I request sometime the week
2     of June 4th which is a little more than two weeks?
3              MR. NADLER:  That works better for me too, if it's okay
4     with the Court.
5              THE COURT:  Donna?
6              COURTROOM DEPUTY:  Okay.  Which day?
7              MR. PASANO:  Any time, 5th, 6th or 7th would be
8     perfect.
9              COURTROOM DEPUTY:  June 5th, 10 a.m.
10             MR. NADLER:  Thank you, Your Honor.
11             THE COURT:  All right.  So it will be before me June
12    5th, 10 a.m.
13             Anything else on behalf of the Government?
14             MR. NADLER:  No, Your Honor.  Thank you.
15             THE COURT:  On behalf of the defense?
16             MR. PASANO:  No, Your Honor.  Thank you, Your Honor.
17             THE PROBATION OFFICER:  Your Honor, Ilene Alonso with
18    pretrial.  Just wanted to request, in addition to the conditions
19    that have already been stated on the record, to have him report
20    to pretrial services as directed and not to visit any commercial
21    transportation establishments, if it's agreed on by the Court.
22             THE COURT:  Okay.  So we're going to add a couple of
23    things to the bond.  First of all, sir, you're going to report
24    to pretrial services as directed.  I understand that all his
25    passports and travel documents are already in the possession of
```

1    the United States Government; is that correct?

2              MR. NADLER:  Yes, Your Honor.

3              THE COURT:  Okay.  Sir, you're also not to visit any

4    commercial transportation establishments:  Airports, seaports,

5    marinas, bus terminals, train stations whatsoever.

6              All right.  Anything else?  Sorry about that, I forgot

7    pretrial services.

8              THE PROBATION OFFICER:  Thank you, Your Honor.

9              THE COURT:  All right.  Thank you very much.

10             MR. NADLER:  Thank you, Your Honor.

11             (PROCEEDINGS CONCLUDED)

12                             *  *  *  *  *

13                     C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
14   **digital audio recording** of proceedings in the above-entitled
     matter.

15

16   5/20/2019              /s/ Dawn M. Savino
     Date                   DAWN M. SAVINO, RPR
17

18

19

20

21

22

23

24

25