**TABLE OF CONTENTS EXHIBIT 2A-2S**

Exhibit 2A – Complaint Affidavit Listing Defendant as Supervisor

Exhibit 2B – 11/11/2020 Email Chain between Defendant and RPB re Drunken Meats Deal

Exhibit 2C – 11/24/2020 Email Chain Between Defendant, RPB, ODC and TL re Drunken Meats

Exhibit 2D – 11/25/2020 Email Chain Between Defendant, RPB. LG. VG and DM re Charlemagne Kaiser

Exhibit 2E – 12/10/2020 Email Chain Between Defendant, RPB, LG, and TL re GH Contribution to DM

Exhibit 2F – 12/10/2020 Email Between Defendant and RPB re Solution

Exhibit 2G – 12/17/2020 Email Chain Between Defendant, LG and TL re Herd

Exhibit 2H – 12/31/2020 Email Chain Between Defendant and ODC re Drunken Meats Projections

Exhibit 2I – 1/31/2021 Email Between Defendant and ODC re ODC Regenerative LLC

Exhibit 2J – 2/14/2021 Email Between Defendant and RPB re Note

Exhibit 2K – 2/16/2021 Email Chain Between Defendant and LG re Drunken Meats

Exhibit 2L – 3/6/2021 Email Between Defendant and TL re Invoice

Exhibit 2M - First Amended Operating Agreement Charlemagne Kaiser LLC dba Drunken Meats

Exhibit 2N - Revolving Loan Agreement Between Charlemagne Kaiser LLC and The Great Bhakta Corp.

Exhibit 2O - Charlemagne Kaiser LLC Promissory Note

Exhibit 2P – Guaranty Agreement Between Defendant and The Great Bhakta Corp.

Exhibit 2Q - Charlemagne Kaiser LLC 2020 Annual Report

Exhibit 2R – ODC Regenerative LLC 2021 Articles of Organization

Exhibit 2S - – ODC Regenerative Farms LLC 2021 Articles of Organization

# EXHIBIT 2A

AFFIDAVIT
19047202014526

OKEECHOBEE COUNTY SHERIFFS OFFICE

## IN THE CIRCUIT/COUNTY COURT 19 JUDICIAL CIRCUIT IN AND FOR OKEECHOBEE COUNTY FLORIDA

**AFFIDAVIT**
19047202014526

State of Florida
vs. SCOTT ERIC SMITH

**GOVERNMENT EXHIBIT**
**2A**
**18-cr-20685-KMW**

Court Case Number
472020CF000674

Agency Case Number
20S22816

In County OKEECHOBEE,
State of Florida

To all and singular the Sheriffs of the State of Florida whereas DALE LAFLAM has made an oath on 2020-10-29,
that in the aforesaid county SCOTT ERIC SMITH did unlawfully violate

| Statute | Rec # | AON | Level | Count | Code Value | Bond |
|---------|-------|-----|-------|-------|------------|------|
| F.S. 812.014 (2a1) | 2786 | 2399 | FELONY | 1 | LARC | $500000.00 |

Description: GRAND 1ST DEGREE 100K DOLS MORE OR LEO SEMI

Qualifiers:

Enhancers:

TOTAL BOND                                           **$500000.00**

1 First Degree Grand Theft (F 1)
COUNT 1: On or about August 8, 2020 through October 13, 2020 Scott Eric Smith did unlawfully
and knowingly obtain or use or endeavor to obtain or to use the property of another, to-wit: U.S.
Currency, the property of
Okeechobee Livestock Market as owner or custodian, of the value of $100,000 or more, with
intent to either permanently or temporarily deprive the true owner of a right to the property or a
benefit therefrom or to appropriate the property to the use of the taker or to the use of any person
not entitled thereto, in violation of Florida Statute 812.014;

contrary to the law in such case and provided, and against the peace and dignity of the State of Florida.

FILED FOR RECORD
OKEECHOBEE COUNTY
2020 OCT 29 PM 4: 03

**Suspect**



AFFIDAVIT
19047202014526

OKEECHOBEE COUNTY SHERIFFS OFFICE

**First**
SCOTT

**Middle**
ERIC

**Last**
SMITH

**Sfx**

**Race**
WHITE

**Ethnicity**
NOT HISPANIC OR
NOT LATINO

**Gender**
M

**Citizenship**
UNITED STATES OF AMERICA (USA)

**Height**
5' 5

**Weight**
157

**Hair**
BROWN

**Eye**
HAZEL

**Skin**
MEDIUM

## Statement of Probable Cause / Narrative

DURING THE FIRST WEEK OF AUGUST OF 2020, T███ C███ PRESIDENT OF OKEECHOBEE
LIVESTOCK MARKET, INC. MET WITH SCOTT SMITH AT BHAKTA FARMS ON STATE ROAD 60 IN INDIAN
RIVER COUNTY. THE PURPOSE OF THE MEETING WAS FOR MR. CLEMONS TO BROKER A DEAL TO SELL
CATTLE FROM BKAKTA FARMS TO MATT PEARCE THROUGH THE OKEECHOBEE LIVESTOCK MARKET.

ON AUGUST 8, 2020, OKEECHOBEE LIVESTOCK MARKET RECEIVED 288 HEAD OF CATTLE FROM BHAKTA
FARMS. THESE CATTLE INCLUDED 91 DRY COWS AND 197 OF PAIRS (COWS WITH CALVES). THE CATTLE
WERE THEN SOLD TO M███ P███ AND THE OKEECHOBEE LIVESTOCK MARKET ISSUED CHECK #
███ PAYABLE TO BHAKTA FARMS IN THE AMOUNT OF $279,327.00. OKEECHOBEE LIVESTOCK
MARKET'S CHECKING ACCOUNT IS WITH CENTERSTATE BANK.

IN THE FIRST WEEK OR SO OF OCTOBER 2020, OKEECHOBEE LIVESTOCK MARKET PERSONNEL NOTICED
THE CHECK ISSUED TO BHAKTA FARMS HAD NOT CLEARED THE BANK. T███ C███ CONTACTED
SCOTT SMITH WHO SAID IT WAS PROBABLY ON SOMEONE'S DESK, THAT THE COMPANY HAD SO MUCH
MONEY, THE CHECK ISN'T THAT IMPORTANT TO THEM.

SCOTT SMITH TELLS T███ C███ THE CHECK ISSUED TO BHAKTA FARMS HAS EITHER BEEN LOST OR
MISPLACED, AND SCOTT SMITH ASKED THEM TO RE-ISSUE THE CHECK. BUT THIS TIME, SCOTT SMITH
ASKS THEM TO WRITE THE CHECK PAYABLE TO SMITH LIVESTOCK SERVICES. A WRITTEN AGREEMENT IS
DRAFTED AND SIGNED BY SCOTT SMITH AND T███ C███ ON 10/12/2020. THE AGREEMENT DETAILS
THE LOST OR MISPLACED CHECK, THE CANCELLING OF THE ORIGINAL CHECK, AND THAT SCOTT SMITH
REPRESENTING BHAKTA FARMS, HAS ABSOLUTE AUTHORITY OVER THE CATTLE OPERATION OF BHAKTA
FARMS.

ON OCTOBER 13, 2020, OKEECHOBEE LIVESTOCK MARKET ISSUES CHECK # ███ TO SMITH LIVESTOCK
SERVICES IN THE AMOUNT OF $279,292.00.

THE INVESTIGATION REVEALED THAT ALSO ON 10/13/20, SCOTT SMITH PRESENTED THE CHECK TO
CENTERSTATE BANK AND EXCHANGED IT FOR A CASHIER'S CHECK. IT WAS ALSO LEARNED THAT THE

AFFIDAVIT                                                    OKEECHOBEE COUNTY SHERIFFS OFFICE
19047202014526

ORIGINAL CHECK ISSUED TO BHAKTA FARMS WAS DEPOSITED INTO THEIR JP MORGAN CHASE ACCOUNT ALSO ON 10/13/20.

OKEECHOBEE LIVESTOCK MARKET HAS SUFFERED A LOSS OF $279,292.00.

ON TUESDAY, OCTOBER 28, 2020, DEPUTIES WITH THE INDIAN RIVER COUNTY SHERIFF'S OFFICE, VERO BEACH, FLORIDA, ARRESTED SCOTT ERIC SMITH ON OUTSTANDING CATTLE THEFT, FRAUD AND GRAND THEFT WARRANTS IN THE STATE OF WYOMING.  WHEN SMITH WAS FIRST STOPPED, HE PROVIDED THEM WITH A FICTITIOUS NAME AND DATE OF BIRTH AND WAS ARRESTED FOR THAT TOO.

**Incident Start**       **Incident End**
2020-10-13              2020-10-13

## Witnesses

| NAME | PHONE | EMAIL | ADDRESS |
|------|-------|-------|---------|
| A███ C███ | | | 1055 HWY 98 OKEECHOBEE, FL 34972 |
| C████ C███ | 863███ | | 1055 HWY 98 OKEECHOBEE, FL 34972 |
| M██████ C███ | 863███ | | 1055 HWY 98 OKEECHOBEE, FL 34972 |

## Victims

| NAME | PHONE | EMAIL | ADDRESS |
|------|-------|-------|---------|
| OKEECHOBEE LIVESTOCK MARKET | 8637633127 | | 1055 HIGHWAY 98 OKEECHOBEE, FL 34972 |

## Vehicles

## Suspect (Continued)

| SSN | SID Number | FBI Number |
|-----|-----------|-----------|
| ███ | ███ | ███ |

**Drivers License**          **Drivers License Expiration**          **Drivers License State**

AFFIDAVIT
19047202014526

OKEECHOBEE COUNTY SHERIFFS OFFICE

| Other ID | ID Type | | DOC Number |
|---|---|---|---|

| Military ID | Military Status Date | Military Status | |
|---|---|---|---|

| Primary Language | Interpreter Required | | |
|---|---|---|---|

| Phone Number | Email Address | | |
|---|---|---|---|

| Employer Name | Contact Name | | Phone Number |
|---|---|---|---|
| BHAKTA FARMS | GUSTAVO HERNANDEZ | | 3057996240 |

| Description | Date | Address | |
|---|---|---|---|
| RESIDENCE (LAST KNOWN) | 2020-10-28 | VERO BEACH, FL 32960 | |

I hereby request that an arrest warrant be issued for SCOTT SMITH for violation of Florida State Statute(s) listed above. Under penalties of perjury, I, DALE  LAFLAM, declare that I have read the foregoing and that the facts stated therein are true and correct to the best of my knowledge and belief.

Electronically Signed on 2020-10-29
DALE  LAFLAM

Electronically Signed on 2020-10-29
Witnessed by: JAVIER GONZALEZ

# EXHIBIT 2B

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Wednesday, November 11, 2020 10:47 AM |
| **To:** | Raj P Bhakta |
| **Cc:** | Leo |
| **Subject:** | RE: Drunker meats deal |

> **GOVERNMENT
> EXHIBIT**
> **2B**
> **18-cr-20685-KMW**

Raj pal,

Thanks for your consideration and support. I am grateful.

Yes, God willing DM will be a great success. I need it to be so and cannot have it any other way.

And while I'll be 101% focused on DM, I remain available to continue helping you and Leo with your trust, as well as with Bhakta and the relaunch of GMC, a project that is close to my heart.

Per our conversation, I'm putting together a summary of the terms we discussed last night, as well as an excel with the concrete numbers.
I will take the below thoughts into consideration and get back to you with concrete feedback by this Friday, so we can memorialize everything by next week.

