# COMPOSITE EXHIBIT 3

GOVERNMENT
EXHIBIT

**3**

18-CR-20685

**Composite Exhibit 3 Summary**

**Ex. 3-A.**   Summary Chart of Net Outgoing Transfers from GSTF Classes C & D Accounts, previously filed at ECF No. 238-1

*$2,000,000 - Domaine Select Wine & Spirits (DSWS)*

**Ex. 3-B.**   Excerpt DSWS Series A Private Placement Memorandum (indicating company roles of Defendant Gustavo Adolfo Hernandez Frieri, Jorge Mora,[1] Paolo Domeneghetti,[2] and Allison Domeneghetti[3])

**Ex. 3-C.**   Note and Note Purchase Agreement between DSWS and GSTF for $1 million, dated Sept. 16, 2016 (executed by Defendant)

**Ex. 3-D.**   Note and Note Purchase Agreement between DSWS and Defendant for $1 million, dated Oct. 18, 2017 (executed by Defendant and Allison Domeneghetti)

*$297,586.49 - Global Securities Advisors GP (GSA)*

**Ex. 3-E.**   Summary Chart of Transfers from GSTF Classes C & D Accounts to GSA Account

**Ex. 3-F.**   Interrogatory Answers from *Krono Holdings* Miami-Dade Civil Litigation (executed by Defendant and on GSA Account transfers to Defendant and Olympia De Castro[4] between January and April 2018)

*$90,000 - Global Securities Management LLC (GSM)*

**Ex. 3-G.**   Excerpt from ECF No. 131, Land Trust TH 041117 Petition (regarding sources of funds for purchase of condo unit in Hollywood, Florida)

**Ex. 3-H.**   Cesar Hernandez[5] E-mail Requesting GSTF Loan to GSM for $90,000 and Translation

**Ex. 3-I.**   GSTF Loan to GSM for $90,000, dated April 17, 2017 (maturity 1 month)

**Ex. 3-J.**   GSTF Class C Account Wire Transfer to GSM Account for $90,000

*$2,670,000 - GSM for GSTF Loans to "Global" entities*

**Ex. 3-K.**   Excerpts from GSTF Loans to GSM Colombia SAS for $2 million, dated Aug. 31, 2016; Global Securities Management Corp (GSM Corp) for $555,000, dated Aug. 17, 2017; GSM for $100,000, dated Sept. 25, 2017; and GSM Corp for $1,037,500, dated Dec. 26, 2018, which was funded in part by $570,000 from GSTF Classes C & D (executed by Defendant on behalf of GSTF or GSM Corp)

**Ex. 3-L.**   GSTF Classes C & D Accounts Wire Transfers to GSM Account (totaling $2,670,000)

*$148,500 - Dario Pacheco Angulo*

**Ex. 3-M.**   GSTF Loan to Port 10 S.A.S. for $150,000, dated Nov. 14, 2017 (executed by Pacheco Angulo[6])

**Ex. 3-N.**   GSTF Class D Account Wire Transfer to Pacheco Angulo in Panama

---

[1] Defendant's friend with support letter filed at ECF No. 365-2, at 58.
[2] Defendant's friend with support letter filed at ECF No. 365-7, at 29.
[3] Defendant's friend and also trustee of DC 2019 Irrevocable Trust with support letter filed at ECF No. 365-7, at 27.
[4] Defendant's ex-wife with support letter filed at ECF No. 365-2, at 2.
[5] Defendant's brother with support letter filed at ECF No. 365-2, at 39.
[6] Defendant's friend with support letter referenced at ECF No. 365, at 6-7, and filed at ECF No. 365-2, at 67.

## Net Outgoing Transfers from GSTF Accounts for Class C and Class D

| Country / Counterparty Name* | CNB 1466054 (GSTF Class C) | CNB 55102421 (GSTF Class D) | Net Outgoing Total |
|---|---|---|---|
| **Barbados** | | **($599,805.00)** | **($599,805.00)** |
| IUB Corporation | | ($599,805.00) | ($599,805.00) |
| **Cayman Islands** | **($6,951.22)** | | **($6,951.22)** |
| Harneys Services (Cayman) Limited | ($6,951.22) | | ($6,951.22) |
| **Colombia** | **($3,813,057.33)** | **($1,798,970.00)** | **($5,612,027.33)** |
| Anka S.A.S Technology and Services | ($43,057.32) | | ($43,057.32) |
| GSM Colombia SAS | ($2,000,000.00) | | ($2,000,000.00) |
| Himmel SAS | | ($898,970.00) | ($898,970.00) |
| Serfindata SA | ($1,770,000.01) | ($900,000.00) | ($2,670,000.01) |
| **Cyprus** | **($9,480.84)** | | **($9,480.84)** |
| Royal Pine & Associates | ($9,480.84) | | ($9,480.84) |
| **Ireland** | **($34,902.70)** | | **($34,902.70)** |
| Eversheds Sutherland Client Account | ($34,902.70) | | ($34,902.70) |
| **Panama** | **($719,310.00)** | **($2,118,500.00)** | **($2,837,810.00)** |
| D▮▮ P▮▮ A▮▮ | | ($148,500.00) | ($148,500.00) |
| Market Real Solutions SA | ($717,000.00) | ($1,970,000.00) | ($2,687,000.00) |
| PLS Overseas Inc | ($2,310.00) | | ($2,310.00) |
| **Peru** | | **($43,660.00)** | **($43,660.00)** |
| Rebaza Alcazar Abogados Civil De | | ($43,660.00) | ($43,660.00) |
| **Singapore** | | **($50,362.63)** | **($50,362.63)** |
| Asiaciti Trust Singapore Pte Ltd | | ($50,362.63) | ($50,362.63) |
| **UK** | **($17,856.00)** | **($4,130.83)** | **($21,986.83)** |
| Harney Westwood Riegels Operations | | ($4,130.83) | ($4,130.83) |
| Intertrust Management Ltd EUR | ($2,856.00) | | ($2,856.00) |
| Maples and Calder | ($15,000.00) | | ($15,000.00) |
| **US** | **($2,898,431.55)** | **($2,305,016.57)** | **($5,203,448.12)** |
| APEX Fund Services (Charlotte) LLC | | ($11,000.00) | ($11,000.00) |
| APEX Fund Services (US) Inc | ($8,000.00) | ($10,500.00) | ($18,500.00) |
| Boubalos Holdings LLC | | ($200,000.00) | ($200,000.00) |
| Domaine Select Wine & Spirits | ($1,300,000.00) | ($700,000.00) | ($2,000,000.00) |
| Global Securities Advisors GP | ($232,586.49) | ($65,000.00) | ($297,586.49) |
| Global Securities Management LLC | ($848,540.00) | ($1,144,000.00) | ($1,992,540.00) |
| Global Shared Solutions Corp | ($45,000.00) | ($92,476.57) | ($137,476.57) |
| Harney Westwood Riegels Operations | | ($2,040.00) | ($2,040.00) |
| ▮▮▮▮ LLC | ($396,000.00) | | ($396,000.00) |
| K▮▮ R▮▮ | ($53,305.06) | | ($53,305.06) |
| Morgan Stanley Wealth Management (FFC to Trento Group SA) | | ($80,000.00) | ($80,000.00) |
| Paez and Associates PA | ($15,000.00) | | ($15,000.00) |
| **Grand Total** | **($7,499,989.64)** | **($6,920,445.03)** | **($14,420,434.67)** |

**EXHIBIT 1**

Page 1 of 1

GOVERNMENT
EXHIBIT
**3-A**
18-CR-20685

BOOKLET #: 1          NAME: GLOBAL SECURITIES TRADE FINANCE

## PRELIMINARY CONFIDENTIAL
## PRIVATE PLACEMENT MEMORANDUM
### DATE: SEPTEMBER 22, 2016

# DOMAINE SELECT WINE & SPIRITS, LLC



DIVERSITY          CHARACTER          EXPRESSION          TRADITION

**Private Placement of up to $5,000,000 of**
**Series A Convertible Notes due 2021**
**Offering Price: 100%**

**Suitability of the Series A Convertible Notes for Investment:** The Notes are highly speculative and are suitable only for investors who are capable of understanding the complexities and risks specific to the Notes, and who are prepared to lose their entire investment. You should reach a decision to invest in the Notes after carefully considering, with your advisors, the risks and suitability of the Notes in light of your investment objectives and the specific information set out in this Private Placement Memorandum. The Issuer is not responsible for determining the suitability of an investment in the Notes. See "Risk Factors" beginning on page 16.

This Private Placement Memorandum is subject to change or amendment without notice. This Private Placement Memorandum is not an offer to sell or a solicitation of an offer to buy these Notes in any Jurisdiction in which such offer or solicitation would be illegal.

GOVERNMENT
EXHIBIT
**3-B**
18-CR-20685

CONFIDENTIAL

## DOMAINE SELECT WINE & SPIRITS, LLC



## Table of Contents

Table of Contents ...................................................................................................................2

Introduction ...........................................................................................................................8

Special Note Regarding Forward-Looking Statements ..................................................11

Special State Legends ...........................................................................................................11

Summary ................................................................................................................................15

Risk Factors ...........................................................................................................................21

The Offering ..........................................................................................................................28

Management & Advisors ......................................................................................................32

Investor Suitability Requirements .....................................................................................33

Subscribing ............................................................................................................................35

Restrictions and Warning ...................................................................................................37

Estimated Use of Proceeds .................................................................................................40

Capitalization ........................................................................................................................41

Selected Financial Data .......................................................................................................41

CONFIDENTIAL

**Investor Instructions**



DIVERSITY        CHARACTER        EXPRESSION        TRADITION

Full Legal Name of Note Holder: GLOBAL SECURITIES TRADE FINANCE

Social Security Number: _____

Residence (Full Address): _____

Telephone Number: _____ Email: _____

Prior to investing, each potential investor of Notes must do the following:

1.  Carefully read with your legal and financial advisors this entire Subscription Booklet, including the "Risk Factors" in the Memorandum.

2.  Complete, execute and deliver each of the (i) Convertible Promissory Note, (ii) Note Purchase Agreement, and (iii) IRS Form W-9 (or W-8 for non-U.S. persons), each included in this Subscription Booklet as Exhibits C, D, E, and G, respectively. A completed document package will be sent to you.

3.  Deliver payment in the amount of the Notes subscribed for in accordance with the wire transfer and check instructions:

    Wire Instructions:              Domaine Select Wine & Spirits, LLC
                                    Bank Name: Capital One

                                    Beneficiary: Domaine Select Wine & Spirits
                                    Account Number: ███████3654
                                    Routing Number: 065000090
                                    SWIFT Code: HIBKUS44

    Checks should be made out to "Domaine Select Wine & Spirits. LLC" and delivered to:

                                    Domaine Select Wine & Spirits. LLC
                                    Attention: Mark Nowicki
                                    105 Madison Ave., 13th Floor
                                    New York, NY 10016
                                    mnowicki@domaineselect.com

CONFIDENTIAL

| | PROPRIETARY BRAND | PRIMATERRA | LA MAIALINA | MANISCALCO | QUATTRO MANI | BORGO M |
|---|---|---|---|---|---|---|
| **2014** | Case Ships | 32,316 | 19,133 | | 12,177 | 7,046 |
| | Revenue (1,000s) | $1,769 | $1,296 | | $780 | $421 |
| | Margin (1,000s) | $707 | $486 | | $332 | $173 |
| **2015** | Case Ships | 37,250 | 19,647 | 789 | 10,325 | 9,481 |
| | Revenue (1,000s) | $1,895 | $1,314 | $41 | $628 | $485 |
| | Margin (1,000s) | $881 | $559 | $16 | $267 | $196 |
| **2016 Estimate** | Case Ships | 43,959 | 22,535 | 6,994 | 9,371 | 5,062 |
| | Revenue (1,000s) | $2,240 | $1,534 | $375 | $575 | $292 |
| | Margin (1,000s) | $1,001 | $700 | $142 | $245 | $118 |
| | A&P (1,000s) | $158 | $95 | $24 | $34 | $15 |
| | CAAP | $843 | $605 | $118 | $211 | $103 |
| | Potential Multiple | 10 | 8 | 6 | 4 | 4 |
| | Projected Valuation | $   8,430 | $   4,840 | $   708 | $   844 | $   412 |

| | | |
|---|---|---|
| Total Valuation | $ | 15,234 |

See Exhibit A for valuation methodology.

## Investor Exit Strategies

As explained in this Memorandum, the Notes offered hereby are speculative and an investment in the Notes involves a high degree of risk. This Offering is suitable only for persons who are able to bear the risk of loss of their entire investment. If the Company is able to achieve its planned growth strategies, manage and mitigate the risks described in this Memorandum, as well as those risks of which the Company currently is not aware, then prospective investors may be able to receive a return of and a return on their investment.

- Upon maturity, the Company repays the principal amount plus accrued and unpaid interest, unless the Note holder chooses to convert the Notes into Membership Interests of the Company.
- If, prior to maturity, the Company sells more than $30,000,000 in Membership Interests, the Notes will automatically convert to the same kind of membership interests as the Company sold, subject to a $30,000,000 cap.
- If, at maturity, the Company is unable to pay the principal amount plus accrued and unpaid interest, and the Note holder does not choose to convert the Notes into Membership Interests of the Company, the Note holder will have a security interest in the intellectual property of the Company's named proprietary brands and may foreclose on this security interest by taking ownership of such proprietary brands or if the collateral is sold receiving the proceeds of such sale.

See Exhibit B and C for the detailed terms of the Notes.

## Related Party Transactions

1.   During 2016, the Company entered into four (4) transactions with Vino Holdings ("VH") a related party, as summarized below:
- Two (2) purchase agreements for an aggregate amount of $1,258,830, whereby VH purchased inventory from the Company, and the Company repurchased the same inventory over a one (1) year period. The Company paid VH the cost of such inventory plus an additional 20% annualized interest rate upon repurchasing such inventory.
- Two (2) financing agreements for an aggregate amount of $205,296, whereby VH purchased inventory on behalf of the Company, and the Company repaid VH over a 120-

CONFIDENTIAL

day period.  The Company paid VH the cost of such inventory plus an additional 20% annualized interest rate upon repayment.

2.  The Company sold, to participating members of the Holding Company, the Company's equity in Whistle Pig, LLC for $500,000.

3.  Participating members of the Company also advanced $500K to the Company secured by a second mortgage on the warehouse of Vine-Craft, LLC.

## Company Offices

The Company's office is located 105 Madison Ave., 13th Floor, New York, NY 10016.

CONFIDENTIAL

## Management & Advisors

The following persons are dedicated full-time to the Company and/or are members of the Board of Directors (denoted by **).

**Daniel M. Holtz** is Managing Principal of Walden Capital Management (WCM), a Miami-based financial services company. WCM arranged for the start-up capitalization of Oceania Cruises, a Miami-based cruise line. Daniel continues to serve on the Board of Prestige Cruise Holdings, Inc, the parent of Regent Seven Seas Cruises and Oceania brands. Previously, Daniel served as Chairman of both Verifier Capital Holdings and Envera. Daniel has served in the capacity of President and COO of Capital Bank and EVP of Capital Bank's Retail Banking Division. Daniel holds a BA from The University of Florida.

**Gustavo Adolfo Hernández Frieri** is Managing Principal for GSA, LLC, an asset management firm. Gustavo acts as Director for Global Securities Holdings, Corp. Prior, Gustavo was Chair of Political Economy at the Universidad de los Andes in Bogotá, Colombia. Gustavo holds an M.Sc. from the Institut d'Etudes Politiques in Paris, in Economics & Political Science. He holds a J.D. from the Universidad del Rosario in Bogotá, Colombia.

**Jorge Mora** is a Senior Managing Director and Head of the Financial Sponsors Coverage Group of Macquarie Capital USA. Prior to that he was a Managing Director at Lazard Frères & Co., and a Managing Director at UBS. At UBS Jorge was the lead banker in over 75 transactions. From 1997 to 2001 Jorge was a Managing Director with The Exxel Group. Jorge began his investment banking career at Donaldson, Lufkin & Jenrette in 1993. Jorge has a BA from The University of Miami in Entrepreneurship and an MBA in Finance from The Wharton School of Business with graduate courses in International Economics at The Johns Hopkins School of Advanced International Studies.

**Evis Savvides**, Interim President, COO & CFO, joined the Company in 2015 most recently from a consulting group focused on the design and execution of profit-driven strategies. Prior to that, Evis served as the COO for Deutsch Family Wine & Spirits from 2006 to 2012. Evis started his career in Public Accounting in 1994. In 2000, he moved to the Management Consulting area where he served as a partner of a CPA firm's consulting division. In 2006, Evis assumed the role of Chief Operating Officer for Deutsch Family Wine & Spirits, where he helped Deutsch grow profitably and build an environment capable of managing the organization's aggressive growth. Evis holds a BS and MS in Accounting from Old Dominion University and is a CPA.

Paolo Domeneghetti, Co-Founder, President of Import Division, lends international prowess stemming from three decades of experience in wine and spirits paired with a vast array of in depth relationships. Paolo began with his family's Italian wine distribution business in 1989 and later worked in the restaurant and wine & spirits industry in California, Seattle, NYC and Miami. He received honors from Associazione Italiana Sommeliers, Italian Institute of Foreign Trade and is a frequent panelist / speaker at industry trade events. Paolo has a Degree in Economics & Commerce from the Università Politecnica delle Marche.

Allison Domeneghetti, Co-Founder & President of Merchants Division, offers a distinctive perspective based on a professional and academic background in fine arts, coupled with comprehensive experience in fine wine auctions, spirits & wine sales, marketing and management. Allison began at Sotheby's NYC, then held roles with The New Museum and other NYC and Miami fine art galleries. She co-founded ARTWALK, offering private guided tours through NYC galleries and studios. She was previously a Fine Wine Specialist at Peerless Importers. Allison graduated Magna Cum Laude from Columbia University's Barnard College

**Mark Nowicki**, VP of Finance, joined the Company in February 2016, from The Winebow Group, a $650 million alcohol beverage importation and distribution company, where he spent 13 years, most recently as VP of Finance. Prior to The Winebow Group, Inc. worked for Popular Club Plan, Inc., a subsidiary of J. Crew Group, Inc. Thirty years of combined financial experience directing and guiding businesses through

CONFIDENTIAL

THEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

## SERIES A CONVERTIBLE NOTES

$1,000,000.00                                                                September 22, 2016

FOR VALUE RECEIVED, Domaine Select Wine & Spirits, LLC, a Delaware limited liability company (the "*Company*"), promises to pay on September 22, 2021, to Global Securities Trade Finance, a company incorporated under the laws of the Cayman Islands or its registered assigns ("*Investor*"), in lawful money of the United States of America, the principal sum of ONE MILLION DOLLARS ($1,000,000.00), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from, and including, the date of this Series A Convertible Promissory Note (this "*Note*") until paid in full on the unpaid principal balance at an accrual rate equal to 10% per annum, computed on simple interest.

This Note to be issued by the Company pursuant to the terms of that certain Note Purchase Agreement dated as of September 22, 2016 (the "*Purchase Agreement*") to the persons and entities identified therein as Investors (collectively, the "*Investors*") References herein to an "*Investor*" refers to the particular Investor that holds this Note. All payments of principal and interest under this Note shall be made pro rata among all Investors. All payments shall be applied first to accrued and unpaid interest and, thereafter, to principal.

Other than as specifically provided herein, this Note may not be prepaid, in whole or in part, without the prior written consent of an Investor Majority (as defined in the Purchase Agreement).

1.     Conversion.

(a)     Five business days prior to the stated maturity date (the "Notice Day"), investors will have the right to convert such Note to units of Membership Interests. On the Notice Day, if a Note holder chooses to convert, such Note holder must provide written notice to the Company of such decision. Such written notice shall be sent via certified mail to the attention of Chief Financial Officer, Attn: Conversion of Note, at the Company's offices at 105 Madison Ave., 13th Floor New York, NY 10016. Investors must include their full name, address, phone number, email address, and a clear statement that such Investor is irrevocably converting its Notes to units of Membership Interests of the Company. Such Note holder's written notice to the Company shall not become effective unless and until the Company provides a written acknowledgement to the Note holder of receipt of such decision by the Note holder. If the Company does not provide such written acknowledgment to any respective Note holder, such Note holder shall be considered to demand payment of the principal and accrued interest on the Notes. If any Note is required to be paid on the stated maturity date or accelerated, simple interest shall accrue at the rate of 10% per annum from the issuance date or interest payment date, as applicable, and through, and excluding, the maturity date or date of acceleration of such Note, and any interest paid, shall be paid at maturity.

(b)     Fractional Shares. No fractional shares shall be issued upon conversion of this Note. In the case of a calculation that would otherwise result in a fractional share, the value of the fractional shares shall be paid in cash.

GOVERNMENT
EXHIBIT
**3-C**
18-CR-20685

(c)   Payment. Unless this Note has been converted in accordance with the provisions of this Section 1 or accelerated, the entire outstanding principal amount of this Note and all accrued and unpaid interest on this Note up to, but excluding the Stated Maturity Date, shall become fully due and payable on September 22, 2021 (the "**Stated Maturity Date**"); provided that the Investor who holds this Note shall have the option to forgo such payment and instead convert this Note as provided herein.

