EXHIBIT H

# OPERATING AGREEMENT
## OF
## 3 GRAMERCY PARK WEST LLC

In accordance with the New York Limited Liability Company Act (the "Act") and subject to the Articles of Organization, which were filed on the 29th day of July, 2005 with the New York Department of State.  The Gramercy Irrevocable Trust, a Nova Scotia Trust (the "Trust"), as sole member of 3 GRAMERCY PARK WEST LLC adopts the following resolutions regarding the conduct of the business and affairs of 3 GRAMERCY PARK WEST LLC, a New York limited liability company ("Company").

## SECTION 1
## THE COMPANY

1.1     Definitions.

Capitalized words and phrases used in this Operating Agreement have the following meanings:

"Act" means the New York Limited Liability Company Act, Chapter 18, as amended from time to time (or any corresponding provisions of succeeding law).

"Articles" means the Articles of Organization filed with the New York Department of State pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Articles of Dissolution" means a certificate filed in accordance with the New York Limited Liability Company Act Section 705.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or, (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the consent or

acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days.

"Business" means the business of operating and managing 3 GRAMERCY PARK WEST LLC.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed pursuant to this Operating Agreement and the Articles and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments; (ii) obligations as lessee under capital leases; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and, (v) obligations under direct or indirect guarantees of [including obligations (contingent or otherwise) to assure a creditor against loss in respect of] indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii) and (iv), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"Dissolution Event" shall have the meaning set forth in Section 10.1 hereof.

"Effective Date" means the date the Articles of Organization were filed.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Liquidation Period" has the meaning set forth in Section 10.7 hereof.

"Liquidator" has the meaning set forth in Section 10.9(a) hereof.

"Manager" means the Member who shall also serve as the Manager of the Company.

"Member" means any Person (i) who is referred to as such in Section 2.1, or who has become a substituted Member pursuant to the terms of this Operating Agreement; and, (ii) who has not ceased to be a Member. "Member(s)" means all such Persons.

"Percentage Interests" means a Member's percentage of LLC interests reflected in Section 2.1.

"Person" means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

"Reconstitution Period" has the meaning set forth in Section 10.1(b) hereof.

"Regulations" mean this Operating Agreement of 3 GRAMERCY PARK WEST LLC including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"Treasury Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Member" has the meaning set forth in Section 7.3(a) hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

"Units or Unit" means any ownership interest in the Company representing a Capital Contribution of $1.00, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this agreement. The Company shall issue 100 Units.

"Voluntary Bankruptcy" has the meaning set forth in the definition of "Bankruptcy."

1.2     Name.

The name of the Company shall be 3 GRAMERCY PARK WEST LLC and all business of the Company shall be conducted in such name. The Manager may change the name of the Company upon ten (10) days notice to the Member(s).

1.3     Purpose; Powers.

(a)     The purposes of the Company are (i) to operate the Business; (ii) to make such additional investments and engage in such additional activities as the Members may approve; and, (iii) to engage in any and all activities related or incidental to the purposes set forth in clauses (i) and (ii).

(b)     The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) hereof and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Manager pursuant to Section 5 hereof.

1.4     Principal Place of Business.

The principal place of business of the Company shall be 2665 South Bayshore Drive, Suite 703, Miami, Florida 33133. The Manager may change the principal place of business of the Company to any other place within or without the State of New York upon ten (10) days notice to the Member(s). The registered office of the Company in the State of New York initially is located at Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960.

1.5     Term.

The term of the Company shall commence on the date the articles of organization of the Company (the "Articles") are filed with the New York Department of State in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 10 hereof.

1.6     Filings; Agent for Service of Process.

(a)     The Manager is hereby authorized to and shall cause the Articles to be filed with the New York Department of State in accordance with the Act. The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of New York, including the preparation and filing of such amendments to the Articles and such other assumed name articles, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)     a change in the Company name;

(ii)     a correction of false or erroneous statements in the Articles or the desire of the Member(s) to make a change in any statement therein in order that it shall accurately represent the agreement among the Member(s); or,

(iii)     a change in the time for dissolution of the Company as stated in the Articles and in this Operating Agreement.

(b)     The Member(s) and the Manager shall execute and cause to be filed original or amended articles and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

(c)     The registered agent for service of process on the Company in the State of New York shall be Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960 or any successor as appointed by the Member(s) in accordance with the Act.

(d)     Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 10, the Manager shall promptly execute and cause to be filed

articles of dissolution in accordance with the Act and the laws of any other jurisdictions in which the Manager deems such filing necessary or advisable.

