UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-CR-20685-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

v.

GUSTAVO ADOLFO HERNANDEZ FRIERI,

    Defendant,

And

OLYMPIA DE CASTRO,

    Third-Party Petitioner.

_____/

**OLYMPIA DE CASTRO'S RESPONSE TO THE
GOVERNMENT'S MOTION TO COMPEL DISCOVERY RESPONSES**

Olympia De Castro, through undersigned counsel, responds to the government's Motion to Compel (DE 421) ("Motion") as follows:

### I. FACTUAL BACKGROUND

The facts at issue in this ancillary criminal forfeiture matter are straight forward. The $900,000 (plus interest) at issue came from the sale of an interest in a retail wine shop, acquired by Ms. De Castro in 2015 from her then husband Gustavo Hernandez. Mr. Hernandez was invited in 2014 to acquire an interest in a fine wine wholesale and importation business. New York legal counsel advised Mr. Hernandez that it would violate so-called "tied-house" laws to simultaneously hold an interest in a retail wine shop and an importation/wholesale business involving alcohol. Mr. Hernandez followed his New York

lawyer's advice and transferred the interest in the retail wine shop to his then wife. All of the documents support this. See Petition (DE 296).

The government has pursued a misguided scorched-earth campaign to smear and intimidate Ms. De Castro, who had no involvement in her ex-husband's criminal conduct. The government began its aggressive tactics against Ms. De Castro when it subpoenaed her for documents and testimony in the criminal case regarding issues that related solely to ancillary forfeiture matters, and not to any issue relevant to the criminal case. Then, after it had in essence "deposed" Ms. De Castro – without her counsel being able to participate in or object to that process – the government resisted Ms. De Castro's own efforts to take discovery in this matter.

Next, the government scandalously accused Ms. De Castro of perjury and obstruction of justice by allegedly "doctoring" her Financial Affidavit in her divorce, a document she produced in response to the government's document requests. The Financial Affidavit (Bates No. ODC 0930) shows that Ms. De Castro was asserting dominion and control over the $900,000 at issue because she listed it there as a Contingent Asset.[1] The government baselessly claims the reference on ODC 0930 to the $900,000, and the case number of the civil suit Ms. De Castro filed and won to recover the $900,000, was "doctored."

The government demanded an explanation for this entry on the Financial Affidavit and undersigned counsel immediately promised he would investigate the issue and would provide a written response *by June 3, 2021*. But, rather than wait for counsel to respond, the

---

[1] The government purports to attach the Financial Affidavit to the Motion as Exhibit 4, but it inexplicably blocks out the entire page at ODC 0930. This is *not* how Ms. De Castro produced it to the government. Attached hereto as "Exhibit A" is the Financial Affidavit as actually produced by Ms. De Castro (with ODC 0930 not entirely blocked out).

2

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

government instead rushed to file the Motion the day before, so that it could make public its false allegations that Ms. De Castro "doctored" the Financial Affidavit. Just as promised, on June 3, 2021, undersigned counsel provided the government a written explanation resolving its wild and scurrilous accusations of criminality. The Declaration of Amy Steele Donner (a copy is attached as Exhibit B, hereafter "Donner Dec."), a former judge of the Florida Eleventh Circuit Court and Ms. De Castro's divorce counsel, states that Ms. Donner's office inputted the items concerning the $900,000 and civil case numbers as a contingent asset, way back in early 2020. Donner Dec. ¶¶ 9-10. The fact is that, in fulsome response to document requests, Ms. De Castro produced a responsive document that was in no way "doctored." In short, Ms. De Castro did nothing wrong.

The government, on notice from undersigned counsel that there was a valid Joint Defense Agreement in place between Mr. Hernandez, his counsel and Ms. De Castro, and undersigned counsel, sent discovery requests aimed squarely at privileged communications between Mr. Hernandez and Ms. De Castro and between Mr. Hernandez and undersigned counsel. (Document requests 2-4 and interrogatory 3). The government then engaged in a sham "meet and confer" process regarding Ms. De Castro's objections raising the Joint Defense[2] and Marital Communication privileges. Before the objections on privilege were ever filed, the government insisted on a meet and confer, and undersigned counsel agreed to and participated in the telephone call on May 26, 2021. This was obviously not productive. The next day, just hours after the objections were filed, undersigned counsel participated in a

---

[2] As more fully discussed, *infra*, a Joint Defense Agreement does not, strictly speaking, confer any privilege. Instead, a proper agreement acts as an exception to a potential waiver of the underlying attorney-client communication and work product privileges. For economy, though, we sometimes refer to it as the "joint defense privilege."

