**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-20685-Cr-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GUSTAVO ADOLFO
HERNANDEZ FRIERI,

      Defendant,

v.

OLYMPIA DE CASTRO, and
597 HIBISCUS LANE REVOCABLE TRUST,

      Third-Party Petitioners.

_____/

**ORDER ON THE GOVERNMENT'S MOTION TO COMPEL**

This matter is before the Court on the United States of America's (the "Government") motion to compel third-party petitioner Olympia De Castro ("Ms. De Castro") to complete better discovery responses and produce documents. [D.E. 421]. Ms. De Castro responded to the motion on June 16, 2021 [D.E. 427] to which the Government replied on June 23, 2021. [D.E. 431]. Therefore, the Government's motion is now ripe for disposition. After careful consideration of the motion,

response, reply, relevant authorities, and for the reasons discussed below, the Government's motion to compel is **GRANTED**. [1]

## I.    BACKGROUND

On August 16, 2018, a federal grand jury returned an indictment that charged Gustavo Adolfo Hernandez Frieri ("Mr. Hernandez Frieri") and others with a conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B), among other counts.  [D.E. 19].  The indictment included a request for the forfeiture of real property located at 597 Hibiscus Lane, Miami, Florida 33137 ("the Miami House").  On August 17, 2018, the Government recorded a notice of lis pendens on the Miami House.  [D.E. 36].  The Government renewed that notice on September 19, 2019 and again on September 18, 2020.  [D.E. 145, 238-12].  When the Court authorized Mr. Hernandez Frieri's release pending trial on bond, the Court ordered him to not encumber any properties or investments, including the Miami House.  [D.E. 101].

On November 26, 2019, the Court accepted Mr. Hernandez Frieri's guilty plea as to count one of the indictment [D.E. 162] and he agreed "to liquidate assets, or complete any other tasks which will result in the immediate payment of the forfeiture money judgment in full, or full payment in the shortest amount of time, as requested by the [United States Attorney's] Office."  [D.E. 163 at ¶ 14].  Mr. Hernandez Frieri also agreed that he would "not sell, hide, waste, encumber,

---

[1]     On December 23, 2020, the Honorable Kathleen Williams referred all forfeiture-related motions to the undersigned Magistrate Judge for disposition. [D.E. 268].

destroy, or otherwise devalue any asset without prior approval of this Office, until his forfeiture money judgment is paid in full." *Id*. at ¶ 15.

On February 4, 2020, the Court entered a preliminary forfeiture order against Mr. Hernandez Frieri and imposed a monetary judgment in the amount of $12,330,000. [D.E. 175]. The Court entered a second preliminary forfeiture order on September 28, 2020 that forfeited, subject to third-party interests, the Miami House and the Mr. Hernandez Frieri's interest as a settlor or grantor of the Florida Trust. [D.E. 239 at 5-6]. The order credited Mr. Hernandez Frieri's forfeiture money judgment of $12,330,000 with $818,990.01 that was finalized in the criminal case against Abraham Edgardo Ortega.[2] *Id*.

On January 11, 2021, the Court entered a third preliminary forfeiture order that forfeited $900,000 plus interest from the sale of real property. Ms. De Castro filed a timely filed a notice of claim and verified petition, asserting ownership of the assets that resulted from the sale of real property in Dania Beach, Florida. [D.E. 296]. The Government responded to the petition on March 8, 2021 [D.E. 323] with the position that Ms. De Castro is a nominal owner of the forfeited property, that she does not qualify as someone "other than the defendant" under 21 U.S.C. § 853(n)(2), and that she fails to hold a superior interest under 21 U.S.C. § 853(n)(6)(A). *Id*.

The Government served discovery requests on April 21, 2021, including interrogatories and requests for production. Ms. De Castro responded to the

---

[2]     The forfeiture money judgment was imposed as a condition of Mr. Hernandez Frieri's guilty plea that the Court entered on November 26, 2019. [D.E. 163].

requests on May 13, 2021 and, after conferral discussions, the parties agreed to an extension for her to respond on May 26, 2021.    On the same day of the conferral, Ms. De Castro produced a redacted financial affidavit from her divorce proceedings. The Government inquired as to whether Ms. De Castro altered this document because it was executed in December 2019 but referred to a 2020 lawsuit and a related case number.  The Government requested an unredacted and file-stamped version of the affidavit, but Ms. De Castro refused to comply.

