UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 18-CR-20685-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

v.

GUSTAVO ADOLFO HERNANDEZ FRIERI

and

OLYMPIA DE CASTRO
    Third-Party Petitioner

_____/

**DEFENDANT GUSTAVO HERNANDEZ'S OBJECTIONS TO
(ECF#468) MAGISTRATE JUDGE TORRES' ORDER GRANTING
(ECF#421) THE GOVERNMENT'S MOTION TO COMPEL**

On August 25, 2021, Magistrate Judge Torres granted the government's motion to compel discovery responses from Third-Party Petitioner Olympia De Castro in one of the ancillary forfeiture proceedings in this case. ECF#468. The compelled discovery consists of emails over which Ms. De Castro and her former husband, defendant Gustavo Hernandez, asserted privilege pursuant to a Joint Defense Agreement between the De Castro and Hernandez legal camps, as well as the marital privilege. The emails, identified in Ms. De Castro's privilege log at



ECF#427-4, include communications between Mr. Hernandez, his criminal defense lawyers, and Ms. De Castro's lawyers.

Although Mr. Hernandez is not a party to the ancillary forfeiture proceedings giving rise to Judge Torres' order, the order compels disclosure of communications over which Hernandez asserts a privilege. Accordingly, Hernandez files this appeal of and objections to Judge Torres' order and respectfully requests that the Court reverse the order directing disclosure of joint defense and marital communications. Mr. Hernandez requests a hearing.

## INTRODUCTION

The facts in this criminal forfeiture matter are set out in detail in Ms. De Castro's Petition, ECF#296. Generally, the Petition shows as follows:

In 2008, after Mr. Hernandez and Ms. De Castro were married, Hernandez invested $900,000 for a minority membership interest in IWM Holdings LLC (IWM), a retail wine shop in New York.

Mr. Hernandez held the membership interest in his name, was a director of IWM, served as a guarantor for obligations of IWM, and was registered as a principal of IWM with the New York State Liquor Authority.

Ms. De Castro involved herself at IWM since 2008 in several ways, including by hosting events there and by building the financial model for IWM to help guide the finance team.

In 2014, Hernandez was invited to acquire an interest in a wine wholesale and importation business. New York legal counsel advised Hernandez that New York "tied-house" laws did not allow for Hernandez to simultaneously hold an interest in a retail wine shop and an interest in an importation/wholesale alcohol business. Following the advice of New York counsel, Hernandez transferred his interest in IWM, the retail wine shop, to his wife De Castro.

Ms. De Castro became a member of IWM's Board of Advisors, registered as a principal of IWM, received tax reporting K-1 documents, and became an equity holder in IWM.

A few years later, the IWM interests were sold, and De Castro was entitled to receive $900,000 from that sale. When the funds were not forthcoming, De Castro was forced to file a State Civil Action in Miami-Dade County, *De Castro v. Holtz*, *et al*, Case No. 20-000080-CA-01.

Ms. De Castro was represented by attorney Guy Rasco of Devine Goodman & Rasco, LLP (who continues to be her lawyer in this ancillary forfeiture matter). By then Mr. Hernandez had been indicted and was represented by Michael Pasano of Carlton Fields. The parties entered into a joint defense agreement.

As described in detail in Mr. Rasco's affidavit, "[a]t the outset of the State Civil Action, in December 2019, undersigned counsel [Rasco], which represents Ms. De Castro, and Ms. De Castro entered into a Joint Defense Agreement (JDA) with

Ms. De Castro's then soon-to-be-ex-husband, Gustavo Adolfo Hernandez Frieri, and his counsel Michael Pasano." ECF#427-5, ¶4.

The shared common legal interest and legal strategy of the parties was to secure Ms. De Castro's rights to the $900,000 from the sale of the IWM interests that De Castro had obtained from her husband Hernandez. ECF#427-5, ¶5-6. The De Castro and Hernandez camps "agreed to share information regarding the State Civil Action between and among themselves and their legal counsel with the understanding that doing so would advance their common legal interest and with the understanding that neither party would share with any third party what they had shared between and among them." ECF#427-5, ¶8.