So be thinking of the name you want to baptize our uber bull! Much better than a cow, since it is the sire that will mark all the progeny. We will work to get the absolute best carcass quality marbling bull. Click this link to see an ideal sire.

And yes, one day this brand will be sold, but I believe in building it as if you're always going to hold on to it!

My best, GH

---

**From:** Raj P Bhakta <rpb@bhaktafarms.com>
**Sent:** Wednesday, November 11, 2020 9:37 AM
**To:** Gustavo Hernandez <Gustavo@greenmcfarms.com>
**Cc:** Leo <leoj.gibson2.0@gmail.com>
**Subject:** Drunker meats deal

Gustavo:

Good speaking last night. DM will be a success I am sure if you throw your whole self into it. I gave a little more reflection to our economic arrangements and here's what I came up with:

Lease: 100k per year. I will have a distillery build within 12 months of having permits.  When it is built rent goes up to 200k. I am open to building a visitor's center, etc as you get going.  2020 rent will be minimal and as mutually agreed. Willing to roll to 50% of 2021 into debt facility.

IP assignment: RPB assign DM name to OZF entity for 4% revenue;

Equity: I contribute OZF with 100k in cash (willing to do a bit more here)  based on a one million pre-money valuation. I would like you to invest 100k as well.

Line of Credit: I sell herd and recievables for the "lost" herd to DM; I think this should be around $500k , provide an agreed amount of additional credit @ 10% interest (willing to take some PIK interest in first year.)

Warrants, or whatever you want to call it,

RPB or designee to receive 20% off the top upon the sale of the business.

I want you to succeed here with all my heart. You must just get the business going. Sell, sell, sell. You have a magic name and you a story that wins at the BBQ or the dinner table. Name the uber cow after me when it is bred please. I fail in many thinks at least I will achieve immortality in a cow through you my friend. I am here to help where I can.  I would like to be in agreement that this brand is being created for sale. There are a couple more things to talk through, and we have some simple paper work to do, but let's hash out our deal terms in simple terms and we can then formalize, also simply.

I am happy to discuss.

-Raj

# EXHIBIT 2C

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Tuesday, November 24, 2020 12:51 PM |
| **To:** | Raj Bhakta |
| **Cc:** | Olympia  De Castro; Toni Linke |
| **Subject:** | DM |

> GOVERNMENT
> EXHIBIT
> **2C**
> 18-cr-20685-KMW

Raj,

As I briefed Toni and you, to set up the DM e-commerce platform we need to input the bank account that will receive monies. Details below.

We can either (1) use the current account number under Charlemagne and transfer this account to ODC once we finalize the transaction, or (2) we set up a new account under Charlemagne with ODC as signer.

I recommend (1) since it is faster/easier.

Separately, we also need a CC for DM with a $1k limit for the online payments we need to make for the website Apps.

I recommend we request the card under ODC as cardholder.

Please confirm.

Thanks

**From:** Florian Root <florian@yourmajesty.co>
**Sent:** Tuesday, November 24, 2020 11:59 AM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Cc:** Michael Hoang <michael@yourmajesty.co>; Dodi Raditya <dodi@yourmajesty.co>
**Subject:** Third Party Plugins - Setup and Pricing

Hi Gustavo,

Below the notes from our meeting just now.

**Action points**

- Shopify Payment - Gustavo to set up before the end of this week
- Billing details - same as above
- Store details & Store address - filled in
- Bold subscriptions & taxes - food items don't need tax so no further information required
- Stripe - 2FA and routing information and bank account info to be setup (please share with Dodi at your convenience today).
- Bold subscriptions - payment gateway - And connect the stripe account here
- YM to share pricing overview
- YM to add the on-location pickup to the Shopify shipping options
- YM to share more information around transactional costs per order for Shopify

Cheers,

**Florian Root**
Senior Digital Producer
Office: +31 (0) 207371418
Personal: +31 (6) 30055141
yourmajesty.co

👕 🏷️ Read our opinion piece: **<u>Digital Fashion: A New Essential</u>** - Our take on how digital fashion can help brands today.

# EXHIBIT 2D

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Drew Mattox <Drew.Mattox@plantemoran.com> |
| **Sent:** | Wednesday, November 25, 2020 12:08 PM |
| **To:** | Leo Gibson; Valerie Grunduski |
| **Cc:** | Gustavo Hernandez; Raj Bhakta |
| **Subject:** | RE: Charlemagne Kaiser |

GOVERNMENT
EXHIBIT
**2D**
18-cr-20685-KMW

Hi Leo,

Valerie is out until next week. How does Tuesday morning December 1st look for everyone? Valerie and I are available from 8 to 10 am MST (10 to noon EST).

Drew

**Drew Mattox | Tax Partner**
Plante Moran, 1321 Oakridge Drive, Fort Collins, CO 80525
Direct Dial: 970.282.5439 | Mobile: 503.327.3956 | Fax: 303.740.9009
Plante Moran | Twitter | Facebook | LinkedIn | Blogs | Manage Your Email Subscriptions



**From:** Leo Gibson <leoj.gibson2.0@gmail.com>
**Sent:** Wednesday, November 25, 2020 9:24 AM
**To:** Drew Mattox <Drew.Mattox@plantemoran.com>; Valerie Grunduski <Valerie.Grunduski@plantemoran.com>
**Cc:** Gustavo Hernandez <gustavo@bhaktafarms.com>; Raj Bhakta <raj@bhaktafarms.com>
**Subject:** Charlemagne Kaiser

**ATTENTION:** This email was sent to Plante Moran from an **_external source_**. Please be extra vigilant when opening attachments or clicking links.

Hi Drew and Val:

We are getting close to launching Charlemagne Kaiser dba Drunken Meats.  Raj funded the entity in July 2019 with the cap gain from WP.  It will be a DTC high end meat business based at the ranch in Vero.

Gustavo Hernandez, copied, will serve as the CEO of the business.  We will be injecting some additional capital.  Raj and Gustavo had been talking about a structure where Gustavo would own 100% of the equity, and Raj would get paid through revenue sharing (% of top line sales), a lease and repayment of a loan.

I am concerned that if Raj loses his equity stake, he will lose the benefit of the OZF structure.  Further, we want to ensure that whatever payments/distributions are being made to Raj are tax efficient.  Still, there is basic agreement on how we want to see the upside of the company weighted as between Gustavo and Raj.  I just want to make sure we do it in a way that does not blow OZF treatment, and that minimizes ordinary income.

Please let us know if you have time to discuss.  If you are not working for the balance of this week, next week would be fine.

Thanks,

Leo

--
Leo J. Gibson
802-417-6616

---

This email, including any attachments, may contain confidential information and is intended solely for use by the individual to whom it is addressed. If you received this email in error, please notify the sender, do not disclose its contents to others, and delete it from your system. Any other use of this email and/or attachments is prohibited. This message is not meant to constitute an electronic signature or intent to contract electronically.

# EXHIBIT 2E

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Thursday, December 10, 2020 1:55 PM |
| **To:** | Raj Bhakta; Toni Linke |
| **Cc:** | Leo Gibson |
| **Subject:** | GH contribution to DM |
| **Attachments:** | DM-Livestock Purchase-Sale Agreement - Rocking711 2nd set of females-12-09-2000 - FINAL.pdf; DM-Livestock Purchase-Sale Agreement - Rocking711 2nd set of steers - 12-09-2020 - FINAL.pdf; DM-L-Loan Agreement-12.10.20.docx |

GOVERNMENT
EXHIBIT
**2E**
18-cr-20685-KMW

Raj –

Per your instruction to Toni and I, I'm proceeding to fund the urgent capex required by Drunken Meats as a loan to the company.

As I shared in earlier messages, I committed to purchase the animals DM needs for its beef program.

The animals are penned up and the hauler is contracted to pick them up on Monday 12/14 to ship them to Vero, so the deadline for payment is tomorrow.

I cannot delay this any further since otherwise DM will lose these animals of which I cannot find any more.

The total amount to be loaned to the company is $47,056.

Please see enclosed the livestock purchase contract, and the loan agreement to Charlemagne Kaiser in the same terms of the RPB loan to the company.

Please confirm you are in agreement.

Thanks

# EXHIBIT 2F

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Thursday, December 10, 2020 2:08 PM |
| **To:** | Raj Bhakta |
| **Subject:** | Solution |

GOVERNMENT
EXHIBIT
**2F**
18-cr-20685-KMW

Raj,

I don't want to be a pain for you.

I appreciate our friendship and don't want to complicate matters for you or for myself.

If you want out of business with me, I'll find an investor to buy the loan from you asap. Just tell me.

Once I pay you the loan, if you want I can move the cattle elsewhere.

And if you want me to pay you for the DM brand, just tell me what you think is fair.

The wellbeing of my family and my future is 100% tied to this company, and unlike you I'm not a position in which I can afford to not succeed.

Please let me know. Thanks.

# EXHIBIT 2G

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Leo Gibson <leoj.gibson2.0@gmail.com> |
| **Sent:** | Thursday, December 17, 2020 5:14 PM |
| **To:** | Gustavo Hernandez |
| **Cc:** | Toni Linke |
| **Subject:** | Re: herd received today |

> GOVERNMENT
> EXHIBIT
> **2G**
> 18-cr-20685-KMW

Got it.  Thanks

On Thu, Dec 17, 2020 at 5:12 PM Gustavo Hernandez <Gustavo@drunkenmeats.com> wrote:

Thanks.

Yes, I've kept records of the livestock purchase agreements and payments.

I've shared these via email with you all, and reconciled payments with Toni.

There have also been minor payments (<$3k) I've made to ensure the health of the current herd; i.e.: vet, meds, and feed.

I have kept receipts, but if I buy the herd it is irrelevant since I would assume 100% of these expenses.

**From:** Leo Gibson <leoj.gibson2.0@gmail.com>
**Sent:** Thursday, December 17, 2020 5:07 PM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Cc:** Toni Linke <Toni@bhaktaspirits.com>
**Subject:** Re: herd received today

That's fine.  We just need to make sure that as we unwind things, the records and documents reflect that these are animals for which you paid out of your own pocket.

Thanks,

1

Leo

On Thu, Dec 17, 2020 at 5:03 PM Gustavo Hernandez <Gustavo@drunkenmeats.com> wrote:

Leo –

Per our previous exchange regarding the herd, please note today we received in Vero 55 heads of cattle at the ranch, including 13 steers, 27 cows and 15 calves (9 bulls, 6 heifers).

I already circulated separately the livestock purchase agreement and the health certificates.

As I shared with you, I paid $47,100 for this cattle, plus $2,500 for the hauler.

Please let me know if you need any additional information.

Thanks

--

Leo J. Gibson

802-417-6616

--
Leo J. Gibson
802-417-6616

# EXHIBIT 2H

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Olympia De Castro <olympia.decastro@gmail.com> |
| **Sent:** | Thursday, December 31, 2020 9:04 AM |
| **To:** | Gustavo Hernandez |
| **Subject:** | Re: DM-F-Projections-draft.xlsx |

GOVERNMENT
EXHIBIT
**2H**
18-cr-20685-KMW

Ok.

Two things that come to mind is rev share should tier back down if revenues drop.

At the min there needs to be a buy out of rev share for change in control. I can calculate what that would mean in terms of economics when you add historical payouts, equity payout plus rev share buy out. Including time value of money the equivalent equity percentage you may be saving from a 50/50 partnership may be minimal.

Also ideally agreeing RPB additional capital in fusions are not tied to additional ownership. Otherwise we should wait for some time before paying back his loan in order to have financing optionality. Rather than taking him out and being unable to get more third party leverage. Then having to bring him back in triggering a dilution.