2.     Investor Conversion Right.

Five business days prior to the stated maturity date (the "Notice Day"), Investors have the right to convert such Note to units of Membership Interests. Any election made after the Notice Day shall become null and void. On the Notice Day, if an Investor chooses to convert, such Investor must provide written notice to the Company of such decision. Such written notice shall be sent via certified mail to Chief Financial Officer, Attn: Conversion of Note, at the Company's offices at 105 Madison Ave., 13th Floor New York, NY 10016. You must include your full name, address, phone number, email address, Note information, and a clear statement that you are irrevocably converting your Notes to units of Membership Interests of the Company, and sign such notice. Such Investor's written notice to the Company shall not become effective unless and until the Company provides a written acknowledgement to the Investor of receipt of such decision by the Investor. If the Company does not provide such written acknowledgment to any respective Investor, such Investor shall be considered to demand payment of the principal and accrued and unpaid interest on the Notes. If any Note is required to be paid on the stated maturity date or accelerated, simple interest shall accrue at the rate of 10% per annum from the issuance date or interest payment date, as applicable, and through, and excluding, the maturity date or date of acceleration of such Note, and if any interest is paid, it shall be paid at maturity.

3.     Acceleration.

(a)   Event of Default. The occurrence of any one or more of the following shall constitute an "**Event of Default**": (i) nonpayment of interest or principal on a Note seven (7) business days after the stated interest payment date or maturity date, respectively; provided, however that the Company has not sent a written acknowledgment of conversion to such respective Holder, or (ii) bankruptcy of the Company.

(b)   Remedies. If there shall be any Event of Default, at the option and upon the declaration of the Investor and notice to the Company, this Note shall accelerate and the unpaid principal and then accrued and unpaid interest hereunder shall immediately become due and payable.

4.     Miscellaneous.

(a)   Governing Law. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict-of-law principles.

(b)   Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (i) when delivered personally, (ii) one business day after being deposited with an overnight courier service (costs prepaid), (iii) when sent by facsimile or e-mail if sent during normal business hours and on the next business day if sent after normal business hours, in each case with confirmation of transmission by the transmitting equipment, or (iv) when received or rejected by the

3

addressee, if sent by certified or registered mail, return receipt requested, postage prepaid, in each case to the addresses, facsimile numbers and e-mail addresses and marked to the attention of the person (by name or title) designated on the signature page hereto (or, in the case of notices and other communications to Investor, as indicated in the Company's records) or to such other address, facsimile number, e-mail address or person as such party may designate by a notice delivered to the other party hereto.

(c)    Amendments and Waivers.  This Note may be amended or waived in accordance with the provision of Section 7(h) of the Purchase Agreement.

(d)    Expenses; Waivers.  If action is instituted to collect this Note, the Company shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred in connection with such action.

(e)    Pari Passu Notes.  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all accrued and unpaid interest on this Note shall be pari passu in right of payment and in all other respects to the other Notes.  If Investor receives payments in excess of its/his/her pro rata share (determined on the basis of a fraction, the numerator of which is the then unpaid principal of this Note and the denominator of which is the then aggregate unpaid principal of all the Notes) of the Company's payments to all Investors, then Investor shall hold in trust all such excess payments for the benefit of the other Investors and shall pay such amounts held in trust to such other Investors upon demand by such Investors.

*(Signature Page Follows)*

4

IN WITNESS WHEREOF, the parties have caused this Convertible Promissory Note to be duly executed and issued as of the date first written above.

Domaine Select Wine & Spirits, LLC
a Delaware limited liability company

By: _____

Name:   EVIS SAUVIACS

Title:   INIC.2.M PRESIDENT

Address:   105 MADISON AVE 13TH F2
NY NY 10016

Telephone: ███████████

E-mail:   ESAUVIOC @ DOMAINESGCE.COM

ACCEPTED AND AGREED

By: _____

Name:

Title:

Address: _____
_____

Facsimile: _____

E-mail: _____

Attention: _____

*[Signature Page to Convertible Note]*

# NOTE PURCHASE AGREEMENT

Domaine Select Wine & Spirits, LLC, a Delaware limited liability company (the "*Company*"), and the undersigned persons and entities listed on Schedule A attached hereto (each, an "*Investor*" and collectively, the "*Investors*") are entering into this Note Purchase Agreement dated as of September 22, 2016 (this "*Agreement*").

## RECITAL

To provide the Company with additional resources to conduct its business, the Investors are willing to loan to the Company in one or more disbursements up to a maximum aggregate amount of $5,000,000.00, subject to the conditions specified herein.

## AGREEMENT

Now, therefore, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and each Investor, intending to be legally bound, hereby agree as follows:

1.  **Purchase and Sale of Notes**.

    a.  Issuance of Notes.  Subject to the terms and conditions hereof, the Company agrees to sell and issue, and each Investor severally agrees to purchase, a Series A Convertible Note in the form of Schedule B attached hereto (each, a "*Note*" and collectively, the "*Notes*") up to a maximum aggregate principal amount of $5,000,000.00 in one or more closings from time to time (each, a "*Closing*" and the first such Closing, the "*First Closing*"), which shall take place remotely via exchange of signatures and documents at such location and time and in such manner as shall be mutually agreed upon, orally or in writing, by the Company and the Investors purchasing a majority of the aggregate principal amount of the Notes at each such Closing (each such date, a "*Closing Date*" and the date of the First Closing, the "*First Closing Date*").  At each Closing, the Company will deliver to each Investor participating in such Closing a Note against receipt by the Company from such Investor of (i) in the case of the First Closing, the amount set forth opposite such Investor's name on Schedule A attached hereto, and (ii) in the case of all Closings occurring after the First Closing, the principal amount set forth in the corresponding Note delivered by the Company to such Investor (the "*Purchase Price*").  The Purchase Price shall be paid by check or wire transfer.  The Company may conduct Closings from time to time after September 22, 2016 to but not including the Maturity Date.  Each Note will be registered in the applicable Investor's name in the Company's records. The Investors' obligations to purchase the Notes are several and not joint.

    b.  Maturity Date.  The maturity date of each Note issued hereunder shall be September 22, 2021.

    c.  Payments.  The Company will make all cash payments due under each Note in immediately available funds by 3:00 p.m. (New York City Time) on the date such payment is due in the manner and at the address of the applicable Investor as specified on Schedule A attached hereto or at such other address as such Investor or other registered holder of such Note (each, a "*Holder*") may from time to time direct the Company in writing pursuant to Section 7(f).

2.  **Representations and Warranties of the Company**.  At the applicable Closing, the Company represents and warrants to each Investor purchasing a Note at such Closing as follows:

CONFIDENTIAL

a. _Due Incorporation, Qualification, etc._  The Company (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) has all requisite corporate power and authority to carry on its business as now conducted, and (iii) is duly qualified as a foreign limited liability company, and is in good standing, in the State of New York.

b. _Authority_.  All corporate action on the part of the Company necessary for the authorization, execution, delivery and performance by the Company of this Agreement and each Note (collectively, the "_Transaction Documents_") has been taken or will be taken before the applicable Closing.

c. _Enforceability_.  Each Transaction Document, when executed and delivered by the Company, shall constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except (i) as may be limited by bankruptcy, insolvency or other laws relating to or affecting creditors' rights generally and by general principles of equity, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (iii) to the extent that the enforceability of indemnification provisions may be limited by applicable laws.

d. _Noncontravention_.  The execution, delivery and performance by the Company of the Transaction Documents and the consummation of the transactions contemplated thereby will not, except as could not reasonably be expected to have a material adverse effect on the Company, (i) violate (x) the Company's Certificate of Incorporation or Bylaws, (y) any material order, writ, injunction, judgment or decree of any governmental authority applicable to the Company or any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound, or (z) to the Company's knowledge, any statute, rule or regulation applicable to the Company or (ii) result in the creation or imposition of any lien or other similar encumbrance (other than arising under the Transaction Documents) upon any assets of the Company.

3.  **Representations and Warranties of the Investors**.  At the applicable Closing, each Investor purchasing a Note at such Closing, for that Investor alone, represents and warrants to the Company as follows:

a. _Authority; Enforceability_.  Such Investor has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement, when executed and delivered by such Investor, shall constitute a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms, except (i) as may be limited by bankruptcy, insolvency or other laws relating to or affecting creditors' rights generally and by general principles of equity, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (iii) to the extent that the enforceability of indemnification provisions may be limited by applicable laws.

b. _Investment Intent_.  Such Investor is acquiring the Note and the equity securities issuable upon conversion of the Note (collectively, the "_Securities_") solely for investment for his or her own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling, transferring, granting any participation in, or otherwise distributing the same.  Such Investor does not have, with respect to any of the Securities, any contract, agreement, arrangement, commitment, undertaking or instrument, whether written or oral, with any individual, partnership, corporation (including a business trust), joint stock company, limited liability company, unincorporated association, joint venture or other entity or governmental authority to sell, transfer, grant participations or otherwise distribute the same to such person or to any third person.  Such Investor, if not an individual, has not been formed for the specific purpose of acquiring the Securities.

CONFIDENTIAL

c.  Disclosure of Information.  Such Investor has received, or has had full access to, all of the information he or she considers necessary or appropriate to make an informed investment decision with respect to the Securities.  Such Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and the business, management, properties and financial condition of the Company.

d.  Investment Experience.  Such Investor has experience as an investor in securities of companies in the development stage and is able to fend for himself or herself, can bear the economic risk of his or her investment and has such knowledge and experience in financial or business matters that he or she is capable of evaluating the merits and risks of his or her investment in the Securities and protecting his or her own interests in connection with such investment.  Such Investor acknowledges that any investment in the Securities involves an extremely high degree of risk and that the Company's future prospects are uncertain.  Such Investor is able, without materially impairing his or her financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of his or her investment.

e.  Accredited Investor.  Such Investor (i) is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D (see Schedule C for definition), as presently in effect, and (ii) has discussed with its legal and financial advisors the risks of such investment and such investor was advised that such investment is suitable.

f.  Compliance with Laws.  Such Investor is in compliance with any applicable state and federal securities regulations or laws.

4.  **Conditions to Obligations of the Investors.**  Each Investor's obligation to purchase one or more Notes at the applicable Closing is subject to the fulfillment, on or prior to the applicable Closing Date, of the following conditions, any of which may be waived, in whole or in part, by all Investors purchasing Notes at such Closing:

a.  Representations and Warranties.  The representations and warranties made by the Company in Section 3 shall be true and correct when made and on the applicable Closing Date.

b.  Governmental Approvals and Filings.  Except for any notices required or permitted to be filed after the applicable Closing Date with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

c.  Legal Requirements.  At the applicable Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Company or the Investors are subject.

d.  Transaction Documents.  The Company shall have duly executed and delivered to the applicable Investor this Agreement and each Note being issued to the applicable Investor hereunder.

5.  **Conditions to Obligations of the Company.**  The Company's obligation to sell and issue the Notes to each Investor at each applicable Closing is subject to the fulfillment, on or prior to the applicable Closing Date, of the following conditions, any of which may be waived, in whole or in part, by the Company:

a.  Representations and Warranties.  The representations and warranties made by the relevant Investor in Section 4 shall be true and correct when made and on the applicable Closing Date.

CONFIDENTIAL

b.  Governmental Approvals and Filings.  Except for any notices required or permitted to be filed after the applicable Closing Date with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

c.  Legal Requirements.  At the applicable Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Company or the Investors are subject.

d.  Transaction Documents; Purchase Price.  Each Investor shall have delivered to the Company (i) this Agreement duly executed by such Investor and (ii) the Purchase Price in respect of each Note being purchased by such Investor.

6.  **Restrictions on Transfer**.

a.  Restricted Securities.  Each Investor understands that the Securities have not been, and will not be, (i) registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of such Investor's investment intent and the accuracy of such Investor's representations and warranties as expressed herein or (ii) registered or qualified in any state in which they are offered.  Each Investor also understands that the Securities are "restricted securities" under applicable federal and state securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, pursuant to such laws, such Investor must hold the Securities indefinitely unless they are registered with the SEC and qualified by state authorities or an exemption from such registration and qualification requirements is available.  Each Investor acknowledges that the Company has no obligation to register or qualify the Securities for resale and that, if an exemption from registration or qualification is available, it may be conditioned on various requirements, including the time and manner of sale, the holding period for the securities and requirements relating to the Company which are outside of such Investor's control and which the Company is under no obligation, and may not be able, to satisfy.

b.  Further Limitations on Disposition.  Without in any way limiting the representations and warranties set forth herein, each Investor agrees not to make any sale or disposition of all or any portion of the Securities unless and until the transferee has agreed, in writing, for the benefit of the Company to be subject to all of the terms and conditions hereof to the same extent as if the transferee were the original holder of the Note and:

i.  there is then in effect a registration statement under the Securities Act covering such proposed disposition, and such disposition is made in accordance with such registration statement; or

ii.  such Investor shall have notified the Company of the proposed sale or disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed sale or disposition and, if reasonably requested by the Company, such Investor shall have furnished the Company with an opinion of counsel reasonably satisfactory to the Company that such sale or disposition will not require registration under the Securities Act or any applicable state securities laws; provided, however, that, except in unusual circumstances, no such opinion shall be required for sales or dispositions made in compliance with SEC Rule 144.

Notwithstanding the provisions of clauses (i) and (ii) above, no such registration statement or opinion of counsel shall be necessary for a transfer by (x) such Investor (if such Investor is a partnership or limited liability company) to a partner (or retired partner) or member (or retired member) of such Investor, or to the estate of any such partner, retired partner, member or retired member, or (y) gift, will or intestate

CONFIDENTIAL

succession to such Investor's spouse, siblings, lineal descendants or ancestors; provided, however, that the transferee agrees, in writing, to be subject to all of the terms and conditions hereof to the same extent as if the transferee were the original holder of the Note. The Company may issue stop-transfer instructions to its transfer agent in connection with the transfer restrictions set forth in this Agreement.

      c.   Registration, Exchange and Replacement of Notes. The Company will keep books for the registration (and registration of transfer) of the Notes. Prior to presentation of any Note for registration or transfer, the Company shall treat the person in whose name the Note is registered as the owner and holder of the Note for all purposes, whether or not the Note is overdue, and the Company shall not be affected by notice to the contrary. Subject to any restrictions on, or conditions to, transfer set forth herein, the holder may, at its option, in person or by duly authorized attorney, surrender the Note for exchange at the address listed on the signature page of the Company and, promptly thereafter, at the Company's expense, receive in exchange therefor one or more new notes for the same aggregate principal amount as the then unpaid principal amount of the Note so surrendered, dividing such unpaid principal amount among the new note or notes, as applicable, in the proportions so requested, in writing, by such holder or his or her duly authorized attorney, dated the date to which interest shall have been paid on the Note so surrendered (or, if no interest shall have yet been so paid, dated the date of the Note so surrendered) and registered in the name of such person or persons as shall have been designated, in writing, by such holder or his or her duly authorized attorney. Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of, and the loss, theft, destruction or mutilation of, a Note and either (i) the receipt of an indemnity acceptable to the Company (in the case of loss, theft or destruction) or (ii) surrender of such Note (in the case of mutilation), the Company shall, at its expense, execute and deliver in lieu of such Note a new note executed in the same manner as the Note being replaced, in the same principal amount as the then unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note (or, if no interest shall have yet been so paid, dated the date of such Note).

      d.   Lock-Up Agreement. Each Investor hereby agrees that he or she will not, during the period commencing on the date of the final prospectus relating to the registration by the Company for its own behalf of shares of its common stock or any other equity securities (the "Common Stock") under the Securities Act on a Form S-1 (excluding a registration relating solely to employee benefit plans on Form S-1) or Form S-3 and ending on the date specified by the Company and the underwriter(s) (such period not to exceed 180 days in the case of the Company's first underwritten public offering of its Common Stock under the Securities Act that includes securities to be sold on behalf of the Company to the public (the "Company IPO") or 90 days in the case of any registration other than the Company IPO, or such other period as may be requested by the Company or the underwriter(s) to accommodate regulatory restrictions on (x) the publication or other distribution of research reports and (y) analyst recommendations and opinions, including the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4) (or any successor provisions or amendments thereto), as applicable, (i) sell, dispose of, make any short sale of, offer, hypothecate, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any shares of Common Stock of the Company or other securities convertible into or exercisable or exchangeable (directly or indirectly) for shares of Common Stock of the Company whether such shares or other securities are then held by Investor or thereafter acquired (such shares and other securities, the "Lock-Up Shares") or (ii) enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Lock-Up Shares. The foregoing provisions of this Section 6(d): (A) shall not apply to the sale of any Lock-Up Shares to an underwriter pursuant to an underwriting agreement or to the transfer of any Lock-Up Shares by such Investor to any trust for the direct or indirect benefit of such Investor or an Immediate Family Member (as defined below) of such Investor (provided that the trustee of the trust agrees, in writing, to be bound by the restrictions set forth herein and provided further that any such

CONFIDENTIAL

transfer does not involve a disposition for value) and (B) shall be applicable to such Investor only if all directors and officers of the Company are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than 5% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of all outstanding shares of Preferred Stock). The underwriters for any registered offering described in this Section 6(d) are intended third party beneficiaries of this Section 6(d) and shall have the right, power and authority to enforce the provisions of this Section 6(d) as though they were parties hereto. Each Investor further agrees to execute such agreements as may be reasonably requested by the underwriter(s) in connection with any registered offering described in this Section 6(d) and that are consistent with this Section 6(d) or necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Lock-Up Shares until the end of such period. "*Immediate Family Member*" means a spouse or domestic partner, child or stepchild, grandchild, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, cousin, aunt, uncle, niece or nephew of a natural persons referred to herein. A person shall be deemed to be a "domestic partner" of another person if the two persons (i) reside in the same residence and plan to do so indefinitely, (ii) have resided together for at least one year, (iii) are each at least 18 years of age and mentally competent to consent to contract, (iv) are not blood relatives closer than would prohibit legal marriage in the state in which they reside, (v) are financially interdependent, as demonstrated to the Company's reasonable satisfaction, and (vi) have each been the sole spousal equivalent of the other for the year prior to the determination of "domestic partner" status and plan to remain so indefinitely; provided, however, that a person shall not be deemed to be a "domestic partner" if he or she is married to another person or has any other spousal equivalent.

7. **Miscellaneous**.

a. Survival. The representations, warranties, covenants and agreements made herein shall survive the execution and delivery hereof and the First Closing and shall in no way be affected by any investigation made by or on behalf of any party hereto.

b. Successors and Assigns. Subject to the restrictions on transfer described herein, the provisions hereof shall inure to the benefit of, and be binding upon, the respective successors, permitted assigns, heirs, executors, administrators and transferees of the parties hereto. Nothing herein, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors, permitted assigns, heirs, executors and administrators any rights, duties or obligations under or by reason of this Agreement, except as expressly provided herein.

c. Governing Law. This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict-of-law principles.

d. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

e. Interpretation. Capitalized terms shall have the meanings as defined herein, and the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined. For purposes of this Agreement, (x) words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (y) the word "or" is not exclusive, and (z) the

CONFIDENTIAL

words "herein," "hereof," "hereby," "hereto," "hereunder" and words of similar import refer to this Agreement as a whole.  Unless the context otherwise requires, references herein:  (i) to a Section or an Exhibit or Schedule means a Section or an Exhibit or Schedule of, or attached to, this Agreement; (ii) to agreements, instruments and other documents shall be deemed to include all subsequent amendments, supplements and other modifications thereto; (iii) to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation referred to; (iv) to any person includes such person's successors and assigns, but, if applicable, only if such successors and assigns are not prohibited by this Agreement; and (v) to any gender includes each other gender; (vi) to natural s shall be deemed to include artificial entities such as corporations, partnerships, trusts and limited liability companies.  The Schedules and Exhibits attached hereto shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  The titles, captions and headings herein are for convenience of reference only and shall not affect the meaning or interpretation hereof.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

f.  Notices.  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (i) when delivered if delivered by hand, (ii) one business day after being deposited with an overnight courier service (costs prepaid), (iii) when sent by facsimile or e-mail if sent during normal business hours and on the next business day if sent after normal business hours (New York time), in each case with confirmation of transmission by the transmitting equipment, or (iv) when received or rejected by the addressee, if sent by certified or registered mail, return receipt requested, postage prepaid, in each case to the addresses, facsimile numbers and e-mail addresses and marked to the attention of the Investor (by name or title) designated on Schedule B attached hereto or on the signature pages hereto (or, in the case of notices and other communications to an Investor, as indicated in the Company's records) or to such other address, facsimile number, e-mail address or as such party may designate by a notice delivered to the other parties hereto.

g.  Expenses.  Each party shall pay all of his/her/its own costs and expenses (including attorney's fees and disbursements) that he/she/it incurs with respect to the negotiation, execution and delivery of the Transaction Documents.

h.  Amendments and Waivers.  Any provision of this Agreement and the Notes issued hereunder may be amended or waived upon the written consent of the Company and holders who hold more than 50% of the aggregate then outstanding principal amount of the Notes (an "***Investor Majority***").  Any amendment or waiver effected in accordance with this Section 7(h) shall be binding upon all of the parties hereto; provided, however, that the Company shall promptly give written notice thereof to all holders who did not consent, in writing, to such amendment or waiver.  Notwithstanding the foregoing, (i) no amendment or waiver shall disproportionately reduce the amount of principal outstanding under any given Note without the written consent holder of such Note, (ii) no amendment or waiver of any provision of any Note shall be made unless all Notes are similarly amended or waived, as applicable, and (iii) this Agreement may be amended by the Company, without the consent of any Investor, to add parties as Investors hereunder in connection with Closings occurring after the First Closing (with any such amendment taking effect at the applicable Closing and any such additional parties being thereafter deemed as "Investors" for all purposes hereunder and added to Schedule A attached hereto).  Subject to the foregoing, the Investors and their respective successors and assigns acknowledge that, by operation of this Section 7(h), an Investor Majority will have the right and power to amend or waive any provision of any Note, whether or not the holder of such Note has specifically consented thereto and thus diminish or eliminate any rights of such Investor or reduce or eradicate any obligations of the Company.  No waivers of, or exceptions to, any term, condition or provision hereof, in any one or more instances, shall be

CONFIDENTIAL

deemed to be, or construed as, a further or continuing waiver of, or exception to, any such term, condition or provision.

      i.   Separability; Severability.  The Company's agreement with each Investor is a separate agreement, and the sale of Notes to each Investor is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of this Agreement or any part hereof by any Investor, whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement or any part hereof with respect to any other Investor.  Should any provision contained herein be held as invalid, illegal or unenforceable, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth herein.

      j.   Delays or Omissions.  Except as otherwise provided herein, no delay or omission to exercise any right, power or remedy accruing to any party hereunder upon any breach or default of any other party hereunder shall impair any such right, power or remedy of such nonbreaching or nondefaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of (or in) any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Subject to Section 7(f) and Section 7(h), any waiver, permit, consent or approval, of any kind or character on the part of any party, of any breach or default hereunder (or any waiver on the part of any party of any provisions or conditions hereof) must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either hereunder or by law or otherwise afforded to any party, shall be cumulative and not alternative.

      k.   Entire Agreement.  The Transaction Documents constitute the full and entire understanding and agreement of the parties hereto with respect to the subject matter contained therein and supersede any and all other communications, representations, agreements, understandings and letters of intent, whether written or oral, between or among any of the parties hereto with respect to the subject matter contained therein.

      l.   Further Assurances.  Each party hereto agrees to cooperate fully with the other parties hereto and to execute and deliver, or cause to be executed and delivered, such further agreements, instruments and documents and to give such further written assurance and take such further acts as may be reasonably requested by any other party hereto to evidence and reflect the transactions contemplated by the Transaction Documents and to carry into effect the intents and purposes of the Transaction Documents.

      m.   Waiver of Conflicts. Each Investor acknowledges that he/she (i) has read the Transaction Documents to which he/she is a party, (ii) has been represented in the preparation, negotiation and execution of the Transaction Documents to which he/she is a party by legal counsel of his/her own choice or has voluntarily declined to seek such legal counsel, and (iii) understands the terms and consequences of the Transaction Documents to which he/she/it is a party and is fully aware of the legal and binding effect thereof.  Each Investor understands that the Company has been represented in the preparation, negotiation and execution of the Transaction Documents by lawyers and that such lawyers has not represented any Investor (or any director, employee or stockholder of the Company or any Investor) in the preparation, negotiation and execution of any Transaction Document.