    1.7    <u>Title to Property</u>.

All property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in his individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its property in the name of the Company and not in the name of any Member. The Member(s) hereby agree that no Member, nor any successor in interest to any Member, shall have the right while this Operating Agreement remain in effect, including, without limitation, during the period the Company is in liquidation following any dissolution, to have any Company asset partitioned, or to file a complaint or institute any proceedings at law or in equity to have such asset partitioned; and each Member, on behalf of himself, his successors, successors-in-title, and assigns, hereby waives any such right.

    1.8    <u>Payments of Individual Obligations</u>.

The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

    1.9    <u>Independent Activities; Transactions with Member(s)</u>.

    (a)    The Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that the Manager may deem appropriate in his discretion.

    (b)    Insofar as permitted by applicable law, neither this Operating Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member to participate in any such activities, and as a material part of the consideration for the execution of this Operating Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

    (c)    To the extent permitted by applicable law and subject to the provisions of this Operating Agreement, the Manager is hereby authorized to cause the Company to purchase property from, sell property to or otherwise deal with any Member or Manager, <u>provided</u> that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been made with an independent third party.

## SECTION 2
## MEMBER(S)' CAPITAL CONTRIBUTIONS

2.1    <u>Original Capital Contributions</u>.

The name, address, original capital contribution, and initial percentage interest of each of the Member(s) is as follows:

| <u>Names and Address</u> | Original Capital <u>Percentage Contribution</u> | <u>Interest (%)</u> | <u>Units</u> |
|---|---|---|---|
| Gramercy Irrevocable Operating Trust A Nova Scotia Trust C/O Trustee AMERICAS FIDUCIARY LTD., a Nevis corporation P.O. Box 3463 Road Town, Tortola BVI | $100.00 | 100% | 100 |

2.2    <u>Additional Capital Contributions</u>.

The Member(s) may make additional capital contributions only with the written consent of all Member(s). If any Member contributes additional capital, his Percentage Interest shall not change. Nothing herein shall be construed to require the Member(s) to make any additional capital contributions.

2.3    <u>Capital Account</u>.

A Capital Account shall be maintained for each Member in accordance with Code Section 704(c), and such account shall be adjusted annually to reflect (i) additions or withdrawals of capital by any Member and (ii) allocations of profit, loss or gain allocated to such Member in accordance with Section 3, below.  Capital Accounts shall be adjusted at the end of each calendar year, or more frequently at the direction of the Managers.  No Member shall be permitted to withdraw any capital from his Capital Account without the approval of the majority of the Member(s).

## SECTION 3
## ALLOCATIONS

3.1    <u>Allocation of Profits and Losses</u>.

Except as to special allocations set forth in Sections 3.2 and 3.3, all profits, income, gain, deduction and loss shall be allocated to the Member(s) according to their Percentage Interests in the Company.  All allocations of profit, gain or loss shall be reflected in each Member's Capital Account.

3.2    <u>Regulatory Allocations</u>.

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Company's minimum gain during any fiscal year, each Member shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in the Company's minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Member's nonrecourse debt minimum gain attributable to a Member nonrecourse debt during the Company's fiscal year, each Member who has a portion of the Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions. Nonrecourse deductions for any fiscal year shall be specially allocated to the Member(s) in proportion to their respective percentage interests.

(d)     Member Nonrecourse Deductions. Any Member nonrecourse deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(e)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of the Company's assets, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining capital accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the capital accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member(s) in accordance with their interests in the Company in the event Treasury

Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member(s) to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

      3.3      <u>Curative Allocations</u>.

The allocations set forth in Section 3.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Member(s) that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 3.3. Therefore, notwithstanding any other provision of this Section 3.3 (other than the Regulatory Allocations), the Tax Matters Member, as provided in Section 7.3(a) shall make such offsetting special allocations of the Company's income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all of the Company's items were allocated pursuant to Sections 3.1.

      3.4      <u>Other Allocation Rules</u>.

      (a)      The Member(s) are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of the Company's income and loss for income tax purposes.

      (b)      Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Member(s)' interests in the Company's profits are in proportion to their percentage interests.

      (c)      To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Tax Matters Member shall endeavor to treat distributions of net cash from operations or net cash from sales or refinancings as having been made from the proceeds of a nonrecourse liability or a Member nonrecourse debt.

      3.5      <u>Tax Allocations: Code Section 704(c)</u>.

In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Member(s) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's

capital account or share of profits, losses, other items, or distributions pursuant to any provision of this Operating Agreement.