3

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

second meet and confer with the government. Mr. Paster wrote an email summarizing the matters discussed, and undersigned counsel advised he would review the summary and respond. Once again, rather than wait for the response of undersigned counsel, the government filed the Motion.

Undersigned counsel considered the other issues discussed at the meet and confer on May 27 and has responded. On June 10, 2021, Ms. De Castro provided the government with a Declaration of undersigned counsel setting forth the details of the Joint Defense Agreement (Exhibit C, hereafter "Rasco Dec."), a privilege log (Exhibit D), and amended discovery responses (Exhibit E).

## II. ARGUMENT

The government's Motion is largely moot given that Ms. De Castro has produced the Rasco Declaration regarding the joint defense privilege issues, revised discovery responses, a privilege log, and the Donner Declaration making clear that Ms. De Castro did not "doctor" any document. But we address some of these issues below in substance.[3]

### A. The Financial Affidavit

Government document request Number 8 sought documents showing Ms. De Castro "exercised dominion or control over International Wine Merchants [the retail wine shop interest that was sold to generate the $900,000]." In response, Ms. De Castro produced a redacted version of her divorce proceedings' Financial Affidavit. Exhibit A. Page ODC 0930 lists the $900,000 and the style of the civil suit Ms. De Castro filed and then won to force the

---

[3] We do not address, because we need not, the government's premature complaint that no privilege log was provided with Ms. De Castro's production (Motion at 9 – 10). This issue is mooted by Ms. De Castro's timely provision of the log.

4

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

civil defendants to pay her $900,000. Contrary to the government's reckless allegations, now made public by its precipitous filing of the Motion,[4] Ms. De Castro did not "doctor" the Financial Affidavit. Exhibit A; Donner Dec (Exh. B) ¶¶ 8-10.

All that remains at issue regarding the Financial Affidavit is that the government now wants to see all of the properly redacted, private financial information contained elsewhere in the document. The Court should not permit this.

The only part of the Financial Affidavit germane to this case is the unredacted material on ODC 0930 – the portion responsive to the government's request for documents evidencing Ms. De Castro's exercise of dominion and control over the asset. The Donner Declaration sets forth in great detail exactly how that information appeared on the affidavit, inputted by her office in early 2020. No doubt remains as to what happened; there was no criminal conduct of Ms. De Castro. The other financial information will do nothing to further explain this issue and is irrelevant to the merits of Ms. De Castro's claim or the government's defenses here.

Moreover, not only are those personal financial details irrelevant, the government has demonstrated, by virtue of its hasty and outrageous allegations of criminality, that it cannot act responsibly when documents are produced to it. Ms. De Castro, an innocent petitioner, should not have to endure any further concocted allegations the government may try to make based on totally irrelevant financial information contained in the Financial Affidavit.

---

[4] Recall that undersigned counsel promised the government that the government would, on a date certain, receive an explanation regarding the Financial Affidavit, and that counsel made good on that promise on that date. But the government, evidently eager to slander Ms. De Castro in the public record, rushed to file the Motion *one day before that*. Sadly, we can only conclude the government rushed to file as it did lest it receive counsel's explanation and be deprived of the chance to blackguard Ms. De Castro in the public record.

5

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

Finally, the Court should reject the government's frivolous last argument that Ms. De Castro "placed her finances at issue" in her Petition by stating that she needs the $900,000 "to support herself and her three small children." As explained by the fictional Mickey Bergman: "Everybody needs money. That's why they call it money."[5] Ms. De Castro in no different.[6]

### B. The Marital Privilege

The government claims that the marital privilege does not protect communications between Ms. De Castro and her then husband after Ms. De Castro filed for divorce on May 22, 2019. Ms. De Castro maintains the marital privilege extends to the date of their divorce on February 10, 2020. The Court should recognize the marital privilege here through the date of the divorce. Because the couple continued to live together after Ms. De Castro filed for divorce, the government's proposed cutoff of the marital privilege is not supported even by the law it cites.

The government attempts to truncate Ms. De Castro's marital communications privilege by similarly truncating the law clearly set forth in *United States v. Singleton*, 260 F.3d 1295, 1301 (11th Cir. 2001). *Singleton* instructs that "[a] district court should focus upon the following three objective factors as especially important: (1) was the couple cohabiting?; (2) if they were not cohabiting, how long had they been living apart?; *and* (3) had either spouse filed for divorce? A district court may, of course, consider other objective evidence of the parties' intent or lack of intent to reconcile." *Id.* at 1301 (*emphasis supplied*) The coordinate conjunction "and" is telling here, but ignored by the government, just as where the

---

[5] Heist (David Mamet dir., 2001).

[6] Ms. De Castro will of course make available to the Court *in camera* a copy of the unredacted Financial Affidavit should the Court wish to review it.