On May 26, 2021, Ms. De Castro objected to the Government's remaining discovery requests seeking documents and communications between her, Mr. Hernandez Frieri, and the law firm of Devine Goodman & Rasco ("DGR") on privilege grounds and a joint defense agreement ("JDA").[3]   The parties later participated in two conferrals and the Government requested information on the JDA so that it could assess its validity and scope.  However, the Government alleges that Ms. De Castro refused to identify (1) a common legal interest, (2) a start and end date for the JDA, (3) the relevant parties, and (4) whether the JDA was in writing.    Instead, Ms. De Castro purportedly told the Government that this information would only be provided to the Court *ex parte* and refused to produce a privilege log or an unredacted version of the financial affidavit.

## II.    ANALYSIS

The Government seeks to compel Ms. De Castro to provide complete responses to interrogatories and requests for production because of a failure to comply with her discovery obligations pursuant to a JDA and a marital privilege.

---

[3]    DGR only represents Ms. De Castro in these proceedings.

The Government says that neither privilege applies here, but even if they do, Ms. De Castro waived it because of her refusal to produce a timely privilege log.   The Government's final request is to compel Ms. De Castro to produce an unredacted financial affidavit because this "is necessary to clear up a later addition to the affidavit, to test De Castro's veracity, and because De Castro placed her financial situation in dispute."  [D.E. 421 at 11].[4]

After the Government filed the pending motion to compel, Ms. De Castro produced a privilege log, served amended discovery responses, supplemented her reasons for relying on a JDA, and explained her alterations to the financial affidavit.  While the Government appreciates these efforts, to some extent, it says that the motion is still ripe for disposition because Ms. De Castro has (1) failed to identify a common legal interest to sustain a joint defense privilege, (2) failed to establish the requested period for the marital privilege to apply, and (3) failed to provide a sufficient explanation for the redacted financial affidavit.  We consider each argument in turn.[5]

---

[4]      Ancillary forfeiture proceedings arise in the context of a criminal proceeding, but they are civil in nature.  *See* Fed. R. Crim. P. 32.2(c)(4); *United States v. Cohen,* 243 F. App'x 531, 534 (11th Cir. 2007) (citing *United States v. Gilbert,* 244 F.3d 888, 907 (11th Cir. 2001)).  The Federal Rules of Civil Procedure and the Federal Rules of Evidence are thus applicable in ancillary proceedings and, after the close of discovery, a party may move for summary judgment. Fed. R. Crim. P. 32.2(c)(1)(B); Fed. R. Evid. 1101; *United States v. Brown,* 509 F. Supp. 2d 1239, 1241 (M.D. Fla. 2007).

[5]      We omit any consideration of the privilege log dispute because Ms. De Castro produced it in response to the motion to compel and the Government does not raise it as pending matter in its reply.

5

A.     **_Whether a Joint Defense Agreement Applies_**

The first issue is whether Ms. De Castro can rely on a JDA in her refusal to provide complete discovery responses.[6]   The Government seeks communications involving Ms. De Castro, her attorneys at DGR, and Mr. Hernandez Frieri. Although DGR only represents Ms. De Castro, the Government says that the law firm has no connection to Mr. Hernandez Frieri, that he breaks any applicable privilege that might otherwise exist, and that the Court should overrule any objection based on the existence of a JDA.

Ms. De Castro's response is that, after the Government hastily filed its motion to compel, she produced a detailed explanation setting forth information on how the JDA applies and that much of the Government's request is now moot.  [D.E. 427 at 4 ("The government's Motion is largely moot given that Ms. De Castro has produced the Rasco Declaration regarding the joint defense privilege issues, revised discovery responses, a privilege log, and the Donner Declaration making clear that Ms. De Castro did not "doctor" any document.")].   She also says that she meets every factor that courts consider when determining the applicability of the privilege and that she is entitled to withhold certain documents because of the agreement with her former husband.