For his part, Hernandez's attorney Michael Pasano encouraged communications between Hernandez and De Castro's lawyer, Mr. Rasco, pursuant to the joint defense. As described by Hernandez,

> From the onset of the communications with Mr. Rasco, Mr. Pasano (a) assured Hernandez that communications with Mr. Rasco were privileged, (b) authorized Hernandez to communicate with Mr. Rasco pursuant to their joint defense agreement, and (c) encouraged Hernandez to communicate directly with Mr. Rasco, under the full expectation that the communications were privileged. Mr. Rasco, in turn, agreed to keep all communications with Mr. Pasano and with Hernandez confidential pursuant to their joint defense agreement. See Rasco Declaration, ECF#427-5:¶¶8-9, 15-16.

ECF#444, ¶6.



The State Civil Action was settled in Ms. De Castro's favor, with an agreement that De Castro would receive $900,000 plus interest. Soon thereafter, in December 2020, the government started to focus its efforts on forfeiting De Castro's $900,000 as a purported substitute asset of Mr. Hernandez. ECF#427-5 ¶11. The joint defense agreement and joint defense communications between the Hernandez and De Castro camps continued with the approval and encouragement of attorneys Pasano and Rasco, "to protect [the $900,000] from the unjustified predations of the government, to the benefit of the couple's children." ECF#427:9.

In the proceedings to forfeit the $900,000, the government moved to compel De Castro to produce the joint defense communications between and among Mr. Rasco, Mr. Pasano, Hernandez, and some that included undersigned counsel. The government argued that no valid joint defense could exist between the Hernandez and De Castro camps because Hernandez did not own the $900,000. ECF#448:2. Magistrate Judge Torres agreed. Although Hernandez and De Castro share a common adversary (the government), in pending ongoing litigation (this case), and share a common legal strategy and interest to preserve the $900,000 for De Castro to provide for their three minor children, Judge Torres found that "none of that matters, however, if Mr. Hernandez Frieri holds no legal interest in the $900,000 asset." ECF#468:10. In Judge Torres' view, "if Ms. De Castro was the only person

with any rights or interest to the $900,000, it raises the question as to how a JDA can exist when Mr. Hernandez Frieri owns none of the assets." ECF#468:9.

But no case requires joint ownership of an asset to sustain a joint defense agreement (indeed, as shown below, even parties who are adverse can have a valid joint defense). And the leading case in the Eleventh Circuit on joint defense agreements, *United States v. Almeida*, only requires that "clients share a common interest about a legal matter." 341 F.3d 1318, 1324 (11th Cir. 2003). Accordingly, Judge Torres' order compelling disclosure of communications between the Hernandez and De Castro camps must be reversed.

Judge Torres did not address *Almeida* in his order, nor did Judge Torres address Hernandez's arguments that Hernandez relied on his lawyer's encouragement and advice that communications with De Castro's lawyers were privileged and would remain confidential. Mr. Hernandez first filed "*Defendant's Joinder In ECF#427 'Olympia De Castro's Response to The Government's Motion to Compel Discovery Responses.*'" ECF#444. Following the government's response (ECF#448), Hernandez filed *Hernandez-Frieri's Reply to Government's Response [ECF#448] to Hernandez-Frieri's Joinder [ECF#444] to Olympia De Castro's Response [ECF#427] to Government's Motion to Compel [ECF#421]*. ECF#451.

In these pleadings, Hernandez not only explained why a valid joint defense agreement existed between the parties under the Eleventh Circuit's leading case

*Almeida*, ECF#451:2-3, but Hernandez also explained that his own lawyer, Michael Pasano, encouraged the communications with Mr. Rasco and assured Hernandez that those communications were privileged. ECF#444:5. Mr. Hernandez also explained that Mr. Rasco and undersigned counsel, too, believed that the communications with Hernandez were privileged and were authorized by Hernandez's counsel, Mr. Pasano, pursuant to a valid joint defense. ECF#444:4-5.

Finally, and explicitly, Hernandez's pleading stated: "Mr. Hernandez requests an opportunity to be heard." ECF#444, ¶2.