I would say structure the $500k as a line of credit, where you can pay down but the $500k is always available for future draws under the same facility.
No fee for undrawn capital, only interest expense on what is outstanding. No structuring, legal or closing fee passed on to company. No expiration on line.


On Dec 31, 2020, at 1:53 AM, Gustavo Hernandez <Gustavo@drunkenmeats.com> wrote:


Let's review the projections with the concrete numbers/scenarios to come up with a plan.



On Dec 30, 2020, at 11:03 PM, Olympia De Castro <olympia.decastro@gmail.com> wrote:


This is very high level.

What I know is
- the key here is understanding whether the business margins can support this. In my model margins may look healthy, but I believe marketing costs are underestimated and will be a higher percentage of rev. I also believe fixed costs will continue to increase as the business grows. Furhterfmore, if sales are impacted by externalities, the company will not be nimble to withstand and be quickly drained of cash.

- if the business does not have high margin, like a SaaS business where a rev share is more appropriate, rev share will weigh the business down and extract value that could be invested in growth or necessary talent to support this growth.

- rev shares as I have seen them are either:

1

i) royalty, ala franchise, which often fail when also saddled with capex, despite more favorable financing terms, subway, etc and that's given the benefits of marketing costs taken on at the franchisor level

ii) a replacement to equity to create exit and in such cases should be structured as such with caps that make sense for equivalent of equity to be paid out

iii) a loan structure, which should also have a cap between 2-3x cap max .

- the speed of growth has a big impact on this cost of capital. the faster you grow the more onerous the cost of capital. This is particularly concerning with no cap

- while I understand you need a deep pocket investor, rest assured that any additional capital RPB puts in will come attached with new warrants and ownership asks, so that additional funding will further dilute me, even if made in the form of a loan, I know Leo will ask for this.
 - agreeing to an indefinite rev share is a death sentence for the business.
You will also likely get push back from lenders and future acquirors.

RPB is getting current income from the rent, the indefinite and increasing rev share + an increasing equity base if he is asked to fund anything further.

I worry this business will consume significant time and be left with no value as most is paid out via varying mechanisms.

On Wed, Dec 30, 2020 at 9:27 PM Gustavo Hernandez <Gustavo@drunkenmeats.com> wrote:

--
_____
Olympia A. De Castro
M 917.216.5565
olympia.decastro@gmail.com

2

# EXHIBIT 2I

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Olympia De Castro <olympia.decastro@gmail.com> |
| **Sent:** | Sunday, January 31, 2021 6:24 PM |
| **To:** | Gustavo Hernandez |
| **Subject:** | Fwd: Corporate Filing - 900356831029 |

> **GOVERNMENT**
> **EXHIBIT**
> **2I**
> **18-cr-20685-KMW**

Begin forwarded message:

> **From:** limitedonline@dos.state.fl.us
> **Date:** January 31, 2021 at 3:17:42 PM PST
> **To:** olympia.decastro@gmail.com
> **Subject: Corporate Filing - 900356831029**
>
> The Articles of Organization for ODC REGENERATIVE LLC were filed
> electronically on January 13, 2021, effective January 07, 2021,
> as verified by this email and authentication number shown below
> and were assigned document number L21000029440.  Please refer
> to this number whenever corresponding with this office.
>
> Please allow up to 24 hours for your record to appear on Sunbiz.org.
>
> Electronic filing and certification is provided for in section
> 15.16, Florida Statutes and has the same legal effect as any
> other filing or certificate.
>
> To maintain "active" status with the Division of Corporations,
> an annual report must be filed yearly between January 1st and
> May 1st beginning in the year following the file date or effective
> date indicated above.  If the annual report is not filed by May
> 1st, a $400 late fee will be added.  It is your responsibility
> to remember to file your annual report in a timely manner.
>
> A Federal Employer Identification Number (FEI/EIN) will be required
> when this report is filed.  Apply today with the IRS online at:
>
> <https://sa.www4.irs.gov/modiein/individual/index.jsp>
>
> Please be aware if the limited liability company's address changes,
> it is the responsibility of the limited liability company to
> notify this office.
>
> Should you have any questions regarding this matter, please contact
> this office at the address given below.
>
> Jessica Fason
> Regulatory Specialist II

New Filing Section


Division of Corporations - P.O. Box 6327
- Tallahassee, FL  32314


Letter Number:  210131181237-900356831029

# EXHIBIT 2J

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Sunday, February 14, 2021 10:36 AM |
| **To:** | Raj Bhakta |
| **Subject:** | note |

GOVERNMENT
EXHIBIT
**2J**
18-cr-20685-KMW

Raj,

We started this business in friendship, and in friendship I am writing to you.

When you came to visit at the house in Sicily you proposed we start a business together, and that we did. Also, throughout this period, I attempted to lend you a hand wherever you asked.

Then you came to the realization you were stretched thin, and you proposed multiple iterations as to how we proceeded going forward. I have by now said yes to four of these separate iterations you proposed, and every time we are to finalize, you changed tack. I then attempt to communicate with you and/or Leo to find a resolution, and just hit a wall of delay and silence.

By now the business is getting affected, I am personally getting affected and our relationship is getting affected. Why allow for things to get to this Raj?

I remain interested in maintaining a relationship with you, ideally in partnership form but if this cannot be done, definitely in friendship form. I also remain interested in helping GMC pro bono, because I believe in its mission.

But we need to converse and bring matters to a closing, whatever the direction be.

Understanding we did not seem to see eye to eye on the economics of the deal, I proposed we repay you the loan in full, and that in consideration for the TM, we pay you the rev share in the agreed upon terms. And for the lease, if you wanted to proceed, we will honor the agreed terms.

I also repeated how this back and forth is causing damage to the business, delaying the launch yet again, and costing money in additional costs and lost revenue.

And still this has not elicited a response from you.

In spite of your collective silence, in good faith, I have continued investing capital into the business to pay everything the business has required these past months (ca. $190k), and ensure we protect the integrity of the herd, buy the required livestock, pay ranch personnel, etc.

Again, as I have repeated to you, I appreciate your support. And I understand your busy and have other priorities. But I cannot help but say this is not the way to treat a partner, in particular if you consider them a friend.

Please let me know how you want to proceed. I'm available to converse anytime.

Thanks.

# EXHIBIT 2K

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Tuesday, February 16, 2021 2:59 PM |
| **To:** | Leo Gibson |
| **Subject:** | RE: DM |

GOVERNMENT
EXHIBIT
**2K**
18-cr-20685-KMW

Yes!

And we don't have the bank account linked yet to receive payments. Now we finalize closing docs, I'll input the Chase account into the system.

All payments will go only into this CK Chase account.

DM bought a separate Quickbooks license, and the accounting and inventory management is integrated with the payment platform processing so we can do straight through processing.

---

**From:** Leo Gibson <Leo@bhaktaspirits.com>
**Sent:** Tuesday, February 16, 2021 2:55 PM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Subject:** RE: DM

Got it.

Let me know when it's up.  Can't wait to try it.

Leo

---

**From:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Sent:** Tuesday, February 16, 2021 2:55 PM
**To:** Leo Gibson <Leo@bhaktaspirits.com>
**Subject:** RE: DM

We have no inventory uploaded yet!

---

**From:** Leo Gibson <Leo@bhaktaspirits.com>
**Sent:** Tuesday, February 16, 2021 2:54 PM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Subject:** RE: DM

Just tried to put an order in but it did not go through.

Or is the payment function not up yet?  I took that to be what you meant by back end e-comm engine.

Regards,

Leo

**From:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Sent:** Tuesday, February 16, 2021 11:59 AM
**To:** Leo Gibson <Leo@bhaktaspirits.com>
**Subject:** RE: DM

PS: check https://drunken-meats.myshopify.com/

This is still the 'staging' site and most images are still placeholders, but the back end e-commerce engine is already fully operational.

By next week (2/24) we're doing the soft launch of the site, and assuming we get packaging/labels etc. on time, we're targeting 3/2 as hard launch date.

---

**From:** Leo Gibson <Leo@bhaktaspirits.com>
**Sent:** Tuesday, February 16, 2021 11:51 AM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Cc:** Raj Bhakta <raj@bhaktaspirits.com>; Toni Linke <Toni@bhaktaspirits.com>
**Subject:** RE: DM

$488 initial draw with a month end reconciliation works for me.

Fat Tuesday seems like an auspicious day to launch this partnership.

I'll get you scanned signatures in a bit.

Regards,

Leo

---

**From:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Sent:** Tuesday, February 16, 2021 11:45 AM
**To:** Leo Gibson <Leo@bhaktaspirits.com>
**Cc:** Raj Bhakta <raj@bhaktaspirits.com>; Toni Linke <Toni@bhaktaspirits.com>
**Subject:** RE: DM

Thanks Leo.

Re. spend this last month, we have been covering expenses for herd, personnel, ranch maintenance etc. We will share with Toni receipts and payment confirmations.

But since these are minor expenses, and it is truly mission critical we close ASAP so we can finalize orders of packaging etc. to launch this month, I'd suggest we close with the $488k as the initial draw amount and reconcile cash for month end.

As for the other documents for the closing, I believe these were the final versions. I dated them as of today for closing.

Please let me know.

2

**From:** Leo Gibson <Leo@bhaktaspirits.com>
**Sent:** Tuesday, February 16, 2021 10:43 AM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Cc:** Raj Bhakta <raj@bhaktaspirits.com>; Toni Linke <Toni@bhaktaspirits.com>
**Subject:** RE: DM

Gusti:

This is generally ok.  I need to confirm with Toni that the initial note/draw is still $488,402.97.  If we are going to make the lease effective as of the signing date, rather than retroactive to 1/1, we should look at any spend in the last month and a half and allocate it 70/30 if appropriate and roll that into the initial note/draw, no?

I have also attached what I believe to be the final versions of the other documents (Guaranty, Subscription Agreement, Operating Agreement, Rev Share Agreement), which I have not updated yet.  Lmk if you agree that these are the latest agreed upon versions.

Regards,

Leo

**From:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Sent:** Monday, February 15, 2021 4:49 PM
**To:** Leo Gibson <Leo@bhaktaspirits.com>
**Cc:** Raj Bhakta <raj@bhaktaspirits.com>
**Subject:** RE: DM

Hi Leo,

I conversed with Raj this AM and agreed to close the deal in line with the below proposed terms, including his option to convert $500,000 of the debt at a $5 million valuation.

Please see enclosed a clean/redline versions of your revised Loan Agreement reflecting this change.

I also enclosed a copy of all other closing documents, including the Security Agreement, the TM Security Agreement, the Promissory Note, and the Lease Agreement.

Please let me know if I should circulate execution copies today.

Thanks.

**From:** Leo Gibson <Leo@bhaktaspirits.com>
**Sent:** Saturday, February 6, 2021 10:55 AM
**To:** Gustavo Hernandez <Gustavo@drunkenmeats.com>
**Cc:** Raj Bhakta <raj@bhaktaspirits.com>
**Subject:** DM

Gusti:

I discussed this with Raj.  He is simply not willing to do a deal where he puts so much capital at risk in exchange for a 12.5% equity interest, plus whatever additional value can be assigned to the rev share (perhaps the equivalent of another 15%?).  The lease is over in 2 years, so in terms of discounting its benefit, it does not add much to the scale.

We would be comfortable with the deal if we were allowed the ability to convert up to $500,000 of the debt at a $5 million valuation.  I realize that this is not something that we discussed at the outset, and I regret that it entered the discussion at this late date.  But a full view of the financial implications, the risk associated with an unproven business, and the competing demands for our capital, which became apparent during year end budgeting, and which have led us to cast a sharper eye on outgoing cash.  Bottom line: RPB, and the Trust, need to see more upside from this deal before we put that kind of additional capital at risk.