CONFIDENTIAL

n.  <u>Shareholder's Agreement</u>. The Notes make reference to a Shareholder's Agreement to which each Investor shall be bound if he/she exercises certain conversion rights described in Section 1 and 2 of the Notes.

(signature page follows)

CONFIDENTIAL

Intending to be legally bound, the undersigned have caused this Note Purchase Agreement to be duly executed and delivered.

COMPANY:

a Delaware limited liability company

By: _____

Name:  EULS SAUVIKS

Title:  Interim President

Date:  9/22/16

Address:  105 Madison Ave., 13th Flr

        New York, NY  10016

Telephone:  ████████

E-mail:  esauvides @ donahz3elect.com


INVESTOR:

By: _____

Name:

Title:

Date:

## Schedule A

### Schedule of Investors

| Name and Address of Investor | Note Amount |
|---|---|
| Global Securities Trade Finance | $1,000,000.00 |

Updated: September 22, 2016, and as may be further updated and amended by the Company from time to time.

## NOTE PURCHASE AGREEMENT

Domaine Select Wine & Spirits, LLC, a Delaware limited liability company (the "***Company***"), and the undersigned persons and entities listed on Schedule A attached hereto (each, an "***Investor***" and collectively, the "***Investors***") are entering into this Note Purchase Agreement dated as of October 18, 2017 (this "***Agreement***").

## RECITAL

To provide the Company with additional resources to conduct its business, the Investors are willing to loan to the Company in one or more disbursements up to a maximum aggregate amount of $10,000,000.00, subject to the conditions specified herein.

## AGREEMENT

Now, therefore, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and each Investor, intending to be legally bound, hereby agree as follows:

    1.    **Purchase and Sale of Notes**.

    a.  Issuance of Notes. Subject to the terms and conditions hereof, the Company agrees to sell and issue, and each Investor severally agrees to purchase, a Series A Convertible Note in the form of Schedule B attached hereto (each, a "*Note*" and collectively, the "*Notes*") up to a maximum aggregate principal amount of $10,000,000.00 in one or more closings from time to time (each, a "*Closing*" and the first such Closing, the "*First Closing*"), which shall take place remotely via exchange of signatures and documents at such location and time and in such manner as shall be mutually agreed upon, orally or in writing, by the Company and the Investors purchasing a majority of the aggregate principal amount of the Notes at each such Closing (each such date, a "*Closing Date*" and the date of the First Closing, the "*First Closing Date*"). At each Closing, the Company will deliver to each Investor participating in such Closing a Note against receipt by the Company from such Investor of (i) in the case of the First Closing, the amount set forth opposite such Investor's name on Schedule A attached hereto, and (ii) in the case of all Closings occurring after the First Closing, the principal amount set forth in the corresponding Note delivered by the Company to such Investor (the "*Purchase Price*"). The Purchase Price shall be paid by check or wire transfer. The Company may conduct Closings from time to time after October 18, 2017 to but not including the Maturity Date. Each Note will be registered in the applicable Investor's name in the Company's records. The Investors' obligations to purchase the Notes are several and not joint.

    b.  Maturity Date. The maturity date of each Note issued hereunder shall be February 22, 2022.

    c.  Payments. The Company will make all cash payments due under each Note in immediately available funds by 3:00 p.m. (New York City Time) on the date such payment is due in the manner and at the address of the applicable Investor as specified on Schedule A attached hereto or at such other address as such Investor or other registered holder of such Note (each, a "*Holder*") may from time to time direct the Company in writing pursuant to Section 7(f).

    2.    **Representations and Warranties of the Company**. At the applicable Closing, the Company represents and warrants to each Investor purchasing a Note at such Closing as follows:

GOVERNMENT
EXHIBIT
**3-D**
18-CR-20685

CONFIDENTIAL

a. <u>Due Incorporation, Qualification, etc</u>. The Company (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) has all requisite corporate power and authority to carry on its business as now conducted, and (iii) is duly qualified as a foreign limited liability company, and is in good standing, in the State of New York.

b. <u>Authority</u>. All corporate action on the part of the Company necessary for the authorization, execution, delivery and performance by the Company of this Agreement and each Note (collectively, the "*Transaction Documents*") has been taken or will be taken before the applicable Closing.

c. <u>Enforceability</u>. Each Transaction Document, when executed and delivered by the Company, shall constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except (i) as may be limited by bankruptcy, insolvency or other laws relating to or affecting creditors' rights generally and by general principles of equity, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (iii) to the extent that the enforceability of indemnification provisions may be limited by applicable laws.

d. <u>Noncontravention</u>. The execution, delivery and performance by the Company of the Transaction Documents and the consummation of the transactions contemplated thereby will not, except as could not reasonably be expected to have a material adverse effect on the Company, (i) violate (x) the Company's Certificate of Incorporation or Bylaws, (y) any material order, writ, injunction, judgment or decree of any governmental authority applicable to the Company or any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound, or (z) to the Company's knowledge, any statute, rule or regulation applicable to the Company or (ii) result in the creation or imposition of any lien or other similar encumbrance (other than arising under the Transaction Documents) upon any assets of the Company.

3. **Representations and Warranties of the Investors**. At the applicable Closing, each Investor purchasing a Note at such Closing, for that Investor alone, represents and warrants to the Company as follows:

a. <u>Authority; Enforceability</u>. Such Investor has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement, when executed and delivered by such Investor, shall constitute a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms, except (i) as may be limited by bankruptcy, insolvency or other laws relating to or affecting creditors' rights generally and by general principles of equity, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (iii) to the extent that the enforceability of indemnification provisions may be limited by applicable laws.

b. <u>Investment Intent</u>. Such Investor is acquiring the Note and the equity securities issuable upon conversion of the Note (collectively, the "*Securities*") solely for investment for his or her own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling, transferring, granting any participation in, or otherwise distributing the same. Such Investor does not have, with respect to any of the Securities, any contract, agreement, arrangement, commitment, undertaking or instrument, whether written or oral, with any individual, partnership, corporation (including a business trust), joint stock company, limited liability company, unincorporated association, joint venture or other entity or governmental authority to sell, transfer, grant participations or otherwise distribute the same to such person or to any third person. Such Investor, if not an individual, has not been formed for the specific purpose of acquiring the Securities.

CONFIDENTIAL

    c. <u>Disclosure of Information</u>. Such Investor has received, or has had full access to, all of the information he or she considers necessary or appropriate to make an informed investment decision with respect to the Securities.  Such Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and the business, management, properties and financial condition of the Company.

    d. <u>Investment Experience</u>. Such Investor has experience as an investor in securities of companies in the development stage and is able to fend for himself or herself, can bear the economic risk of his or her investment and has such knowledge and experience in financial or business matters that he or she is capable of evaluating the merits and risks of his or her investment in the Securities and protecting his or her own interests in connection with such investment.  Such Investor acknowledges that any investment in the Securities involves an extremely high degree of risk and that the Company's future prospects are uncertain.  Such Investor is able, without materially impairing his or her financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of his or her investment.

    e. <u>Accredited Investor</u>.  Such Investor (i) is an "accredited investor" within the meaning of Securities and Exchange Commission ("*SEC*") Rule 501 of Regulation D (see <u>Schedule C</u> for definition), as presently in effect, and (ii) has discussed with its legal and financial advisors the risks of such investment and such investor was advised that such investment is suitable.

    f. <u>Compliance with Laws</u>. Such Investor is in compliance with any applicable state and federal securities regulations or laws.

  4. **Conditions to Obligations of the Investors**.  Each Investor's obligation to purchase one or more Notes at the applicable Closing is subject to the fulfillment, on or prior to the applicable Closing Date, of the following conditions, any of which may be waived, in whole or in part, by all Investors purchasing Notes at such Closing:

    a. <u>Representations and Warranties</u>. The representations and warranties made by the Company in <u>Section 3</u> shall be true and correct when made and on the applicable Closing Date.

    b. <u>Governmental Approvals and Filings</u>.  Except for any notices required or permitted to be filed after the applicable Closing Date with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

    c. <u>Legal Requirements</u>.  At the applicable Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Company or the Investors are subject.

    d. <u>Transaction Documents</u>.  The Company shall have duly executed and delivered to the applicable Investor this Agreement and each Note being issued to the applicable Investor hereunder.

  5. **Conditions to Obligations of the Company**.  The Company's obligation to sell and issue the Notes to each Investor at each applicable Closing is subject to the fulfillment, on or prior to the applicable Closing Date, of the following conditions, any of which may be waived, in whole or in part, by the Company:

    a. <u>Representations and Warranties</u>.  The representations and warranties made by the relevant Investor in <u>Section 4</u> shall be true and correct when made and on the applicable Closing Date.

    CONFIDENTIAL

b. Governmental Approvals and Filings. Except for any notices required or permitted to be filed after the applicable Closing Date with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

c. Legal Requirements. At the applicable Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Company or the Investors are subject.

d. Transaction Documents; Purchase Price. Each Investor shall have delivered to the Company (i) this Agreement duly executed by such Investor and (ii) the Purchase Price in respect of each Note being purchased by such Investor.

6. **Restrictions on Transfer**.

a. Restricted Securities. Each Investor understands that the Securities have not been, and will not be, (i) registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of such Investor's investment intent and the accuracy of such Investor's representations and warranties as expressed herein or (ii) registered or qualified in any state in which they are offered. Each Investor also understands that the Securities are "restricted securities" under applicable federal and state securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, pursuant to such laws, such Investor must hold the Securities indefinitely unless they are registered with the SEC and qualified by state authorities or an exemption from such registration and qualification requirements is available. Each Investor acknowledges that the Company has no obligation to register or qualify the Securities for resale and that, if an exemption from registration or qualification is available, it may be conditioned on various requirements, including the time and manner of sale, the holding period for the securities and requirements relating to the Company which are outside of such Investor's control and which the Company is under no obligation, and may not be able, to satisfy.

b. Further Limitations on Disposition. Without in any way limiting the representations and warranties set forth herein, each Investor agrees not to make any sale or disposition of all or any portion of the Securities unless and until the transferee has agreed, in writing, for the benefit of the Company to be subject to all of the terms and conditions hereof to the same extent as if the transferee were the original holder of the Note and:

i. there is then in effect a registration statement under the Securities Act covering such proposed disposition, and such disposition is made in accordance with such registration statement; or

ii. such Investor shall have notified the Company of the proposed sale or disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed sale or disposition and, if reasonably requested by the Company, such Investor shall have furnished the Company with an opinion of counsel reasonably satisfactory to the Company that such sale or disposition will not require registration under the Securities Act or any applicable state securities laws; provided, however, that, except in unusual circumstances, no such opinion shall be required for sales or dispositions made in compliance with SEC Rule 144.

Notwithstanding the provisions of clauses (i) and (ii) above, no such registration statement or opinion of counsel shall be necessary for a transfer by (x) such Investor (if such Investor is a partnership or limited liability company) to a partner (or retired partner) or member (or retired member) of such Investor, or to the estate of any such partner, retired partner, member or retired member, or (y) gift, will or intestate

 CONFIDENTIAL

succession to such Investor's spouse, siblings, lineal descendants or ancestors; provided, however, that the transferee agrees, in writing, to be subject to all of the terms and conditions hereof to the same extent as if the transferee were the original holder of the Note. The Company may issue stop-transfer instructions to its transfer agent in connection with the transfer restrictions set forth in this Agreement.

c. Registration, Exchange and Replacement of Notes. The Company will keep books for the registration (and registration of transfer) of the Notes. Prior to presentation of any Note for registration or transfer, the Company shall treat the person in whose name the Note is registered as the owner and holder of the Note for all purposes, whether or not the Note is overdue, and the Company shall not be affected by notice to the contrary. Subject to any restrictions on, or conditions to, transfer set forth herein, the holder may, at its option, in person or by duly authorized attorney, surrender the Note for exchange at the address listed on the signature page of the Company and, promptly thereafter, at the Company's expense, receive in exchange therefor one or more new notes for the same aggregate principal amount as the then unpaid principal amount of the Note so surrendered, dividing such unpaid principal amount among the new note or notes, as applicable, in the proportions so requested, in writing, by such holder or his or her duly authorized attorney, dated the date to which interest shall have been paid on the Note so surrendered (or, if no interest shall have yet been so paid, dated the date of the Note so surrendered) and registered in the name of such person or persons as shall have been designated, in writing, by such holder or his or her duly authorized attorney. Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of, and the loss, theft, destruction or mutilation of, a Note and either (i) the receipt of an indemnity acceptable to the Company (in the case of loss, theft or destruction) or (ii) surrender of such Note (in the case of mutilation), the Company shall, at its expense, execute and deliver in lieu of such Note a new note executed in the same manner as the Note being replaced, in the same principal amount as the then unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note (or, if no interest shall have yet been so paid, dated the date of such Note).

d. Lock-Up Agreement. Each Investor hereby agrees that he or she will not, during the period commencing on the date of the final prospectus relating to the registration by the Company for its own behalf of shares of its common stock or any other equity securities (the "Common Stock") under the Securities Act on a Form S-1 (excluding a registration relating solely to employee benefit plans on Form S-1) or Form S-3 and ending on the date specified by the Company and the underwriter(s) (such period not to exceed 180 days in the case of the Company's first underwritten public offering of its Common Stock under the Securities Act that includes securities to be sold on behalf of the Company to the public (the "*Company IPO*") or 90 days in the case of any registration other than the Company IPO, or such other period as may be requested by the Company or the underwriter(s) to accommodate regulatory restrictions on (x) the publication or other distribution of research reports and (y) analyst recommendations and opinions, including the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4) (or any successor provisions or amendments thereto), as applicable), (i) sell, dispose of, make any short sale of, offer, hypothecate, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any shares of Common Stock of the Company or other securities convertible into or exercisable or exchangeable (directly or indirectly) for shares of Common Stock of the Company whether such shares or other securities are then held by Investor or thereafter acquired (such shares and other securities, the "*Lock-Up Shares*") or (ii) enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Lock-Up Shares. The foregoing provisions of this Section 6(d): (A) shall not apply to the sale of any Lock-Up Shares to an underwriter pursuant to an underwriting agreement or to the transfer of any Lock-Up Shares by such Investor to any trust for the direct or indirect benefit of such Investor or an Immediate Family Member (as defined below) of such Investor (provided that the trustee of the trust agrees, in writing, to be bound by the restrictions set forth herein and provided further that any such transfer does not involve a disposition for value) and (B) shall be applicable to such Investor only if all directors and officers of the Company are subject to the

CONFIDENTIAL

same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than 5% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of all outstanding shares of Preferred Stock). The underwriters for any registered offering described in this Section 6(d) are intended third party beneficiaries of this Section 6(d) and shall have the right, power and authority to enforce the provisions of this Section 6(d) as though they were parties hereto. Each Investor further agrees to execute such agreements as may be reasonably requested by the underwriter(s) in connection with any registered offering described in this Section 6(d) and that are consistent with this Section 6(d) or necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Lock-Up Shares until the end of such period. "*Immediate Family Member*" means a spouse or domestic partner, child or stepchild, grandchild, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, cousin, aunt, uncle, niece or nephew of a natural persons referred to herein. A person shall be deemed to be a "domestic partner" of another person if the two persons (i) reside in the same residence and plan to do so indefinitely, (ii) have resided together for at least one year, (iii) are each at least 18 years of age and mentally competent to consent to contract, (iv) are not blood relatives closer than would prohibit legal marriage in the state in which they reside, (v) are financially interdependent, as demonstrated to the Company's reasonable satisfaction, and (vi) have each been the sole spousal equivalent of the other for the year prior to the determination of "domestic partner" status and plan to remain so indefinitely; provided, however, that a person shall not be deemed to be a "domestic partner" if he or she is married to another person or has any other spousal equivalent.

7. **Miscellaneous**.

a. Survival. The representations, warranties, covenants and agreements made herein shall survive the execution and delivery hereof and the First Closing and shall in no way be affected by any investigation made by or on behalf of any party hereto.

b. Successors and Assigns. Subject to the restrictions on transfer described herein, the provisions hereof shall inure to the benefit of, and be binding upon, the respective successors, permitted assigns, heirs, executors, administrators and transferees of the parties hereto. Nothing herein, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors, permitted assigns, heirs, executors and administrators any rights, duties or obligations under or by reason of this Agreement, except as expressly provided herein.

c. Governing Law. This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict-of-law principles.

d. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

e. Interpretation. Capitalized terms shall have the meanings as defined herein, and the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined. For purposes of this Agreement, (x) words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (y) the word "or" is not exclusive, and (z) the words "herein," "hereof," "hereby," "hereto," "hereunder" and words of similar import refer to this Agreement as

CONFIDENTIAL

a whole. Unless the context otherwise requires, references herein: (i) to a Section or an Exhibit or Schedule means a Section or an Exhibit or Schedule of, or attached to, this Agreement; (ii) to agreements, instruments and other documents shall be deemed to include all subsequent amendments, supplements and other modifications thereto; (iii) to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation referred to; (iv) to any person includes such person's successors and assigns, but, if applicable, only if such successors and assigns are not prohibited by this Agreement; and (v) to any gender includes each other gender; (vi) to natural s shall be deemed to include artificial entities such as corporations, partnerships, trusts and limited liability companies. The Schedules and Exhibits attached hereto shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. The titles, captions and headings herein are for convenience of reference only and shall not affect the meaning or interpretation hereof. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

f.  Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (i) when delivered if delivered by hand, (ii) one business day after being deposited with an overnight courier service (costs prepaid), (iii) when sent by facsimile or e-mail if sent during normal business hours and on the next business day if sent after normal business hours (New York time), in each case with confirmation of transmission by the transmitting equipment, or (iv) when received or rejected by the addressee, if sent by certified or registered mail, return receipt requested, postage prepaid, in each case to the addresses, facsimile numbers and e-mail addresses and marked to the attention of the Investor (by name or title) designated on Schedule B attached hereto or on the signature pages hereto (or, in the case of notices and other communications to an Investor, as indicated in the Company's records) or to such other address, facsimile number, e-mail address or as such party may designate by a notice delivered to the other parties hereto.

g.  Expenses. Each party shall pay all of his/her/its own costs and expenses (including attorney's fees and disbursements) that he/she/it incurs with respect to the negotiation, execution and delivery of the Transaction Documents.

h.  Amendments and Waivers. Any provision of this Agreement and the Notes issued hereunder may be amended or waived upon the written consent of the Company and holders who hold more than 50% of the aggregate then outstanding principal amount of the Notes (an "*Investor Majority*"). Any amendment or waiver effected in accordance with this Section 7(h) shall be binding upon all of the parties hereto; provided, however, that the Company shall promptly give written notice thereof to all holders who did not consent, in writing, to such amendment or waiver. Notwithstanding the foregoing, (i) no amendment or waiver shall disproportionately reduce the amount of principal outstanding under any given Note without the written consent holder of such Note, (ii) no amendment or waiver of any provision of any Note shall be made unless all Notes are similarly amended or waived, as applicable, and (iii) this Agreement may be amended by the Company, without the consent of any Investor, to add parties as Investors hereunder in connection with Closings occurring after the First Closing (with any such amendment taking effect at the applicable Closing and any such additional parties being thereafter deemed as "Investors" for all purposes hereunder and added to Schedule A attached hereto). Subject to the foregoing, the Investors and their respective successors and assigns acknowledge that, by operation of this Section 7(h), an Investor Majority will have the right and power to amend or waive any provision of any Note, whether or not the holder of such Note has specifically consented thereto and thus diminish or eliminate any rights of such Investor or reduce or eradicate any obligations of the Company. No waivers of, or exceptions to, any term, condition or provision hereof, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of, or exception to, any such term, condition or provision.