## SECTION 4
## DISTRIBUTIONS

### 4.1 Distribution.

The Manager shall make distributions of profits and gain to the Member(s) in accordance with their Percentage Interests at such times as the Manager may determine. All such distributions shall be deducted from the respective Member(s)' Capital Account.

### 4.2 Minimum Distributions.

Notwithstanding Section 4.1, the Manager shall make minimum annual distributions from the Company on the last day of any calendar year to the extent that any Member incurs an income tax liability due to allocation of profit or gain according to the Member's Percentage Interests in the Company.

### 4.3 Amounts Withheld.

All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Member(s) shall be treated as amounts paid or distributed, as the case may be, to the Member(s) with respect to which such amount was withheld pursuant to this Section 4.3 for all purposes under this Operating Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Member(s), and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Member(s) with respect to which such amount was withheld.

### 4.4 Limitations on Distributions.

(a)     The Company shall make no distributions to the Member(s) except (i) as provided in this Section 4 and Section 10 hereof; or, (ii) as agreed to by a majority of the Member(s).

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Member(s) on account of their capital contributions, would exceed the fair value of the Company's assets.

## SECTION 5
## MANAGEMENT

### 5.1 Manager.

(a)     The management of the Company shall be vested in the Manager designated by the Members as provided in Section 5.1(c) hereof.

(b)     The number of Managers shall be no less than one (1) unless otherwise provided herein. The initial manager of the Company shall be Gustavo Adolfo Hernandez Frieri.

(c)     Each Member shall have the right to appoint one Manager, which may be such Member.

(d)     A Manager shall remain in office until removed by the Class Member who appointed the Manager, or upon the resignation, disability or death of such Manager. The respective Class Member shall replace the departing Manager by delivering to the Company a statement designating a successor Manager and setting forth such successor Manager's business addresses and telephone numbers.

(e)     The Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of being or having been the Manager of the Company.

(f)     The Manager shall have the power to delegate authority to such officers, employees, agents and representatives of the Company, as they may from time to time deem appropriate.

(g)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

5.2     <u>Manager's Powers.</u>

(a)     Except as otherwise provided in this Operating Agreement, all powers to control and manage the Business and affairs of the Company shall be exclusively vested in the Manager and the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute, the Articles or this Operating Agreement directed or required to be exercised or done by the Member(s) and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(i)     Conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized;

(ii)    Acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iii)    Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iv)    Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Operating Agreement and the Articles in accordance with the terms of this Operating Agreement, both as Manager and, if required, as attorney-in-fact for the Member(s) pursuant to any power of attorney granted by the Member(s) to the Manager;

(v)    Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

(vi)    Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(vii)    Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(viii)    Care for and distribute funds to the Member(s) by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Operating Agreement, and perform all matters in furtherance of the objectives of the Company or this Operating Agreement;

(ix)    Contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(x)    Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(xi)    Take, or refrain from taking, all actions, not expressly proscribed or limited by this Operating Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(xii)     Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Member(s) or the Manager in connection with activities arising out of, connected with, or incidental to this Operating Agreement, and to engage counsel or others in connection therewith;

(xiii)     Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them;

(xiv)     Indemnify a Member or the Manager or former Member or Manager, and to make any other indemnification that is authorized by this Operating Agreement in accordance with the Act.

(xv)     All acts of the Manager, taken voluntarily and in good faith, shall be authorized hereunder. Any acts of the Manager under duress or on behalf of any creditor of a Member shall not be authorized hereunder.

5.3     Duties and Obligations of the Manager.

(a)     The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Member or the Manager, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Member or the Manager; (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or the Manager, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Member(s); (iii) causing the Company to pay its liabilities from assets of the Company; and, (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)     The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of New York and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member(s) or to enable the Company to conduct the business in which it is engaged; and, (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of property in accordance with the provisions of this Operating Agreement and applicable laws.

(c)     The Manager shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Member(s), including the safekeeping and use of all of the property and the use thereof for the exclusive benefit of the Company.

5.4     Indemnification of the Manager.

(a)     Unless otherwise provided in Section 5.4(d) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Company's property) shall indemnify, save harmless, and pay all judgments and claims against the Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)     Unless otherwise provided in Section 5.4(d) hereof, in the event of any action by a Member against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including reasonable attorneys' fees incurred in the defense of such action.