6

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

government correctly quotes a *Singleton* footnote: "The unanimous rulings of other circuit courts . . . have held that marital communications made while the parties are legally married but permanently separated are not privileged." (Motion at 8). The crucial coordinate conjunction in that sentence is the word "but." The import of *Singleton* is that couples who maintain merely the legal formality of marriage, while being in reality permanently separated, cannot expect their communications to remain privileged. That's not what happened here.

Indeed, the *sine qua non* for martial privilege in *Singleton* is not merely the couple's legal status, but their legal status *combined* with cohabitation. The result is clear, and *Singleton* states it clearly: "We, too, therefore, strictly interpret that portion of the privilege's requirement and hold that only ***communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege***. *United States v. Singleton*, 260 F.3d 1295, 1298 (11th Cir. 2001) (emphasis supplied). This describes this couple precisely.

The filing of a divorce petition does not "invalidate" or end a marriage. Some divorce petitions languish, unpursued. Some are withdrawn. But no divorce petition ends a marriage by its mere filing. Until the decree of divorce, Ms. De Castro and Mr. Hernandez were spouses in a "valid marriage." It is without dispute that they continued to cohabitate. The marital communication privilege should apply through February 10, 2020.

### C. The Joint Defense Issues

Ms. De Castro produced a detailed declaration of undersigned counsel setting forth the underpinnings of the Joint Defense Agreement and common interest, along with a privilege log, and revised discovery responses. Ms. De Castro is entitled to the protection of the Joint Defense Agreement.

7

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

In *Del Monte International v. Ticofrut, S.A.*, 2017 WL 1709784 (S.D. Fla. May 2, 2017) Magistrate Judge Goodman comprehensively surveyed, selected and synthesized the corpus of case law surrounding joint defense agreements in the Eleventh Circuit and elsewhere. *Del Monte* reiterates the understanding that a joint defense agreement does not create, and "[t]he common interest doctrine is not, in and of itself, a privilege. Rather, it is an exception to the rule of waiver concerning the attorney-client privilege and the work product doctrine." *Del Monte* at *6. Underlying that doctrine are "several bedrock principles which most courts agree are applicable [and these 14] rules . . . create the framework for evaluating" claims of common interest doctrine that implicate joint defense agreements. *Id. Del Monte* then goes on to set out those 14 rules. *Id* at *6 – 8. With respect to every one of them, the common interest and the joint defense agreement between Ms. De Castro and Mr. Hernandez are vindicated by the facts here. Accordingly, *infra*, we address the 14 *Del Monte* factors listed in order, quoting but condensing Magistrate Judge Goodman's discussion of each (in **bold**) and omitting the citations:

1. **The party claiming the privileges has the burden of establishing their applicability.** Ms. De Castro has accepted and, with the attached privilege log, the Rasco Declaration and this response, borne that burden.

2. **The party claiming the privilege must provide the Court with underlying facts demonstrating the existence of the privilege, which may be established by affidavit.** This is precisely what Ms. De Castro has done, via the Rasco Declaration.

3. **"An improperly asserted claim of privilege is no claim of privilege at all."** Ms De Castro's claim of privilege has in fact been properly asserted. Only the government's headlong rush to file this Motion, before Ms. De Castro could serve her privilege log and the Rasco Declaration, has allowed the government to suggest otherwise. (Which, we suggest, is precisely *why* the Motion was rushed to filing despite the ongoing meet and confer process.)

4. **The burden to sustain a privilege is a heavy one.** . . . but it is not an unsupportable one and, in this case, it is a burden more clearly understood and

8

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

more easily borne than in other cases (including *Del Monte*). The close commonality of the legal interest surrounding the $900,000 asset, as set forth in the Rasco Declaration is so manifest here as to be nearly common sense. It was initially their shared interest for Ms. De Castro to obtain her asset from the civil defendants who held it unlawfully. Now Ms. De Castro wants to retain possession of more than a million dollars of principal and interest that belongs, and has long belonged, exclusively to her, largely so that she and her children might continue to survive. Mr. Hernandez wishes for the same, as it serves his interest to have his children provided for as he heads to prison and all of *his* assets are taken by the government.

5. **The common interest doctrine does not create an independent privilege.** Ms. De Castro is relying here on entirely run-of-the-mill, long-standing attorney-client communication and work product privileges, as set forth in the accompanying privilege log (Exh. D) and in the Rasco Dec. (Exh. C) at ¶3. The joint defense agreement asserted here operated only to forestall any waiver of those utterly uncontroversial privileges when she or her counsel communicated with Mr. Hernandez or his counsel.