Courts in the Eleventh Circuit "recognize the joint-defense agreement under the common-interest doctrine and apply it to the same range of communications that are protected under the attorney-client privilege." _Pensacola Firefighters'_

---

[6]     Neither party requested that the Court hold an evidentiary hearing to assess any of the matters in dispute.  Instead, each party relied on the sworn testimony taken thus far and presented arguments to that effect.

*Relief Pension Fund Bd. of Trs. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 2011 WL 3512180, at *6 (N.D. Fla. July 7, 2011) (citing *Hope for Families & Comm. Serv., Inc. v. Warren*, 2009 WL 1066525 (M.D. Ala. Apr. 21, 2009)).[7] "Under the 'common interest' exception to waiver, a party may share its work product with another party without waiving the right to assert the privilege when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is legal, and not solely commercial." *Mitsui Sumitomo Ins. Co. v. Carbel, LLC*, 2011 WL 2682958, at *4 (S.D. Fla. July 11, 2011). "In theory, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest," and "[i]n practice, they must have demonstrated cooperation in formulating a common legal strategy." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D. N.Y. 1995). Thus, the "proponent of the joint defense/common interest privilege must establish that, when communications were shared among individuals with common legal interests, the act of sharing was part of an ongoing common legal enterprise." *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B,* 230 F.R.D. 398, 416 (D. Md. 2005) (quotation omitted).

Perhaps the most instructive decision on the common interest doctrine is Judge Goodman's decision in *Del Monte Int'l GMBH v. Ticofrut, S.A.*, 2017 WL

---

[7]      Courts refer to a joint defense agreement and common-interest doctrine interchangeably and we do the same here.  We note, however, that the doctrine is not itself a privilege but an exception to the rule of waiver with respect to the attorney-client privilege and the work-product doctrine.  *See Del Monte Int'l GMBH*, 2017 WL 1709784, at *6 ("The common interest doctrine is not, in and of itself, a *privilege*. Rather, it is an exception to the rule of waiver concerning the attorney-client privilege and the work product doctrine.").

1709784, at *6 (S.D. Fla. May 2, 2017), because it analyzes the fourteen bedrock principles that courts consider when determining the applicability of the common interest doctrine. There is no need to consider all fourteen principles because, after the filing of the motion to compel and Ms. De Castro's amended discovery response, the Government's argument is directed primarily at a failure to identify a common legal interest between Ms. De Castro and Mr. Hernandez Frieri.

In a declaration filed in support of Ms. De Castro's opposition, Guy Austin Rasco ("Mr. Rasco"), states that he represented Ms. De Castro in December 2019 where she and her former husband entered into a JDA. The purpose of the JDA was to secure the recovery of $900,000 in assets that Walden Capital Corporation should have paid to Ms. De Castro for the December 2016 sale of her interests in Salondera LLC.[8]  [D.E. 427-3 at ¶ 3].  Mr. Rasco asserts that the former couple shared a common legal interest because the lawsuit enforced Ms. DeCastro's rights and ensured that the money collected would be secured for the benefit of her three children:

> Ms. De Castro and Mr. Hernandez shared a common legal interest at that time in securing Ms. De Castro's rights in the $900,000 Asset, primarily to ensure that the Asset – which was hers and hers alone – would be secured for Ms. De Castro to provide for their three children.

*Id*. at ¶ 5.

In November 2020, the state court case settled with the payment of $900,000 payment plus interest to Ms. De Castro.  *Id*. at ¶ 10.  However, shortly after the settlement, the Government sought to forfeit the same assets with the argument

---

[8]     The caption of the state court case was *Olympia de Castro v. Daniel Holtz, Toni Holtz, and Walden Capital Corporation*.

that they belonged to Mr. Hernandez Frieri.  *Id*. at ¶ 11.  Mr. Rasco says, at this point, the JDA "turned on the same common interest – that the Asset be adjudged Ms. De Castro's property, so that it could provide for the parties' three children." *Id*. at ¶ 12.  However, the common legal strategy shifted "away from securing the asset from the claims of the defendants in the State Civil Action, and toward establishing fact-based defenses to the United States' claims in the Forfeiture Action that the Asset belonged not to Ms. De Castro."  *Id*. at ¶ 13.  Because this meets all the requirements of the common interest privilege and neither Ms. De Castro, Mr. Hernandez Frieri nor any lawyer shared information or communications with outside participants to the JDA, Ms. De Castro objects to any discovery request that targets these privileged communications.