But Judge Torres held no hearing, and in fact noted the contrary in his order -- that no evidentiary hearing was requested by the parties. ECF#468:6 n.6 ("Neither party requested that the Court hold an evidentiary hearing to assess any of the matters in dispute. Instead, each party relied on the sworn testimony taken thus far and presented arguments to that effect").

Although Judge Torres issued an order stating that he had "considered Defendant's arguments," ECF#470, his 20-page order did not squarely address them. Mr. Hernandez respectfully objects to Judge Torres' findings, and requests a hearing.

# ARGUMENT

1. **<u>Joint ownership of an asset is not required for a valid joint defense agreement</u>**

Mr. Hernandez incorporates the arguments he advanced in ECF#444 and ECF#451 that Hernandez and De Castro need not have common ownership of the $900,000 in order to participate in a valid and enforceable JDA. To the contrary, parties in litigation (who, until joined in litigation, may be total strangers) routinely enter into a joint defense to pool information and collaborate in litigation against a common litigation adversary, even if those parties do not have shared ownership of property. In *United States v. Almeida*, the Eleventh Circuit held:

> [M]any courts have held that the attorney-client privilege gives rise to a concomitant "joint defense privilege" which "serves to protect the confidentiality of communications passing from one party to the attorney for another party *where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.*" As the Second Circuit observed, "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a *common interest about a legal matter.*"

*United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003) (emphasis added).

In *Almeida*, the Eleventh Circuit upheld the JDA between two co-defendants whose only common interest was their shared adversity to the government in the criminal litigation, requiring only that the "clients share *a common interest about a legal matter*," not a common ownership of an asset. *Almeida* stands for proposition that two co-conspirators (the co-defendants in *Almeida*), who shared no common



financial interest, had no joint ownership of property, were not related by blood or marriage, and did not have three minor children together, could enter into a valid joint defense agreement against a common adversary, the United States government. Judge Torres' order fails to explain how the two defendants in *Almeida* had a greater common legal interest against the United States government than Hernandez and De Castro do in this case.

Judge Torres cites to Judge Goodman's order in *Del Monte Int'l GMBH v. Ticofrut, S.A.*, 2017 WL 1709784 (S.D. Fla. May 2, 2017), as "perhaps the most instructive decision on the common interest doctrine," but Judge Goodman's order does not require common ownership of assets to sustain a joint defense either. And in another instructive decision by Judge Goodman on the common interest doctrine, Judge Goodman upheld a joint defense agreement, finding that under the "common interests" or "joint defense" or "pooled information exception," parties can "pool information" when they "share unified interests," even if the parties are antagonistic on some issues, their legal positions are incompatible in some respects, or even if the parties become opponents as plaintiff and defendant in the litigation. Judge Goodman held:

**Applicable Legal Principles and Analysis**

*Visual Scene, Inc. v. Pilkington Brothers, PLC*, 508 So. 2d 437 (Fla. 3d DCA 1987), provides a comprehensive summary of the law governing the common interest privilege, and both state and federal courts have relied upon it by citing it with approval . . . *Visual Scene* outlined several legal concepts which are critical to evaluating the common interest privilege:

1.  A voluntary disclosure of privileged material to a third party typically waives the attorney-client privilege.

2.  The "common interests" exception, also known as the "joint defense" or "pooled information exception," enables litigants who share unified interests to exchange the privileged information without losing the protection created by the privilege.

3.  Under the exception, clients and their respective attorneys may exchange information freely among themselves without fear that the exchange will cause the privilege to be forfeited.

4.  Courts have recognized the exception in myriad settings: where the group members are criminal co-defendants, where they are civil co-defendants, where companies have been individually summoned to the grand jury, where parties confront potential litigation, where members of a class of plaintiffs are pursuing separate litigation in state and federal courts, where parties are defendants in separate actions and (the rule established in *Visual Scene*) **where parties are antagonistic on some issues but united as to others**.

5.  **The exception can apply even where two parties are on opposite sides of a case** (as long as they have another viable common interest).

6.  The exception relates not only to communications protected by the attorney-client privilege, but it also applies to work product materials.