Raj and I both believe in you, your drive, your vision, your tenacity and your smarts.  You have shown tremendous composure under trying circumstances, and your conduct in our dealings under those circumstances has been completely impressive.  You are the sort of man that we want on our side.  (Those traits which make you so formidable can also make things challenging when you are on the other side of a negotiation!)  Still, though the discussions of the last couple of months have been occasionally fraught, we have dug deep into the guts of this proposed enterprise, which I think will prove a very useful exercise if we can get this done.

I am hopeful we can do a deal.  I would love to see where DM can go with you and Olympia at the helm.

Regards,

Leo

# EXHIBIT 2L

**Lunkenheimer, Kurt (USAFLS)**

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **Sent:** | Saturday, March 6, 2021 10:35 PM |
| **To:** | Toni Linke |
| **Subject:** | invoice reminder: #BHA20020106 from Your Majesty Co. |
| **Attachments:** | INVOICE_BHA20020106_Your_Majesty_Co.pdf |

**GOVERNMENT
EXHIBIT
2L**
**18-cr-20685-KMW**

FYI – I paid for this change order to make changes to the DM site to remove from the GMC/BF site, plus DM packaging work. Should be allocated 70/30 DM/BF. Thanks.

---

**From:** Harvest <notifications@harvestapp.com>
**Sent:** Sunday, January 10, 2021 10:06 PM
**To:** Gustavo Hernandez <gustavo@bhaktafarms.com>
**Subject:** Past due invoice reminder: #BHA20020106 from Your Majesty Co.



Dear Customer,

This is a friendly reminder to let you know that Invoice BHA20020106 is 19 days past due. If you have already sent the payment, please disregard this message. If not, we would appreciate your prompt attention to this matter.

Thank you for your business.

Your Majesty Co.

This invoice was sent by Kasper Kuijpers

<[kasper@yourmajesty.co](mailto:kasper@yourmajesty.co)> to Gustavo Hernandez

<[gustavo@bhaktafarms.com](mailto:gustavo@bhaktafarms.com)> and Leo Gibson

<[Leo@bhaktafarms.com](mailto:Leo@bhaktafarms.com)>

Powered by

# EXHIBIT 2M



GOVERNMENT
EXHIBIT
**2M**
18-cr-20685-KMW

# FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF CHARLEMAGNE KAISER, LLC D/B/A DRUNKEN MEATS

THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT (the "Agreement") is made and entered into effective as of the 16 day of February, 2021, by Charlemagne OZF, LLC and ODC Regenerative, LLC (collectively, the "Members").

The parties to this Agreement, desiring to enter into an agreement regarding the limited liability company known as Charlemagne Kaiser, LLC d/b/a Drunken Meats (the "Company") pursuant to the provisions of the Florida Limited Liability Company Act (the "Act"), hereby amend and restate the Operating Agreement of the Company for the purposes and on the terms and conditions set forth in this Agreement.

## ARTICLE I - DEFINITIONS

1.1    <u>Definitions</u>.    Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

(a)    "Agreement" means this Agreement, as amended, modified, supplemented or restated from time to time.

(b)    "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the State of Florida's Secretary of State's Office pursuant to the Act.

(c)    "Manager" shall mean ODC Regenerative, LLC or his duly elected successor.

(d)    "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

(e)    "Membership Interest" shall refer to the percentage ownership interest owned by each Member in the Company.  The Membership Interest of each Member is set forth on Schedule A.

## ARTICLE II - THE COMPANY

2.1    <u>Formation</u>.

(a)    The Members agrees to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein.

(b)     The name of each Member and Membership Interest owned shall be listed on Schedule A, and upon execution of this Agreement, each Member shall be a Member of the Company.

2.2     <u>Name; Principal Place of Business</u>.     The name of the Company shall be Charlemagne Kaiser, LLC.  The principal office of the Company shall be located at 12600 State Road 60, Vero Beach, FL, 32966, or at such other place as the Manager may from time to time determine.

2.3     <u>Term</u>.     The term of the Company shall commence on the date of the filing of the Certificate of Formation in the Florida Secretary of State's Office and shall continue indefinitely unless dissolved in accordance with the provisions of this Agreement.

2.4     <u>Registered Agent</u>.     The Company's registered agent and office in Florida shall be as set forth in the Certificate of Formation of the Company filed with the Florida Secretary of State's Office, as the same may from time to time be amended.

2.5     <u>Fiscal Year</u>.     The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6     <u>Taxation as Partnership</u>.     The Company shall be treated as a partnership for U.S. federal income tax purposes.

## ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

3.1     <u>Nature of Business</u>.     It is the intent of the Members that the Company take all steps reasonably necessary to become and if reasonably possible maintain its status as a "qualified opportunity fund business," as such term is defined in Section 1400Z-2(d)(1) of the Code.  The business of the Company shall be to own (directly or through a nominee or subsidiary), invest in, develop, improve, operate, manage, lease and/or sell cattle, livestock, beef, meats, food products, or other businesses.  The Company shall also engage in such other activities as may be necessary or incidental to the foregoing business activities.

3.2     <u>Powers of the Company</u>.     The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Section 3.1, including, but not limited to the powers permitted under the Act.

## ARTICLE IV - CAPITAL CONTRIBUTIONS AND ACCOUNTS

2

4.1     <u>Capital Contributions</u>.     Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") set forth on Schedule A.

4.2     <u>Capital Accounts; Assets</u>.     An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.3     <u>Maintenance of Capital Accounts</u>.     To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital made by such Member to the Company, and such Member's share of the net profits of the Company, and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such Member's share of the net losses of the Company.


## ARTICLE V - MEMBERS

5.1     <u>Powers of Members</u>.     The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to this Agreement. All Members shall constitute one class or group of Members of the Company for all purposes of the Act.

5.2     <u>Admission of Members</u>.     No person shall be admitted as a Member of the Company after the date of formation of the Company without the consent of the Manager.

5.3     <u>Transfer of Company Interest</u>.     No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the consent of the Manager. Any purported Transfer in contravention of this Section 5.3 shall be null and void.

5.4     <u>Rights and Obligations of Transferee</u>.     The transferee of an interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the transferring Member would have been entitled, and the obligation to contribute to the Operating Account under this Agreement with respect to the transferred interest, and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member

3

unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.5   <u>Partition</u>.   Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property, and any Transferee who is not a Member shall, by acceptance of a transferred interest in the Company, be deemed to have waived such rights of partition.

5.6   <u>Sale of Company Interest</u>.   A Member may sell a Company interest, first by obtaining consent of the Manager at a price negotiated between the selling Member and the buyer, and second, by offering to the remaining Members a right to purchase, pro rata, the whole of the interest at the negotiated price, such right be exercised within one (1) month of the date of the written consent. In the event the whole of the interest is not purchased by the remaining Members, the selling Member may sell to the buyer at the price negotiated.

5.7   <u>Sale of Company Interest, No Buyer</u>.   If a Member wishing to sell an interest in the Company ("retiring Member") does not have a buyer, and no other Member wishes to purchase, the retiring Member may, upon unanimous consent of the Members, deliver the Company interest to the Company to be held in escrow, except, however, only upon delivery to the Company of an agreement of another Member to pay all assessments that will become due during the escrow period on the account of such interest. The said agreement to pay assessments may include recovery against the Capital Account and assignment of the use of the property of the retiring Member to the paying Member. If the property is sold during an escrow period, the share to be distributed to the retiring    Member shall be valued as of the date the interest is sold. During an escrow period, the retiring Member shall have no membership rights under ARTICLE VI and ARTICLE VII, below, but shall have the continuing right to sell the Company interest.


## ARTICLE VI - MANAGEMENT

6.1   <u>Management, Duties, and Restrictions</u>.

   (a)   <u>General Management</u>.   The management and control of the operations of the Company shall rest with the Manager.

   (b)   <u>Powers of the Manager</u>.   Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Manager is and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Manager shall include, but not be limited to, the following:

4

(1)     to engage personnel, attorneys, accountants, or such other persons as may be deemed necessary or advisable;

(2)     to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3)     to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4)     to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5)     to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(c)     <u>Liability of Manager</u>.   In carrying out his duties, the Manager shall not be liable to the Company or to any Members for any actions taken in good faith and reasonably believed to be in the best interest of the Company.

(d)     <u>Fiduciary Duties of Manager</u>.  The Manager and any officers shall owe a duty of loyalty and duty of care to the Company and the Members.

(e)     <u>Reliance on Act of Manager</u>.   Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager.  Any persons other than a member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by Manager for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(f)     <u>Delegation, Officers</u>.   The Manager may appoint individuals with such titles as he may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Manager may delegate in writing to any such person, and the Members shall also appoint an officer to act on behalf of the Members as aforesaid for the purpose of executing instruments which are to be filed with the Florida Secretary of State or a Registry of Deeds in a county in which the Company shall own real estate.  The Manager shall be ODC Regenerative, LLC.

5

(g) <u>Books and Records</u>.  The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations.  All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEETINGS

7.1   <u>Voting</u>.    Full authority over the Company's management and control are vested with the Manager.  Upon the Manager's death or incapacity, each Member shall be entitled to vote on a replacement Manager in proportion to his or her Membership Interest in the Company from time to time.  Such vote may be exercised by written or oral notification, including telephonic, by a Member to the other Members.

7.2   <u>Member Consents</u>.    Any vote taken by the Company shall require the vote and approval of Members owning fifty-one percent (51%) or more of the Membership Interests at the time of such vote, except that any amendment that would materially prejudice the rights or privileges of any Member holding a less than fifty percent (50%) interest shall require the consent of such minority Member(s), which shall not be unreasonably withheld.

7.3   <u>Meetings of the Members</u>.    The Members may, but shall not be required to, meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement.  Meetings of the Members may be called at any time by any Member.  Notice of any meeting shall be given to all Members not less than fourteen (14) days nor more than thirty (30) days prior to the date of such meeting.  Attendance at meetings may be via telephone conference.  Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at the meeting.  Every proxy must be signed by the Member or his or her attorney-in-fact.  A quorum for each meeting shall be one more than one-half the number of all Members.

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1   <u>Allocation of Profits and Losses</u>.    The net profits, net losses, net cash flow and net proceeds of any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Membership Interests of each Member.  Net profits and net losses shall, for both

6

accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

8.2  <u>Distribution to Members</u>.  The Members shall receive, in proportion to their respective Membership Interests in the Company, as much of the Company's Net Cash From Operations as the Manager may from time to time determine. For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, guaranteed payments and contingencies, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY

9.1  <u>Events of Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(a)  the conclusion of the term of the Company set forth in Section 2.3 hereof;

(b)  the sale or disposition of all or substantially all of the assets of the Company;

(c)  the written consent of the Manager; or

(d)  the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

9.2  <u>Winding Up</u>.  Upon the dissolution of the Company, a Member selected by the remaining Members (in either case, the "Liquidating Members"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2.  The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The

7

remaining assets shall next be applied to the repayment of any loans made by the Members to the Company.  All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods.  Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any contingent liabilities, expenses and obligations of the Company.  Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY

10.1   <u>Liability</u>.   Except as otherwise provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

## ARTICLE XI - MISCELLANEOUS

11.1   <u>Governing Law</u>.   The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida.

11.2   <u>Agreement Binding</u>.   This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3   <u>Notices</u>.   Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service, addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

\*   \*   \*

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

8

IN WITNESS whereof, the Members acknowledge that they have executed this Operating Agreement on the date written above.