                                                                                     CONFIDENTIAL

i.    Separability; Severability.  The Company's agreement with each Investor is a separate agreement, and the sale of Notes to each Investor is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of this Agreement or any part hereof by any Investor, whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement or any part hereof with respect to any other Investor.  Should any provision contained herein be held as invalid, illegal or unenforceable, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth herein.

j.    Delays or Omissions.  Except as otherwise provided herein, no delay or omission to exercise any right, power or remedy accruing to any party hereunder upon any breach or default of any other party hereunder shall impair any such right, power or remedy of such nonbreaching or nondefaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of (or in) any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Subject to Section 7(f) and Section 7(h), any waiver, permit, consent or approval, of any kind or character on the part of any party, of any breach or default hereunder (or any waiver on the part of any party of any provisions or conditions hereof) must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either hereunder or by law or otherwise afforded to any party, shall be cumulative and not alternative.

k.    Entire Agreement.  The Transaction Documents constitute the full and entire understanding and agreement of the parties hereto with respect to the subject matter contained therein and supersede any and all other communications, representations, agreements, understandings and letters of intent, whether written or oral, between or among any of the parties hereto with respect to the subject matter contained therein.

l.    Further Assurances.  Each party hereto agrees to cooperate fully with the other parties hereto and to execute and deliver, or cause to be executed and delivered, such further agreements, instruments and documents and to give such further written assurance and take such further acts as may be reasonably requested by any other party hereto to evidence and reflect the transactions contemplated by the Transaction Documents and to carry into effect the intents and purposes of the Transaction Documents.

m.    Waiver of Conflicts.  Each Investor acknowledges that he/she (i) has read the Transaction Documents to which he/she is a party, (ii) has been represented in the preparation, negotiation and execution of the Transaction Documents to which he/she is a party by legal counsel of his/her own choice or has voluntarily declined to seek such legal counsel, and (iii) understands the terms and consequences of the Transaction Documents to which he/she/it is a party and is fully aware of the legal and binding effect thereof.  Each Investor understands that the Company has been represented in the preparation, negotiation and execution of the Transaction Documents by lawyers and that such lawyers has not represented any Investor (or any director, employee or stockholder of the Company or any Investor) in the preparation, negotiation and execution of any Transaction Document.

n.    Shareholder's Agreement.  The Notes make reference to a Shareholder's Agreement to which each Investor shall be bound if he/she exercises certain conversion rights described in Section 1 and 2 of the Notes.

(signature page follows)

CONFIDENTIAL

Intending to be legally bound, the undersigned have caused this Note Purchase Agreement to be duly executed and delivered.

**COMPANY:**

a Delaware limited liability company

By: _____

Name: Allison Domeneghetti

Title: Member

Date: October 18, 2017

Address: 105 Madison Ave, 13th Floor
New York, NY 10016

Telephone: ▮▮▮▮▮▮▮▮▮▮▮▮

E-mail: ADomeneghetti@domainreselock.com

**INVESTOR:**

**GUSTAVO HERNANDEZ**

By: _____

Name:

Title:

Date: October 18, 2017

**SERIES A CONVERTIBLE NOTES**

$1,000,000                                                                                    October 18, 2017

FOR VALUE RECEIVED, Domaine Select Wine & Spirits, LLC, a Delaware limited liability company (the "***Company***"), promises to pay on February 22, 2022, to Gustavo Hernandez, ("***Investor***"), in lawful money of the United States of America, the principal sum of THREE HUNDRED TWENTY FIVE THOUSAND, EIGHT HUNDRED AND THIRTY THREE DOLLARS AND THIRTY THREE CENTS ($325,823.33), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from, and including, the date of this Series A Convertible Promissory Note (this "***Note***") until paid in full on the unpaid principal balance at an accrual rate equal to 10% per annum, computed on simple interest.

This Note to be issued by the Company pursuant to the terms of that certain Note Purchase Agreement dated as of February 22, 2017 (the "***Purchase Agreement***") to the persons and entities identified therein as Investors (collectively, the "***Investors***") References herein to an "***Investor***" refers to the particular Investor that holds this Note. All payments of principal and interest under this Note shall be made pro rata among all Investors. All payments shall be applied first to accrued and unpaid interest and, thereafter, to principal.

Other than as specifically provided herein, this Note may not be prepaid, in whole or in part, without the prior written consent of an Investor Majority (as defined in the Purchase Agreement).

1.      Conversion.

      (a)      Five business days prior to the stated maturity date (the "Notice Day"), investors will have the right to convert such Note to units of Membership Interests. On the Notice Day, if a Note holder chooses to convert, such Note holder must provide written notice to the Company of such decision. Such written notice shall be sent via certified mail to the attention of Chief Financial Officer, Attn: Conversion of Note, at the Company's offices at 105 Madison Ave., 13th Floor New York, NY 10016. Investors must include their full name, address, phone number, email address, and a clear statement that such Investor is irrevocably converting its Notes to units of Membership Interests of the Company. Such Note holder's written notice to the Company shall not become effective unless and until the Company provides a written acknowledgement to the Note holder of receipt of such decision by the Note holder. If the Company does not provide such written acknowledgment to any respective Note holder, such Note holder shall be considered to demand payment of the principal and accrued interest on the Notes. If any Note is required to be paid on the stated maturity date or accelerated, simple interest shall accrue at the rate of 10% per annum from the issuance date or interest payment date, as applicable, and through, and excluding, the maturity date or date of acceleration of such Note, and any interest paid, shall be paid at maturity.

      (b)      <u>Fractional Shares</u>. No fractional shares shall be issued upon conversion of this Note. In the case of a calculation that would otherwise result in a fractional share, the value of the fractional shares shall be paid in cash.

      (c)      <u>Payment</u>. Unless this Note has been converted in accordance with the provisions of this <u>Section 1</u> or accelerated, the entire outstanding principal amount of this Note and all accrued and unpaid interest on this Note up to, but excluding the Stated Maturity Date,

2

shall become fully due and payable on February 22, 2022 (the "***Stated Maturity Date***"); provided that the Investor who holds this Note shall have the option to forgo such payment and instead convert this Note as provided herein.

2.     Investor Conversion Right.

Five business days prior to the stated maturity date (the "Notice Day"), Investors have the right to convert such Note to units of Membership Interests. Any election made after the Notice Day shall become null and void. On the Notice Day, if an Investor chooses to convert, such Investor must provide written notice to the Company of such decision. Such written notice shall be sent via certified mail to Chief Financial Officer, Attn: Conversion of Note, at the Company's offices at 105 Madison Ave., 13th Floor New York, NY 10016. You must include your full name, address, phone number, email address, Note information, and a clear statement that you are irrevocably converting your Notes to units of Membership Interests of the Company, and sign such notice. Such Investor's written notice to the Company shall not become effective unless and until the Company provides a written acknowledgement to the Investor of receipt of such decision by the Investor. If the Company does not provide such written acknowledgment to any respective Investor, such Investor shall be considered to demand payment of the principal and accrued and unpaid interest on the Notes. If any Note is required to be paid on the stated maturity date or accelerated, simple interest shall accrue at the rate of 10% per annum from the issuance date or interest payment date, as applicable, and through, and excluding, the maturity date or date of acceleration of such Note, and if any interest is paid, it shall be paid at maturity.

3.     Acceleration.

(a)     Event of Default. The occurrence of any one or more of the following shall constitute an "***Event of Default***": (i) nonpayment of interest or principal on a Note seven (7) business days after the stated interest payment date or maturity date, respectively; provided, however that the Company has not sent a written acknowledgment of conversion to such respective Holder, or (ii) bankruptcy of the Company.

(b)     Remedies. If there shall be any Event of Default, at the option and upon the declaration of the Investor and notice to the Company, this Note shall accelerate and the unpaid principal and then accrued and unpaid interest hereunder shall immediately become due and payable.

4.     Miscellaneous.

(a)     Governing Law. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict-of-law principles.

(b)     Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (i) when delivered personally, (ii) one business day after being deposited with an overnight courier service (costs prepaid), (iii) when sent by facsimile or e-mail if sent during normal business hours and on the next business day if sent after normal business hours, in each case with confirmation of transmission by the transmitting equipment, or (iv) when received or rejected by the addressee, if sent by certified or registered mail, return receipt requested, postage prepaid, in each case to the addresses, facsimile numbers and e-mail addresses and marked to the attention of the person (by name or title) designated on the signature page hereto (or, in the case of notices and other communications to Investor, as indicated in the Company's

records) or to such other address, facsimile number, e-mail address or person as such party may designate by a notice delivered to the other party hereto.

(c)     Amendments and Waivers.  This Note may be amended or waived in accordance with the provision of Section 7(h) of the Purchase Agreement.

(d)     Expenses; Waivers.  If action is instituted to collect this Note, the Company shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred in connection with such action.

(e)     Pari Passu Notes.  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all accrued and unpaid interest on this Note shall be pari passu in right of payment and in all other respects to the other Notes.  If Investor receives payments in excess of its/his/her pro rata share (determined on the basis of a fraction, the numerator of which is the then unpaid principal of this Note and the denominator of which is the then aggregate unpaid principal of all the Notes) of the Company's payments to all Investors, then Investor shall hold in trust all such excess payments for the benefit of the other Investors and shall pay such amounts held in trust to such other Investors upon demand by such Investors.

*(Signature Page Follows)*

4

IN WITNESS WHEREOF, the parties have caused this Convertible Promissory Note to be duly executed and issued as of the date first written above.

Domaine Select Wine & Spirits, LLC
a Delaware limited liability company

By: _____

Name: Allison Domeneghetti

Title: member

Address: 105 Madison Ave, 13th Floor
New York, NY 10016

Telephone: ███████████

E-mail: ADomeneghetti@domaineselect.com

**ACCEPTED AND AGREED**

By: _____

Name: Gustavo Hernandez

Title: Legal Representative

Address: 3 Gramercy Park West Apt 1

New York, NY 10003

Facsimile: _____

E-mail: ghernandez@gsadvisors.net

Attention: _____

*[Signature Page to Convertible Note]*

**GSTF - CLASS C**
**City National Bank x6054**

| Date Posted | Counterparty (CP) | CP Bank | CP Acct | Memo | Outgoing Funds |
|---|---|---|---|---|---|
| 06/15/2016 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice: PF0616; 1% Placement Fee for GSTF Class C (1% of $7mm) | ($70,000.00) |
| 08/01/2016 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice 0085 MF 0816 C Class | ($7,000.00) |
| 11/01/2016 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF C 1116 November 2016 Management Fee | ($7,000.00) |
| 12/01/2016 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF-C 1216 December 2016 Management Fee USD 7 000.00 | ($7,000.00) |
| 01/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice MF0117C January 2016 GSTF C Management Fee | ($7,000.00) |
| 02/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF C 0217 February 2017 GSTF Class C Management Fee | ($7,000.00) |
| 03/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF C 0317 March 2017 Management Fee | ($7,000.00) |
| 04/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF C 0417 April 2017 Management Fee USD 8586 49 | ($8,586.49) |
| 05/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF 0517 May 2017 management Fee USD 8000 | ($8,000.00) |
| 06/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Inv GSTF C 0617 June 2017 Management Fee Advance USD 8000 | ($8,000.00) |
| 07/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | INV GSTF C 0717 July 2017 Management Fee Advance USD 8000 | ($8,000.00) |
| 08/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF 0817 August 2017 Management Fee Advance | ($8,000.00) |
| 09/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF C 0917 September 2017 Management Fee Advance | ($8,000.00) |
| 10/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 11/02/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 12/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 01/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 02/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 03/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 04/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 05/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| 06/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($8,000.00) |
| | | | | **TOTAL** | **($232,586.49)** |

GOVERNMENT
EXHIBIT
**3-E**
18-CR-20685

**GSTF - CLASS D**
**City National Bank x2421**

| Date Posted | Counterparty (CP) | CP Bank | CP Acct | Memo | Outgoing Funds |
|---|---|---|---|---|---|
| 06/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Inv GSTF D 0617 June 2017 Management Fee Advance 5000 | ($5,000.00) |
| 07/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | INV GSTF D 0717 July 2017 Management Fee Advance USD 5000 | ($5,000.00) |
| 08/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF D 0817 August 2017 Management Fee Advance | ($5,000.00) |
| 09/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | Invoice GSTF D 0917 September 2017 Management Fee Advance | ($5,000.00) |
| 10/03/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 11/02/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 12/01/2017 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 01/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 02/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 03/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 04/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 05/02/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| 06/01/2018 | Global Securities Advisors GP | Wells Fargo | x1939 | (blank) | ($5,000.00) |
| | | | | **TOTAL** | **($65,000.00)** |

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL ACTION

KRONOS HOLDINGS INVESTMENTS, LLC,

      Judgment Creditor,

v.

GLOBAL SECURITIES HOLDINGS, LLC
and CESAR HERNANDEZ,

      Judgment Debtor.              CASE NO.: 2014-19185-CA-01 (05)

v.

CESAR HERNANDEZ; TULIA HERNANDEZ;
GUSTAVO ADOLFO HERNANDEZ FRIERI;
OLYMPIA DE CASTRO; CESAR HERNANDEZ,
JR.; GLOBAL SECURITIES ADVISORS GP,
LLC; GLOBAL STRATEGIC INVESTMENTS,
LLC; GLOBAL FINANCE MANAGEMENT
CORP.; and GLOBAL SECURITIES
MANAGEMENT, LLC.

      Supplemental Defendants.
_____/

**DEFENDANT, GLOBAL SECURITIES ADVISORS GP, LLC'S ANSWERS AND
OBJECTIONS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

      Defendant, Global Securities Advisors GP, LLC, ("Advisors"), pursuant to Fla. R.

Civ. P. 1.340, hereby responds to Plaintiff's Second Set of Interrogatories ("the

Interrogatories").

**GENERAL OBJECTIONS**

      1.    Advisors objects to the Interrogatories to the extent that they require

Advisors to provide information or to perform acts beyond those required by the Florida

Rules of Civil Procedure.

GOVERNMENT
EXHIBIT
**3-F**
18-CR-20685

2.      Advisors objects to the Interrogatories to the extent that they require the
disclosure of any information protected from discovery by the attorney/client privilege
and/or the work-product doctrine.  Advisors shall produce no information immune from
discovery pursuant to any recognized privilege or doctrine.

3.      Advisors objects to the Interrogatories to the extent that they require the
disclosure of any confidential and/or proprietary information.  Advisors shall produce
responsive information only pursuant to an appropriate protective order limiting the use
and dissemination of confidential or proprietary information.

<u>INTERROGATORIES</u>

1.      (i) Identify the recipients of each of the following payments, and (ii)
describe in detail the reason that Advisors made the payment:

| TRANSFERS FROM ADVISORS 01/11/18 - 04/30/18 ||
|---|---|
| **Date** | **Amount** |
| 01/23/18 | $17,500.00 |
| 02/01/18 | $2,500.00 |
| 02/01/18 | $8,000.00 |
| 02/06/18 | $3,000.00 |
| 02/07/18 | $10,000.00 |
| 02/16/18 | $11,000.00 |
| 03/01/18 | $5,275.00 |
| 03/01/18 | $8,000.00 |
| 03/07/18 | $10,000.00 |
| 03/07/18 | $6,000.00 |
| 03/12/18 | $1,305.00 |
| 04/02/18 | $19,200.00 |
| 04/02/18 | $8,000.00 |
| 04/06/18 | $48,456.19 |
| 04/19/18 | $3,100.00 |
| 04/30/18 | $10,000.00 |
| 04/30/18 | $25,000.00 |
| 04/30/18 | $14,000.00 |

<u>ANSWER:</u>

2

1.      Advisors is managed by Gustavo Hernandez, the sole employee of Advisors since its inception. All the income received by Advisors is solely attributable to the advisory work rendered by Mr. Hernandez. As the sole director and the sole employee of Advisors, Mr. Hernandez instructs the accounting department of the Global Securities Group to process payments from Advisors on behalf of Mr. Hernandez. The accounting department has confirmed that all payments to Gustavo and Olympia Hernandez, as well as those made on behalf of Mr. Hernandez to Antonio Matres, Mystic Gardens and Coco Raynes were made as part of Mr. Hernandez's compensation for services he rendered to his clients. Payments made to American Express were reimbursement for expenses of Advisors or payment of compensation to Mr. Hernandez. Advisors has no assets and no infrastructure of its own and relies on the intrastructure provided by the Global Securities Group.

| Date | Amount | Recipients |
|------|--------|-----------|
| 1/23/2018 | $17,500.00 | Olympia De Castro |
| 2/1/2018 | $2,500.00 | Gustavo Hernandez |
| 2/1/2018 | $8,000.00 | unknown |
| 2/6/2018 | $3,000.00 | unknown |
| 2/7/2018 | $10,000.00 | Antonio Matres |
| 2/16/2018 | $11,000.00 | Olympia De Castro |
| 3/1/2018 | $5,275.00 | Antonio Matres |
| 3/1/2018 | $8,000.00 | Gustavo Hernandez |
| 3/7/2018 | $10,000.00 | Antonio Matres |

| 3/7/2018 | $6,000.00 | American Express |
|----------|-----------|------------------|
| 3/12/2018 | $1,305.00 | unknown |
| 4/2/2018 | $19,200.00 | Olympia De Castro |
| 4/2/2018 | $8,000.00 | Gustavo Hernandez |
| 4/6/2018 | $48,456.19 | American Express |
| 4/19/2018 | $3,100.00 | Gustavo Hernandez |
| 4/30/2018 | $10,000.00 | Antonio Matres |
| 4/30/2018 | $25,000.00 | Gustavo Hernandez |
| 4/30/2018 | $14,000.00 | Olympia De Castro |

2.      On March 7, 2018, Advisors made a $6,000 payment to American Express. (i) Identify the signatories on that American Express account, and (ii) describe in detail the reason that Advisors made the payment.

**ANSWER:**

**(i)     Gustavo Hernandez.**

**(ii)    This was for reimbursement of expenses to Advisors.  American Express statements have been previously produced in discovery.**

3.      On April 6, 2018, Advisors made a $48,456.19 payment to American Express. (i) Identify the signatories on that American Express account, and (ii) describe in detail the reason that Advisors made the payment.

**ANSWER:**

**(i)     Gustavo Hernandez.**

4

(ii)     **This was for reimbursement of expenses to Advisors. American**

**Express statements have been previously produced in discovery.**

4.     For every transfer of $1,000 or more made by Advisors after January 11,

2018 to any of Cesar Hernandez Sr., Cesar Hernandez Jr., Tulia Hernandez, Gustavo

Hernandez, or Olympia de Castro (or for any of their benefit), describe:

a.  the amount of the transfer;

b.  the date of the transfer;

c.  the identity of the recipient of the transfer;

d.  the identity of the person who authorized the transfer;

e.  the identity of the person for whose benefit the transfer was made;

f.   the reason the transfer was made; and

g.  the reasons that the Court should not find that the transfer was a

distribution.

**ANSWER:**

**See responses to item (1) above.**

| Amount | Date | Recipients | Authorized by |
|---|---|---|---|
| $17,500.00 | 1/23/2018 | Olympia De Castro | Gustavo Hernandez |
| $2,500.00 | 2/1/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $8,000.00 | 2/1/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $11,000.00 | 2/16/2018 | Olympia De Castro | Gustavo Hernandez |
| $8,000.00 | 3/1/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $19,200.00 | 4/2/2018 | Olympia De Castro | Gustavo Hernandez |
| $8,000.00 | 4/2/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $3,100.00 | 4/19/2018 | Gustavo Hernandez | Gustavo |

| | | | Hernandez |
|---|---|---|---|
| $25,000.00 | 4/30/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $14,000.00 | 4/30/2018 | Olympia De Castro | Gustavo Hernandez |
| $7,000.00 | 5/4/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $15,000.00 | 5/9/2018 | Olympia De Castro | Gustavo Hernandez |
| $11,000.00 | 6/1/2018 | Olympia De Castro | Gustavo Hernandez |
| $7,000.00 | 6/4/2018 | Gustavo Hernandez | Gustavo Hernandez |
| $7,000.00 | 6/18/2018 | Olympia De Castro | Gustavo Hernandez |
| $28,000.00 | 7/5/2018 | Olympia De Castro | Gustavo Hernandez |

The transfers were not distributions of Advisors.  They were payment of expenses of Advisors.  To the extent monies were paid to Gustavo Hernandez, Olympia de Castro, Antonio Matres, Coco Raynes, or Mystic Gardens, these amounts are attributable to Gustavo Hernandez and paid by Advisors to him as compensation, being the sole Director and the sole employee of Advisors, and who generates all the income of Advisors with the advisory services he renders to his clients.