(c)     Unless otherwise provided in Section 5.4(d) hereof, the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of the Manager, if for the benefit of the Company and in accordance with this Operating Agreement the Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)     Notwithstanding the provisions of Sections 5.4(a), 5.4(b) and 5.4(c) above, such Sections shall be enforced only to the maximum extent permitted by law and the Manager shall not be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)     The obligations of the Company set forth in this Section 5.4 are expressly intended to create third party beneficiary rights of the Manager and any Member is authorized, on behalf of the Company, to give written confirmation to the Manager of the existence and extent of the Company's obligations to the Manager hereunder.

5.5     Bankruptcy, Other Circumstances, and Involuntary Assignment by Managers.

The Manager shall not cease to be such by reason of any of the following. An order for relief against the Manager is entered under Chapter 7 of the federal bankruptcy law, or the Manager: (a) makes a general assignment for the benefit of creditors; (b) files a voluntary petition under the federal bankruptcy law; (c) files a petition or answer seeking for the Manager any reorganization arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (d) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Manager in any proceeding of this nature; or, (e) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties. In addition the following circumstance shall not cause a person to cease to be a Manager: sixty days after the commencement of any

proceeding against the Manager seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if with sixty days after the appointment without the Manager's consent or acquiescence of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties, the appointment is not vacated or stayed, or within sixty days after the expiration of any such stay, the appointment is not vacated.

## SECTION 6
## ROLE OF MEMBER(S)

6.1 <u>Rights or Powers</u>.

The Member(s) shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way as a Member. Notwithstanding the foregoing, the Member(s) have all the rights and powers specifically set forth in this Operating Agreement and, to the extent not inconsistent with this Operating Agreement, in the Act.

6.2 <u>Voting Rights</u>.

No Member has any voting right except with respect to those matters specifically reserved for a Member vote which are set forth in this Operating Agreement and as required in the Act.

6.3 <u>Meetings of the Member(s)</u>.

(a) Meetings of the Member(s) may be called upon the written request of any Member. The call shall state the location of the meeting and the nature of the business to be transacted. Notice of any such meeting shall be given to all Member(s) not less than seven (7) days nor more than thirty (30) days prior to the date of such meeting. Member(s) may vote in person, by proxy or by telephone at such meeting and may waive advance notice of such meeting. Whenever the vote or consent of Member(s) is permitted or required under this Operating Agreement, such vote or consent may be given at a meeting of the Member(s). Except as otherwise expressly provided in this Operating Agreement, the unanimous vote of the Member(s) shall be required to constitute the act of the Member(s).

(b) For the purpose of determining the Member(s) entitled to vote on, or to vote at, any meeting of the Member(s) or any adjournment thereof, the Manager or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) days before any such meeting.

(c) Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date

thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

        (d)     Notwithstanding this Section 6.3, the Company may take any action contemplated under this Operating Agreement as approved by the consent of the Member(s), such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 12.1 hereof, or to such other address as such Person may from time to time specify by notice to the Member(s) and the Manager.

    6.4      <u>Withdrawal/Resignation</u>.

Except as otherwise provided in Sections 4 and 10 hereof, no Member shall demand or receive a return on or of its capital contributions or withdraw from the Company without the consent of all Member(s). Except as otherwise provided in the Act or this Operating Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Operating Agreement, which shall be equal to the fair value of his LLC interests the Company as of the date of resignation. Under circumstances requiring a return of any capital contributions, no Member has the right to receive any property other than cash except as may be specifically provided herein.

    6.5      <u>Member Compensation</u>.

No Member shall receive any interest, salary or drawing with respect to its capital contributions or its capital account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Operating Agreement.

    6.6      <u>Member(s)' Liability</u>.

No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the Debts or any other obligations or liabilities of the Company. A Member shall be liable only to make its capital contributions and shall not be required to restore a deficit balance in its capital account or to lend any funds to the Company or, after its capital contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Member may be required to repay distributions made to it as provided in this Operating Agreement or Section 18-504 of the Act. The Manager shall not have any personal liability for the repayment of any capital contributions of any Member.

    6.7      <u>Partition</u>.

While the Company remains in effect or is continued, each Member agrees and waives its rights to have any of the Company's property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any of the Company's property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

6.8     Confidentiality.

Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others without the prior written consent of all Member(s) any information which (i) pertains to this Operating Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary. No Member shall use any information which (i) pertains to this Operating Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.8 to describe information which is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, and relates either directly, or indirectly to the Company or the Business. Information which (i) is available, or becomes available, to the public through no fault or action by such Member; or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.9     Transactions Between a Member and the Company.

Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

6.10    Other Instruments.

Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Operating Agreement.