6. **The common interest doctrine applies only "when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is legal, and not solely commercial."** The shared legal interest here, like the common adversary, is patent: First to secure Ms. De Castro's right to the asset from the civil defendants and then to protect it from the unjustified predations of the government, to the benefit of the couple's children. Rasco Dec. (Exh. C) ¶¶5, 11, 12.

7. **The mere fact of a shared interest in the outcome of litigation, is insufficient to justify successful invocation of the common interest doctrine.** Ms. De Castro is not claiming to have established a joint defense agreement merely because she and Mr. Hernandez wanted the same result (in the civil case below, and with respect to this Petition). Rather, as extensively set forth herein, Ms. De Castro carefully established and scrupulously maintained the joint defense agreement in satisfaction of these *Del Monte* factors to pursue common legal interests via coordinated legal strategies.

8. **Parties seeking to use the common interest doctrine must in practice demonstrate cooperation in forming "a common legal strategy."** The core functionality of this joint defense agreement was to secure the asset from the civil defendants in the first place. Then the strategy was designed to allow Mr. Hernandez, who was fighting for his liberty, and Ms. De Castro, who was fighting to retain her lawfully owned asset, to coordinate their legal strategies to the degree necessary to secure the just and proper outcome in this proceeding (which is for Ms. De Castro to keep the $900,000 to help support herself and her children), without compromising their other legal interests. To that end, they did form and implement common legal strategies. Rasco Dec. (Exh. C) ¶¶6, 10, 13.

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

9. **To determine whether communications were made with a common interest, "one must first answer the questions whether the communication was 'made and maintained under circumstances where it is reasonable to assume that disclosure to third parties was not intended.'"** At every stage, the parties to the joint defense agreement and their respective attorneys took steps to ensure communications shared under the agreement were limited only to them. Rasco Dec. (Exh. C) ¶¶8, 9, 15, 16.

10. **Courts evaluating a common interest doctrine claim often focus on whether the group members took affirmative steps to protect confidentiality. If steps are taken, then they support application of the doctrine.** All participants here established and implemented such steps throughout the relevant time. Rasco Dec. (Exh. C) ¶¶8, 9, 15, 16.

11. **The involvement of legal counsel is often a significant factor.** All related counsel were at the core of the communications being shared. Rasco Dec. (Exh. C) ¶¶4, 8, 15.

12. **Although a common interest understanding need not necessarily be in writing or a particular form, "an agreement there must be."** This agreement was never reduced to writing, largely because it did not need to be. But it was *explicit* among the participants and its reasons for being were clear to them. Rasco Dec. (Exh. C) ¶4.

13. **As a general theme, albeit not a hard and fast rule because there are fact-specific exceptions, parties involved in arms-length business transactions (in contrast to collaborative business ventures, such as mergers) are less likely to qualify for common interest doctrine protection because there is a greater risk that courts will view them as adverse to each other and not covered by the common interest doctrine.** This factor doesn't really have application to the facts in this matter. Ms. De Castro originally obtained the $900,000 asset from then-husband Mr. Hernandez in an arms-length transaction, as fully described in her Petition. But they never litigated any aspects of that transaction between themselves, and the joint defense agreement here doesn't implicate that transaction that occurred in 2015.

14. **Memorializing a common interest privilege through a formal written agreement should be done before the sharing of information begins.** While this agreement was not set down in writing – largely because it did not need to be – the parties to it were careful not to share information relevant to the agreement until they had expressly put it in place. Rasco Dec. (Exh. C) ¶¶4, 7, 14.

In sum, Ms. De Castro is entitled to the protections of the attorney-client and work product privileges, and the joint defense agreement in this matter, which was emplaced to

10

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

vindicate her common legal interests with Mr. Hernandez and to effectuate their joint legal strategies.

### III.  CONCLUSION

Had the government not rushed to file this Motion the day before the promised delivery of the Donner Declaration and days before Ms. De Castro was able to file her privilege log and the Rasco Declaration – indeed, had the government acted in the barest good faith in this affair – this ill-conceived Motion need never have come before the Court. Now that it has, it should be handily denied.

Dated this 16th day of June, 2021.

                Respectfully submitted,

                DEVINE GOODMAN & RASCO, LLP
                2800 Ponce de Leon Blvd., Suite 1400
                Coral Gables, FL 33134
                Tel: 305-374-8200
                Email: grasco@devinegoodman.com

                */s/ Guy A. Rasco*
                Guy A. Rasco., Esq.
                Fla. Bar No.: 727520
                Robert J. Kuntz, Jr., Esq.
                Fla. Bar. No.: 094668
                *Attorneys for Third-Party Petitioner*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the CM/ECF Filing System this 16th day of June, 2021, on all counsel of record.

/s/ *Guy A. Rasco*
Guy A. Rasco

12

Devine Goodman & Rasco, LLP  2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208