The problem with Ms. De Castro's response is that she never explains how she and her husband share a common legal interest to sustain the existence of a JDA.  She identifies the common legal interest as securing *her rights* in the $900,000 asset and to ensure that it would be secured for her children.  Mr. Rasco's declaration further states that the $900,000 asset was "[Ms. De Castro's] and hers alone," making it unclear how Mr. Hernandez Frieri has any legal interest with the money in question.  In other words, if Ms. De Castro was the only person with any rights or interest to the $900,000, it raises the question as to how a JDA can exist when Mr. Hernandez Frieri owns none of the assets.

Ms. De Castro never answers this question directly in her response.  She only paraphrases what Mr. Rasco presents in his declaration:

> The shared legal interest here, like the common adversary, is patent: first to secure Ms. De Castro's right to the asset from the civil defendants and then to protect it from the unjustified predations of the government, to the benefit of the couple's children.

[D.E. 421 at 9].

This is not, however, a common legal interest. Ms. De Castro has instead conflated a common legal interest with a common adversary in litigation. While both are required for the common interest doctrine to apply, "[a] shared interest in the outcome of litigation, or the fact that an opponent is a common adversary, is insufficient to justify successful invocation of the common interest doctrine." *Del Monte Int'l GMBH*, 2017 WL 1709784, at *7 (citing *Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*, 300 F.R.D. 590, 597 n. 10 (S.D. Fla. 2014); *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996)); *see also McCullough v. Fraternal Ord. of Police, Chi. Lodge 7*, 304 F.R.D. 232, 240 (N.D. Ill. 2014) ("A shared rooting interest in the 'successful outcome of a case' is not a common legal interest.") (citing cases).

Indeed, the only connection that Mr. Hernandez Frieri has with respect to the $900,000 asset is his status as the former husband of Ms. De Castro and the father of three children. None of that matters, however, if Mr. Hernandez Frieri holds no legal interest in the $900,000 asset. Ms. De Castro cannot have her cake and eat it too where she claims that the $900,000 is "hers and hers alone," and, in the same breath, suggest that her former husband has some legal interest to secure the assets for the former couple's children. [D.E. 427-3 at ¶ 5].

Ms. De Castro has identified, at best, a common commercial or personal

10

interest.   But, neither of those is an adequate substitute for a common legal interest.   *See Walsh*, 165 F.R.D. at 18 ("The parties claiming protection under the doctrine must show that they had a common legal, as opposed to commercial, interest, and that they cooperated in formulating a common legal strategy.") (citing *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995)).   And to the extent Ms. De Castro suggests that Mr. Hernandez Frieri had a desire to help her succeed in litigation, that too is equally insufficient.   *See SR Int'l Business Ins. Co. Ltd. v. World Trade Center Properties,* 2002 WL 1334821, at *3 (S.D.N.Y. 2002) ("Sharing a desire to succeed in an action does not create a 'common interest'") (citing cases).   Thus, the Government's motion to compel is **GRANTED** to the extent it seeks the discovery of information shared among Ms. De Castro, Mr. Hernandez Frieri, and DGR because the disclosure of confidential communications to a third-party vitiates any applicable privilege that might otherwise exist.[9]

### B.   *Whether the Marital Privilege Applies*

The next issue is the applicability of Ms. De Castro's marital privilege.   Ms. De Castro is withholding information because her her marital privilege continued until February 2020, or the date her divorce was finalized.   The Government argues