> The common interest privilege, which is an exception to the waiver doctrine, does not become automatically lost merely because the participants later become antagonistic. In fact, **it can apply "notwithstanding that in another respect [the parties] are adversaries in the litigation and aligned as plaintiff and defendant** respectively." *Visual Scene*, 508 So. 2d at 443.
>
> Moreover, **the exception (or privilege) does not require that the participants' legal positions be compatible in all respects**. Thus, it can apply where different lawyers represent clients who have **only "some" interests in common**.
>
> In practical terms, **where one party in a common interest scenario "makes a statement to the attorney for another party to the relationship, for the limited purpose of the 'pooled information' situation, the attorney for one becomes the attorney for the other**." *Visual Scene*, 508 So. 2d at 440, n.3. Therefore, "the confidentiality enjoyed by a client with his own attorney is extended to communications with any attorney representing another in the group." *Id.*
>
> Because the common interest rule "is concerned with the relationship between the transferor and the transferee at the time that the confidential information is disclosed[, t]he fact that the parties' interests have diverged over the course of the litigation does not necessarily negate the applicability of the common interest rule.

*Companhia Energetica Potiguar v. Caterpillar Inc.*, 2015 WL 13779201 *3-4 (S.D. Fla. Nov. 5, 2015) (emphasis added).[1]

Judge Torres was mistaken that Hernandez could not enter into a valid joint defense with De Castro unless Hernandez owned the asset the government seeks to

---

[1] This block quote is "cleaned up," meaning that internal citations have been omitted for ease of reading.



forfeit. Indictments routinely include forfeiture allegations. Under Judge Torres' order, co-defendants in criminal cases could not enter into valid joint defense agreements unless they also admit ownership of assets the government seeks to forfeit. That is not what *Almeida* requires.[2] And insofar as the government contends that *Hernandez*, not De Castro, is the owner of the $900,000, that would be sufficient under Judge Torres' order to justify entering into a JDA to protect what the government contends are Hernandez's property rights. At bottom, regardless of who prevails on the ownership of the $900,000, it is undisputed that the government is pursuing these forfeiture proceedings to inflict punishment *on Hernandez*, so Hernandez certainly has a common interest to avoid the pain that the government proposes to inflict upon him by forfeiting the asset from its rightful owner.

To support his conclusions, Judge Torres found that "the only connection that Mr. Hernandez Frieri has with respect to the $900,000 asset is his status as the former husband of Ms. De Castro and the father of three children." ECF#468:10. Not so. Mr. Hernandez has several "connections" to the $900,000 asset.

*First*, during his marriage to De Castro, Hernandez obtained the minority membership interest in IWM, which Hernandez later transferred to De Castro. Ms.

---

[2] Ironically, if Hernandez had asserted ownership of the $900,000, the government would likely argue that Hernandez is *adverse* to Ms. De Castro, who asserts exclusive ownership of the funds, and that they therefore lack a common interest sufficient to sustain a valid JDA.



De Castro then sold that interest in IWM, generating the $900,000 that the government seeks to forfeit.

*Second,* while Hernandez served as director of IWM, De Castro involved herself at IWM by hosting events there and by building the financial model for IWM to help guide the finance team.

*Third,* Hernandez transferred his interest in IWM to De Castro while she was still his wife. Ms. De Castro became a member of IWM's Board of Advisors, registered as a principal of IWM, received tax reporting K-1 documents, and became an equity holder in IWM.

*Fourth,* after the civil action settled in De Castro's favor, the government sought forfeiture of De Castro's $900,000 as purported substitute assets *of Hernandez* and proposed that the funds be forfeited as part of *Hernandez*'s sentence and punishment in this criminal case.

*Fifth*, because Hernandez will be spending the next 3+ years in prison, De Castro is *de facto* a single mother who will be supporting the couple's three minor children, in part with the $900,000 that is rightfully hers from the IWM interest that De Castro received from Hernandez.