CHARLEMAGNE OZF, LLC

By: Raj Peter Bhakta
Its: Manager

ODC Regenerative, LLC

9

Schedule A

| Member Name | Ownership Interest |
| --- | --- |
| Charlemagne OZF, LLC | 12.5% |
| ODC Regenerative, LLC | 87.5% |

# EXHIBIT 2N

GOVERNMENT
EXHIBIT
**2N**
18-cr-20685-KMW

# REVOLVING LOAN AGREEMENT

Between

## THE GREAT BHAKTA CORP.

as Lender

and

## CHARLEMAGNE KAISER, LLC

as Borrower

February 16, 2021

## TABLE OF CONTENTS

| | |
|---|---|
| 1. | 3 |
| 2. | 4 |
| 3. | 4 |
| 4. | 5 |
| 5. | 5 |
| 6. | 6 |
| 7. | 6 |
| 8. | 6 |
| 9. | 6 |
| 10. | 6 |
| 11. | 6 |
| 12. | 6 |
| 13. | 7 |
| 14. | 9 |
| 15. | 9 |

**THIS LOAN AGREEMENT** (as amended, restated, supplemented or modified from time to time, the "Agreement") is made on February 16, 2021.

BETWEEN

**The Great Bhakta Corp., a Florida corporation,** with a principal address at 12600 SR 60, Vero Beach, FL 32966 (hereinafter referred to as the **"Lender"**);

AND

**DRUNKEN MEATS LLC,** a Florida limited liability company (the **"Borrower"**), with a principal office at 12600 SR 60, Vero Beach, FL 32966.

The Lender and the Borrower Parties are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

## THE PARTIES HERETO AGREE AS FOLLOWS:

**1. DEFINITIONS**

Capitalized terms and phrases, whether in singular or plural form, shall have, for the purposes of this Agreement, the meanings set forth below:

1.1  **Annual Rate** means the annual rate of 7.5%.

1.2  **Intentionally omitted**

1.3  **Business Day** means any day (other than a Saturday or Sunday) on which banks are open for general business in the US.

1.4  **Currency** means US Dollar.

1.5  **Effective Date** means the date of this Agreement.

1.6  **Event of Default** means any of the events or circumstances specified in <u>section 15</u>.

**1.7**  **Intentionally omitted**

1.8  **Interest** means the aggregate amount of interest with respect to the Loan owed under this Agreement.

1.9  **Intentionally omitted**

1.10  **Loan** means the interest bearing loan made available by the Lender to the Borrower according to section 3.1.

1.11  **Principal Balance** means the principal balance of the Loan owed hereunder by the Borrower to the Lender, reduced by any amount repaid by the Borrower.

1.12  **Termination Date** means the day of the five year anniversary of the Effective Date, or if such day is not a Business Day, the preceding Business Day or any other day agreed between the Parties.

1.13  **Loan Documents** means this Agreement, the Note, Guaranty and the Security Agreements (as defined

herein).

1.14   **Material Adverse Effect** means an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse effect on the Borrower's ability to repay the Loan or perform its obligations under this Agreement.

## 2.   INTERPRETATION

2.1   Words importing the singular shall include the plural and vice versa.

2.2   Headings are inserted for convenience of reference only.

2.3   Capitalized terms shall have the meaning ascribed to them in section 1.

## 3.   LOAN AMOUNT

3.1   Credit Facility.  Subject to the following terms and conditions, Lender agrees to make a credit facility available to Borrower (the "Credit Facility") in the maximum amount of One Million and 00/100 Dollars ($1,000,000) (the "Maximum Credit Balance") pursuant to which Lender will make loans to Borrower (each an "Advance") in such amounts as Borrower may request from time to time; provided, however, that with each request for an Advance, Borrower shall disclose to Lender in writing the proposed use of such Advance and Lender shall have the right to reject such request if Lender disapproves of the proposed use as disclosed by Borrower.  The aggregate outstanding principal balance of all Advances made hereunder may not exceed the Maximum Credit Balance.  Amounts borrowed under the Credit Facility may be repaid prior to the Termination Date (defined below) without penalty and may be re-borrowed subject to the terms hereof.

3.2   Lender's commitment to lend hereunder terminates on February 16, 2026 (the "Termination Date"), if not sooner terminated as specified under this Agreement.

3.3   Lender shall not be obligated to make any Advance which would cause the outstanding principal balance of the Credit Facility (the "Credit Balance") to exceed the Maximum Credit Balance.

3.4   Lender shall not be obligated to make any Advance if an Event of Default or an event which, with the giving of notice or lapse of time, or both, would become an Event of Default (a "Potential Default") has occurred and has not been waived by Lender or cured by Borrower.

3.5   Lender shall not be obligated to make any Advance if Lender disapproves of the proposed use thereof by Borrower as disclosed by Borrower in connection Borrower's request for such Advance, approval of which shall not be unreasonably withheld.

3.6   Credit Note.  Borrower's indebtedness to Lender for amounts borrowed under each Advance under the Credit Facility and for interest accrued thereon shall be evidenced by Borrower's separate promissory note to Lender, on a standard form for commercial promissory note satisfactory to Lender in the amount of each Advance, not to exceed in the aggregate the Maximum Credit Balance (the "Credit Note"). Each Credit Note shall be subject to the terms and conditions of this Agreement.  At the closing of this Loan, Borrower shall sign an initial Credit Note (the "Note") in the principal amount of Four Hundred Eighty-Eight Thousand Four Hundred Two and 97/100 ($488,402.97) Dollars in favor of Lender reflecting Borrower's obligation to repay Lender for sums contributed by Lender, or its affiliates, prior to closing. There shall be no additional cash contributed by Lender to Borrower in return for the Note.  The calculation of the amount due under the initial Note is set forth as Exhibit B.

3.7   Within 28 days of the execution of this Agreement, Drunken Meats will assume the liability for the repayment of the debt in the original principal amount of $55,313.73 owed to Chrysler Financial related to the pickup truck used for farm operations, or otherwise cause that amount to be repaid, and, in connection therewith, have both Bhakta Farms, LLC and Raj Peter Bhakta fully released from any obligation related thereto.

3.8   The Loan represents a secured obligation of the Borrower for the due and punctual payment of the principal and interest in respect of it and performance of all the obligations of the Borrower with respect to it.

3.9   After the occurrence of an Event of Default and any necessary acceleration of maturity of the Credit Note, at Lender's option, the interest rate applicable to the Credit Note may be increased to the rate of ten percent (10%) per annum.

3.10   Method of Borrowing.  Requests for Advances may be submitted by Borrower in writing utilizing the Advance Request Certificate in the form of Appendix A hereto. All Advance Request Certificates shall set forth the proposed use of such Advance by Borrower, and shall be subject to the approval of Lender. Advances shall be disbursed directly to Borrower or as determined by Lender with the consent of the Borrower.

4.   **SECURITY**

4.1   As a condition to the Loan, Borrower has this date entered into the following (collectively the "**Security Agreements**"): (a) All Asset Security Agreement of even date herewith (the "All Asset Security Agreement") from Borrower in favor of Lender; and (b) that certain Trademark Security Agreement of even date herewith (the "Collateral Assignment") from Borrower in favor of Lender.  Pursuant to the Security Agreement Security Agreement the Borrower's obligations under this Agreement shall be secured by a security interest in favor of Lender over the Borrower's assets as described in the Security Agreements (the "**Collateral**").

5.   **PURPOSE**

5.1   The Borrower shall apply amounts borrowed by it under the Loan towards (directly or indirectly) its operations and for general business purposes.

6.   **INTEREST AND REPAYMENT**

6.1   The Loan shall bear interest at the Annual Rate.

6.2   Interest shall accrue and be payable as follows: PIK interest in year one with a bullet payment due on the first anniversary of this Agreement, with cash interest due monthly thereafter on or before the last day of each month following the first anniversary.

6.3   Interest payable hereunder shall be calculated on the basis of a year of 365/366 days and the actual number of days elapsed.

6.4   Lender may elect to convert up to $500,000 of the Credit Balance to an equity interest in Borrower at any time, at a $5 million valuation.

7.      REPAYMENT

7.1     Unless repaid earlier in accordance with the terms of this Agreement, the Borrower shall repay the Principal Balance as well as any outstanding accrued interest in full on the Termination Date.

7.2     Notwithstanding the foregoing the Borrower shall be entitled to make additional earlier payments, in whole or in part without bonus or penalty, to reduce or repay the Loan in whole. Any prepayments shall be applied first to accrued but unpaid interest and the balance thereof shall be applied to the Principal Balance.

7.3     All sums payable by the Borrower under this Agreement shall be paid in full without set-off or counterclaim or any deduction for or on account of any present of future income or other taxes, levies, duties or other charges whatsoever, save as required by law. If the Borrower is compelled by law to make any such deduction or withholding, the Borrower will promptly pay to the Lender such additional amount which it would receive if there had been   no such deduction or withholding.

8.      Intentionally omitted

9.      COSTS

9.1     Intentionally omitted.

9.2     All charges and expenses incurred by the Lender in or in connection with the enforcement of, or the preservation of any rights under this Agreement including, but without limitation, stamp duties, registration costs and any reasonable legal expenses and fees, if any, shall be payable by the Borrower on demand of the Lender.

10.     ASSIGNMENT

10.1    The Borrower may not assign, transfer or otherwise dispose of all or part of its rights or obligations under this Agreement, the Note or the other Loan Documents unless approved in writing by the Lender at its sole discretion.

10.2    The Lender may not assign, transfer or otherwise dispose of all or part of its rights or obligations under or delegate any of its rights or remedies under this Agreement or the other Loan Documents unless approved in writing by the Borrower Parties in their sole discretion.

11.     NOTICES

11.1    Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in person, or by registered mail, charges prepaid to the address of each Party first listed above.

11.2    Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered if so delivered prior to 6:00 p.m. local time at the place of receipt (or, if such day is not a Business Day or such communication is delivered or transmitted after 6:00 p.m. local time at the place of receipt, on the next following Business Day) or, if mailed, on the fifth (5th) Business Day following the date of mailing.

11.3    Each party may at any time change its address for service from time to time by giving notice to the other parties in accordance with this clause.

12.     REMEDIES, WAIVERS, AMENDMENTS AND CONSENTS

12.1    No failure on the part of the Lender to exercise, and no delay on its part in exercising, any right or remedy under this Agreement may be deemed to be a waiver thereof, nor will any single or partial exercise of any right or

remedy preclude any other or future exercise thereof or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law or otherwise.

12.2    This Agreement and the other Loan Documents embody the entire agreement between the Parties as to the matters set forth herein, and supersedes all previous statements, representations and agreements between the Parties relating to the subject-matter of this Agreement. This Agreement is being executed simultaneously with the other Loan Documents and it shall be read, construed and interpreted in conjunction with the Loan Documents.

12.3    Any provision of this Agreement may be amended but no amendment shall be binding on any Party unless and until it shall have been recorded in writing and executed by duly authorized representatives of each Party.

**13.    SEVERABILITY**

13.1    If at any time any provision of this Agreement is, becomes or is held to be illegal, invalid or unenforceable in any respect, partly or wholly, under the law of any jurisdiction, the legality, validity and enforceability of such provision under the law of any jurisdiction, and of the remaining provisions of this Agreement, shall not be affected or impaired thereby

**14.    COVENANTS OF THE BORROWER**

14.1    Certain Affirmative Covenants. The Borrower covenant and agree that until full and complete repayment of the Loan, the Borrower shall:

(a) Cooperate with the Lender in executing such further instruments and documents as the Lender shall reasonably request to carry out the transactions contemplated by the Loan Documents; provided, however, that the Borrower shall be under no obligation to provide a security interest in any collateral other than the Collateral;

(b) Intentionally omitted;

(c) Intentionally omitted;

(d) intentionally omitted;

(e) Defend the Lender's right, title and security interest in and to the Collateral and the proceeds thereof against the claims and demands of all persons.