6

## OATH OF AFFIRMATION

Global Securities Advisors GP, LLC

By: _____

Its: ___Manager_____
(Title)

I, Gustavo Hernandez, make the prior statements based upon personal knowledge and under penalty of perjury.

representing the estimated cost of 24 months of condominium assessments and a portion of the closing charges, respectively.

On April 10, 2017, Tulia and Cesar created the Land Trust to receive and manage the Condominium for the benefit of Cesar and Tulia. *See* Trust Agreement, attached as Exhibit 3. On that same date, Tulia and Cesar created the Pour Over Trust making their four adult children – Stephanie Hernandez, Cesar Gabriel Hernandez Jr., Juan David Hernandez, and Daniela Sofia Hernandez – the beneficiaries of the Condominium owned by the Land Trust. *See* Pour Over Trust, attached as Exhibit 4.

On April 14, 2017, the Land Trust closed on the Condominium and PMG Driftwood, LLC executed a Special Warranty Deed transferring the rights and interests in the Condominium to the Land Trust. *See* HUD Settlement Statement and Special Warranty Deed, attached as Composite Exhibit 5. The HUD Settlement Statement reflects that the amount to be paid by Tulia for the Condominium after application of fees and closing costs was $1,078,205.97. *Id.* Further, the Settlement Statement reflects that Tulia paid $962,086.14 prior to closing with $900,000 was deposited in escrow, $61,500 applied as a closing credit from the seller, and an additional $586.14 adjustment for unpaid county taxes from seller. Tulia paid the balance of $116,119.83 due at closing by April 19, 2017, which are the funds the Government contends subjects the Condominium to forfeiture. The sources of all funds to purchase the Condominium are as follows.

**B. Sources of Funding.**

### a. Cesar's Proceeds from the Sale of a Stake in a Real Estate Development Company.

In 2003, Cesar met Rajiv Bhakta. At the time, Bhakta was soliciting investors for his family's real estate development company, which was then pursuing a project in Vail, Colorado.

GOVERNMENT
EXHIBIT
**3-G**
18-CR-20685

Cesar and Gustavo informally agreed in 2003 to invest with Bhakta and to split the proceeds of

that investment evenly amongst themselves.  To effectuate this investment, the Florida corporation

GSH—which is the passive parent company of Cesar's former company GSI—took a minority 31

percent stake in the Bhakta's development corporation, which is now called Vanquish Vail I & II,

LLC.

Twelve years later, in 2015, Bhakta's efforts had substantially increased the value of the

development corporation and Bhakta began floating to Cesar and Gustavo the prospect of buying

out GSH's minority stake.  Cesar and Gustavo both agreed to this buyout.  Consequently, on July

29, 2016, Bhakta's corporate entity Vanquish Vail I & II, LLC wired $2,000,000 to an Occidental

Bank (Barbados) Ltd. account held by GSH's parent company, the British Virgin Islands

corporation Global Finance Management Corporation ("GFM").  *See* Occidental Bank Statement,

attached as Exhibit 6.

Cesar and Tulia ultimately decided to buy the Condominium with the funds from this

distribution after months of deliberation.[5]  Thus, Cesar notified Gustavo he was taking his share

of the distribution from the Bhakta investment and asked Publio Velasco—who, as stated above,

served as the accountant for several corporate entities affiliated with different members of the

Hernandez family, including GFM—to wire a $210,000 deposit to the escrow agent designated in

the Purchase Agreement.  Velasco completed this wire through GFM and subsequently completed

three additional wires to the escrow agent from GFM: (1) for $290,000 on January 5, 2017; (2) for

$250,000 on February 8, 2018; and (3) for $150,000 on February 24, 2017.  Thus, Cesar's share

---

[5] To protect their children's financial futures, they also decided to vest formal ownership of the
Condo in the Land Trust, and to vest ownership of the Land Trust in the Pour Over Trust.

Stumphauzer Foslid Sloman Ross & Kolaya, PLLC | Attorneys at Law
2 South Biscayne Boulevard, Suite 2550 | Miami, FL 33131 | T + 1 305.371.9686 | F +1 305.371.9687

www.sfslaw.com
10

in the proceeds from the 2003 Vail investment funded $900,000 of the Condo's $1,050,000
Purchase Agreement price.

### b. Cesar's Earnings from Panamerica Capital Group.

As noted above, the gross amount due to seller at closing was $1,078.205.97.   After
applying the $900,000 deposits, a seller's credit of $61,500, and unpaid county taxes of $586.14,
a $116,119.83 shortfall remained.  Cesar and Tulia sought and obtained a one-month extension for
closing.

Cesar and Tulia did not have $116,119.83 in liquid assets at that time.  Cesar did, however,
know that he was entitled to $37,870 in business referral fees he generated for a Panamanian
corporation which was then affiliated with the Hernandez family, Panamerica Capital Group
("PCG").  Accordingly, Cesar requested that Velasco pay Cesar's PCG earnings, received in GSM
Account 7276 on April 17, 2017, directly to the Purchase Agreement escrow agent.  Although
Cesar had requested the full $37,870 be sent to the escrow agent, Velasco exercised his discretion
to limit the transfer to $30,000, which he did through GSM on April 18, 2017.[6]  *See* GSM Account
7276 April 2017 Statement, attached as Exhibit 7.  Thus, Tulia and Cesar needed to obtain the
remaining $86,119.83 from another source after attempting but failing to secure a loan from a
traditional mortgage lender due to the time constraints.

---

[6] Agent Vega states this $30,000 came from GSTF 6054 because $30,000 were wired from GSTF
6054 to GSM Account 7276 on April 3, 2017.  Agent Vega then states $30,000 were transferred
from GSM Account 7276 to the escrow agent on April 18, 2017.  Agent Vega's declaration,
however, fails to establish a factual link between these two transfers other than that they were both
$30,000.  Notably, Agent Vega did not account for a $30,000 transfer to Global Shared Solutions
Corp. Business Checking out of the GSM Account 7276 on that same date.

Stumphauzer Foslid Sloman Ross & Kolaya, PLLC | Attorneys at Law
2 South Biscayne Boulevard, Suite 2550 | Miami, FL 33131 | T + 1 305.371.9686 | F +1 305.371.9687

www.sfslaw.com

11

### c. Loan from Uruguayan Business Partner.

Aware that his share of the development corporation sale proceeds and his earnings from PCG would still not cover the entire purchase amount for the Condominium, Cesar sought an informal short-term $80,000 loan from his acquaintance Marcelo Romaniello, a Uruguayan national affiliated with an investment group called Polo Sur. Romaniello agreed to provide the loan but was unable to send the funds to Cesar quickly enough to meet the extended closing date. Accordingly, Cesar went back to Velasco and asked that GSM provide another short-term loan to satisfy the remaining shortfall. Cesar notified Velasco that he would repay this short-term loan as soon as he received funds from Romaniello. Velasco fulfilled Cesar's request by obtaining a short-term loan of $90,000 loan from GSM, which, in turn, obtained a loan of $90,000 from GSTF on April 18, 2017.

Velasco then wired $86,119 from GSM to the Purchase Agreement escrow agent on April 19, 2017, which covered the remaining shortfall and consummated the Purchase Agreement. *See* Exhibit 7. Less than a month later, on May 10, 2017, Cesar instructed Romaniello to wire GSM the $80,000 he had requested as partial repayment for GSM's loan, but Romaniello discounted the interest from the loan and wired only $71,600. *See* GSM Account 7276 May Statement, attached as Exhibit 8. Velasco, however, repaid GSTF only $50,460 of the $71,600 and credited Cesar that amount in the GSM accounting Thus, by May 10, 2017 and to this date, Cesar repaid all but approximately $39,540 of GSM short-term $90,000 loan.

### MEMORANDUM OF LAW

Tulia and Cesar only came to know that Velasco obtained the funds for the short-term $86,119 loan from GSTF, the entity the Government has alleged was Gustavo's "fake fund" used to launder Defendant Ortega's criminal proceeds. *United States v. Guruceaga, et al*, Case No. 18-

Stumphauzer Foslid Sloman Ross & Kolaya, PLLC | Attorneys at Law
2 South Biscayne Boulevard, Suite 2550 | Miami, FL 33131 | T + 1 305.371.9686 | F +1 305.371.9687

www.sfslaw.com

12

| | |
|---|---|
| **From:** | Cesar Hernandez |
| **To:** | Marcela Velásquez Reyes |
| **Cc:** | Publio Velasco |
| **Subject:** | Closing |
| **Date:** | Thursday, April 13, 2017 10:24:51 AM |
| **Attachments:** | Sage Closing Instructions- ENGLISH (3).pdf |

MV

Pls mira instrucciones de giro y envía los 30k ( Unit es 2E).

Please Publio envía un correo corto a Gustavo para el loan de Trade Finance a  GSM de $ 90k, rate usual que usan.

Slds,


Cesar G. Hernández
The Global Securities Group

Aviso de Confidencialidad: La información contenida en este mensaje es estrictamente confidencial y pertenece a THE GLOBAL SECURITIES GROUP " GLOBAL" o sus empresas afiliadas. Si Usted no es el destinatario real, por favor destruya este mensaje. Queda prohibida la reproducción parcial o total de la misma sin autorización expresa del Emisor. THE GLOBAL SECURITIES GROUP " GLOBAL" o sus empresas afiliadas no se hacen responsable por los daños que los equipos puedan sufrir por consecuencia de este mensaje.

Confidentiality Notice: The information contained in this message is strictly confidential and is the exclusive property of THE GLOBAL SECURITIES GROUP " GLOBAL" or its affiliates. If you are not the intended recipient please delete this message. It is prohibited the partial or total reproduction without subsequent written confirmation. THE GLOBAL SECURITIES GROUP " GLOBAL" or its affiliates  is not liable for the presence of any virus in it that causes or may cause damage to your equipment or software

**GOVERNMENT EXHIBIT**

**3-H**

18-CR-20685

| | |
|---|---|
| From: | César Hernández |
| To: | Marcela Velásquez Reyes |
| Cc: | Publio Velasco |
| Subject: | Closing |
| Date: | Thursday, April 13, 2017 10:24:51 AM |
| Attachments: | Sage Closing Instructions-ENGLISH (3).pdf |

MV

Pls look at transfer instructions and send the 30k (Unit is 2E).

Publio, please send a short email to Gustavo for the   Trade Finance loan to GSM for $ 90k, usual rate they use.

Regards,


Cesar G. Hernández
The Global Securities Group

Aviso de Confidencialidad: La información contenida en este mensaje es estrictamente confidencial y pertenece a THE GLOBAL SECURITIES GROUP " GLOBAL" o sus empresas afiliadas. Si Usted no es el destinatario real, por favor destruya este mensaje. Queda prohibida la reproducción parcial o total de la misma sin autorización expresa del Emisor. THE GLOBAL SECURITIES GROUP " GLOBAL" o sus empresas afiliadas no se hacen responsable por los daños que los equipos puedan sufrir por consecuencia de este mensaje.

Confidentiality Notice: The information contained in this message is strictly confidential and is the exclusive property of THE GLOBAL SECURITIES GROUP " GLOBAL" or its affiliates. If you are not the intended recipient please delete this message. It is prohibited the partial or total reproduction without subsequent written confirmation. THE GLOBAL SECURITIES GROUP " GLOBAL" or its affiliates is not liable for the presence of any virus in it that causes or may cause damage to your equipment or software.

---

LOAN AGREEMENT

dated as of

April 17, 2017

among

Global Securities Management LLC
as Borrower

and

GLOBAL SECURITIES TRADE FINANCE
as Lender

---

GOVERNMENT
EXHIBIT
3-I
18-CR-20685

1

LOAN AGREEMENT dated as of April 13, 2017, (the "Agreement") among: (i) Global Securities Management LLC a corporation duly incorporated and validly existing under the laws of the Florida State of United States (the "Borrower"); and (ii) Global Securities Trade Finance, a financial entity duly incorporated and validly existing under the laws of the Cayman Islands (the "Lender" and, together with the Borrower, the "Parties").

## ARTICLE I
### DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Section, unless otherwise specifically provided herein. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but are not expressly defined herein must be understood by common sense, according to the generalized use given to them. The definitions of terms herein shall apply to both the singular and plural forms of the terms defined.

As used in this Agreement the following terms have the meanings specified below:

(a)    "Agreement" as mentioned in the first paragraph of this document, shall mean this loan agreement.

(b)    "Borrower" has the meaning specified in the first paragraph of this Agreement.

(c)    "Business Day" means any day, other than Saturday or Sunday, on which banks in Cayman Islands or New York City are authorized or required by law to remain open.

(d)    "Closing Date" means the execution date of this Agreement.

(e)    "Default Rate" shall have the meaning specified in Section 2.04(a) of this Agreement.

(f)    "Dollars" or "USD$" refers to Dollars of the United States of America.

(g)    "Event of Default" means any event specified as such in Article IV below.

(h)    "Interest Payment Date" means the Maturity Day.

1

(i)        "Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(j)        "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, structure, shareholder composition or financial condition of the Borrower; (b) a material impairment of the ability of the Borrower to make payments under the Loan when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any of their obligations under the Loan and/or this Agreement.

(k)        "Maturity Date" means the date corresponding to one (1) month after the disbursement date of the Loan or, if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, case in which such Maturity Date shall be the immediate preceding Business Day.

(l)        "Note" has the meaning specified in Section 2.02(a) (ii) of this Agreement.

(m)       "Parties" has the meaning specified in the first paragraph of this Agreement.

(n)        "Principal" has the meaning specified in Section 2.01 (i) of this Agreement.

(o)        "Payment Date" means the Maturity Date.

(p)        "Structuring Fee" has the meaning specified in Section 2.04 (h) of this agreement

(q)        "Tax Deductions" has the meaning set forth in Section 2.05 of this Agreement.


ARTICLE II
CONDITIONS OF THE FACILITY

SECTION 2.01 *The Loan.* (i) Subject to the terms of this Agreement, the Lender shall grant to the Borrower a Loan in an aggregate principal amount of ninety thousand Dollars USD$90,000.00 (the "Principal").

(ii) Amounts borrowed as Loan that are repaid or prepaid may not be reborrowed.

(iii) The Principal will be disbursed on the Closing Date, meaning the date in which the lender disburses the amount borrowed via wire transfer based on instructions provided by the Borrower on or before April 30, 2017.

2

SECTION 2.02 *Conditions Precedent*. The Lender's obligation to make the Loan under this Agreement shall be subject to the fulfillment of the following condition precedent prior to the disbursement, to the entire satisfaction of the Lender:

(a)     The Lender shall have received the following documents, each of which shall be in form and substance satisfactory to the Lender:

(i)     Executed Agreement. This Agreement, duly executed and delivered by the Parties hereto; and

(ii)     Note. The Note, duly executed and delivered by the Borrower substantially in the form of Schedule 1 (the "Note"), delivered to the Lender for its benefit on or before the Closing Date, appropriately completed and in a way satisfactory to the Lender.

(b)     There shall not have occurred since the Closing Date any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the financial, economic or political situation in the United States and Cayman Islands which in the opinion of the Lender would affect the repayment of Loan and/or the disbursements to be made pursuant to this Agreement.

In the event that any of the conditions precedent set forth under this Section are not duly and timely satisfied by the Borrower, the Lender may, at its sole discretion, waive such condition precedent and disburse the Loan on the respective disbursement date.

SECTION 2.03 *Repayment of the Loan*. The Borrower shall repay the total principal amount of the Loan on the Payment Date. Repayment of the Loan shall be made by the Borrower by means of acquiring from an IEM an amount in US Dollars equivalent, at the corresponding payment date. Repayment must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| Bank Name: | Citi National Bank |
| Swift Code : | CNNJUS33 |
| ABA #: | 021201639 |
| Account Name: | Global Securities Trade Finance – CLASS C |
| Account #: | 1466054 |

SECTION 2.04 *Interest Rate*. The Borrower shall pay to the Lender interest on the unpaid USD$ Principal amount of the Loan, from the period from - and including - the disbursement date to - but excluding - the Payment Date, at a rate per annum of 8.00% per annum (the "Interest Rate").

(c)     The Borrower shall pay to the Lender interest on the Loan at a rate of 10.00 % per annum in excess of the Interest (the "Default Rate") at any time during the existence and / or continuance of an Event of Default.

3

(d)      Accrued interest on the Loan shall be payable on the Interest Payment Date; provided that interest payable at the Default Rate shall also be payable on demand by the Lender. The payment of interest shall be made in accordance with the calculations provided to it by the Lender and previously sent to the Borrower.

(e)      The default interests specified in clause (a) above shall, to the extent permitted by applicable law, continue to accrue until paid,  after as well as before any bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding up, or composition or readjustment of debts of the Borrower.

SECTION 2.05 *Taxes.* Any and all payments by the Borrower to the Lender under this Agreement and/or with respect to the Loan shall be made free and clear of and without deduction or withholdings for any taxes. If any amount to be paid to Lender hereunder is subject to any deductions or withholdings for any present or future taxes, levies, imposts, duties, fees, charges, or liabilities imposed by any competent governmental authority (including but not limited to income withholding taxes) (hereinafter "Tax Deductions"), then:

(i)      the sum payable shall be increased as necessary so that after making all required deductions and / or withholdings, the Lender receives an amount equal to the sum it would have received if no such deductions had been made;

(ii)      Borrower shall make such deductions and withholdings and provide evidence to the Lender of the payment of any required withholding taxes to any applicable taxing authority at the request of the Lender; and

(iii)      Borrower shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law.

Borrower agrees to indemnify and hold harmless the Lender for the full amount of any applicable taxes paid by the Borrower and any liability (including penalties, interest, additions to tax and expenses) arising therefrom or with respect thereto, whether or not such taxes were correctly or legally asserted.

SECTION 2.06 *Optional Prepayments.* The Borrower with previous approval of the Lender may prepay the Loan in whole or in part at any time prior to the Maturity Date, provided that the Borrower gives the Lender prior written notice of any such prepayment as provided in this Agreement (and, upon the date specified in such notice, the prepayment amount shall become due and payable hereunder). Prepayments shall not cause the Borrower to pay any penalties, fees or any other additional amount   If the borrower does not have the approval by the lender, the borrower should pay a penalty of two months of interest.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

4

The Borrower represents and warrants to the Lender that, as of both the date of this Agreement and the Borrowing Date:

(a) *Trust existence of Borrower and power.* The Borrower (i) is a company duly organized, validly existing in good standing under the laws of the United States and Cayman Islands; (ii) has all requisite corporate power and all material governmental approvals necessary to own or lease its properties and carry on its business as now being or as proposed to be conducted, except where failure to have such governmental approvals (in the aggregate) is not reasonably likely to have a material adverse effect; (iii) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary; (iv) has full power, authority and legal right to make and perform its obligations hereunder to which it is a party and to borrow the Loan hereunder; and (v) the Borrower is not considered to be "in dissolution" nor in liquidation under and pursuant its applicable law.

(b) *Corporate Authorization; No Contravention.* The execution, delivery and performance by the Borrower of this Agreement and the consummation of the transaction, have been duly authorized by all necessary corporate or other action (including any necessary shareholder action), and do not contravene: (i) the by-laws or any shareholder or voting agreement; (ii) any applicable law, decree, judgment, award, injunction or similar legal restriction in effect, except to the extent that any contravention thereof is not reasonably likely to have a material adverse effect; or (iii) any document or other contractual restriction binding upon or affecting it or any of its properties, except to the extent that any contravention thereof is not reasonably likely to have a material adverse effect.

(c) *Binding Effect.* This Agreement and the Note have been duly executed and delivered and contains legal, valid and binding obligations of the Borrower, enforceable in accordance with its terms, in each case except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

(d) *Pari Passu.* The payment obligations of the Borrower hereunder are and will at all times be unconditional general obligations of it, and rank and will at all times rank at least *pari passu* with all other present and future unsubordinated debt of the Borrower, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and as may be limited by equitable principles of general applicability.

(e) *Litigation.* There is no litigation, investigation, arbitration or other proceeding pending or, to the best knowledge of the Borrower threatened against him or its property before any arbitrator or governmental authority having jurisdiction with respect thereto that: (i) individually or in the aggregate, has had or, if adversely determined, could reasonably be expected to have a material adverse effect, (ii) purports to materially and adversely affect any transaction contemplated hereby or (iii)

5

purports to materially and adversely affect the legality, validity, binding effect or enforceability of this Agreement.

(f)     *No Additional Governmental Authorization.* Except for the filing of the Loan with the Governmental Central Bank (obligation which will be complied by the Borrower prior to the disbursement date), no approval, consent, exemption, authorization, registration or other action by, or notice to, or filing with, any Governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement.