**SECTION 7**
**ACCOUNTING, BOOKS AND RECORDS**

7.1     Accounting, Books and Records.

(a)    The Company shall keep on site at its principal place of business each of the following:

(i)    A current list of the full name and last known business address of each Member and the Manager, separately identifying the Member(s) in alphabetical order and the Manager, in alphabetical order;

(ii)    A copy of the filed Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any document has been executed; and

(iii)    Copies of any then effective Regulations of the Company.

(b)    The Manager shall determine the accounting methods utilized by the Company.

7.2    Reports.

(a)    In General. The Tax Matters Member of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

(b)    Reports. Within ninety (90) days after the end of each fiscal year, the Tax Matters Member shall furnish each Member with a copy of the balance sheet of the Company as of the last day of the applicable period, an income statement for the Company for such period, and a statement of the Company's cash flow for such period. Annual statements shall also include a statement of the Member's capital accounts and changes therein for such fiscal year.

7.3    Tax Matters.

(a)    Tax Elections. The Member of the Company has elected Gustavo Adolfo Hernandez Frieri to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(b)    Tax Information. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each fiscal year of the Company but not later than five (5) months after the end of each fiscal year.

## SECTION 8
## AMENDMENTS

Amendments to this Operating Agreement may be proposed by any Member(s). Following such proposal, the Member(s) shall submit a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Member(s) shall include in any such submission a recommendation as to the proposed amendment. The Member(s) shall seek the written vote of the Member(s) on the proposed

amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the unanimous affirmative vote of the Member(s). Notwithstanding the foregoing, this Operating Agreement shall not be amended without the consent of each Member adversely affected (i) if such amendment would modify the limited liability of a Member; or, (ii) alter the interest of a Member in profits, losses, other items, or any Company distributions.

**SECTION 9**
**TRANSFERS**

9.1    <u>Restrictions on Transfers</u>.

No Member may Transfer all or any portion of its LLC interests without the written consent of a majority of the Member(s)

9.2    <u>Right of First Refusal</u>.

The Member(s) have a right of first refusal on any LLC interests sold by Member(s) to third parties. A selling Member must offer to sell all, but not less than all of his or her LLC interests to the remaining Member(s), prior to selling to third parties. The sale price shall be at fair market value based on the performance of the Company as determined by the Company's accountant (as defined hereinafter) computed in accordance with Section 9.4 hereof, and payable as provided in Section 9.6(a) of this Operating Agreement.

9.3    <u>Sale of LLC Interests Upon Death of Member</u>.

(a)    <u>Purchase of LLC Interests</u>. Upon the death of a Member, such deceased Member's spouse or personal representative shall have the right to sell such deceased Member's LLC interests at fair market value to third parties, subject to the provisions of Section 9.2. The remaining Member(s) may purchase the deceased Member's LLC interests pro rata, in accordance with the procedures and terms set forth in this Section 9.

(b)    <u>Notice of Death</u>. In the event of the death of a Member, the personal representative or administrator of the deceased Member's estate shall notify the Company (the "Notice") of such Member's death, within thirty (30) days of appointment as personal representative. The actual giving of Notice by the personal representative shall not be construed to be a condition to the right of the remaining Member(s) to purchase the deceased Member's LLC interests.

(c)    <u>Meeting Following Notice</u>. Within ninety (90) days of the Company's receipt of Notice or discovery of the death of the Member, whichever occurs first, the Managers of the Company shall call a meeting of the Member(s) of the Company.  At the meeting, a proportionate share of the LLC interests of the deceased Member shall be offered for sale to the remaining Member(s). If anyone Member declines to purchase his pro rata allocation of LLC interests so offered, the remaining Member(s) shall have an option to purchase such LLC interests on a pro rata basis, under the terms hereof.

(d)   Purchase Price.   The purchase price for the deceased Member's LLC interests shall be determined as set forth in Section 9.4 hereof, and shall be payable as set forth in Section 9.6(b) of this Operating Agreement.

(e)   Continuing Restrictions.   In the event that all of such LLC interests of the deceased Member so offered for sale are not purchased by the remaining Member(s), the heirs or beneficiaries, as the case may be, of the deceased Member shall become the owner(s) of the deceased Member's LLC interests, and the restrictions imposed by this Operating Agreement upon such LLC interests shall continue to apply.   In no event shall the deceased Member's Personal Representative be required to sell less than all of the deceased Member's LLC interests.

9.4   Purchase Price Under Section 9.2.

(a)   For purposes of a purchase and sale of LLC interests pursuant to Section 9.2 hereunder, the purchase price of each interest shall be its fair market value as determined by the Company's accountant ("Accountant"), as of the end of the month immediately preceding the month in which the sale of LLC interests is scheduled to occur.