---

[9]      We note that "[a]lthough disclosure of confidential communications to third parties vitiates the *attorney-client privilege . . . work-product* protection is analyzed differently due to the policies that give rise to the protection. With work product protected materials, disclosure operates only to waive the protection for  the *actual* material disclosed, not other materials." *Brown v. NCL (Bahamas), Ltd.*, 155 F. Supp. 3d 1335, 1338 (S.D. Fla. 2015) (emphasis in original).   It is unclear what privilege might have been lost with the disclosures to Mr. Hernandez Frieri because that question is not yet presented in this record.

that, under Eleventh Circuit case law, any marital privilege terminated on May 22, 2019 because that is the date Ms. De Castro filed for divorce.  [D.E. 262 at ¶ 6].

Ms. De Castro says that the Government's proposed cutoff date is unsupported and that the facts of this case weigh strongly in her favor.  She asks that the Court recognize the marital privilege through the date of her divorce because she and her former husband lived in the same household this entire time.  Ms. De Castro also suggests that the Government has misinterpreted the Eleventh Circuit's prior decisions on the marital privilege because, with cohabitation plus marriage, their communications are fully protected.  Because the filing of a divorce does not invalidate a marriage and Ms. De Castro and her former husband cohabitated until their divorce was finalized on February 10, 2020, she concludes that any communications between the two are privileged and should not be compelled.

Federal law recognizes two marital privileges: (1) the marital confidential communications privilege, and (2) the spousal testimonial privilege.  *Singleton*, 260 F.3d at 1297 (citing *Trammel v. United States*, 445 U.S. 40, 50–51 (1980)).  Marital privileges "must be narrowly construed because they impede the search for truth."  *Id.* at 1300. "Federal courts have consistently recognized the 'well settled proposition that the party seeking the privilege has the burden of establishing all of its essential elements.'"  *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 638–39 (S.D. Fla. 2011) (internal quotation marks omitted) (quoting *In*

*re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529, 1532 (S.D. Fla. 1997)); *see also In re Grand Jury Subpoenas*, 318 F.3d 379, 384 (2d Cir. 2003) (collecting cases).

Neither the Government nor Ms. De Castro make an explicit reference to the specific privilege at issue. However, the dispute here must concern the communications privilege because, unlike the testimonial privilege, the former survives a terminated marriage whereas the latter does not. *See Singleton*, 260 F.3d 1295, 1298 n.2 ("Unlike the testimonial privilege, the communications privilege generally survives a terminated marriage."). (citing *Pereira v. United States,* 347 U.S. 1, 6 (1954)). The communications privilege "excludes information privately disclosed between husband and wife in the confidence of the marital relationship." *Harrison v. United States,* 577 F. App'x 911, 913 (11th Cir. 2014) (citing *Trammel,* 445 U.S. at 51). While there is a presumption that communications within a marriage are confidential, *see Singleton*, 260 F.3d at 1299 (citing *Blau v. United States,* 340 U.S. 332 (1951)), "the privilege does not apply to communications made in the presence of third parties, and generally applies to statements, not acts." *Harrison,* 577 F. App'x at 913 (citing *Pereira v. United States,* 347 U.S. 1, 6 (1954)). "It also does not apply to conversations between husband and wife about crimes in which they are jointly participating." *United States v. Abram,* 171 F. App'x 304, 310 (11th Cir.2006) (citing *United States v. Entrekin,* 624 F.2d 597, 598 (5th Cir.1980)).

The issue here is whether Ms. De Castro has a marital communications privilege until the date of her divorce. It is well-established that the marital

communications privilege is unavailable when made during a "moribund" marriage or when the spouses have permanently separated with no reasonable expectation of reconciliation. *See Singleton*, 260 F. 3d at 1300. When this occurs, the Eleventh Circuit instructs district courts to consider three objective factors plus any additional evidence that may show an intent (or lack thereof) to reconcile:

> Having determined that the marital communication privilege is not available in cases of permanent separation prior to divorce, we next consider the factors that should be considered by district courts in determining whether there was a permanent separation at the time of the communication. A district court should focus upon the following three objective factors as especially important: (1) Was the couple cohabiting?; (2) if they were not cohabiting, how long had they been living apart?; and (3) had either spouse filed for divorce? A district court may, of course, consider other objective evidence of the parties' intent or lack of intent to reconcile. A court also may (not must) consider testimony by the spouses themselves regarding their subjective intent, but simply because one or both spouses testifies that the couple intended to stay married and that the communications at issue were thought by them to be protected, the communications need not be deemed privileged where objective factors undermine the credibility of that testimony.