These connections between Hernandez and the $900,000 are far greater than what many criminal co-defendants have when they enter into valid and enforceable JDAs, some having not even met until they are indicted together. Indeed, as Judge

Goodman held in *Companhia Energetica Potiguar,* some parties enter into valid JDAs even when they are *dis*connected, such as when they are adversaries, antagonistic, or even aligned as opponents as plaintiff vs. defendant. 2015 WL 13779201 *3-4 (S.D. Fla. Nov. 5, 2015).

The joint defense between Hernandez and De Castro was valid because they shared a unified interest to prevent the forfeiture of $900,000 (as part of Hernandez's sentence and punishment in this criminal case) and to preserve the $900,000 for De Castro (its rightful owner) for the care of the Hernandez / De Castro minor children. Hernandez and De Castro shared "a common interest about a legal matter" in this litigation, against a common adversary, which is all the Eleventh Circuit required in *Almeida*. 341 F.3d at 1324. The communications exchanged between the Hernandez and De Castro camps were designed to further their shared interests in this litigation. Although Hernandez and De Castro are not technically co-defendants, they are parties in the same litigation, who formed a coordinated legal strategy in an effort to defeat the government's efforts to punish Hernandez by forfeiting assets that belong to his ex-wife, for the care of their three children. This is a valid joint defense.

2. **Hernandez reasonably believed that his communications with De Castro's lawyers were privileged**

Judge Torres did not address Hernandez's argument (ECF#444:3-5) that Hernandez was encouraged by his own criminal defense counsel, Michael Pasano,

to communicate directly with Mr. Rasco and with De Castro's other lawyer, Margot Moss, about the criminal case and the forfeiture matters, and was assured by Mr. Pasano that communications with De Castro's lawyers were privileged pursuant to a valid joint defense agreement.

To deny privilege protection to Hernandez's communications would lead to a troubling result. It would cause Hernandez, who was reasonably acting pursuant to the advice and encouragement of his counsel, to lose the confidentiality of communications that were never intended to be disseminated, and have those communications disclosed to the prosecutors, who are not only his adversaries, but also the adversaries of De Castro and of their minor children.

Mr. Hernandez credibly and reasonably believed that his communications were privileged and would not be disclosed to the government. Mr. Pasano assured Hernandez that his communications with Mr. Rasco were privileged, and Mr. Rasco held himself out to be part of a valid joint defense agreement under which Mr. Rasco would maintain the confidentiality of his communications with Hernandez. Mr. Hernandez reasonably relied on these representations and reasonably believed that he had a privilege with lawyers who jointly put forth a unified front in the fight against the government's forfeiture efforts. The Court should uphold the privilege and deny the government's motion to compel. *See Gucci America, Inc. v. Guess?, Inc.*, 2011 WL 9375 *2 & n.14, 31 (S.D.N.Y. Jan. 3, 2011) ("Even if the

communications at issue were not made to an attorney, the privilege may be successfully claimed if the client reasonably believed that the person to whom the communications were made was in fact an attorney), citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 923 (8th Cir.1997); *United States v. Rivera*, 837 F. Supp. 565, 568 n. 1 (S.D.N.Y. 1993) ("It is common ground among the parties that the attorney-client privilege attaches to confidential communications made to an individual in the genuine, but mistaken, belief that he is an attorney"); *United States v. Mullen & Co.*, 776 F. Supp. 620, 621 (D.Mass. 1991) ("[T]he attorney-client privilege may apply to confidential communications ... when the client is under the mistaken, but reasonable, belief that the professional from whom legal advice is sought is in fact an attorney"); *United States v. Tyler*, 745 F.Supp. 423, 425 (W.D.Mich. 1990) (same); *United States v. Boffa*, 513 F. Supp. 517, 523 (D.Del. 1981) (client who reasonably believes that an individual is an attorney is "entitled to the benefits of the privilege as long as his bona fide belief in his counsel's status is maintained").