(f) comply in all material respects with all requirements of law except where the failure to so comply is not reasonably likely to have a Material Adverse Effect.

(g)    pay and discharge, before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and levies except where the failure to so pay or discharge is not reasonably likely to have a Material Adverse Effect or where such are being contested in good faith.

(h)    furnish to the Lender upon reasonable written request copies of its annual financial statements and upon the occurrence and during the continuance of an Event of Default, such other information respecting the financial condition of the Borrower as the Lender may from time to time reasonably request in writing.

**15.   EVENTS OF DEFAULT; ACCELERATION**

15.1   Events of Default. Each of the following shall constitute an "Event of Default":

(a) The Borrower shall fail to make any payment of principal or interest on the Loan on or before the fourteenth (14) day following on the date which such payment is due;

(b) The Borrower shall fail to perform any other term, covenant or agreement contained herein or in any Loan Document and such failure shall continue for sixty (60) days following the date upon which written notice of such failure has been given to the Borrower by the Lender;

(c) Any material representation or warranty of the Borrower in any Loan Document shall prove to have been false in any material respect upon the date when made;

(d) The Borrower shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator; (ii) be generally unable to pay the Borrower's debts as such debts become due; (iii) make a general assignment for the benefit of the Borrower's creditors; (iv) commence a voluntary case under the United States Bankruptcy Code (as now or hereafter in effect); (v) file a petition seeking to take advantage of any other law of any jurisdiction relating to bankruptcy, insolvency, or composition or readjustment of debts; (vi) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against the Borrower in an involuntary case under the United States Bankruptcy Code, or (vii) take any action for the purpose of effecting any of the foregoing;

(e) A proceeding or case shall be commenced (other than by Lender or any of its affiliates), without the application or consent of the Borrower, in any court of competent jurisdiction, seeking (i) the liquidation of the Borrower's assets, or the composition or readjustment of the Borrower's debts, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of any substantial part of the Borrower's assets, or (iii) similar relief in respect of the Borrower under any law of any jurisdiction relating to bankruptcy, insolvency, or the composition or readjustment of debts, and such proceedings or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect for a period of sixty (60) days; or an order for relief against the Borrower shall be entered in an involuntary case under any bankruptcy, insolvency, composition, readjustment of debt, liquidation of assets or similar law of any jurisdiction;

(f) Any provision of the either of the Security Agreement shall for any reason cease to be valid and binding on the Borrower or the Borrower shall so state in writing; or the Security Agreement shall for any reason cease to create a valid lien on the Collateral purported to be covered thereby, or such lien shall cease to be a perfected and lien with respect to the Collateral, except to the extent that subordination of Lender's security interest in the assets of the Borrower may be required to obtain financing; or

16.2   Remedies Upon Default. Upon the occurrence of any Event of Default and during the continuance thereof, the Lender, following ten days prior written notice to the Borrower, may declare the Loan, all interest thereon and all other amounts and obligations payable under any Loan Document to be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Borrower; (2) in addition to the remedies set forth above, the Lender shall have the rights and remedies (a) set forth in the Security Agreements, (b) in any other instrument or agreement securing, evidencing, or relating to any of the obligations of the Borrower hereunder, and (c) all the rights and remedies of a secured party under the Uniform Commercial Code and (d) the Lender shall also have the right to offset any amounts otherwise payable from the Lender to the Borrower by the amount of such unpaid principal and/or interest; and (3) Borrower further waive and agree not to assert any rights or privileges they may acquire under Section 9-112 of the Uniform Commercial Code and (4) the Borrower

shall be liable for the deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay all amounts to which the Lender is entitled, and the reasonable attorneys' fees of any attorneys employed by the Lender to collect such deficiency.

17. **COUNTERPARTS**

17.1    This Agreement may be executed in any number of counterparts, and this has the same effect as if signatures on the counterparts were on a single copy of this Agreement.

18. **GOVERNING LAW – JURISDICTION**

18.1    This Agreement is governed by and shall be construed in accordance with the State of Florida.

18.2    The state and federal courts located in Indian River County, Florida shall be the exclusive venue for, and have exclusive venue jurisdiction over, the Parties hereto with respect to any matter arising out of or relating to this Agreement, and the Parties hereby submit to such courts' jurisdiction over the Parties with respect to any matter arising out of or relating to this Agreement. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the jurisdiction and laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

18.3    Section 18.1 and 18.2 also apply in relation to any disputes arising in connection with the validity of this Agreement.

19. **ADDITIONAL REPRESENTATIONS.** Borrower is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Florida. Borrower is duly qualified and authorized to transact business and in good standing as a foreign limited liability company in each jurisdiction in which the failure to so qualify would be reasonably likely to result in a Material Adverse Effect. All limited liability company action on the part of Borrower, its board of managers, managers, and members necessary for the authorization, execution, delivery and performance of this Agreement and the Loan Documents and the performance of its obligations hereunder and thereunder has been taken. Borrower has all requisite limited liability power to execute and deliver this Agreement and the other Loan Documents and to carry out and perform their obligations under the terms of this Agreement and the Loan Documents. This Agreement and each of Loan Document when executed and delivered, shall constitute the valid and binding obligation of Borrower enforceable in accordance with its terms except: (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally; (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

The parties have executed this Agreement, in two originals, as of the date of this agreement.

THE LENDER

THE GREAT BHAKTA CORP.

By: Raj Peter Bhakta
Its: President/CEO


THE BORROWER

CHARLEMAGNE KAISER, LLC

By: _____
Its:    ODC Regenerative, LLC as its Manager

## EXHIBIT A: EXISTING INDEBTEDNESS

None

# EXHIBIT B

| | | |
|---|---|---|
| Current Liabilities | | |
| Accounts Payable | | |
| 2000 · Accounts Payable | 945.00 | |
| Total Accounts Payable | 945.00 | |
| Other Current Liabilities | | |
| 2060 · Intercompany | | |
| 3061 · Balthazar Rex | 71,108.16 | Your Majesty |
| 3063 · Bhakta Farms | 47,851.50 | Bills paid by BF for DM(On P&L) |
| 3062 · Bhakta Empire | 785.89 | Bills paid by BE for DM(On P&L) |
| Total 2060 · Intercompany | 119,745.55 x | |
| 3450 · Due To's | | |
| 2475 · Due to RPB | 250,000.00 | |
| Total 3450 · Due To's | 250,000.00 x | Raj loaned money |
| Total Other Current Liabilities | 369,745.55 | |
| Total Current Liabilities | 370,690.55 | |
| Total Liabilities | 370,690.55 | |
| Equity | | |
| 3000 · Opening Balance Equity | 100,948.45 x | |
| Net Income | -106,268.40 | |
| Total Equity | -5,312.92 | |
| TOTAL LIABILITIES & EQUITY | 248,377.65 | |

| | | |
|---|---|---|
| | 471,836.00 loan | |
| | 101,804.43 cash | |
| | 369,771.90 net debt | |

| | |
|---|---|
| 471,836.00 Loan | |
| 9,218.94 Truck *** | |
| 8,500.00 Polaris Ranger | |
| 1,848.00 Tradework | |
| 488,402.97 | |

*** Appox. #

| AP Liabilities | | | |
|---|---|---|---|
| | $ | 690.00 | Okeechobee Livestock Vet |
| | $ | 150.00 | Lee Ann White |
| | $ | 105.00 | Gatekeeper |
| | $ | 945.00 | |
| Balthazar Rex | $ | 216.96 | Samples-FedEx |
| | $ | 70,891.20 | Your Majesty |
| | $ | 71,108.16 | |
| Bhakta Farms | $ | 18,800.00 | Cows |
| | $ | 20,051.50 | Scott & Farm Hand |
| | $ | 300.00 | Cattle Shoot |
| | $ | 7,700.00 | ATV |
| | $ | 47,851.50 | |
| Bhakta Empire | $ | 375.00 | Vet League |
| | $ | 101.65 | Supplies |
| | $ | 2,259.24 | Scott Travel |
| | $ | (2,000.00) | 2019 Taxes |
| | $ | 50.00 | Cattle Max |
| | $ | 785.89 | |

APPENDIX A

ADVANCE REQUEST CERTIFICATE

Pursuant to the Credit Agreement, Charlemagne Kaiser, LLC (the "Borrower") hereby requests an Advance from you under the Agreement for an amount equal to [_____] ($_____). All capitalized but undefined terms used herein shall have the meaning attributed to them in the Credit Agreement.

In connection with this Advance Request, the Borrower certifies to you as follows:

(1)  All representations and warranties contained in the Credit Agreement are true and correct with the same force and effect as though such representations and warranties had been made on and as of the date hereof;

(2)  Borrower is in compliance with all the terms and provisions of the Credit Agreement, and of the Credit Notes, and no condition, event, or act exists which, with the giving of notice or lapse of time, or both, would constitute an event of default under any of such documents;

(3)  No material adverse change in the condition, financial or otherwise, of the Borrower has occurred that would adversely affect the ability of the Borrower to meet and carry out its obligations under the Credit Agreement or the Credit Notes, or to perform the transactions contemplated thereby; and

(4)  The proceeds of the Advance will be used solely for the following business purposes:

CHARLEMAGNE KAISER, LLC

Dated _____ __, 202__

By:

# EXHIBIT 2O

GOVERNMENT
EXHIBIT
**2O**
18-cr-20685-KMW

# CHARLEMAGNE KAISER, LLC PROMISSORY NOTE

$488,402.97

February 16, 2021
Vero Beach, Florida

FOR VALUE RECEIVED, CHARLEMAGNE KAISER, LLC, a Florida limited liability company ("Borrower"), hereby unconditionally promises to pay to The Great Bhakta Corp., a Florida corporation (the "Lender"), in lawful money of the United States and in immediately available funds, the principal amount of Four Hundred Eighty-Eight Thousand Four Hundred Two and 97/100 ($488,402.97) Dollars (the "Principal Amount"), together with accrued and unpaid interest thereon calculated as set forth as provided in this note (this "Note"). This Note has been issued pursuant to the terms of the Loan Agreement (as defined below), which is incorporated herein by reference.   Interest shall accrue and be payable in accordance with the provisions of the Loan Agreement and the Principal Amount of this Note, together with interest shall be payable in accordance with the terms of the Loan Agreement.

If not sooner paid all amounts outstanding under this Note shall be due and payable on the Termination Date or earlier if accelerated following an Event of Default, as each is defined in the Loan Agreement.

NATURE OF OBLIGATIONS. This Note represents a secured obligation of the Borrower, which is secured by the Security Agreement and Trademark Security Agreement. Lender's rights and remedies upon the occurrence and during the continuance of an Event of Default (as defined in the Loan Agreement) shall be those set forth in the Loan Agreement.

WAIVER. The Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note.

GOVERNING LAW. This Note shall be governed in all respects by the internal laws of the state of Florida as applied to agreements entered into among Florida residents to be performed entirely within Florida, without regard to conflict of laws rules.

LOST NOTE. In the event of any loss of this Note by Lender, Borrower shall execute a replacement promissory note in favor of Lender on the same terms and conditions of this Note upon the receipt by Borrower of an affidavit of lost note, in form and substance reasonably satisfactory to Borrower, duly executed and delivered by Lender.