(g)     *No default.* No default or Event of Default exists or would result from the incurring of any obligations by the Borrower. As of the Closing Date, the Borrower is not in default under or with respect to any contractual obligation in any respect which, individually with all such defaults, could reasonably be expected to have a Material Adverse Effect, or that would, if such default had occurred after the Closing Date, create an Event of Default.

(h)     *Taxes.* The Borrower have filed all material tax returns and reports required to be filed under the laws of the British Virgin Islands, and have paid all material taxes, assessments, fees and other governmental charges levied or imposed upon its properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with applicable accounting rules.

(i)     *Commercial acts.* The Borrower's obligations under this Agreement and the Notes are commercial in nature and are subject to civil and commercial law, and the execution and performance of this Agreement and the Note constitute private and commercial acts and not governmental or public acts and the Borrower is subject to legal action in respect of the Loan.

ARTICLE IV
EVENTS OF DEFAULT

SECTION 4.01 Each of the following events is herein called an "Event of Default"

(a)     *Non payment.* Any scheduled payment of the Principal or interest, fees or any other amount payable hereunder or under any Note is not paid in full when and where due and the Borrower fails to correct such action within five (5) Business Days;

(b)     *Representation or warranty.* Any representation, warranty or certification made or deemed made herein (or in any modification or supplement hereto) by the Borrower, shall prove to have been inaccurate in any material respect as of the time made;

(c)     *Observance of obligations.* The Borrower remains in default for a period of ten (10) days or more in the observance or performance of any of its

6

other obligations under this Agreement (other than as provided in Sections (a) or (b) above);

(d)     *Monetary Judgments.* One or more judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle (including any relating to any arbitration) is/are rendered against the Borrower in an amount exceeding USD$500,000 (or its equivalent in any other currency) in the aggregate and shall remain unsatisfied, undischarged and in effect for a period of sixty (60) or more calendar days without a stay of execution, unless the same is either: (i) adequately bonded or covered by insurance where the surety or the insurer, as the case may be, has admitted liability in respect of such judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle or (ii) is being contested by appropriate proceedings properly instituted and diligently conducted and, in either case, such process is not being executed against any property of the Borrower;

(e)     *Non-monetary Judgments.* Any non-monetary judgment, order, decree, award, settlement or agreement to settle (including any relating to any arbitration) is rendered against or agreed by the Borrower that (in the aggregate) has had or could reasonably be expected to have a material adverse effect, and a stay of execution thereof shall not be obtained within forty-five (45) days from the date of entry or agreement thereof;

(f)     *Loss of property.* Any governmental authority having jurisdiction with respect thereto shall condemn, nationalize, seize or otherwise expropriate any substantial portion of the property or the capital stock of the Borrower and such action is not reversed within a period of sixty (60) days;

(g)     *Loss of Licenses or permits.* Any governmental or other authorization, consent, license, permit, concession, approval (including any foreign exchange approval) or authorization that is necessary or appropriate under Governmental applicable laws for the execution, delivery or performance by the Borrower of any material obligation hereunder, in order for this Agreement to be valid, enforceable and admissible in evidence shall not be obtained or shall be withdrawn or shall cease to be in full force and effect or shall be modified in a manner that, in each case, could reasonably be expected to have a material adverse effect; and

(h)     *Governmental decisions.* Any restriction or requirement not in effect on the date of this Agreement is imposed, whether by legislative enactment, decree, regulation, order or otherwise that limits the availability or the transfer of foreign exchange by the Borrower in a manner that would reasonably be expected to materially adversely affect the payment of the Borrower's obligations hereunder, or

(i)     *Change of Control.* A Change of Control shall occur that has not been consented to by the Lender.

7

If any Event of Default has occurred and is continuing, the Loan, together with accrued interest thereon and any fees and all other obligations accrued hereunder and under the Note shall immediately become due and payable.

ARTICLE V
OBLIGATIONS OF BORROWER

SECTION 5.01 So long as the Loan is unpaid or unsatisfied, unless the Lender waives compliance in writing:

(a)    *Financial Statements.*  The Borrower shall deliver to the Lender, in form and detail satisfactory to the Lender, as soon as available, but not later than ninety (90) calendar days after the end of each December 31st of each year, a copy of the audited financial statements of the Borrower as at the end of such fiscal year.

(b)    *Notices.* The Borrower shall notify the Lender promptly upon becoming aware thereof: (i) of the occurrence of any Event of Default; and (ii) of any event that has had or could reasonably be expected to have a Material Adverse Effect, including (a) breach or non-performance of, or any default under, a contractual obligation of the Borrower; (ii) any litigation, investigation or other proceeding between the Borrower and any authority or third party; (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower. Each notice under this Section 5.01 (b) shall be accompanied by a written statement by the legal representative of the Borrower setting forth details of the occurrence referred to therein, and stating what action the Borrower proposes to take with respect thereto and at what time.

(c)    *Preservation of Corporate Existence.* The Borrower shall: (i) preserve and maintain in full force and effect its corporate existence and good standing under the laws of the British Virgin Islands; and (ii) preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits and licenses necessary or desirable in the normal conduct of its business.

(d)    *Compliance with Laws.* The Borrower shall comply in all material respects with all applicable requirements of Law of any authority having jurisdiction over them or their business except where noncompliance therewith could not reasonably be expected to have a Material Adverse Effect.

(e)    *Inspection of Property and Books and Records.* The Borrower shall maintain proper books of record and account, in which full, true and correct entries in conformity with applicable accounting regulation consistently applied shall be made of all financial transactions and matters involving their assets and business. The Borrower shall permit representatives of the Lender

8

to visit and inspect any of their properties, to examine their respective corporate or trust, financial and operating records, and to discuss their affairs, finances and accounts with their respective directors, officers, and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower.

(f) *Endorsement and Custody of Promissory Notes. As collateral, the Borrower* shall endorse in favor of the Lender promissory notes duly issued on his favor by individuals that have borrowed from him with the purpose of working capital facility

## ARTICLE VI
### MISCELLANEOUS

SECTION 6.01 *Confidentiality.* Under no circumstance, any information regarding the transactions contemplated herein shall be made available to any person, regulatory entity or to the public by Lender or Borrower, without the prior written consent of the Lender or Borrower, as the case may be. The Lender agrees that it will keep at all times the confidential information related and provided to them by Borrower, unless there is a request to disclose such information by an authority or unless disclosure is required by law or financial reporting purposes. In this case, it shall notify the Borrower before the disclosure indicating the mandatory nature of it.

SECTION 6.02 *Amendments.* Any amendment to this Agreement shall be made in writing prior mutual agreement between the Parties.

SECTION 6.03 *Assignment.* (a) The Borrower may not assign its rights and obligations under this Agreement without the prior written authorization granted by the Lender.

(b)  The Lender may at any time assign this Agreement to a third party without the consent of the Borrower, in which case written notice of such assignment, together with payment instructions, addresses and related information with respect to the assignee, shall have been given to the Borrower by the Lender and the assignee.

SECTION 6.04 *Notices.* All notices and communications provided for herein shall be in writing and shall be deemed to have been duly notified on the date of delivery, if delivered personally, by courier or by telecopy, receipt confirmed, or seven Business Days after mailing, if sent by registered or certified mail, return receipt requested, postage prepaid, to the party to whom it is directed at the following address (or at such other address as any Party hereto shall hereafter specify by notice in writing to the other Parties hereto):

If to Lender:
Global Securities Trade Finance

405 Lexington Avenue, 41st Floor
New York, NY, 10174
Tel:  (212) 905 4927
Fax: (212) 905 4930

If to Borrower, at the following address:
Global Securities Management
701 Brickell Ave
Suite 1420
Miami, FL 33131


SECTION 6.05 *Applicable law and Choice of Forum*. This Agreement shall be construed in accordance with the laws of the Cayman Islands.

In case of any dispute in connection with this Agreement, other than any dispute that may be resolved through an executive judicial proceeding, such dispute shall be settled by one (1) arbitrator appointed jointly by the Parties, who shall act in accordance with the rules appropriate under Governmental applicable laws. If the Parties fail to reach an agreement and the arbitrator is not appointed for any reason whatsoever within twenty (20) days after the date on which a dispute was notified in writing from one party to the other, any one of the parties may request to make such appointment. The place of arbitration shall be Miami, Florida, USA, and the arbitrators shall decide based on law.

SECTION 6.06. *No Waiver; Cumulative Remedies.*  No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

SECTION 6.07. *Costs and Expenses.*  The Borrower shall pay or reimburse the Lender within five (5) Business Days after demand for all reasonable costs and expenses (including attorney costs) incurred by Lender in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or in any other agreement or document in connection thereof during the existence of an Event of Default or after acceleration of the Loan.

SECTION 6.08. *Indemnity.* Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold the Lender and each of their respective officers, directors, employees, counsel, agents and attorneys-in fact (each, an "Indemnified Person") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses and disbursements (including the fees and disbursements of counsel to the Lenders) of any kind or nature whatsoever which may at any time (including at any time following repayment of the Loan) be imposed on, incurred by or asserted against any such person in any way relating to or arising out of this Agreement or any

10

document contemplated by or referred to herein, or the transactions contemplated hereby, or any action taken or omitted by any such person under or in connection with any of the foregoing, including with respect to any investigation, litigation or proceeding (including any insolvency proceeding or appellate proceeding) related to or arising out of this Agreement or the Loan or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto; provided, however, that the Borrower shall have no obligation hereunder to any Indemnified Person with respect to indemnified liabilities resulting from the gross negligence or willful misconduct of any Indemnified Person. The agreements in this Section 6.08 shall survive payment of the Loan.

SECTION 6.09. *Severability.* The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

SECTION 6.10. *Schedules:*

Schedule 1-. Form of Notes to be granted by the Borrower.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Global Securities Management LLC., as Borrower

By: _____

Cesar Hernandez Jr
Director

11

Global Securities Trade Finance, as Lender

By: _____

Gustavo Hernandez - Director

**Schedule 1**

**PROMISSORY NOTE  No. 01**
**FOR: US $ 90,000.00**
**FINAL MATURITY: MAY 17, 2017**
**DISBURSEMENT DATE: APRIL 10, 2017**

12

Global Securities Management LLC a company legally constituted in accordance with the laws of the State of Florida, USA, represented legally by Cesar Hernandez Jr, identified as it appears later and as established in the certificate of existence and legal representation of the company issued by the State of Florida (hereinafter the "Debtor"), as debtor, hereby declares:

FIRST: That the Debtor has received as an onerous mutual from Global Securities Trade Finance, an entity duly constituted and existing in accordance with the laws of the Cayman Islands (hereinafter the "Creditor") the sum of ninety thousand United States Dollars, United States of America (USD $ 90,000,000), attributable to the credit referred to in the credit agreement dated April 17, 2017 between the Debtor and the Creditor (hereinafter the "Credit Agreement").

SECOND: That the Debtor shall pay unconditionally in favor of the Creditor or his order the sum of ninety thousand United States Dollars (USD $ 90,000.oo), for capital, within a term of one (1) month counted to Starting on April 17, 2017. The amount given in mutual will be paid in a single installment on the date indicated above.

THIRD: During the total term of this promissory note, the Debtor will recognize and pay, on the amount of the principal due, remuneratory interest at the rate of eight percent (8.00%) annual cash. The interest will be payable at maturity and its settlement will be calculated based on the provisions of the Credit Agreement for the purpose.

FOURTH: If the payment of the sums owed under this promissory note are not made on the dates established for the purpose, they shall be paid on a daily basis and interest for late payment shall be paid at a rate equivalent to 10.00 % per annum in excess of the Interest established in the third paragraph previous. The default interest mentioned herein shall be caused and paid for the duration of the delay. The tolerance of the Creditor to receive payment of interest and / or capital arrears, shall not imply extension or novation of the obligations incorporated in this promissory note. The Debtor will also pay, in case of extrajudicial or judicial collection of the credit, the expenses that demand the collection including the lawyer's fees.

FIFTH: Payments made to the Creditor to meet the obligations arising from this promissory note, shall be applied in the following order: taxes, commissions, expenses and judicial costs and collection or collection, if any, interest arrears if any, interests Remuneration and finally to capital repayments.

SIXTH: The Debtor authorizes the Creditor to declare the expiration of the term and demand the immediate payment of this security in the event of default in the payment of any sums owed under this promissory note, as well as in the event of any event of default, the terms and conditions set forth in the Credit Agreement.

13

SEVENTH: The obligations assumed by the Debtor in accordance with the Credit Agreement are extended to any novation or extension of the expiration date granted by the Creditor, if any. In these periods the debtor's payment obligation will remain unchanged.

EIGHTH: The Debtor unconditionally accepts any endorsement or assignment made by the Creditor of the present Note, without its being necessary for new authorizations or acceptances by the Debtor.

NINTH: We authorize the total or partial payment of both the interest and the capital of this security to be recorded in systematic or manual records established by the Creditor for the purpose.

TENTH: This promissory note shall be governed by the laws of the British Virgin Islands and Cayman Islands.

Pursuant to the foregoing, this note is signed in the city of Miami, Florida, USA, on April 17, 2017

Global Securities Management
Cesar Hernandez Jr

14

## 021201639  City National Bk of NJ
## Outgoing Wire Detail

### General Information

| | |
|---|---|
| Wire Number | 46248 |
| Type of Wire | New Domestic |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 117478078 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Passed |
| | Analysis Decision: |
| | Final Decision: |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 1466054 |
| Fee Account | DDA Wire Out 1466054 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,46248 |
| Reference Number | 14965602 |
| Override Flag | No |
| Wire Amount / Currency | $90,000.00 USD |
| Wire Fee | $25.00 Br-01 Domestic Wire Fee |

### Audit Trail

| | |
|---|---|
| Entered | 04/19/2017 09:14 AM by System |
| | Komal Ramkirath |
| | Gustavo Hernandez |
| Verified | 04/19/2017 09:15 AM by Nasser Awad |
| OFAC Approved | 04/19/2017 09:17 AM by Rebeca Arriaza Reason: Not a match based on name. |
| Posted | 04/19/2017 09:17 AM by System |
| Forwarded to Fed | 04/19/2017 09:17 AM by System |
| Completed | 04/19/2017 09:17 AM by System |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 04/19/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 121000248 Wells Fargo Bank |
| Fedwire Type | CTR 1000 |
| IMAD | 20170419GMQFMP01001884 |
| OMAD | 20170419I1B7031R00590004191017FTO 3 |

### Originator Instructions

| | |
|---|---|
| Originating FI | F 021201639 |
| Originator | Global Securities Trade Finance D 1466054 701 Brickell Avenue Miami FL 33131 |

### Beneficiary Instructions

| | |
|---|---|
| Beneficiary FI | Wells Fargo Bank F 121000248 169 SW 8TH Street Miami FL 33130 |
| Beneficiary | Global Securities Management 7276 701 Brickell Ave Miami FL 33131 |
| Originator To Beneficiary | GSTF Class C funding to Global Securities Management LLC |

GOVERNMENT
EXHIBIT
3-J
18-CR-20685

1

---

LOAN AGREEMENT

dated as of

August 31, 2016

among

GSM Colombia SAS

as Borrower

and

GLOBAL SECURITIES TRADE FINANCE
as Lender

---

GOVERNMENT
EXHIBIT
3-K
18-CR-20685

1

LOAN AGREEMENT dated as of August 31, 2016 (the "Agreement") among: (i) GSM Colombia SAS], a corporation duly incorporated and validly existing under the laws of the Republic of Colombia (the "Borrower"); and (ii) Global Securities Trade Finance, a financial entity duly incorporated and validly existing under the laws of the Cayman Islands (the "Lender" and, together with the Borrower, the "Parties").

## ARTICLE I
### DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Section, unless otherwise specifically provided herein. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but are not expressly defined herein must be understood by common sense, according to the generalized use given to them. The definitions of terms herein shall apply to both the singular and plural forms of the terms defined.

As used in this Agreement the following terms have the meanings specified below:

(a)     "Agreement" as mentioned in the first paragraph of this document, shall mean this loan agreement.

(b)     "Anniversary Fee" means 1.0% of the total amount of the Facility, payable on Effective Date

(c)     "Borrower" has the meaning specified in the first paragraph of this Agreement.

(d)     "Business Day" means any day, other than Saturday or Sunday, on which banks in Colombia or New York City are authorized or required by law to remain open.

(e)     "Closing Date" means the execution date of this Agreement.

(f)     "Default Rate" shall have the meaning specified in Section 2.04(a) of this Agreement.

(g)     "Dollars" or "USD$" refers to Dollars of the United States of America.

(h)     "Event of Default" means any event specified as such in Article IV below.

1

(i)      "<u>Interest Payment Date</u>" means the Maturity Day.

(j)      "<u>Loan</u>" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(k)      "<u>Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the business, structure, shareholder composition or financial condition of the Borrower; (b) a material impairment of the ability of the Borrower to make payments under the Loan when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any of their obligations under the Loan and/or this Agreement.

(l)      "<u>Maturity Date</u>" means the date corresponding to 360 days after the disbursement date of the Loan or, if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, case in which such Maturity Date shall be the immediate preceding Business Day.

(m)      "<u>Note</u>" has the meaning specified in Section 2.02(a) (ii) of this Agreement.

(n)      "<u>Parties</u>" has the meaning specified in the first paragraph of this Agreement.

(o)      "<u>Principal</u>" has the meaning specified in Section 2.01 (i) of this Agreement.

(p)      "<u>Payment Date</u>" means the Maturity Date.

(q)      "<u>Renewal Fee</u>" means 1.0% of the total amount of the Facility, payable on Effective Date

(r)      "<u>Structuring Fee</u>" has the meaning specified in Section 2.04 (h) of this Agreement.

(s)      "<u>Tax Deductions</u>" has the meaning set forth in Section 2.05 of this Agreement.

ARTICLE II
<u>Conditions of the Facility</u>

<u>SECTION 2.01</u> *The Loan.* (i) Subject to the terms of this Agreement, the Lender shall grant to the Borrower a Loan in an aggregate principal amount of two million Dollars USD$2,000,000.00 (the "<u>Principal</u>").

(ii) Amounts borrowed as Loan that are repaid or prepaid may not be reborrowed.

2

(iii) The Principal will be disbursed on the Closing Date, meaning August 31, 2016.

(iii) Loan must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| **Banco Intermediario**<br>**Ciudad**<br>**Código Swift**<br>**ABA Routing**<br>**Chips** | **CITIBANK N.A.**<br>**NEW YORK – USA**<br>**CITIUS33**<br>**021000089**<br>**0008** |
| **Banco Pagador**<br>**Código Swift**<br>**Cuenta**<br>**Direccion** | **BANCO DE OCCIDENTE**<br>**OCCICOBC**<br>**████0229**<br>Playa es Calle 51 No. 47-25<br>Medellin, Colombia |
| **Beneficiario**<br>**Número de Cuenta**<br>**Dirección**<br>**Teléfono** | **GSM COLOMBIA  S.A.S.**<br>**Cuenta Corriente # ████576 1**<br>Carrera 1 #70A-26 suite #101<br>Bogotá D.C., Colombia<br>Tel. (57) 3165234547 |

<u>SECTION 2.02</u> *Conditions Precedent.* The Lender's obligation to make the Loan under this Agreement shall be subject to the fulfillment of the following condition precedent prior to the disbursement, to the entire satisfaction of the Lender:

(a)     The Lender shall have received the following documents, each of which shall be in form and substance satisfactory to the Lender:

(i)     <u>Executed Agreement</u>. This Agreement, duly executed and delivered by the Parties hereto; and

(ii)     <u>Note</u>. The Note, duly executed and delivered by the Borrower substantially in the form of <u>Schedule 1</u> (the "<u>Note</u>"), delivered to the Lender for its benefit on or before the Closing Date, appropriately completed and in a way satisfactory to the Lender.

3

(b)      There shall not have occurred since the Closing Date any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the financial, economic or political situation in the Republic of Colombia which in the opinion of the Lender would affect the repayment of Loan and/or the disbursements to be made pursuant to this Agreement.

In the event that any of the conditions precedent set forth under this Section are not duly and timely satisfied by the Borrower, the Lender may, at its sole discretion, waive such condition precedent and disburse the Loan on the respective disbursement date.

SECTION 2.03 *Repayment of the Loan.* The Borrower shall repay the total principal amount of the Loan on the Payment Date. Repayment must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| Bank Name: | City National Bank |
| Swift Code: | CNNJUS33 |
| ABA #: | 021201639 |
| Account Name: | Global Securities Trade Finance - CLASS C |
| Account #: | 1466054 |

SECTION 2.04 *Interest Rate.* The Borrower shall pay to the Lender interest on the unpaid USD$ Principal amount of the Loan, from the period from - and including - the disbursement date to - but excluding - the Payment Date, at a rate per annum of 12% per annum in Colombian Pesos (the "Interest Rate").

(c)      The Borrower shall pay to the Lender interest on the Loan at a rate equivalent to 2% per annum in excess of the Interest Rate in Colombian Pesos per annum (the "Default Rate") at any time during the existence and / or continuance of an Event of Default.

(d)      Late Interest will be calculated at 2% per annum in excess of the Interest Rate

(e)      Accrued interest on the Loan shall be payable on the Interest Payment Date; provided that interest payable at the Default Rate shall also be payable on demand by the Lender. The payment of interest shall be made in accordance with the calculations provided to it by the Lender and previously sent to the Borrower.