(b)   In the event a selling Member disagrees with the fair market value as determined by the Company's Accountant, then the selling Member shall appoint his own Accountant to determine such fair market value in accordance with the terms hereof.   In the event such two Accountants cannot agree as to the fair market value of such LLC interests, then the two Accountants shall select one additional Accountant to make such determination, whereupon the fair market value shall be as determined by the majority of such Accountants, or failing a majority decision as to one fair market value, then the average of all three Accountant's estimates shall be and constitute the fair market value of the LLC interests.

(c)   The fair market value determined under this Section 9.4 shall be binding and conclusive on all parties.

(d)   The fees and charges of the Accountant(s) shall be borne by the party who appointed the Accountant, except with respect to the third Accountant, whose fees shall be borne equally by the parties to such purchase and sale.

9.5.   Purchase Price Under Sections 9.3.

(a)   For purposes of a purchase and sale of LLC interests pursuant to Sections 9.3 hereof, the purchase price of each interest shall be the appraised value of each interest taking into consideration goodwill (the "Appraised Value") as determined by a qualified appraiser, familiar with the Business of the Company (the "Appraiser"), and appointed by the Company.

(b)   In the event the personal representative of the deceased Member, as the case may be, disagrees with the Appraised Value as determined by the Company's Appraiser, then the

personal representative of the deceased Member shall appoint his own Appraiser to determine the Appraised Value of each interest. In the event such two Appraisers cannot agree as to the Appraised Value of the LLC interests, then the two Appraisers shall select a third Appraiser to make such determination, whereupon the Appraised Value shall be as determined by the majority of such Appraisers, or failing a majority decision as to one Appraised Value, then the average of all three Appraiser's determinations shall be and constitute the Appraised Value of the LLC interests.

(c)     The Appraised Value determined in accordance with this Section 9.5 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Appraiser(s) shall be borne by the party who appointed the Appraiser, except as to the third Appraiser, whose fees shall be borne equally by the parties to such purchase and sale.

9.6.     <u>Payment of Purchase Price</u>.

(a)     <u>Purchase From Selling Member Pursuant to Section 9.2</u>.  Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the selling Member, pursuant to any sale governed by Section 9.2 hereof, shall be paid at the election of the Company either (i) in cash or (ii) by the payment to the selling Member of an amount equal to 10% of the purchase price in cash or by bank or certified check, and the delivery of a promissory note (the "Note") for the balance of the purchase price. The Note shall be paid in twelve (12) consecutive equal quarterly installments of principal and interest in the amount necessary to fully amortize the principal plus interest in thirty six (36) months, the first of which installments shall be payable ninety (90) days from the date of sale, with the remaining eleven (11) installments payable on the same day of each third month as the date of sale over the next thirty six (36) months.  The Note shall bear simple interest at the rate of interest (not necessarily the best or lowest rate) announced by Chase Manhattan Bank, as its prime rate in effect on the date of sale, provided, however, that such interest rate shall never exceed the maximum rate allowed under law on the date of sale.

(b)     <u>Purchase From Deceased Member Pursuant to Section 9.3</u>. Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the deceased Member pursuant to any sale governed by Section 9.3 hereof, shall be paid in cash at the time of the sale.

(c)     <u>Promissory Note</u>.

<u>Events of Default; Remedies</u>.  A failure by the purchasing Member(s) to pay any installment of the promissory note within ten (10) days from the date such installment is due shall constitute a default hereunder.  In the event of a default, the entire amount of the promissory note shall, at the option of the holder, become immediately due and payable. No remedy conferred herein is intended to be exclusive of any other remedy or remedies and each and every remedy shall be cumulative to every other remedy granted herein or now or hereafter existing at law or in equity or by statute.

9.7     <u>Prohibited Transfers</u>.

Any purported Transfer of LLC interests that is not a permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a permitted Transfer (or if the Manager, in his sole discretion, elects to recognize a Transfer that is not a permitted Transfer), the LLC interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Operating Agreement with respect to the transferred LLC interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such interest may have to the Company.  The restrictions set forth herein shall not restrict any pledging of interest required pursuant to any loan

In the case of a Transfer or attempted Transfer of LLC interests that is not a Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Member(s) from all cost, liability, and damage that any of such indemnified Member(s) may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.8     Rights of Unadmitted Assignees.