*Singleton*, 260 F.3d at 1301.

Ms. De Castro says that *Singleton* undermines the Government's position because she and her former husband were legally married and lived together until February 2020. Ms. De Castro views this as the end of the inquiry because marital communications between cohabiting couples are fully protected. *See Singleton*, 260 F.3d at 1298 ("We, too, therefore, strictly interpret that portion of the privilege's requirement and hold that only communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege."). But, *Singleton* never makes cohabiting a controlling factor;

14

rather, it is one factor to be considered among others.  If Ms. De Castro's view was the law, there would be no need for a court to consider any additional factors or other evidence on reconciliation because cohabitation plus marriage would be dispositive.  Because there is no support for the rule that Ms. De Castro posits, we turn to the application of the remaining *Singleton* factors.

Ms. De Castro assumes that the first factor cuts in her favor because she and her former husband lived under the same roof until the date of their divorce.  She ignores, however, the circumstances leading to her husband's court-ordered home confinement.  When Mr. Hernandez Frieri's bond hearing took place on May 18, 2019, "Ms. De Castro refused to pledge her home . . . as collateral for his $1,500,000 10% bond and refused to co-sign a $25 million personal surety bond."  [D.E. 261 at ¶ 6].  She instead "represented to the Court that [she] was filing for divorce," and she did so on May 22, 2019 or less than one week after the hearing.  *Id*.  Ms. De Castro makes no mention of this in her response, for good reason, because it gives clarity to the reason for the cohabitation.  She also omits her prior court filings where she stated that, while she has "allowed [Mr. Hernandez Frieri] to reside at her home until his sentencing *for the sake of their children*, the parents are *no longer a couple* and [he] has no right or dominion over her home."  [D.E. 261 at 10, n.3 (emphasis added)].[10]  This suggests that, while the former couple may have been living under the same roof, they did so only for the sake of their children because the marital relationship terminated the day Ms. De Castro filed for divorce.

---

[10]     The former couple lived under the same roof for over a year after the divorce was finalized in February 2020.

Ms. De Castro further implies that cohabitation is satisfied with the mere presence of both couples living under the same roof.  Yet, that position is not well supported.  While the Eleventh Circuit has not defined the exact meaning of cohabitation, we are unconvinced that cohabiting is limited to living under the same roof because it fails to consider the possibility that a permanently separated couple may live in different rooms of the same household with limited to no contact.  *See, e.g.*, *Atkinson v. Atkinson*, 157 So. 3d 473, 479 (Fla. 2d DCA 2015) (examining the meaning of cohabitation and concluding that it requires more than the mere presence of another).  That is the situation presented here because Mr. Hernandez Frieri's longtime friend, Jorge Mora, testified that the former couple lives in separate rooms due to a lack of assets.  [D.E. 431-2 ("There's -- you know, they're living in separate rooms and under the same roof.  I'm not exactly sure what other living arrangements you would want them to have given that you've frozen all the assets").  So, although Ms. De Castro assumes that the first *Singleton* factor cuts in her favor, the record shows the opposite.