3. **<u>Hernandez requested but was denied a hearing</u>**

Although the ancillary forfeiture proceedings pertaining to the $900,000 involve only the government and De Castro, the JDA issues raised in those proceedings directly affect Hernandez and his communications with counsel. Mr. Hernandez is the author of many of the emails exchanged with the lawyers. Thus,



while De Castro and the government may not have requested a hearing before Judge Torres, Hernandez did. ECF#444:¶2. The Court should not order disclosure of Hernandez's communications, some of which are very detailed and address issues relating to the criminal case and related forfeiture actions, without a hearing. Additionally, if the Court has any doubt whether the emails were exchanged pursuant to the advice of counsel and a joint defense agreement that all the parties believed was valid and enforceable (an issue Judge Torres did not address), the Court can review the emails in camera.

**4.      The marital communications privilege also applies**

Judge Torres found that the marital communications privilege is unavailable to Hernandez and De Castro for communications they had during the time period when De Castro filed for divorce on May 22, 2019, until February 10, 2020, when the divorce decree issued. Judge Torres concluded that communications during this time period were made after Hernandez and De Castro were permanently separated with no reasonable expectation of reconciliation, although they continued to live together as a family, in the same home with their three children.

In *United States v. Singleton*, the Eleventh Circuit held that when husband and wife are still married, "the confidentiality of communications during a valid marriage is presumed," unless the spouses "are permanently separated; that is, living separately with no reasonable expectation of reconciliation." 260 F.3d 1295,



1300 (11th Cir. 2001). The Court also held: "We, too, therefore, strictly interpret that portion of the privilege's requirement and hold that only communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege." *Id.* at 1298.

The evidence in this case is unlike the evidence in *Singleton* that led the Eleventh Circuit to find that the marital privilege did not apply to communications between the husband and wife in that case. In *Singleton*, the evidence showed, among other things, the following:

> the wife alleged, in the divorce action, that the husband "had abandoned her" the year before
>
> > ▪ *there is no evidence of abandonment between Hernandez and De Castro*
>
> during the marriage, the husband "accused the wife of having affairs with her co-worker(s) and contractor(s)"
>
> > ▪ *there is no evidence of accusations of an affair*
>
> the wife, at the time of the conversations over which she sought privilege protection, was living with a co-worker
>
> > ▪ *there is no evidence that Hernandez or De Castro lived with someone else*
>
> the couple had "a physical altercation" shortly before their separation
>
> > ▪ *there is no evidence that Hernandez and De Castro had physical altercations*



www.royblack.com | 201 S. Biscayne Boulevard Suite 1300 Miami, FL 33131 | p 305.371.6421 f 305-358-2006

the husband spent one night with the wife, but then the wife's boyfriend showed up and another altercation ensued

> ▪ *there is no evidence of any boyfriends or girlfriends of Hernandez or De Castro*

there was another altercation between the husband and wife "in which knives were drawn" and also the wife told the husband that she "would shoot him if she had a gun"

> ▪ *there is no evidence of knives, guns, or any violence between Hernandez and De Castro*

the husband and wife "continued to trade accusations of infidelity throughout the separation"

> ▪ *there is no evidence of accusations of infidelity between Hernandez and De Castro.*

*Singleton*, 260 F.3d at 1301-02.

Even after De Castro filed for divorce, she and Hernandez continued cohabiting in the same family home with their children. While they continued to live under the same roof as a family unit, it was objectively reasonable for Hernandez to expect that their communications would likewise continue to remain confidential even with divorce proceedings pending. The Court should enforce the marital communications privilege and preclude disclosure of communications between Hernandez and De Castro between May 22, 2019, when the divorce action was filed, and February 10, 2020, when the divorce decree issued.



## CONCLUSION

For these reasons, Hernandez respectfully requests that the Court reverse the order compelling disclosure of the joint defense and marital communications identified in De Castro's privilege log at ECF#427-4.

Mr. Hernandez requests a hearing.

                              Respectfully submitted,

                              **BLACK SREBNICK**
                              201 South Biscayne Boulevard
                              Suite 1300
                              Miami, Florida 33131
                              (305) 371-6421

By:    /s/ *Howard Srebnick*
                              **HOWARD SREBNICK**
                              *HSrebnick@RoyBlack.com*
                              Florida Bar No. 919063

                              **JACKIE PERCZEK**
                              *JPerczek@RoyBlack.com*
                              Florida Bar No. 042201