ASSIGNMENT. The rights and obligations of Borrower and Lender will be binding upon and inure to the benefit of the successors, assigns, heirs, administrators and permitted transferees of the parties; provided that Note and the rights and obligations of each party hereunder may be assigned or otherwise transferred only in accordance with the express provisions of the Loan Agreement.

AMENDMENTS. This Note may be amended or modified, and any term or provision hereof may be waived or departure therefrom consented or approved (either generally or in a particular instance and either retroactively or prospectively), only upon the written

consent of Lender and Borrower.

Executed as of the date first written above.

CHARLEMAGNE KAISER, LLC, borrower

By: _____

ODC Regenerative, LLC, its Manager

# EXHIBIT 2P

GOVERNMENT
EXHIBIT
**2P**
18-cr-20685-KMW

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (the "Personal Guaranty") is entered into this 16th day of February, 2021, by GUSTAVO HERNANDEZ, who resides at 597 Hibiscus Lane, Miami, FL, 33137 (the "Personal Guarantor"), and in favor of the Great Bhakta Corp. (the "Lender"), with a place of business at 12600 State Road 60, Vero Beach, FL 32966.

### RECITALS

On the date of this Personal Guaranty the Lender made a loan to Charlemagne Kaiser, LLC pursuant to that certain (i) Note, dated as of the date herein (the "Term Note"), (ii) Loan Agreement and Security Agreement, dated as of the date herein (the "Loan Agreement"), and (iii) other Loan Documents (as defined in the Loan Agreement).

In partial consideration for, and as an inducement to the Lender to extend credit to the Borrower under the Loan Documents, the Personal Guarantor agreed to guaranty the payment and performance of Borrower's obligations under all Loan Documents.

The Personal Guarantor owns an equity interest in the Borrower. As such he will receive substantial benefits from Lender's loan to Borrower under the Loan Documents. The Personal Guarantor acknowledges that Lender would not have entered into the Loan Documents but for Personal Guarantor's execution of this Personal Guaranty.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises of this Personal Guaranty, and intending to be legally bound hereby, the parties hereto agree as follows:

### SECTION 1

### DEFINITIONS

1.1 Definitions. Capitalized terms that are not otherwise defined herein shall have the meaning set forth in the Loan Agreement. If there is a conflict between a definition herein and a definition in the Loan Agreement, the definition in the Loan Agreement shall control. If a capitalized term is not otherwise defined herein or the Loan Agreement it shall have the meaning set forth in the Code.

### SECTION 2

### GUARANTY OF PAYMENT AND PERFORMANCE

2.1 Unconditional Guaranty. The Personal Guarantor hereby unconditionally guarantees to the Lender the full and punctual payment when due, and the performance of all liabilities, agreements and other obligations of the Borrower to the Lender arising under the Note, Loan Agreement, all other Loan Documents, and all extensions, renewals and substitutions thereof (collectively the "Borrower's Obligations").

2.2 Nature of Guaranty. This Personal Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance of the Borrower's

Obligations, and not of their collectability only, and shall remain in force until the full satisfaction of the Borrower's Obligations.

2.3  Obligation of Personal Guarantor.  The Personal Guarantor shall have no obligation under this Personal Guaranty to pay or perform the Borrower's Obligations to Lender until such time that the Borrower defaults in the payment or performance of any of the Borrower's Obligations and fails to timely cure such default. Upon Borrower's failure to timely cure any such default, the obligations of the Personal Guarantor hereunder shall automatically become due and payable to the Lender, without notice or demand.

2.4  Agreement to Pay Costs and Expenses.  The Personal Guarantor agrees to pay to the Lender, on demand, all reasonable costs and expenses (including reasonable court costs and legal expenses) incurred or expended by the Lender in connection with the enforcement of this Personal Guaranty and/or the collection of all sums and Borrower's Obligations guaranteed hereunder, whether such collection be from Borrower or from the Personal Guarantor.

SECTION 3

WAIVERS BY THE PERSONAL GUARANTOR;

THE LENDER'S FREEDOM TO ACT

3.1  Borrower's Impairment.  The obligations of the Personal Guarantor to make payment in accordance with the terms of this Personal Guaranty shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower or its estate in bankruptcy or reorganization resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute or from the decision of any court. The liability of the Personal Guarantor hereunder shall be reinstated and revived, and the rights of the holder or holders of Borrower's Obligations and in any agreement executed by and between Lender and Borrower, shall continue, with respect to any amount at any time paid on account of the indebtedness under any Borrower's Obligations or Loan Documents or hereunder, which shall thereafter be required to be restored or returned by the holder or holders of any Borrower's Obligations or other agreements upon the bankruptcy, insolvency or reorganization of Borrower or for any other reason, all as though such amount had not been paid.

3.2  Agreement to Loan Documents and All Amendments.  Without limiting the generality of any term, condition or obligation herein, the Personal Guarantor agrees to the provisions of any instrument evidencing, securing or otherwise executed in connection with any of the Borrower's Obligations, and agrees that the obligations of the Personal Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower; (ii) any extensions or renewals of any of the Borrower's Obligations; (iii) any terminations, invalidations, rescissions, waivers, amendments or modifications of any of the Loan Documents or any of the terms or provisions of any agreement evidencing, securing or otherwise executed in connection with any of the Borrower's Obligations; (iv)

2

the substitution or release of any entity primarily or secondarily liable for any of the Borrower's Obligations; (v) the adequacy of any rights the Lender may have against the Collateral or any other asset pledged to secure the Borrower's Obligations, or other means of obtaining repayment of the Borrower's Obligations; (vi) the impairment of any asset or collateral securing the Borrower's Obligations, including without limitation the failure to perfect or preserve any rights the Lender might have in such collateral or the substitution, exchange, surrender, release, loss or destruction of any such collateral; or (vii) any other act or omission which might in any manner or to any extent vary the risk of the Borrower or otherwise operate as a release or discharge of the Borrower, all of which may be done without notice to the Personal Guarantor.

3.3  Waiver of Notice.  Notice of the acceptance of this Personal Guaranty and notice of transactions entered into in reliance hereof are hereby waived.  The Personal Guarantor consents to any renewal, extension or postponement of the time of payment of any of the Borrower's Obligations or to any other forbearance or indulgence with respect thereto and consents to any substitution, exchange, modification or release of any security therefore or the release of any other person primarily or secondarily liable on any of the Borrower's Obligations, whether or not notice thereof shall be given to the Personal Guarantor, and agrees to the provisions of any instrument, security or other writing evidencing or securing any of the Borrower's Obligations, and the enforcement hereof shall not be affected by the delay, neglect or failure of Lender to take any action with respect to any security, right, obligation, endorsement, guaranty or other means of collecting the Borrower's Obligations which it may at any time hold, including perfection or enforcement thereof, or any change with respect to Borrower in the form or manner of doing business, whether by incorporation, consolidation, merger, partnership formation or change in membership, or otherwise, it being hereby agreed that Personal Guarantor shall be and remain bound upon this Personal Guaranty irrespective of any action, delay or omission by Lender in dealing with Borrower, any of the Borrower's Obligations, any Loan Document, any collateral that secures the same or any person at any time liable with respect thereto.

SECTION 4

UNENFORCEABILITY OF OBLIGATIONS AGAINST THE BORROWER

4.1  Borrower's Obligations.  If for any reason the Borrower has no legal existence or is under no legal obligation to discharge any of the Borrower's Obligations, or if any of the Borrower's Obligations cannot be recovered from the Borrower by operation of law or for any other reason, this Personal Guaranty shall nevertheless be binding on the Personal Guarantor to the same extent as if the Personal Guarantor at all times had been the principal obligor on all of the Borrower's Obligations, and all amounts due under this Personal Guaranty and all of the Loan Documents shall become immediately due and payable.

4.2  Stay of Borrower's Obligations.  If payment of the Borrower's Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, or for any other reason, all such amounts otherwise subject to acceleration under the terms of any agreement evidencing, securing or otherwise executed in connection with any of the Borrower's

3

Obligations, including the Loan Documents, shall be immediately due and payable by the Personal Guarantor.

## SECTION 5

## SUBROGATION and SUBORDINATION

5.1 Subordination by Personal Guarantor.  Until the payment and performance in full of all Borrower's Obligations, and any and all obligations of the Borrower to the Lender, the Personal Guarantor shall not:

5.1.1 exercise any right against the Borrower arising as a result of payment by the Personal Guarantor hereunder, by way of subrogation or otherwise;

5.1.2 prove any claim in competition with the Lender, or its affiliates, in respect of any payment hereunder, in bankruptcy or insolvency proceedings of any nature;

5.1.3 claim any set-off or counterclaim against the Borrower in respect of any liability of the Personal Guarantor to the Borrower; or

5.1.4 benefit from or exercise any right to participate in any collateral which is pledged to secure the Borrower's Obligation, or which may be held by the Lender.

5.2 Subordination Following Default.  During a continuing Event of Default under the Note, Loan Agreement, Security Agreement and/or all other Loan Documents, the payment of any amounts due with respect to any indebtedness of the Borrower now or hereafter held by the Personal Guarantor is hereby subordinated to the prior payment in full of the Borrower's Obligations.

5.3 Waiver of Demand Rights.  During a continuing Event of Default under the Loan Documents, the Personal Guarantor agrees that it will not demand, sue for or otherwise attempt to collect any indebtedness of the Borrower to it, until the Borrower's Obligations have been paid in full.

5.4 Turnover of Collected Indebtedness.  During a continuing Event of Default under the Note, Loan Agreement or any other Loan Document if, notwithstanding anything herein, the Personal Guarantor shall collect, enforce or receive any amounts in respect of any indebtedness due from the Borrower, such amounts shall be collected, enforced and received by the Personal Guarantor as trustees for the Lender and be paid over to the Lender on account of the Borrower's Obligations, without affecting in any manner the liability of the Personal Guarantor under the other provisions of this Personal Guaranty.

## SECTION 6

## REPRESENTATIONS, WARRANTIES AND COVENANTS

The Personal Guarantor represents, warrants and further covenants the following:

6.1 The execution and delivery of this Personal Guaranty, the consummation of the transactions contemplated hereby and the fulfillment of or compliance with the terms and conditions of this Personal Guaranty, are not prevented or limited by, or do not conflict with

4

or result in a breach of the terms, conditions or provisions of any contractual or other restriction on the Personal Guarantor or any agreement or instrument of whatever nature to which Personal Guarantor is now a party or by which Personal Guarantor or the Personal Guarantor's property is bound or constitutes a default under any of the foregoing.

6.2 The Personal Guarantor received and will receive a direct and material financial benefit from the accommodations extended by the Lender to the Borrower.

6.3 This Personal Guaranty constitutes a valid and legally binding obligation of the Personal Guarantor, enforceable in accordance with its terms.

6.4 The Personal Guarantor shall, at Lender's request, deliver to the Lender, within thirty (30) days after filing, copies of all of Personal Guarantor's executed and filed federal tax returns filed after the date hereof, including without limitation all schedules to such tax returns and requests for an extension to file a return.

## SECTION 7

## MISCELLANEOUS

7.1 Continuing Obligation to Cooperate. The Personal Guarantor agrees to execute and deliver to the Lender all such other and further instruments and documents and take or cause to be taken all such other and further action as the Lender may reasonably request in order to effect and confirm or vest more securely in the Lender all rights contemplated in this Personal Guaranty.

7.2 Amendments. This Personal Guaranty may be amended only by an instrument in writing and duly signed by the Personal Guarantor and an authorized officer of the Lender.