(f)      Interest on the Loan shall be computed on the basis of a quarterly in arrears (including the first day but excluding the Interest Payment Date).

(g)      The default interests specified in clause (c) above shall, to the extent permitted by applicable law, continue to accrue until paid, after as well as before any bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding up, or composition or readjustment of debts of the Borrower.

4

whether or not any Indemnified Person is a party thereto; provided, however, that the Borrower shall have no obligation hereunder to any Indemnified Person with respect to indemnified liabilities resulting from the gross negligence or willful misconduct of any Indemnified Person. The agreements in this Section 6.08 shall survive payment of the Loan.

SECTION 6.09. *Severability.*  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

SECTION 6.10.  *Schedules:*

Schedule 1-. Form of Notes to be granted by the Borrower.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

GSM Colombia SAS as Borrower

By:   _____
Alvaro Jose Gallo
Legal Representative

Global Securities Trade Finance, as Lender

By:   _____
Gustavo Adolfo Hernandez F
Director

12

LOAN AGREEMENT

dated as of

August, 17, 2017

among

GLOBAL SECURITIES MANAGEMENT CORP
as Borrower

and

GLOBAL SECURITIES TRADE FINANCE
as Lender

LOAN AGREEMENT dated as of August, 17, 2017, (the "Agreement") among: (i) **Global Securities Management Corp** a corporation duly incorporated and validly existing under the laws of the British Virgin Islands (the "Borrower"); and (ii) Global Securities Trade Finance, a financial entity duly incorporated and validly existing under the laws of the Cayman Islands (the "Lender" and, together with the Borrower, the "Parties").

ARTICLE I
DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Section, unless otherwise specifically provided herein. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but are not expressly defined herein must be understood by common sense, according to the generalized use given to them. The definitions of terms herein shall apply to both the singular and plural forms of the terms defined.

As used in this Agreement the following terms have the meanings specified below:

(a)    "Agreement" as mentioned in the first paragraph of this document, shall mean this loan agreement.

(b)    "Borrower" has the meaning specified in the first paragraph of this Agreement.

(c)    "Business Day" means any day, other than Saturday or Sunday, on which banks in Colombia or New York City are authorized or required by law to remain open.

(d)    "Closing Date" means the execution date of this Agreement.

(e)    "Default Rate" shall have the meaning specified in Section 2.04(a) of this Agreement.

(f)    "Dollars" or "USD$" refers to Dollars of the United States of America.

(g)    "Event of Default" means any event specified as such in Article IV below.

(h)    "Interest Payment Date" means the Maturity Day.

(i)      "Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(j)      "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, structure, shareholder composition or financial condition of the Borrower; (b) a material impairment of the ability of the Borrower to make payments under the Loan when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any of their obligations under the Loan and/or this Agreement.

(k)      "Maturity Date" means the date corresponding to ninety (90) days after the disbursement date of the Loan or, if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, case in which such Maturity Date shall be the immediate preceding Business Day.

(l)      "Note" has the meaning specified in Section 2.02(a) (ii) of this Agreement.

(m)      "Parties" has the meaning specified in the first paragraph of this Agreement.

(n)      "Principal" has the meaning specified in Section 2.01 (i) of this Agreement.

(o)      "Payment Date" means the Maturity Date.

(p)      "Structuring Fee" has the meaning specified in Section 2.04 (h) of this agreement

(q)      "Tax Deductions" has the meaning set forth in Section 2.05 of this Agreement.


ARTICLE II
CONDITIONS OF THE FACILITY

SECTION 2.01 *The Loan.* (i) Subject to the terms of this Agreement, the Lender shall grant to the Borrower a Loan in an aggregate principal amount of **five hundred fifty five thousand** United States Dollars (USD $555,000.00) (the "Principal").

(ii) Amounts borrowed as Loan that are repaid or prepaid may not be reborrowed.

(iii) The Principal will be disbursed on the Closing Date, meaning the date in which the lender disburses the amount borrowed via wire transfer based on instructions provided by the Borrower on or before August 31, 2017.

SECTION 2.02 *Conditions Precedent.* The Lender's obligation to make the Loan under this Agreement shall be subject to the fulfillment of the following condition precedent prior to the disbursement, to the entire satisfaction of the Lender:

(a)     The Lender shall have received the following documents, each of which shall be in form and substance satisfactory to the Lender:

(i)     Executed Agreement. This Agreement, duly executed and delivered by the Parties hereto; and

(ii)     Note.   The Note, duly executed and delivered by the Borrower substantially in the form of Schedule 1 (the "Note"), delivered to the Lender for its benefit on or before the Closing Date, appropriately completed and in a way satisfactory to the Lender.

(b)     There shall not have occurred since the Closing Date any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the financial, economic or political situation in the Republic of Colombia which in the opinion of the Lender would affect the repayment of Loan and/or the disbursements to be made pursuant to this Agreement.

In the event that any of the conditions precedent set forth under this Section are not duly and timely satisfied by the Borrower, the Lender may, at its sole discretion, waive such condition precedent and disburse the Loan on the respective disbursement date.

SECTION 2.03 *Repayment of the Loan.* The Borrower shall repay the total principal amount of the Loan on the Payment Date. Repayment of the Loan shall be made by the Borrower. Repayment must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| Bank Name: | Citi National Bank |
| Swift Code : | CNNJUS33 |
| ABA #: | 021201639 |
| Account Name: | Global Securities Trade Finance – **CLASS D** |
| Account #: | **55102421** |

SECTION 2.04 *Interest Rate.* The Borrower shall pay to the Lender interest on the unpaid USD$ Principal amount of the Loan, from the period from - and including - the disbursement date to - but excluding - the Payment Date, at a rate per annum of 5% per annum (the "Interest Rate").

(c)     The Borrower shall pay to the Lender interest on the Loan at a rate equivalent to **8% per annum** (the "Default Rate") at any time during the existence and / or continuance of an Event of Default.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Global Securities Management Corp., as Borrower

By: _____
Gustavo Hernandez - Director


Global Securities Trade Finance, as Lender

By: _____
Gustavo Hernandez - Director

LOAN AGREEMENT

dated as of September 25, 2017
among
**Global Securities Management LLC as**
Borrower

and

**GLOBAL SECURITIES TRADE FINANCE**
as Lender

(i)  LOAN AGREEMENT dated as of September 25, 2017, (the "Agreement") among: (ii) Global Securities Management LLC a corporation  duly  incorporated  and validly existing under the laws of the Florida State of United States (the "Borrower"); and (iii) Global Securities Trade Finance, a financial entity duly incorporated and validly existing under the laws of the Cayman Islands (the "Lender" and, together with the Borrower, the "Parties").


## ARTICLE I
### DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Section, unless otherwise specifically provided herein. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but are not expressly defined herein must be understood by common sense, according to the generalized use given to them. The definitions of terms herein shall apply to both the  singular and plural forms of the terms defined.

As used in this Agreement the following terms have the meanings specified below:

(a)    "Agreement"  as mentioned  in the  first paragraph of this document, shall mean this loan agreement.

(b)    "Borrower" has the meaning specified in the first paragraph of this Agreement.

(c)    " Business Day" means any day, other than Saturday or Sunday, on which banks in Cayman Islands or New York City are authorized or required by law to remain open.

(d)    "Closing Date" means the execution date of this Agreement.

(e)    "Default Rate" shall have the meaning specified in Section 2.04(a) of this Agreement.

(f)    "Dollars" or "USD$" refers to Dollars of the United States of America.

(g)    "Event of Default" means any event specified as such in Article IV below.

(h)    "Interest Payment Date" means the Maturity Day.

(i)     "Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(j)     "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, structure, shareholder composition or financial condition of the Borrower; (b) a material impairment of the ability of the Borrower to make payments under the Loan when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any of their obligations under the Loan and/or this Agreement.

(k)     "Maturity Date" means the date corresponding to one (1) month after the disbursement date of the Loan or, if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, case in which such Maturity Date  shall be the immediate preceding Business Day.

(l)     "Note" has the meaning specified in Section 2.02(a) (ii) of this Agreement.

(m)     "Parties" has the meaning specified in the first paragraph of this Agreement.

(n)     "Principal" has the meaning specified in Section 2.01 (i) of this Agreement.

(o)     "Payment Date" means the Maturity Date.

(p)     "Structuring Fee" has the meaning specified in Section 2.04 (h) of this agreement.

(q)     "Tax Deductions" has the meaning set forth in Section 2.05 of this Agreement.

ARTICLE II
CONDITIONS OF THE FACILITY

SECTION 2.01 *The Loan*. (i) Subject to the terms of  this Agreement, the Lender shall grant to the Borrower a Loan in an aggregate principal amount of one hundred thousand Dollars USD$100,000.00 (the "Principal").

(ii)  Amounts borrowed as Loan that are repaid or prepaid may not be reborrowed.

(iii) The Principal will be disbursed on the Closing Date, meaning the date in which the lender disburses the amount borrowed via wire transfer based on instructions provided by the Borrower on or before September 25, 2017.

SECTION 2.02 *Conditions Precedent*. The Lender's obligation to make the Loan under this Agreement shall be subject to the fulfillment of the following condition precedent prior to the disbursement, to the entire satisfaction of the Lender:

(a)    The Lender shall have received the following documents, each of which shall be in form and substance satisfactory to the Lender:

(i)    <u>Executed Agreement</u>. This Agreement, duly executed and delivered by the Parties hereto; and

(ii)    <u>Note</u>. The Note, duly executed and delivered by the Borrower substantially in the form of <u>Schedule 1</u> (the "<u>Note</u>"), delivered to the Lender for its benefit on or before the Closing Date, appropriately completed and in a way satisfactory to the Lender.

(b)    There shall not have occurred since the Closing Date any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the financial, economic or political situation in the United States and Cayman Islands which in the opinion of the Lender would affect the repayment of Loan and/or the disbursements to be made pursuant to this Agreement.

In the event that any of the conditions precedent set forth under this Section are not duly and timely satisfied by the Borrower, the Lender may, at its sole discretion, waive such condition precedent and disburse the Loan on the respective disbursement date.

SECTION 2.03 *Repayment of the Loan*. The Borrower shall repay the total principal amount of the Loan on the Payment Date. Repayment of the Loan shall be made by the Borrower by means of acquiring from an IEM an amount in US Dollars equivalent, at the corresponding payment date. Repayment must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| Bank Name: | Citi National Bank |
| Swift Code : | CNNJUS33 |
| ABA #: | 021201639 |
| Account Name: | Global Securities Trade Finance – CLASS C |
| Account #: | 1466054 |

SECTION 2.04 *Interest Rate*. The Borrower shall pay to the Lender interest on the unpaid USD$ Principal amount of the Loan, from the period from - and including - the disbursement date to - but excluding - the Payment Date, at a rate of 8.00% per annum (the "<u>Interest Rate</u>").

(c)    The Borrower shall pay to the Lender interest on the Loan at a rate of 10.00 % per annum in excess of the Interest (the "Default Rate") at any time of the existence and / or continuance of an Event of Default.

SECTION 6.10. *Schedules:*

Schedule 1-. Form of Notes to be granted by the Borrower.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement    to be duly executed and delivered as of the day and year first above written.

Global Securities Management LLC., as Borrower

By: _____
Publio F. Velasco
Director


Global Securities Trade Finance, as Lender

By: _____
Gustavo Hernandez
Director

LOAN AGREEMENT

dated as of

December 26, 2017

among

GLOBAL SECURITIES MANAGEMENT CORP
as Borrower

and

GLOBAL SECURITIES TRADE FINANCE
as Lender

LOAN AGREEMENT dated as December 26, 2017, (the "Agreement") among: (i) **Global Securities Management Corp** a corporation duly incorporated and validly existing under the laws of the British Virgin Islands (the "Borrower"); and (ii) Global Securities Trade Finance, a financial entity duly incorporated and validly existing under the laws of the Cayman Islands (the "Lender" and, together with the Borrower, the "Parties").

## ARTICLE I
### DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Section, unless otherwise specifically provided herein. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but are not expressly defined herein must be understood by common sense, according to the generalized use given to them. The definitions of terms herein shall apply to both the singular and plural forms of the terms defined.

As used in this Agreement the following terms have the meanings specified below:

(a)     "Agreement" as mentioned in the first paragraph of this document, shall mean this loan agreement.

(b)     "Borrower" has the meaning specified in the first paragraph of this Agreement.

(c)     "Business Day" means any day, other than Saturday or Sunday, on which banks in Colombia or New York City are authorized or required by law to remain open.

(d)     "Closing Date" means the execution date of this Agreement.

(e)     "Default Rate" shall have the meaning specified in Section 2.04(a) of this Agreement.

(f)     "Dollars" or "USD$" refers to Dollars of the United States of America.

(g)     "Event of Default" means any event specified as such in Article IV below.

(h)     "Interest Payment Date" means the Maturity Day.

(i)        "Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(j)        "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, structure, shareholder composition or financial condition of the Borrower; (b) a material impairment of the ability of the Borrower to make payments under the Loan when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any of their obligations under the Loan and/or this Agreement.

(k)        "Maturity Date" means the date corresponding to twelve (12) month after the disbursement date of the Loan or, if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, case in which such Maturity Date shall be the immediate preceding Business Day.

(l)        "Note" has the meaning specified in Section 2.02(a) (ii) of this Agreement.

(m)        "Parties" has the meaning specified in the first paragraph of this Agreement.

(n)        "Principal" has the meaning specified in Section 2.01 (i) of this Agreement.

(o)        "Payment Date" means the Maturity Date.

(p)         "Taxes" has the meaning set forth in Section 2.05 of this Agreement.


ARTICLE II
CONDITIONS OF THE FACILITY

SECTION 2.01 *The Loan.* (i) Subject to the terms of this Agreement, the Lender shall grant to the Borrower a Loan in an aggregate principal amount of **four hundred eighty thousand** United States Dollars (USD $1,037,500.00) (the "Principal").

(ii) Amounts borrowed as Loan that are repaid or prepaid may not be reborrowed.

(iii) The Principal will be disbursed on the Closing Date, meaning the date in which the lender disburses the amount borrowed via wire transfer based on instructions provided by the Borrower on or before December 26, 2017.

SECTION 2.02 *Conditions Precedent.* The Lender's obligation to make the Loan under this Agreement shall be subject to the fulfillment of the following condition precedent prior to the disbursement, to the entire satisfaction of the Lender:

(a)      The Lender shall have received the following documents, each of which shall be in form and substance satisfactory to the Lender:

(i)      Executed Agreement. This Agreement, duly executed and delivered by the Parties hereto; and

(ii)      Note.  The Note, duly executed and delivered by the Borrower substantially in the form of Schedule 1 (the "Note"), delivered to the Lender for its benefit on or before the Closing Date, appropriately completed and in a way satisfactory to the Lender.

(b)      There shall not have occurred since the Closing Date any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the financial, economic or political situation in the Republic of Colombia which in the opinion of the Lender would affect the repayment of Loan and/or the disbursements to be made pursuant to this Agreement.

In the event that any of the conditions precedent set forth under this Section are not duly and timely satisfied by the Borrower, the Lender may, at its sole discretion, waive such condition precedent and disburse the Loan on the respective disbursement date.

SECTION 2.03 *Repayment of the Loan.* The Borrower shall repay the total principal amount of the Loan on the Payment Date. Repayment of the Loan shall be made by the Borrower. Repayment must be made to the following account (unless otherwise notified by the Lender):

| | |
|---|---|
| Bank Name: | Citi National Bank |
| Swift Code : | CNNJUS33 |
| ABA #: | 021201639 |
| Account Name: | Global Securities Trade Finance – **CLASS E** |
| Account #: | **55102480** |

SECTION 2.04 *Interest Rate.* The Borrower shall pay to the Lender interest on the unpaid USD$ Principal amount of the Loan, from the period from - and including - the disbursement date to - but excluding - the Payment Date, at a rate per annum of 5% per annum (the "Interest Rate").

(c)      The Borrower shall pay to the Lender interest on the Loan at a rate equivalent to **8% per annum** (the "Default Rate") at any time during the existence and / or continuance of an Event of Default.

(d)      Accrued interest on the Loan shall be payable on the Interest Payment Date; provided that interest payable at the Default Rate shall also be payable on demand by the Lender. The payment of interest shall be made in accordance with the calculations provided to it by the Lender and previously sent to the Borrower.

proceeding (including any insolvency proceeding or appellate proceeding) related to or arising out of this Agreement or the Loan or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto; provided, however, that the Borrower shall have no obligation hereunder to any Indemnified Person with respect to indemnified liabilities resulting from the gross negligence or willful misconduct of any Indemnified Person. The agreements in this Section 6.08 shall survive payment of the Loan.

SECTION 6.09. *Severability.* The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

SECTION 6.10. *Schedules:*

Schedule 1- Promissory Note to be granted by the Borrower.
Schedule 2- Utilization Request to be submitted by the Borrower.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Global Securities Management Corp., as Borrower

By: _____
Gustavo Hernandez - Director

Global Securities Trade Finance, as Lender

By: _____
Publio Velasco - Director

**021201639  City National Bk of NJ**
**Outgoing Wire Detail**

### General Information

| | |
|---|---|
| Wire Number | 33695 |
| Type of Wire | New International |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 111130602 |
| Wire Status | Complete |
| OFAC Status | OFAC Passed |
| Fraud Analysis | Scan Results: Suspected |
| | Analysis Decision: |
| | Final Decision: Suspected Fraud Overridden |

### Audit Trail

| | |
|---|---|
| Entered | 09/01/2016 10:14 AM by System |
| | Komal Ramkirath |
| | Gustavo Hernandez |
| Modified | 09/01/2016 10:38 AM by Nasser Awad |
| Modified | 09/01/2016 11:15 AM by Nasser Awad |
| Verified | 09/01/2016 11:18 AM by Folasade Salam |
| Suspected Fraud Overridden | 09/01/2016 11:36 AM by Rebeca Arriaza Reason: Wire originated by customer, no fra |
| Memo Added | 09/01/2016 11:36 AM by Rebeca Arriaza |
| | Wire originated by customer, no fraud detected. |
| Posted | 09/01/2016 11:37 AM by System |
| Forwarded to Fed | 09/01/2016 11:37 AM by System |
| Completed | 09/01/2016 11:37 AM by System |

### Originator Instructions

| | |
|---|---|
| Originating FI | F 021201639 |
| Originator | Global Securities Trade Finance D 1466054 701 Brickell Avenue Miami FL 33131 |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 1466054 |
| Fee Account | DDA Wire Out 1466054 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,33695 |
| Reference Number | 23093672 |
| Override Flag | No |
| Wire Amount / Currency | $2,000,000.00 USD |
| Wire Fee | $35.00 Br-01 Intl Wire Fee |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 09/01/2016 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 021000089 CITIBANK NYC |
| Fedwire Type | CTR 1000 |
| IMAD | 20160901GMQFMP01007632 |
| OMAD | 20160901B1Q8021R01987509011237FT 01 |

### Beneficiary Instructions

| | |
|---|---|
| Intermediary FI | CITIBANK N.A. F 021000089 153 East 53rd Street New York NY 10043 |
| Beneficiary FI | BANCO DE OCCIDENTE B OCCICOBC Playa es Calle 51 No 47 25 Medellin Colombia |
| Beneficiary | GSM COLOMBIA SAS D ▇▇▇▇ 576 1 Carrera 1 70A 26 suite 101 Bogota DC Colombia Colombia |
| Originator To Beneficiary | GSM Colombia SAS loan |

GOVERNMENT
EXHIBIT
**3-L**
18-CR-20685

## 021201639  City National Bk of NJ
## Outgoing Wire Detail

### General Information

| | |
|---|---|
| Wire Number | 54806 |
| Type of Wire | New Domestic |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 119138943 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Passed |
| | Analysis Decision: |
| | Final Decision: |

### Audit Trail

| | |
|---|---|
| Entered | 08/18/2017 10:38 AM by System |
| | Komal Ramkirath (A) |
| | Gustavo Hernandez (S) |
| Verified | 08/18/2017 11:10 AM by Folasade Salam |
| OFAC Approved | 08/18/2017 11:10 AM by Vanessa Hernandez |
| | Reason: Not a match based on name. |
| Posted | 08/18/2017 11:11 AM by System |
| Forwarded to Fed | 08/18/2017 11:11 AM by System |
| Completed | 08/18/2017 11:11 AM by System |

### Originator Instructions

| | |
|---|---|
| Originating FI | F 021201639 |
| Originator | Global Securities Trade Finance |
| | D 55102421 |
| | 701 Brickell Avenue |
| | Miami FL 33131 |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 55102421 |
| Fee Account | DDA Wire Out 55102421 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,54806 |
| Reference Number | 37729752 |
| Override Flag | No |
| Wire Amount / Currency | $122,000.00 USD |
| Wire Fee | $25.00 Br-01 Domestic Wire Fee |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 08/18/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 121000248 Wells Fargo Bank |
| Fedwire Type | CTR 1000 |
| IMAD | 20170818GMQFMP01006475 |
| OMAD | 20170818I1B7033R01036008181211FT03 |

### Beneficiary Instructions

| | |
|---|---|
| Beneficiary FI | Wells Fargo Bank |
| | F 121000248 |
| | 169 SW 8TH Street |
| | Miami FL 33130 |
| Beneficiary | Global Securities Management |
| | ▓▓▓▓7276 |
| | 701 Brickell Ave |
| | Miami FL 33131 |
| Originator To Beneficiary | GSTF funds Global Securities Mgt US D122k to acquire Metrolineas portfolio |