A Person who acquires LLC interests but who is not admitted as a substituted Member pursuant to Section 9.9 hereof shall be entitled only to allocations and distributions with respect to such LLC interests in accordance with this Operating Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Operating Agreement.

9.9     Admission of Substituted Member(s).

Subject to the other provisions of this Section 9, a transferee of LLC interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 9.9:

(a)     A majority of the Member(s) consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Member(s);

(b)     The LLC interests with respect to which the transferee is being admitted was acquired by means of a permitted Transfer;

(c)     The transferee of LLC interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Operating Agreement, including this Section 9; and, (ii) assume the obligations of the transferor Member under this Operating Agreement with respect to the transferred LLC interests. The transferor Member shall be released from all such assumed obligations except (A) those obligations or liabilities of the transferor

Member arising out of a breach of this Operating Agreement; (B) in the case of a Transfer to any Person other than a Member, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer;

(d)     The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred LLC interests; and,

(e)     Except in the case of an Involuntary Transfer by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Operating Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the Articles or any other instrument filed with the State of New York or any other state or governmental authority.

9.10    Distributions and Allocations in Respect of Transferred LLC Interests.

If any LLC interests are Transferred during any fiscal year in compliance with the provisions of this Section 10, profits, losses, each item thereof, and all other items attributable to the Transferred LLC interests for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying percentage LLC interests during the fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Tax Matters Member. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such LLC interests were transferred and such other information as the Tax Matters Member may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the LLC interests on the last day of such fiscal year. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.10, whether or not any Tax Matters Member or the Company has knowledge of any Transfer of ownership of any LLC interests.

## SECTION 10
## DISSOLUTION AND WINDING UP

10.1    Dissolution Events.

(a)     Dissolution. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)     The unanimous vote of the Member(s) to dissolve, wind-up, and liquidate the Company.

(ii)     A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

(iii)     Unless Sections 10(a)(i) or 10(a)(ii) cause a prior dissolution, the Company's existence shall terminate on December 31, 2049.

The Member(s) hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)    <u>Reconstitution</u>. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Member(s) may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Operating Agreement by forming a new limited liability company on terms identical to those set forth in this Operating Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 10.2 hereof. If such an election is made within the Reconstitution Period, then:

(i)     The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in this Section 10.1(a);

(ii)     Unless otherwise agreed to by a majority of the Member(s), the Articles and this Operating Agreement shall automatically constitute the Articles and this Operating Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; <u>provided</u> that the right of the Member(s) to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

10.2   <u>Winding Up</u>.

Upon the occurrence of (i) a Dissolution Event; or, (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 10.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Member(s), and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's

business and affairs, provided that all covenants contained in the Regulations and obligations provided for in this Operating Agreement shall continue to be fully binding upon the Member(s) until such time as the property has been distributed pursuant to this Section 10.2 and the Articles has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 10.1(b) hereof. The Liquidator shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof (as determined pursuant to Section 10.9 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

      (a)    First, to creditors (including Member(s) and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Member(s) under Section 18-504 or Section 18-604 of the Act;

      (b)    Second, except as provided in this Operating Agreement, to Member(s) and former Member(s) of the Company in satisfaction of liabilities for distribution under Section 18-504 or Section 18-604 of the Act; and

      (c)    The balance, if any, to the Member(s) in accordance with the positive balance in their capital accounts, after giving effect to all contributions, distributions and allocations for all periods.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 10.

    10.3   Compliance With Certain Requirements of Operating Agreement; Deficit Capital Accounts.

In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 10 to the Member(s) who have positive capital accounts in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his capital account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year during which such liquidation occurs), such Member shall have an obligation to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(3). In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Member(s) pursuant to this Section 10 may be:

      (a)    Distributed to a trust established for the benefit of the Member(s) for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall

be distributed to the Member(s) from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Member(s) pursuant to Section 10.2 hereof; or

(b)     Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Member(s) as soon as practicable.

10.4     Deemed Distribution and Recontribution.

Notwithstanding any other provision of this Section 10, in the event the Company is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the property in-kind to the Member(s), who shall be deemed to have taken subject to all Debts of the Company and other liabilities all in accordance with their respective capital accounts. Immediately thereafter, the Member(s) shall be deemed to have recontributed the property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

10.5     Rights of Member(s).

Except as otherwise provided in this Operating Agreement, each Member shall look solely to the property of the Company for the return of its capital contribution and has no right or power to demand or receive property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such capital contribution, the Member(s) shall have no recourse against the Company or any other Member or the Manager.