However, even if we assume that the cohabiting factor is met, the record shows that Ms. De Castro decided to divorce her husband in the early part of May 2019.[11]  She testified, for instance, that she decided to divorce her husband when

---

[11]   We omit discussion of the other *Singleton* factors because the second only asks how long a couple has lived apart and the third looks to whether either spouse has filed for divorce.  The second factor presumes that the first factor is not met, but for the reasons provided herein, we assume for the sake of argument that the couple cohabitated.  The third factor is also not at issue because the parties agree that Mrs. De Castro filed for divorce on May 22, 2019.  As a result, these factors do not require further analysis and we look to whether there is any other evidence of the parties' intent or lack of intent to reconcile.

law enforcement detained him in Rome and while he awaited extradition to the

United States:

> Q. When did you first discuss divorce with your husband?
> A. Well, I had mentioned it before, when I visited, and then I made up
> my mind during the period that he was detained in Rome, on his way
> to be extradited. And I lost – I lost my job at that point, and I made up
> my mind to get divorced.
> Q. And you're saying that – just to – so I understand you said that you
> discuss it with him when you visited him, and that's back when you
> visited over the holidays?
> A. Yeah. I said that I would consider – I was considering it, but he
> ultimately learned that we were getting divorced when he arrived
> here.
> Q. So whose idea was the divorce?
> A. Mine.
> Q. What was the purpose of the divorce?
> A. Well, I mean, Gustavo had been arrested and charged with very
> serious crimes, and I wanted my children and I to have the opportunity
> to move on with our life.

[D.E. 421-7 at 52:22-53:13].

After Mr. Hernandez Frieri arrived in the United States and obtained bond,

Ms. De Castro served him with divorce papers and allowed him to stay in the home

for the purpose of spending time with their children:

> Q. Where did the defendant arrive after his extradition from Italy?
> A. So when he was extradited, he got bond, and he showed up here, at
> the house. And I served him the divorce, and I said he could stay so he
> could be with the children until he couldn't be with the children
> anymore.

*Id*. at 53:17-22.

Faced with this testimony – where the Government references her own

remarks to show that the former couple lived together under the same roof for the

sole benefit of the children – Ms. De Castro fails to rely on anything to meet her

burden of showing reconciliation.  All she says is that cohabitation plus marriage leads to blanket protection of marital communications.  But, for the reasons already identified, that is not enough.  And even if it was an accurate statement of the law and cohabitation meant solely living under the same roof, Ms. De Castro fails to meet that standard due to a lack of evidence.  Either way, the result remains the same because "[o]nce the Government opposed the allowance of the privilege, the burden of proof was on [Ms. De Castro] to prove by a preponderance of the evidence that she and [Mr. Hernandez Frieri] were not permanently separated at the time of the subject communication." *Singleton*, 260 F.3d 1295, 1301 (11th Cir. 2001) (citing *In re Grand Jury Subpoena,* 831 F.2d 225, 227 (11th Cir. 1987); *In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1520 (11th Cir. 1986)).  Because Ms. De Castro fails to meet her burden and all the evidence in the record shows that she and her former husband had no reasonable expectation of reconciliation on the date she filed for divorce, the Government's motion to compel is **GRANTED** to the extent it seeks information after May 22, 2019 and withheld based on the marital communications privilege.

### C.   *Whether an Unredacted Financial Affidavit Must be Produced*

The final issue is the Government's request for a financial affidavit that Ms. De Castro signed during her divorce proceedings.  Ms. De Castro produced this affidavit in her initial response to the Government's discovery requests.  However, the affidavit she produced is heavily redacted, and the Government suggests that Ms. De Castro made edits after executing it because it references a 2020 lawsuit

and a case number that could not have been known at the time she signed it in December 2019. Thus, to clarify that the affidavit has not been altered in any material respects, the Government requests that Ms. De Castro produce an unredacted and file-stamped affidavit to alleviate any authenticity concerns.

Ms. De Castro strongly disputes the Government's accusation that she altered the financial affidavit in question, but she refuses to produce an unredacted version because it lacks relevance. She says that the reason the Government wants an unredacted copy of her financial affidavit is so that it can rummage through her private finances when none of that information is germane. Indeed, Ms. De Castro claims that the only relevant portion of the financial affidavit is on a single page where it provides evidence of her dominion and control over the $900,000 in assets. [D.E. 427 at 5 ("The only part of the Financial Affidavit germane to this case is the unredacted material on ODC 0930 – the portion responsive to the government's request for documents evidencing Ms. De Castro's exercise of dominion and control over the asset.")].