7.3 Enforceability. If any provisions of this Personal Guaranty shall be held to be illegal or unenforceable, such illegality or unenforceability shall relate solely to such provision and shall not affect the remainder of this Personal Guaranty.

7.4 Venue. The Personal Guarantor and Lender agree that any action or proceeding to enforce or arising out of this Personal Guaranty may be commenced in any court of the State of Florida sitting in Indian River County.

7.5 Service of Process. The Personal Guarantor waive personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to the Personal Guarantor, or as otherwise provided by the laws of the State of Florida or the United States of America.

7.6 No Waiver, Remedies Cumulative. No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. All rights and remedies herein provided are cumulative and are in addition to any other remedies provided by law, any Loan Document or otherwise.

7.7  Survival of Representations.  All representations, warranties and covenants made herein shall survive the amendment to the Loan Documents, and shall continue in full force and effect so long as any Indebtedness is outstanding, there exists any commitment by Lender to the Borrower, and until this Personal Guaranty is formally terminated in writing.

7.8  Indemnity By Personal Guarantor.  In addition to all other Indebtedness, the Personal Guarantor agrees to defend, protect, indemnify and hold harmless the Lender, and all of its Affiliates, Subsidiaries, officers, directors, employees, attorneys, accountants, consultants, agents and any controlling Persons (collectively the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities, obligations, penalties, fees, costs, expenses and settlement agreements, joint and several (including, without limitation, attorneys' and paralegals' fees, costs and expenses) incurred by any of the Indemnified Parties, whether prior to or from and after the date hereof, as a result of or arising from or relating to (i) any suit, investigation, action or proceeding by any Person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any Person under any statute, regulation or common law principle, arising from or in connection with any of the Loan Documents and/or Lender 's furnishing of funds to the Borrower under this Personal Guaranty, (ii) the Lender 's preservation, administration and enforcement of its rights under the Loan Documents and applicable law, including the reasonable fees if the Indebtedness is collected by or through an attorney at law and disbursements of counsel for Lender in connection therewith, whether suit be brought or not and whether incurred at trial or on appeal, and all costs of repossession, storage, disposition, protection and collection of Collateral, (iii) periodic field exams, audits and appraisals performed by Lender; and/or (iv) any matter relating to the financing transactions contemplated by the Loan Documents or by any document executed in connection with the transactions contemplated thereby, other than for such loss, damage, liability, obligation, penalty, fee, cost or expense, any of which arise from an Indemnified Parties' gross negligence or willful misconduct, as determined by a final order of a court of competent jurisdiction.  No Indemnified Party shall by liable for any direct or consequential damages which arise from or are related to the Commitment Letter, this Personal Guaranty or any of the Loan Documents. Borrower's and Personal Guarantor's obligation for indemnification for all of the foregoing losses, damages, liabilities, obligations, penalties, fees, costs and expenses shall be part of the Indebtedness, secured by the Collateral, and chargeable against Borrower's loan accounts.  The indemnity herein shall survive the termination of this Personal Guaranty.

7.9  Tax Obligations.  If the Personal Guarantor should fail to pay any tax or other amount required by this Personal Guaranty to be paid or which may be reasonably necessary to protect or preserve any of the Collateral, or Borrower's, Personal Guarantor's or Lender 's respective interests therein, Lender may make such payment and the amount thereof shall be payable on demand, shall bear interest at the Default Rate from the date of payment by the Lender until paid and shall be deemed to be Indebtedness entitled to the benefit and security of the Loan Documents.  The Personal Guarantor agrees to pay and save Lender harmless against any liability for payment of any state documentary stamp taxes, intangible taxes or similar taxes (including interest or penalties, if any) which may now or

6

hereafter be determined to be payable in respect to the execution, delivery or recording of any Loan Document or the making of any Loan, whether originally thought to be due or not, and regardless of any mistake of fact or law on the part of Lender, Borrower or Personal Guarantor with respect to the applicability of such tax. The agreement herein shall survive the termination of this Personal Guaranty.

7.10 Reinstatement. Notwithstanding anything herein to the contrary, this Personal Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any amount received by the Lender in respect of the Indebtedness is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon the appointment of any receiver, assignee, intervener or conservator of, or trustee or similar official for, the Borrower or any substantial part of its properties, or otherwise, all as though such payments had not been made.

7.11 Notices.  Unless otherwise specifically provided herein, any notice delivered under this Personal Guaranty shall be in writing addressed to the respective party as set forth in Exhibit 7.11, or to such other address as the party addressed shall have previously designated by written notice to the serving party, and may be personally served, sent by facsimile transmission or sent by overnight courier service or certified or registered United States mail and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by facsimile transmission, on the date of transmission if transmitted on a business day before 4:00 p.m. (Vero Beach, Florida time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, one business day after delivery to such courier properly addressed; or (d) if by United States mail, four business days after deposit in the United States mail, postage prepaid and properly addressed.

7.12 Governing Law.  This Personal Guaranty and all Loan Documents shall be deemed contracts made under the laws of the State of Florida, and shall be governed by and construed in accordance with the laws of said state (excluding its conflict of laws provisions if such provisions would require application of the laws of another jurisdiction).

7.13 Successors.  This Personal Guaranty shall be binding upon and shall inure to the benefit of the Borrower, Personal Guarantor and the Lender, and their respective successors.

7.14 Assignment. The Personal Guarantor may not assign any of his rights, obligations, covenants, representations, warranties, duties or responsibilities hereunder and under the Loan Documents. Any such assignment is void. The Lender may assign all or part of its rights hereunder and under the Loan Documents, at any time.

7.15 Counterparts.  This Personal Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts (including facsimile or other electronic transmission), each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

7.16  Exhibits.  Any exhibits annexed hereto are the only exhibits to be annexed to this Personal Guaranty, and the material contained therein shall be incorporated herein.

7.17  Captions.  The captions herein contained are inserted as a matter of convenience only and such captions do not form a part of this Personal Guaranty and shall not be utilized in the construction hereof.

7.18  Powers.  All powers of attorney granted to Lender are coupled with an interest and are irrevocable.

7.19  Approvals.  If this Personal Guaranty calls for the approval or consent of Lender, such approval or consent may be given or withheld in the discretion of Lender unless otherwise specified herein.

7.20  No Punitive Damages.  Each party agrees that it shall not have a remedy of punitive or exemplary damages against the other in any Dispute and hereby waives any right or claim to punitive or exemplary damages it may have now or which may arise in the future in connection with any Dispute.

7.21  Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS PERSONAL GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS PERSONAL GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.21.

7.22  Joint and Several Obligations.  All Indebtedness, representations, warranties, covenants and indemnities set forth herein and in the Loan Documents shall be joint and several among the Borrower and Personal Guarantor.  Lender shall have the right to deal with any individual representative of the Borrower with regard to all matters concerning the rights and obligations of Lender hereunder and pursuant to applicable law with regard to the transactions contemplated under the Loan Documents.  All actions or inactions of the officers, managers, members and/or agents of the Borrower with regard to the transactions contemplated under the Loan Documents shall be deemed with full authority and binding upon the Borrower hereunder.  The foregoing is a material inducement to the agreement of Lender to enter into the terms hereof and to consummate the transactions contemplated hereby.

7.23  Waiver of Certain Defenses. All rights of Lender and all obligations of the Personal Guarantor hereunder and under the Loan Documents shall be absolute and unconditional irrespective of (i) any change in the time, manner or place of payment of, or any other term

8

of, all or any of the Indebtedness, or any other amendment or waiver of or any consent to any departure from any provision of the Loan Documents, (ii) any exchange, release or non-perfection of any other collateral given as security for the Indebtedness, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Indebtedness, or (iii) any other circumstance which might otherwise constitute a defense available to, or a discharge of Borrower, Personal Guarantor or any third party, other than payment and performance in full of the Indebtedness.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Personal Guaranty Agreement as of the day and year first above written.


PERSONAL GUARANTOR:


Gustavo Hernandez


9

# EXHIBIT 2Q

# 2020 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L19000107223

**Entity Name:** CHARLEMAGNE KAISER, LLC

**Current Principal  Place of Business:**

12600 SR 60
VERO BEACH,  FL  32966

**Current Mailing Address:**

12600 SR 60
VERO BEACH,  FL  32966  US

**FEI Number:** 84-2231367                                         **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

BALTHAZAR REX, LLC
12600 SR 60
VERO BEACH, FL  32966  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

| Electronic Signature of Registered Agent | Date |

**Authorized Person(s) Detail :**

| Title | MGR | | Title | AUTHORIZED REPRESENTATIVE |
| Name | BHAKTA, RAJ P | | Name | GIBSON, LEO J |
| Address | 12600 SR 60 | | Address | 12600 SR 60 |
| City-State-Zip: | VERO BEACH  FL  32966 | | City-State-Zip: | VERO BEACH  FL  32966 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: RAJ P BHAKTA                                MANAGER                        03/26/2020

Electronic Signature of Signing Authorized Person(s) Detail                                                          Date

**FILED**
**Mar 26, 2020**
**Secretary of State**
**1562038630CC**

**GOVERNMENT
EXHIBIT
2Q
18-cr-20685-KMW**

# EXHIBIT 2R

# Electronic Articles of Organization For
# Florida Limited Liability Company

**L21000029440**
**FILED 8:00 AM**
**January 13, 2021**
**Sec. Of State**
jafason

## Article I

The name of the Limited Liability Company is:

ODC REGENERATIVE LLC

GOVERNMENT
EXHIBIT
**2R**
18-cr-20685-KMW

## Article II

The street address of the principal office of the Limited Liability Company is:

12600 STATE RD 60
VERO BEACH, FL. US  32966

The mailing address of the Limited Liability Company is:

12600 STATE RD 60
VERO BEACH, FL. US  32966

## Article III

The name and Florida street address of the registered agent is:

OLYMPIA  DE CASTRO
12600 STATE RD 60
VERO BEACH, FL.   32966

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   OLYMPIA DE CASTRO

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
OLYMPIA  DE CASTRO
12600 STATE RD 60
VERO BEACH, FL.  32966  US

**L21000029440**
**FILED 8:00 AM**
**January 13, 2021**
**Sec. Of State**
jafason

## Article V

The effective date for this Limited Liability Company shall be:

01/07/2021

Signature of member or an authorized representative

Electronic Signature: OLYMPIA DE CASTRO

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT 2S

# Electronic Articles of Organization For
# Florida Limited Liability Company

L21000124865
FILED 8:00 AM
March 16, 2021
Sec. Of State
jafason

## Article I

The name of the Limited Liability Company is:

ODC REGENERATIVE FARMS, LLC

GOVERNMENT
EXHIBIT
**2S**
18-cr-20685-KMW

## Article II

The street address of the principal office of the Limited Liability Company is:

12600 STATE RD 60
VERO BEACH, FL.   32966

The mailing address of the Limited Liability Company is:

12600 STATE RD 60
VERO BEACH, FL.   32966

## Article III

Other provisions, if any:

REGENERATIVE FARMING.

## Article IV

The name and Florida street address of the registered agent is:

JUAN CARLOS  GOMEZ
12600 FLORIDA 60
VERO BEACH, FL.   32966

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   JUAN CARLOS GOMEZ GOMEZ

## Article V

The name and address of person(s) authorized to manage LLC:

L21000124865
FILED 8:00 AM
March 16, 2021
Sec. Of State
jafason

Title: MGR
JUAN CARLOS GOMEZ
12600 STATE RD 60
VERO BEACH, FL. 32966

## Article VI

The effective date for this Limited Liability Company shall be:

03/12/2021

Signature of member or an authorized representative

Electronic Signature: JUAN CARLOS GOMEZ

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.