1

## 021201639  City National Bk of NJ
### Outgoing Wire Detail

#### General Information

| | |
|---|---|
| Wire Number | 57464 |
| Type of Wire | New Domestic |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 117304910 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Passed |
| | Analysis Decision: |
| | Final Decision: |

#### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 1466054 |
| Fee Account | DDA Wire Out 1466054 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,57464 |
| Reference Number | 90314131 |
| Override Flag | No |
| Wire Amount / Currency | $100,000.00 USD |
| Wire Fee | $25.00 Br-01 Domestic Wire Fee |

#### Audit Trail

| | |
|---|---|
| Entered | 09/25/2017 08:47 AM by System |
| | Publio Velasco (S) |
| | Marcela Velasquez Reyes (S) |
| Verified | 09/25/2017 08:51 AM by Nasser Awad |
| OFAC Approved | 09/25/2017 08:53 AM by Rebeca Arriaza |
| | Reason: Not a match based on name. |
| Posted | 09/25/2017 08:53 AM by System |
| Forwarded to Fed | 09/25/2017 08:53 AM by System |
| Completed | 09/25/2017 08:53 AM by System |

#### Basic Settlement Information

| | |
|---|---|
| Effective Date | 09/25/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 121000248 WELLS FARGO NA |
| Fedwire Type | CTR 1000 |
| IMAD | 20170925GMQFMP01001554 |
| OMAD | 20170925I1B7033R00627109250953FT03 |

#### Originator Instructions

| | |
|---|---|
| Originating FI | F 021201639 |
| Originator | Global Securities Trade Finance |
| | D 1466054 |
| | 701 Brickell Avenue |
| | Miami FL 33131 |

#### Beneficiary Instructions

| | |
|---|---|
| Beneficiary FI | Wells Fargo Bank |
| | F 121000248 |
| | 169 SW 8TH Street |
| | Miami FL 33130 |
| Beneficiary | Global Securities Management |
| | 7276 |
| | 701 Brickell Ave |
| | Miami FL 33131 |

## 021201639  City National Bk of NJ
## Outgoing Wire Detail

### General Information

| | |
|---|---|
| Wire Number | 64444 |
| Type of Wire | New Domestic |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 114852038 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Passed |
| | Analysis Decision: |
| | Final Decision: |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 1466054 |
| Fee Account | DDA Wire Out 1466054 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,64444 |
| Reference Number | 56193363 |
| Override Flag | No |
| Wire Amount / Currency | $235,000.00 USD |
| Wire Fee | $25.00 Br-01 Domestic Wire Fee |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 12/27/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 121000248 WELLS FARGO NA |
| Fedwire Type | CTR 1000 |
| IMAD | 20171227GMQFMP01001009 |
| OMAD | 20171227I1B7031R00566612270928FT01 |

### Audit Trail

| | |
|---|---|
| Entered | 12/26/2017 04:39 PM by System |
| | Marcela Velasquez Reyes (S) Publio Velasco (S) |
| Modified | 12/27/2017 07:52 AM by Folasade Salam |
| Verified | 12/27/2017 08:20 AM by Chantel Galloway |
| OFAC Approved | 12/27/2017 08:27 AM by Alexandra Valencia Reason: not a match based on name |
| Posted | 12/27/2017 08:28 AM by System |
| Forwarded to Fed | 12/27/2017 08:28 AM by System |
| Completed | 12/27/2017 08:28 AM by System |

### Beneficiary Instructions

| | |
|---|---|
| Beneficiary FI | Wells Fargo Bank F 121000248 169 SW 8TH Street Miami FL 33130 |
| Beneficiary | Global Securities Management 7276 701 Brickell Ave Miami FL 33131 |

### Originator Instructions

| | |
|---|---|
| Originating FI | CITY NATL BK F 021201639 900 BROAD ST NEWARK NJ 07102 |
| Originator | Global Securities Trade Finance D 14660S4 701 Brickell Avenue Miami FL 33131 |

1

**021201639  City National Bk of NJ**
**Outgoing Wire Detail**

### General Information

| | |
|---|---|
| Wire Number | 64443 |
| Type of Wire | New Domestic |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 114844796 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Passed |
| | Analysis Decision: |
| | Final Decision: |

### Audit Trail

| | |
|---|---|
| Entered | 12/26/2017 04:39 PM by System |
| | Marcela Velasquez Reyes (S) Publio Velasco (S) |
| Modified | 12/27/2017 07:51 AM by Folasade Salam |
| Verified | 12/27/2017 08:19 AM by Chantel Galloway |
| OFAC Approved | 12/27/2017 08:27 AM by Alexandra Valencia Reason: not a match based on name |
| Posted | 12/27/2017 08:27 AM by System |
| Forwarded to Fed | 12/27/2017 08:27 AM by System |
| Completed | 12/27/2017 08:27 AM by System |

### Originator Instructions

| | |
|---|---|
| Originating FI | CITY NATL BK F 021201639 900 BRAOD ST NEWARK NJ 07102 |
| Originator | Global Securities Trade Finance D 55102421 701 Brickell Avenue Miami FL 33131 |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 55102421 |
| Fee Account | DDA Wire Out 55102421 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 072 |
| Statement Description | Wire Transfer,64443 |
| Reference Number | 43402283 |
| Override Flag | No |
| Wire Amount / Currency | $335,000.00 USD |
| Wire Fee | $25.00 Br-01 Domestic Wire Fee |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 12/27/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 121000248 WELLS FARGO NA |
| Fedwire Type | CTR 1000 |
| IMAD | 20171227GMQFMP01000996 |
| OMAD | 20171227I1B7033R00567312270927FT01 |

### Beneficiary Instructions

| | |
|---|---|
| Beneficiary FI | Wells Fargo Bank F 121000248 169 SW 8TH Street Miami FL 33130 |
| Beneficiary | Global Securities Management ███████7276 701 Brickell Ave Miami FL 33131 |

1

LOAN AGREEMENT

dated as of

November 14, 2017

among


PORT 10 S.A.S.

as Borrower

and

GLOBAL SECURITIES TRADE FINANCE FUND
as Lender

GOVERNMENT
EXHIBIT
**3-M**
18-CR-20685

LOAN AGREEMENT dated as of November 14, 2017 (the "Agreement") among GLOBAL SECURITIES TRADE FINANCE FUND, a corporation duly organized and existing under the laws of Cayman Islands (the "Lender"); and PORT 10 S.A.S., an entity duly incorporated and validly existing under the laws of Colombia (the "Borrower"), both hereinafter sometimes jointly referred to as (the "Parties").

ARTICLE I
DEFINITIONS

As used in this Agreement, the following capitalized terms have the meanings attributed in this Article I, unless otherwise specifically provided for. The titles, Articles and Sections are included for reference and convenience purposes, but they do not limit, define or describe the scope and intention of the Agreement and they are not considered as part of it. The technical and scientific terms that are not expressly defined herein must have the meanings given by the respective technique or science. The terms that are not technical or scientific, but were not expressly defined herein must be understood by common sense, accordingly to the generalized use given to them. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  As used in this Agreement the following terms have the meanings specified below:

(a)     "Agreement" means this Loan Agreement.

(b)     "Borrower" has the meaning specified in the first paragraph of this Agreement.

(c)     "Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in the Florida are authorized or required by law to remain closed.

(d)     "Closing Date" means the execution date of this Agreement.

(e)     "Dollars" and "USD$" refers to lawful money of the United States of America.

(f)     "Event of Default" means any event or circumstance specified as such in Section 2.07 herein.

(g)     "Interest Payment Date" means the last day of each Interest Period; provided, that if such day is not a Business Day, such Interest Payment Date shall be the next succeeding Business Day unless such next succeeding Interest Payment Date would fall in another calendar month in which event such Interest Payment Date shall be the immediately preceding Business Day.

(h)     "Interest Period" means, (a) initially, the period commencing on the disbursement date of the Loan and ending on the Maturity Date; and (b) thereafter, the period commencing on the last day of the immediately preceding Interest Period, and ending on the Maturity Date; provided, however, that: (A) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension

would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day; and (B) any Interest Period may not extend beyond the Maturity Date.

(i)      "Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

(j)      "Maturity Date" means the date falling on the ten (10) year anniversary of the disbursement date of the Loan, or if such date is not a Business Day, the Maturity Date shall be the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month in which event such Maturity Date shall be the immediately preceding Business Day.

(k)      "Parties" means, collectively, the Borrower and the Lender.

(l)      "Principal Payment Date" means the Maturity Date.

ARTICLE II
CONDITIONS OF THE FACILITY

SECTION 2.01.      *The Loan.* Subject to the terms of this Agreement, the Lender makes available to the Borrower a Loan in an aggregate principal amount equal to One Hundred and Fifty Thousand US Dollars (USD $150,000.00) (the "Principal").

SECTION 2.02.      *Conditions Precedent.* The Lender acknowledges duly receipt of the documents listed hereafter in form and substance satisfactory to the Lender, making the Loan available for disbursement pursuant to the terms of this Agreement.

(a)      The Borrower has sent to the Lender the utilization request, which is attached hereto as Schedule 1; and

(b)      The Borrower has executed a promissory note according to the Lender's format, which is attached hereto as Schedule 2

SECTION 2.03.      *Repayment of the Loan.* The Borrower shall repay the Loan on the Maturity Date, meaning on the one (1) year anniversary of the disbursement date of the Loan made by the Lender to the Borrower. Payment must be made in Dollars to the account provided by Borrower to the Lender in writing.

SECTION 2.04.      *Voluntary Prepayment.* The Borrower may, at any moment, if it gives the Lender not less than 5 Business Days' prior notice, prepay any partial or total outstanding amount of the Loan.

SECTION 2.05.      *Interest Rate.* The rate of interest on the Loan is five percent (5%) per annum over the total Principal amount outstanding at any time. Accrued interest on the Loan shall be payable on each of Interest Payment Date. Interest will accrue as of the disbursement date and until de Maturity Date or the voluntary prepayment date, whichever occurs first.

2

SECTION 2.06.        *Default Interests*. If the Borrower fails to pay any amount payable by it under this Agreement on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at the maximum rate of interest allowed by applicable law.

SECTION 2.07.        *Events of Default*. The following events will be considered Events of Default under this Agreement and, unless cured within 10 Days after its occurrence, will accelerate the payment of the outstanding Loan.

(a)        The Borrower does not pay on the due date any amount payable (Principal or interests) pursuant to this Agreement at the place and in the currency in which it is expressed to be payable.

(b)        Any representation or statement made or deemed to be made by the Borrower under or in connection with this Agreement is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

The Borrower declares and recognizes the following:

(a)        The Borrower is an entity duly organized and existing under the laws of Florida, and it is not facing any ground for dissolution neither it has requested a restructuring process.

(b)        The Borrower has all requisite power and authority to carry on its business as now conducted, and it has been duly authorized by all necessary corporate and, if required, stockholder action.

(c)        The Borrower has the corporate power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated herein.

(d)        The obligations expressed to be assumed by it in this Agreement are, legal, valid, binding and enforceable obligations.

(e)        The payment obligations of the Borrower under the Loan are direct, general, and unconditional obligations of the Borrower. In addition, and to the extent permitted by applicable law, the Loan will have a priority upon other present and future, unsecured and secured, payment obligations of the Borrower

ARTICLE IV
MISCELLANEOUS

SECTION 4.01.        *Taxes*. The Borrower will be held responsible for the causation of any tax resulting from the granting or disburse of the Loan.

SECTION 4.02.        *Applicable Law and jurisdiction*.  This Agreement shall be governed and interpreted by the laws of New York State. Any dispute between the Parties will be resolved by the competent courts in New York.

3

SECTION 4.03.        *Confidentiality*. Under no circumstance, any information regarding the transactions contemplated herein shall be made available to any person, regulatory entity or to the public by Lender or Borrower, without the prior written consent of the Lender or Borrower, as the case may be. The Lender agrees that it will maintain at all times the confidential information related to and provided to them by Borrower, unless there is a request to disclose such information by an authority or unless disclosure is required by law or financial reporting purposes. In this case, it shall notify the Borrower before the disclosure indicating the mandatory nature of it.

SECTION 4.04.        *Amendments*. Any amendment to this Agreement shall be made in writing prior mutual agreement between the Parties.

SECTION 4.05.        *Notices*. All notices and communications provided for herein shall be in writing and shall be deemed to have been duly notified on the date of delivery, if delivered personally, or upon receipt confirmed by courier to the party to whom it is directed at the following address (or at such other address as any Party hereto shall hereafter specify by notice in writing to the other Parties hereto):

If to Borrower, at the following address:

PORT 10 S.A.S.
Avenida Zona France, 5 y 6
Manga, Cartagena
Colombia

If to Lender, at the following address:

Harneys Services (Cayman) Ltd.
4th Floor, Harbour Place
103 South Church Street
PO Box 10240
Grand Cayman, KY1-1002
Cayman Islands


[Remainder of Page Intentionally Left Blank]

4

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

GLOBAL SECURITIES TRADE FINANCE, as Lender

By: 

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PORT 10 S.A.S., as Borrower

By: 

5

Schedule 1                              Utilization Request

From:  PORT 10 S.A.S.
To:      GLOBAL SECURITIES TRADE FINANCE
Dated:  November 14, 2017

Dear Sirs,

### Facility Agreement dated November 14, 2017 (the "Agreement")

1.        We refer to the Agreement. This is a Utilization Request. Terms defined in the
          Agreement have the same meaning in this Utilization Request unless given a different
          meaning in this Utilization Request.

2.        We wish to borrow a Loan on the following terms:

          Utilization Date:              November 14, 2017
          Amount:                        150,000.00

3.        We confirm that each condition specified in Section 2.02 (*Conditions precedent*) is satisfied
          on the date of this Utilization Request.

4.        The proceeds of this Loan should be credited to the below account:

**Beneficiario DARIO PACHECO ANGULO**

**Cuenta No.** ▓▓▓ **3383**

**Banco del Beneficiario ITAU (Panamá) S.A**

**Código Swift: BCTOPAPA**

**Dirección:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **Panamá, República
de Panamá**

**Banco Intermediario Citibank N. A.**

**New York 111 Wall Street New York, N.Y 10043**

**Cuenta No.** ▓▓▓ **5789 ( DE ITAU Panamá en el Citibank)**

**Swift: CITIUS33 ABA code: 021000089**

5.        This Utilization Request is irrevocable.

Yours faithfully

Dario Pacheco Angulo

6

Schedule 2

**Promissory Note No. 01**

**U.S. $150,000** (Principal Amount)

**Maturity Date:** November 14, 2018

PORT 10 S.A.S., a company duly incorporated under the laws of Colombia, (hereinafter "PORT 10"), in his debtor capacity, represents:

**FIRST:** That PORT 10 promises unconditionally to pay to GLOBAL SECURITIES TRADE FINANCE (hereinafter the "Creditor"), or to his order, or to the person representing his rights, the principal amount of U.S. $100,000.00 Dollars of the United States of America, amount which was received by PORT 10 as a commercial loan with interests, and as a result of a that certain Loan Agreement dated November 14, 2017, entered into by and between PORT 10 and the Creditor (hereinafter the "Loan"), by means of which the terms and conditions applicable to the Loan, which is instrumented by this promissory note, were established.

**SECOND:** The rate of interest on the Loan is 5% per annum over the total principal amount outstanding at any time.

**THIRD:** The principal amount owed under this promissory note will be paid by PORT 10 at Maturity. The interests will be paid on each of Interest Payment Date pursuant to the terms provided in the Loan. In the event that the payment date is not a business day in Florida, such payment date shall be the next succeeding business day, unless such day falls in another calendar month in which event such payment date shall be the immediately preceding business day, and as a result thereof, no penalty, premium, moratorium interest or additional cost will be caused To PORT 10.

**FOURTH:** The payment or payments to be made by PORT 10 to Creditor, to attend the obligations derived from this promissory note, will be applied in the following priority: (i) commissions, and judicial and collection costs, if any; (ii) moratorium interests, if any; (iii) interests; and finally (iv) principal payments.

**FIFTH:** Creditor authorizes that the partial or total payment, both of interests as principal of this promissory note, may be evidenced in manual or systematized registers.

**SIXTH:** The liability of PORT 10 is extended to any renewals, and extensions of the maturity date, granted by Creditor, if any, periods in which the payment obligation of PORT 10 will be maintained with no modifications.

**SEVENTH:** This promissory note will be governed by the Laws of New York State.

In light of the above, this promissory note is signed on November 14, 2017.

PORT 10 S.A.S.



Outgoing Wire Transfer Detail as of 02/14/2018 11:50 AM

| Outgoing Transfer Information | | | |
|---|---|---|---|
| Fed Acceptance Date: | | IMAD: | 20171116GMQFMP01006976 |
| Fed Acceptance Time: | | OMAD: | 20171116B1Q8021R02046211161244FT03 |
| Effective Date: | 2017-11-16T00:00:00 | Sender Institution: | 021201639 |
| Debit Account Number: | 55102421 | Sender Institution Name: | |
| Debit Account Type: | Demand Deposit | Upload Date: | 2017-11-16T11:08:33.857 |
| Amount: | 148,500.00 | Originator: | Global Securities Trade Finance |
| Beneficiary: | DARIO PACHECO ANGULO | Originator Address 1: | 701 Brickell Avenue |
| Beneficiary Address 1: | ▮▮▮▮▮▮ | Originator Address 2: | Miami FL 33131 |
| Beneficiary Address 2: | Republica de Panama | Originator Address 3: | |
| Beneficiary Address 3: | | Originating Institution: | 021201639 |
| Beneficiary Institution: | BCTOPAPA | Originating Institution Name: | |
| Beneficiary Institution Name: | ITAU (Panama) S.A. | Originating Institution Address 1: | |
| Beneficiary Institution Address 1: | ▮▮▮▮▮▮ | Originating Institution Address 2: | |
| Beneficiary Institution Address 2: | Republica de Panama | Originating Institution Address 3: | |
| Beneficiary Institution Address 3: | | Receiver Institution: | 021000089 |
| Beneficiary Account: | ▮▮3383 | Receiver Institution Name: | CITIBANK NYC |
| Beneficiary Account Type: | Demand Deposit | Originator to Beneficiary Info 1: | |
| Wire Number: | 61593 | Originator to Beneficiary Info 2: | |
| Wire Status: | Complete | Originator to Beneficiary Info 3: | |
| | | Originator to Beneficiary Info 4: | |

## 021201639 City National Bk of NJ
## Outgoing Wire Detail

### General Information

| | |
|---|---|
| Wire Number | 61593 |
| Type of Wire | New International |
| Originating Branch | City National Bk of New Jersey |
| Source | ECORP ONLINE |
| External Reference | 113420657 |
| Wire Status | Complete |
| OFAC Status | False Positive |
| Fraud Analysis | Scan Results: Suspected |
| | Analysis Decision: |
| | Final Decision: Suspected Fraud Overridden |

### Audit Trail

| | |
|---|---|
| Entered | 11/16/2017 11:08 AM by System |
| | Marcela Velasquez Reyes (S) Publio Velasco (S) |
| Modified | 11/16/2017 11:13 AM by Folasade Salam |
| Verified | 11/16/2017 11:26 AM by Chantel Galloway |
| OFAC Approved | 11/16/2017 11:42 AM by Alexandra Valencia Reason: NOT A MATCH BASED ON NAME |
| Suspected Fraud Overridden | 11/16/2017 11:43 AM by Alexandra Valencia Reason: NO FRAUD DETECTED |
| Posted | 11/16/2017 11:44 AM by System |
| Forwarded to Fed | 11/16/2017 11:44 AM by System |
| Completed | 11/16/2017 11:44 AM by System |

### Originator Instructions

| | |
|---|---|
| Originating FI | F 021201639 |
| Originator | Global Securities Trade Finance D 55102421 701 Brickell Avenue Miami FL 33131 |

### Core Information

| | |
|---|---|
| Debit Account | DDA Wire Out 55102421 |
| Fee Account | DDA Wire Out 55102421 |
| Credit Account | G/L 10200008 |
| Debit Tran Code | 063 |
| Statement Description | Wire Transfer, 61593 |
| Reference Number | 26840227 |
| Override Flag | No |
| Wire Amount / Currency | $148,500.00 USD |
| Wire Fee | $35.00 Br-01 Intl Wire Fee |

### Basic Settlement Information

| | |
|---|---|
| Effective Date | 11/16/2017 Prior to today's date! |
| Sending FI | 021201639 City National Bk of NJ |
| Receiving FI | 021000089 CITIBANK NYC |
| Fedwire Type | CTR 1000 |
| IMAD | 20171116GMQFMP01006976 |
| OMAD | 20171116B1Q8021R02046211161244FT 03 |

### Beneficiary Instructions

| | |
|---|---|
| Intermediary FI | Citibank NA F 021000089 111 Wall Street New York NY 10043 |
| Beneficiary FI | ITAU (Panama) S.A B BCTOPAPA ██████████ Republica de Panama Panama |
| Beneficiary | DARIO PACHECO ANGULO ███3383 ██████████ Republica de Panama Panama |

GOVERNMENT
EXHIBIT
**3-N**
18-CR-20685

1