10.6     Notice of Dissolution/Termination.

(a)     In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Member(s) and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

(b)     Upon completion of the distribution of the Company's property as provided in this Section 10, the Company shall be terminated, and the Liquidator shall cause the filing of the Articles of Dissolution pursuant to Section 705 of the Act and shall take all such other actions as may be necessary to terminate the Company.

10.7     Allocations During Period of Liquidation.

During the period commencing on the first day of the fiscal year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Member(s) pursuant to Section 10.2 hereof (the "Liquidation Period"), the Member(s) shall continue to share profits, losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Section 3 hereof.

10.8    Character of Liquidating Distributions.

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

10.9    The Liquidator.

(a)    Definition. The "Liquidator" shall mean a Person appointed by the Managers to oversee the liquidation of the Company.

(b)    Fees. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 9 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

10.10    Form of Liquidating Distributions.

For purposes of making distributions required by Section 10.2 hereof, the Liquidator may determine whether to distribute all or any portion of the property in-kind or to sell all or any portion of the property and distribute the proceeds therefrom.

**SECTION 11**
**POWER OF ATTORNEY**

11.1    Manager as Attorney-In-Fact.

Each Member hereby makes, constitutes, and appoints the Manager, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all articles of formation, amended name or similar articles, and other articles and

instruments (including counterparts of this Operating Agreement) which the Manager may deem necessary to be filed by the Company under the laws of the State of New York or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Operating Agreement and the instruments described in clause (i), as now or hereafter amended, which the Manager may deem necessary to effect a change or modification of the Company in accordance with the terms of this Operating Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Member(s) in accordance with the terms of this Operating Agreement, (B) the admission of any substituted Member and (C) the disposition by any Member of its interest in the Company; (iii) all articles of cancellation and other instruments which the Manager deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Operating Agreement; and, (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Manager to carry out fully the provisions of this Operating Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

      11.2    <u>Nature of Special Power</u>.

The power of attorney granted to the Manager pursuant to this Section 11:

      (a)    Is a special power of attorney coupled with an interest and is irrevocable;

      (b)    May be exercised by any such attorney-in-fact by listing the Member(s) executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Member(s); and

      (c)    Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Member(s), is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's, or assignee's successors and assigns.

## SECTION 12
## MISCELLANEOUS

      12.1    <u>Notices</u>.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an

officer of the Person to whom the same is directed; or, (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Member(s) and Managers:

(a)     If to the Company, to the address determined pursuant to Section 1.3 hereof;

(b)     If to the Manager or to a Member, to the address set forth in Section 2.1 hereof.

### 12.2    Binding Effect.

Except as otherwise provided in this Operating Agreement, every covenant, term, and provision of this Operating Agreement shall be binding upon and inure to the benefit of the Member(s) and their respective successors, transferees, and assigns.

### 12.3    Construction.

Every covenant, term, and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

### 12.4    Time.

In computing any period of time pursuant to this Operating Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

### 12.5    Headings.

Section and other headings contained in this Operating Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

### 12.6    Severability.

Except as otherwise provided in the succeeding sentence, every provision of this Operating Agreement is intended to be severable, and, if any term or provision of this Operating Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Operating Agreement. The preceding sentence of this Section 12.6 shall be of no force or effect if the consequence of enforcing the remainder of this Operating Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

12.7    Incorporation by Reference.

Every exhibit, schedule, and other appendix attached to this Operating Agreement and referred to herein is not incorporated in this Operating Agreement by reference unless this Operating Agreement expressly otherwise provide.

12.8    Variation of Terms.

All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

12.9    Governing Law.

The laws of the State of New York shall govern the validity of this Operating Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

12.10   Waiver of Jury Trial.

Each of the Member(s) irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Operating Agreement.

12.11   Counterpart Execution.

This Operating Agreement may be executed in any number of counterparts with the same effect as if all of the Member(s) had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

**THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK**

<u>OPERATING AGREEMENT OF 3 GRAMERCY PARK WEST LLC</u>
[SIGNATURE PAGE]

**IN WITNESS WHEREOF,** the parties have executed and entered into this Operating Agreement of the Company as of the day first above set forth.

MANAGER:

By: _____
    Gustavo Adolfo Hernandez Frieri

MEMBER:

Gramercy Irrevocable Trust,
a Nova Scotia Trust

By:   Trustee
      Americas Fiduciary, Ltd.,
      A Nevis corporation

By: _____
    Timothy D. Richards, Director

H:\CLIENTS\Gustavo Hernandez\Corp\3 Gramercy Park West LLC\OPERATING AGREEMENT.doc