Ms. De Castro also relies on the declaration of her former divorce counsel, Amy Steele Donner ("Ms. Donner"), because it details why the 2020 reference appears on the affidavit and clarifies that it was never filed with any court:

> It is my practice to not file the draft Financial Affidavit with the Court, but merely to exchange it with the opposing party if the court permits. That is what we did with Ms. De Castro's draft Financial Affidavit. It was not and has never been filed with the Court.
>
> When I learned that Ms. De Castro had filed a civil action against Daniel Holtz and Toni Holtz in early January of 2020 (I did not represent Ms. De Castro in that action), I recommended that she

amend the draft Financial Affidavit we held for her in our files to add her claim against Mr. Holtz as a contingent asset. Ms. De Castro had informed me earlier of this potential claim. Ms. De Castro agreed to the revision.

My assistant revised the handwritten draft Financial Affidavit by typing in the information for the case caption, and by typing in the section for contingent assets, the *De Castro v. Holtz* case number and the amount of $900,000.

[D.E. 427-2 at 3].

Notwithstanding this explanation, there are several shortfalls with Ms. De Castro's response. While it gives context to the 2020 lawsuit, it confirms that someone – in this case Ms. Donner's assistant – altered Ms. De Castro's financial affidavit after she signed it in December 2019. And Ms. De Castro never made that clear to the Government when she produced it. Ms. Donner also never states in her declaration that this represents the *only* alteration to the financial affidavit, raising questions as to whether the redacted document contains other changes that might have a material impact on the disposition of the pending petition.

The unanswered questions do not end there because Ms. Donner states in her declaration that the financial affidavit was a "draft" prepared in 2019. [D.E. 472-3 at ¶ 6]. But, if that version was merely a draft, it is unclear why Ms. De Castro signed and notarized it in December 2019. Ms. De Castro also never explains why her lawyer altered the affidavit to include a case number for a civil lawsuit *after* she entered into a marital settlement agreement[12] and *after* her divorce was finalized. In other words, if Ms. De Castro signed the marital settlement agreement on

---

[12]    The marital settlement agreement noticeably makes no mention of the $900,000 or a lawsuit. [D.E. 262-2].

January 24, 2020 and her divorce was finalized on February 10, 2020, it is unclear why she revised the financial affidavit on February 13, 2020.

These questions raise substantial doubts as to whether the redacted financial affidavit can be relied upon because (1) it contains a previously undisclosed alteration, (2) there are no assurances that it differs in any respects that might impact the disposition of the pending petition, and (3) there are unanswered questions as to why Ms. De Castro modified it in the first place following the termination of her divorce. However, the most compelling reason the original affidavit should be produced is because of Ms. De Castro's objection that the document contains irrelevant information. That misses the mark too because – when Ms. De Castro filed her petition to the $900,000 in assets – she placed her finances directly in question. [D.E. 296 at 1 ("The Government is improperly attempting to take De Castro's proceeds from the sale of her business interest, proceeds she needs to support herself and her three small children.")]. And the Government is entitled to know the full scope of her financial background to determine if she has a lawful claim to the assets in question. It is unclear how the Government can do so if Ms. De Castro only seeks to disclose a single reference to an affidavit where it references her ownership of $900,000 in assets.

For all we know, Ms. De Castro's entire financial background might undercut her representation that she owns these assets or at least inform the parties as to how she acquired them. And that is directly related to the disposition of the pending petition. So, even if we ignore the red flags identified above, the

Government's document request is relevant to the question of whether Ms. De Castro has a lawful claim to the forfeited assets. Accordingly, the Government's motion to compel an unredacted financial affidavit is **GRANTED**.

### III.   CONCLUSION

For the foregoing reasons, the Government's motion to compel is **GRANTED**:

A.   Ms. De Castro is compelled to provide better discovery responses, including any communications or documents withheld based on the common-interest doctrine and the marital privilege and subject to the limitations identified herein.

B.   Ms. De Castro shall produce an unredacted financial affidavit.

C.   Ms. De Castro shall serve amended discovery responses and complete all productions within seven (7) days from the date of this order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of August, 2021

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge